## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## SOUTH BEND DIVISION

| | | |
|---|---|---|
| *AMERICAN HOME ASSURANCE COMPANY,* | ) | |
| *as subrogee of FOREST RIVER, INC.,* | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 3:21-cv-00252-JD-MGG |
| v. | ) | |
| | ) | |
| *MAKITA CORPORATION OF AMERICA, and* | ) | |
| *MAKITA U.S.A., INC.,* | ) | |
| | ) | |
| Defendants. | ) | |

### DEFENDANTS' BRIEF IN SUPPORT OF ITS MOTION TO STRIKE OPINIONS AND TESTIMONY OF MICHAEL ESKRA

COME NOW, Defendants Makita Corporation of American and Makita, U.S.A., Inc., (hereinafter collectively "Makita" or "Defendants"), by and through their counsel Stanton | Barton LLC, and pursuant to Rule 702 of the Federal Rule of Evidence and *Daubert v. Merrell Dow Pharmaceuticals*, 509 US. 579 (1993) and its progeny and, in compliance with N.D. Ind. L.R. 7-1 and this Court's Order [Doc. 68 and 75], hereby submits its Brief in Support of its Motion to Strike the Opinions and Testimony of Michael Eskra, ("Eskra"), Plaintiff's retained battery and/or causation expert, on the grounds that they are the product of an unsound, unreliable and unscientific methodology that has never been tested, peer reviewed, or accepted by experts in his field, are based on speculation and contrary to the facts and data in this case.

i

## I.    TABLE OF CONTENTS

I.    Table of Contents.................................................................................................... ii

II.   Table of Authorities............................................................................................... iii

III.  Issue Statement ...................................................................................................... v

IV.  Legal Standard:....................................................................................................... 1

V.   Introduction ............................................................................................................ 1

VI.  Pertinent Factual Background: ............................................................................... 3

    A.    The Covert, Unilateral, Undocumented Battery Cell Review:........................ 6

    B.    The "Potential" or "Probable" Cause of the Fire: ......................................... 8

    C.    The Untested & Unscientific Methodology Used by Eskra:......................... 12

    D.    The Lack of a Defect that Caused or Contributed to Cause the Fire: ........................... 16

    E.    The Purchase, Use and History of the Makita Products at Issue.................... 18

VII. Argument ............................................................................................................... 19

    A.    Eskra's Preconceived Opinions are Unsupported by any Scientific, Peer-Reviewed, Tested or Recognized Methodology and are therefore Unreliable and Inadmissible. ... 20

    B.    Eskra's Opinions are Devoid of any Case Specific Testing or Scientific Testing to Ensure Reliability and Acceptance within the Scientific Community........................... 22

    C.    Eskra's Lack of Scientific and Peer-Reviewed Methodology, Decision to Reach Opinions Without Testing and Knowing Violation of the Scientific  Method Makes him Unqualified as an Expert. ............................................................................... 24

II.    TABLE OF AUTHORITIES

**Cases**

*Carroll v. Otis Elevator Co.*, 896 F2d 210 (7th Cir.1990) ............................................................ 24

*Clark v. Takata Corp.*, 192 F.3d 750 (7th Cir.1999) .................................................................... 25

*Cummins v. Lyle Indus.*, 93 F.3d 362 (7th Cir.1996).............................................................. *passim*

*Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993)........................................... *passim*

*Dhillon v. Crown Controls Corp.*, 269 F.3d 865 (7th Cir. 2001) ............................................ 2, 25

*Dilley v. Holiday Acres Properties, Inc.*, No. 16-CV-91-JDP, 2017 WL 2371295 (W.D. Wis.

    May 31, 2017)....................................................................................................................... 12

*Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901 (7th Cir.2007)............................................ 19, 24

*Fuesting v. Zimmer, Inc.*, 421 F.3d 528 (7th Cir. 2005) ..................................... 1, 19, 20, 24

*Gayton v. McCoy,* 593 F3d 610 (7th Cir.2010) ............................................................................ 24

*General Electric Co. v. Joiner*, 522 U.S. 136 (1997) .................................................................. 16

*Gopalratnam*, No. 13-CV-618-PP, 2017 WL 1067768 ............................................................ 2, 20

*Huey v. UPS*, 165 F.3d 1084 (7th Cir. 1999)............................................................................... 25

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) ................................................................ iii

*Lemmermann v. Blue Cross Blue Shield of Wis.*, 713 F. Supp. 2d 791 (E.D. Wis. 2010)........... 22

*Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698 (7th Cir.2009) ....................................... 19, 20, 25

*Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748 (7th Cir.2010) ....................................... 20

*Mid-State Fertilizer Co. v. Exchange National Bank*, 877 F.2d 1333 (7th Cir. 1989) ................ 12

*N. Indiana Pub. Serv. Co. v. Aqua Env'l Container Corp.*, 102 N.E.3d 290 (Ind. Ct. App. 2018). 7

*Rogers v. Ford Motor Co.,* 952 F. Supp. 606 (N.D. Ind. 1997)............................................. 19, 23

*Rosen v. Ciba–Geigy Corp.*, 78 F.3d 316 (7th Cir.1996) ............................................................. 1

*Smith v. Nexus RVs, LLC*, 472 F. Supp. 3d 470 (N.D. Ind. 2020) ................................................. 25

*Tuf Racing Prods., Ind. v. American Suzuki Motor Corp.*, 223 F.3d 585 (7th Cir.2000)............. 24

*United States v. Lanzotti*, 205 F.3d 951 (7th Cir.2000) ................................................................. 23

*Weir v. Crown Equip. Corp.*, 217 F.3d 453 (7th Cir.2000) ........................................................... 20

*Wendler & Ezra, P.C. v. Am. Int'l Grp., Inc.*, 521 F.3d 790 (7th Cir. 2008)............................... 12

**Rules**

Fed. R. Evid. 401 ........................................................................................................................... 28

Fed. R. Evid. 702 ........................................................................................................................... 14

### III.    ISSUE STATEMENT

Defendants challenge the admissibility of Eskra's proffered opinions on the grounds that they are the product of an unsound, untested methodology that has not been peer reviewed, is not generally accepted by experts in the field and on the grounds that they are not reliable and are little more than subjective inadmissible *ipsi dixit*. The issues before the Court with respect to Eskra's opinions include the following:

1. Whether technical opinions that a lithium ion battery cell suffered from an internal fault  is admissible under Rule 702 when the basis for the opinion uses a methodology that has not been tested, subject to peer review, or accepted by experts in the field and which is not repeatable.

2. Whether an expert's opinion on what is "possible" if certain conditions are assumed to exist, in the absence of and/or contrary to the evidence in the case, is sufficient to satisfy the reliability requirements of Rule 702 and to allow testimony that an assumed conditions occurred and resulted in a failure discerned by an unsound, untested *ipsi dixit* methodology that has not been peer reviewed.

3. Whether the subjective *ipsi dixit* of an expert that has not been tested, is not repeatable and cannot be evaluated or challenged because no objective, repeatable scientific methodology exists, satisfies the reliability requirements under Rule 702 such that the proffered expert is allowed to tell the jury his personal belief about what caused a fire if certain assumed conditions existed.

#### IV.    LEGAL STANDARD:

Under Rule 702 and *Daubert,* the factors used in determining the soundness of the expert's methodology include: "(1) whether the proffered conclusion lends itself to verification by the scientific method through testing; (2) whether it has been subjected to peer review; (3) whether it has been evaluated in light of the potential rate of error of the scientific technique; and (4) whether it is consistent with the generally accepted method for gathering the relevant scientific evidence." *Cummins v. Lyle Indus.*, 93 F.3d 362, 368 (7th Cir.1996) (citing *Daubert*, 509 U.S. at 594-95), *see also Fuesting v. Zimmer, Inc.*, 421 F.3d 528, 534–35 (7th Cir. 2005). The Rule 702 "reliability inquiry"[1] is to ensure that the opinions expressed by experts "adhere to the same standards of intellectual rigor that are demanded in their professional work." *Rosen v. Ciba–Geigy Corp.*, 78 F.3d 316, 318 (7th Cir.1996). To ensure the reliability of expert testimony, the Court must consider whether the theory can be and has been verified by the scientific method through testing, whether the theory has been subjected to peer review, the known or potential rate of error, and the general acceptance of the theory in the scientific community. *Cummins*, 93 F.3d at 368. The proffered opinions of Eskra fail to meet any of the requirements of reliability to render them admissible and therefore they must be excluded under Rule 702.

#### V.    INTRODUCTION

Plaintiff seeks to present Eskra's opinions at trial that a battery cell located in a tool crib was a "possible" ignition source or "probable" cause of the fire assuming the fire started where the

---

[1] The 2000 Advisory Committee's Notes to Rule 702 suggest other benchmarks for gauging expert reliability, including: (5) whether "maintenance standards and controls" exist; (6) whether the testimony relates to "matters growing naturally and directly out of research they have conducted independent of the litigation," or developed "expressly for purposes of testifying"; (7) "[w]hether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion"; (8) "[w]hether the expert has adequately accounted for obvious alternative explanations"; (9) "[w]hether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting"; and (10) "[w]hether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give." Fed.R.Evid. 702 *advisory committee's note* (2000 amends.).

cell was found in the tool crib.  Eskra admits he has no methodology, let alone one that is or was subject to testing, peer review or any documented scientific technique. (Exhibit C-2, Deposition Transcript of Michael Eskra May 1, 2023 (hereinafter "Eskra II"), pp. 28-29). Therefore, Eskra's opinions are inconsistent with "the generally accepted method for gathering the relevant scientific evidence". *Cummins*, 93 F.3d at 368. This alone merits exclusion.  Indeed, Eskra's opinions fail to meet any of the reliability factors and are merely "unjustifiably extrapolated from an accepted premise" and a failure to "account for obvious alternative explanations." *Gopalratnam*, No. 13-CV-618-PP, 2017 WL 1067768, at *8–9  (*quoting Fusting I*). The Court must be careful in reviewing the opinions of Eskra. He will call his method "scientific" while at the same time acknowledging that none of the hallmarks of science or reliability are present.

> **Q.    Okay.   Are your opinions in this case based on any scientific methodology?**
> **A.    Yes.**
> **Q.    Has that scientific methodology ever been peer-reviewed?**
> **A.    No.**

(Exhibit C-1, Deposition Testimony of Michael Eskra dated March 7, 2023 (hereinafter "Eskra I"), p. 152:13 to 152:18).

It is not merely that Eskra's opinions are wrong.  They are.  The issue before this Court is whether unscientific subjective opinions based on the desired outcome of a litigant without any methodology, investigation, or testing, that is not repeatable and is contradicted by the facts of the case, satisfies the scientific rigor required by Rule 702 rendering that expert's proffered testimony admissible.  *Dhillon v. Crown Controls Corp.*, 269 F.3d 865, 869 (7th Cir. 2001) (noting the Court acts "as a 'gatekeeper' for expert testimony, only admitting such testimony after receiving satisfactory evidence of its reliability").

> **Q.    If the cells were attacked by fire, you would expect to see damage in the cells, right?**
> **A.    Yes, that would all show that they were attacked by fire.**

2

> **Q.** Right. And the difference between when a cell has evidence of being attacked by fire or the cause of the fire, the only thing we have to go on is what you're telling us, right? Because there's no testing you performed to validate your theory?
>
> **A.** I've applied the scientific method and interpreted peer-reviewed papers and applied science, particularly the gas law.
>
> **Q.** None of the peer-reviewed papers that you have identified in your report determine a methodology for determining when a lithium-ion battery cell is the cause of the fire, do they, sir?
>
> **A.** Not specifically, no.
>
> **Q.** And you have done no test whatsoever at any time in your career to establish the methodology that you're relying on in declaring this cell the cause of the fire, have you?
>
> **A.** No.

(Eskra I, pp. 259:19 to 260:16).

## VI.    PERTINENT FACTUAL BACKGROUND:

On March 12, 2019, around noon, the Forest River manufacturing facility in Goshen, Indiana laid off eighteen employees and by approximately 3:30 p.m. the entire structure was on fire. (Exhibit 1, Elkhart Fire Department Incident Report). Thereafter, Plaintiff retained Fred Hackett on March 13, 2019 to investigate the cause and origin of the fire and assist with their subrogation effort. (Exhibit B, Deposition of Fred Hackett (hereinafter "Hackett"), p. 198:08 to 10). The next day, March 14, 2019, after learning that a Makita product was allegedly stored within a tool crib in the plant, Hackett decided his area of origin and what the cause of the fire would be. (Hackett, p. 355). Four months later, Eskra was retained to support Hackett's selected subrogation target and declare it the cause of the fire. (Eskra I, p. 15).

Given the layoffs and various reports of employees playing with fire, the Elkhart Police Department investigated the incident as a potential arson. (*See* Exhibit 16, Elkhart Police Arson Report (hereinafter "Arson Report")). Although, they followed up on a number of leads they were unable to establish enough evidence to proceed with a criminal case. *Id.* Although eyewitnesses observed the fire when it was relatively small (~1' x 2' and 2'x 3'), they were unable to extinguish

3

it before the fire grew out of control. (Exhibit A, Deposition Testimony of Larry Shaffer (hereinafter "Shaffer") pp. 34-35, 70). According to the six eyewitnesses who were inside the structure, the small fire was observed near the highly flammable material storage area[2] for the plant before it grew out of control.

Importantly, the area where the six eyewitnesses observed the fire was in a location where **_no Makita products were stored or used prior to the fire or found after the fire_**. (Eskra II, p. 68; Hackett, pp. 343-344). Further, no lithium-ion batteries were found in the area where the six witnesses saw the fire. This is important because, for Eskra's causation opinion to be correct, the cell he believed caused this fire must first be found within the area of origin. (Eskra I, p. 154). According to Hacket, the area of origin was in Grid 3B,[3] inside the tool crib on top of a desk. (Hackett, p. 172). However, he made that conclusion two days after the fire on March 14, 2019, before conducting an investigation or learning where the eyewitnesses saw the fire grow from its incipient stage.  (Hackett, p. 355). At that point, the only information Hackett possessed was that a Makita tool[4] was located inside the tool crib on the desk. *Id.*

---

[2] The area where the six eyewitnesses observed the fire grow from its incipient stage was located outside of the enclosed tool crib in the area where Forest River had improperly stored flammable chemicals and materials.  (Exhibit E, Deposition Testimony of Lanny Kistler (hereinafter "Kistler"), pp. 56–57; Arson Report, p. 32).  This is also the area where Lanny Kistler, the tool crib manager, was welding for several hours that day and where a fired worker who just disputed his termination, was observed smoking a cigarette.  (Hackett, pp. 249-251; Exhibit D, Deposition Testimony of Tim Johnson (hereinafter "T.Johnson"), pp. 337; Arson Report, p. 19).  There were electrical appliances such as a welder and a 480V receptacle in the area that Plaintiff's experts chose not to examine. (T.Johnson, pp. 292-293).

[3] After the fire, the plant was divided by 10' x 10' grids to help identify what artifacts were located in what region of the structure.

[4] The Makita drill was in the tool crib when Kistler began his employment approximately two years before the fire. (Kistler, pp. 27-28). Thus its exact model, age and history of use or misuse is unknown.  *Id.*  What we do know is that Kistler never experienced any problems or issues with the Makita products that were located in the tool crib. *Id.* at p. 30.



Figure 3: Tool Crib Plan View

During discovery, each eyewitness was deposed by Defendants and shared their observations for the first-time using photographs, maps and diagrams to pinpoint the location where they saw the fire. (*See e.g.* Exhibit 235). These witnesses were Forest River employees (Plaintiff's insured) who were available to Plaintiff's experts during their "investigation" (if any), but not to Makita—at least not until Plaintiff filed suit. Obtaining eyewitness statements is a basic fire investigation tool. (Exhibit 136). Thus, when finally asked what they saw, each witness confirmed that the fire originated *outside* of the tool crib around the flammable material storage.[5] (*See e.g.* Exhibit 235).

---

[5] Gary Horton saw fire outside the tool crib near the yellow cabinets where the flammable materials were improperly stored. (Exhibit F, Deposition Testimony of Gary Horton (hereinafter "Horton), pp. 27-29). Adam Zimmer saw the fire in the area *outside* the tool crib. (Exhibit G, Deposition Testimony of Adam Zimmer (hereinafter "Zimmer"), p. 35). Larry Shaffer testified that he saw the small fire *outside* the tool crib on boxes of "stuff that was supposed to be inside the fire cabinets." (Shaffer, p. 30). Brandon Tanner similarly saw fire *outside* the tool crib and saw no fire inside the tool crib. (Exhibit H, Deposition Testimony of Brandon Tanner (hereinafter "Tanner"), p. 27). David Whistler saw the small fire outside the tool crib. (Exhibit I, Deposition Testimony of David Whistler (hereinafter "Whistler") p. 67). In fact, of the six eyewitnesses, only Derek Null was uncertain if there was fire in the tool crib

Another basic tenant of fire science investigation, is that the cause of the fire must be located in the area of origin. (Eskra I, p. 154). Here, Eskra is relying on Hackett's determination although, during his deposition, he was unclear what area Hackett had selected. (Eskra I p. 116). Perhaps that was because Eskra did not receive Hackett's Expert Report defining the area of origin until after he authored his conclusions. (Eskra I, p. 93). In addition, Eskra had no knowledge or information concerning where any of the lithium-ion batteries in this fire were found or, more specifically, where the ones that he claimed are now a potential ignition source of the fire were located. (Eskra I, p. 72)

> **Q.    Are you aware of any map that identifies where each of the cells were located in these grids, these 10 by 10 grids?**
> **A.    I do not.**
> **Q.    Did you endeavor to ascertain where each of the cells were found?**
> **A.    No.**

(Eskra I, pp. 72:14 to 72:20).

With the area of origin and cause having been predetermined, Eskra set about the task of selecting which of the cells found inside the tool crib he would declare as the cause of the fire. To be fair, all Eskra was really doing was trying to determine which cells belonged to a Makita product. (Eskra I, p. 117-119)

> ***A.    The Covert, Unilateral, Undocumented Battery Cell Review:***
> In July 2019, approximately four months after the fire, Eskra performed his first task

associated with this case. (Eskra I, p. 163-164). He attended a unilateral destructive lab exam with Hackett to select specific cells for further x-ray and CT scanning.

> **Q.    Okay.  The first section, you've got Section 1 as your assignment, and this discusses the selection process that you and Mr. Hackett engaged in during that July 2019 inspection, right?**
> **A.    Correct.**

---

given his vantage point looking west into the flames—but he was adamant that he did see fire *outside* of the tool crib along the wall where the flammable materials were stored.  (Exhibit J, Deposition Testimony of Derek Null (hereinafter "Null"), pp. 45-47).

**Q.    Okay.  It looks like part of that was to determine from the external tabbing on the incident cell, the battery pack manufacturer, right?**
**A.    That is correct.**

(Eskra I, p. 164:15 to 164:23; *See also* Exhibit 259, Eskra's Expert Report (hereinafter "Eskra Report")).

Eskra admitted no one from Makita was present or even invited to this covert unilateral examination of the artifacts recovered from the scene. *Id.* Eskra had no explanation for this violation except to say that it "wasn't his party". (Eskra I, p. 233). This improper examination was done despite Makita's specific request that the evidence be preserved and not spoiled and stood in direct contravention to fire investigation norms. To make matters worse, there was no protocol established, nor were there any notes or documents showing what cells were reviewed. (Eskra I, pp. 15-23). During this process, Eskra selected "approximately" 20 cells to be x-rayed for investigation. (Eskra I, p. 17). We will never know how many, because Eskra did not document what he reviewed or sent for additional analysis and, of course, Defendants were not present during the manipulation of the evidence[6] as this examination was conducted in secret. *Id.* In keeping with the lack of transparency, Eskra did not obtain copies of the x-rays. (Eskra I, pp. 16-19). Instead, he claims to have looked at the results of the x-ray through someone's phone using Skype. *Id.*  He took no notes of his Skype observations and no one obtained the alleged x-ray images. (Eskra I, p. 35). Thus, we will never know what, if anything, was done or what Eskra saw, if anything.

In order to keep this meeting covert, the two prepared no notes and created no documents in violation of all record keeping norms.  After this "review" was complete, Eskra took photographs of a few artifacts he claimed were later x-rayed. (Eskra I, p. 16).  The covert nature

---

[6] Under Indiana law, a claim of spoliation can be established when the offending party "either negligently or intentionally destroyed, mutilated, altered, or concealed the evidence." *N. Indiana Pub. Serv. Co. v. Aqua Env'l Container Corp.*, 102 N.E.3d 290, 301 (Ind. Ct. App. 2018).

of the secret examination ensured no documentation or evaluation of their "selection" process could be made.

Obviously, Eskra was trying to match the cell tabs and structure with exemplar Makita products to make sure it was a Makita cell in order to justify the conclusion they needed to draw to justify their cause of action. Regardless, as a result of this secret undocumented process, Eskra picked two groupings of two cells which he believed to be of interest (i.e. indicative of Makita products) and had them CT scanned. (Eskra I, pp. 19-20). The criteria used for his selection of these groupings of cells is unknown, but they both happen to have tabbing which is most associated with a Makita product. (Eskra I, p. 117-118). Thus, having found a Makita cell, Eskra now had a cell damaged by fire that he could describe and make whatever conclusion he desired. This was the one and only lab examination Eskra participated in prior to forming his opinions. (Eskra I, p. 14).

**B.      The "Potential" or "Probable" Cause of the Fire:**

On December 2, 2022, Plaintiff disclosed four liability experts, including Eskra, who along with Hackett was designated to render an opinion regarding the origin and cause[7] of the fire. (*See* Exhibit 125). As part of Plaintiff's expert disclosure, Eskra produced report dated December 2, 2022. (Eskra Report). In Eskra's Report and during his depositions[8] his opinion evolved over time from what was potential to what was a probable cause of the fire. (*See* Exhibit 293).

---

[7] Hackett's theory of causation relies solely on Eskra's opinion.
[8] Defendants were forced to take the deposition of Eskra's on three separate occasions given his habit of providing long narrative, argumentative and non-responsive statements to simple questions to conceal the answer and his failure to produce the file materials he was relying upon.



# Eskra's Causation/Ignition Source History



As a fire investigator, Eskra admitted that for his causation opinions to be valid, the area of origin needs to be well defined and accurate. For that, he is relying on Hackett to determine the area of origin, though he was unclear what area Hackett selected. (Eskra I, p. 116). Oddly, Eskra did not receive Hackett's Report identifying the area of origin until after he had authored his conclusions. (Eskra I, p. 93). In addition to not being sure where Hackett placed the area of origin, Eskra had no knowledge or information concerning where any of the lithium-ion batteries in this fire were found. (Eskra I, pp. 72:14 to 72:20)

The battery Eskra believes is a potential ignition source[9] of this fire is contingent upon it being located in the area of origin selected by Hackett. (Exhibit C-3, May 18, 2023 Deposition of Michael Eskra ("Eskra III"), p. 62). As such, one would think that Eskra would set about verifying

---

[9] A potential ignition source is different than the cause of a fire. All electrical appliances or objects capable of producing heat in an area of origin are potential ignition sources.

the exact location in which the cell he declared to be the cause of the fire had been located. Further, Eskra testified that he read but did not rely upon the eyewitness testimony confirming where the fire originated.

> **Q.** **Did you read all of the deposition testimony of the witnesses who claim to be eye witnesses to this fire?**
> **A.** **Yes.**
> **Q.** **Okay.  Did you utilize that information for any purpose in connection with your opinions in this case?**
> **A.** **No.**

(Eskra I, pp. 92:20 to 93:2).

Eskra chose not to evaluate all of the potential ignition sources in Plaintiff's desired area of origin. To be fair, Plaintiff outsourced the review of potential ignition sources to Tim Johnson but, of course, Eskra did not receive Johnson's report until after his report was complete. (Eskra I, p. 93). Thus, he had no evaluation or information concerning the potential ignition sources in the area of origin selected by Hackett.

> **Q.** **Okay.  Have you performed any evaluation into what potential ignition sources existed in the area of origin?**
> **A.** **No.**

(Eskra I, p. 95:17 to 95:20),

During his first deposition, after reviewing all of these evidentiary gaps, Eskra was unwilling to make a declaration of causation. (Eskra I, pp. 283-285). According to Eskra, in a "civilized" world all of the Plaintiff's experts would have gotten together to identify which particular product or potential ignition source they were going to decide was the cause of a fire. (Eskra I, p. 284). In this case, Eskra testified that was never done. *Id.* He did not coordinate with Hackett, Johnson or Kaps (Plaintiff's other retained experts) to ascertain whether the lithium-ion battery cell he identified as a Makita product actually could have caused the fire.

> **Q.    And then who are you leaving it up to to evaluate which of the potential ignition sources at the Forest River facility caused the fire?**
> **A.    In a civilized civilization, the experts would get together and discuss it.**
> **Q.    Okay. In this civilized world, did you, Mr. Hackett, Mr. Johnson and Mr. Kaps get together and decide what caused the fire?**
> **A.    No.**

(Eskra I, pp. 284:18 to 285:1)

Eskra claimed the battery was merely a potential ignition source that had the "potential" to cause fire. *Id.* That can be said of every lithium-ion battery located in the Forest River facility. As a result, after the first deposition, Plaintiff did not appear to have a causation opinion to advance its case. By the second and third depositions, Eskra's opinion had become "more refined", though he admitted to having done no additional work—except for meeting with Plaintiff's counsel and Hackett. (Eskra II, p. 22; Eskra III, p. 9).

During the second deposition, Eskra confirmed that his prior deposition testimony under oath was true and accurate to the best of his knowledge, information, and belief and that he had no changes. (Eskra II, p. 8). Naturally, Eskra made one "slight" modification to his prior opinion— he claimed that the lithium-ion battery cell which he testified was a "***potential ignition source***" and not the cause of the fire was now a "***probable cause of the fire***". (Eskra II, pp. 35-36). This nuanced shift comes after no new information, testing, analysis, or evaluation.

> **Q    Okay. Now, you remember in March when you said that you weren't able to determine the cause of the fire and that all you could say was the Makita cell would be a potential ignition source if it was located in the area of origin? Do you remember that testimony?**
> **A    Yes, sir.**
> **. . . .**
> **Q    Have you done anything, any research, any evaluation, any testing, to change that opinion --**
> **A    No.**

(Eskra II, pp. 36:24 to 37:10).

11

Further, having now learned where the witnesses saw the fire, Eskra testified that even if all six of the eyewitnesses saw the fire at its early stage of development outside the tool crib, he would still say that it was a Makita battery that was a "probable cause" of this fire. (Eskra II, p. 50). This is true even if the cell was not located in the area of origin. *Id.* Confusingly, in Eskra's first deposition he testified that an object that is not in the area of origin ***cannot*** be considered a possible or probable ignition source. (Eskra I, p. 153). The fluid nature of Eskra's opinions are indicative of the freedom associated with rendering an opinion that is devoid of any methodology and is not dependent upon the facts.

Once confronted with the fact that the eyewitnesses saw the fire at its incipient stage outside the tool crib, Eskra claimed it was ***possible*** a lithium-ion battery cell could have shot as far as a hundred fifty feet away.[10] (Eskra I, p. 162). When confronted with the fact the tool crib was constructed of wooden walls, and not the porous cage he had assumed, Eskra claimed that lithium-ion cells could "blow though a steel wall" to suggest a solid wood wall was of little consequence, proving there are literally no obstacles to his opinions that cannot be overcome by making fantastical claims that have no basis in fact and by relying on speculation.. (Eskra II, p. 47-48).

### C.    *The Untested & Unscientific Methodology Used by Eskra:*

Given the absence of a documented, tested or peer reviewed methodology, Plaintiff's cause of action is based solely upon the *ipsi dixit*[11] of Eskra, who claims to have the ability to identify

---

[10] Eskra is not claiming that the same cell managed to fly back into the tool crib after starting the fire as that would be "a highly unusual scenario". (Eskra I, p. 162).

[11] Without meaningful analysis, an expert's opinion is merely *ipse dixit*, which the Court must exclude. *Dilley v. Holiday Acres Properties, Inc.,* No. 16-CV-91-JDP, 2017 WL 2371295, at *2 (W.D. Wis. May 31, 2017), *See also Wendler & Ezra, P.C. v. Am. Int'l Grp., Inc.,* 521 F.3d 790, 791 (7th Cir. 2008) ("We have said over and over that an expert's *ipse dixit* is inadmissible. 'An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process.'") (quoting *Mid-State Fertilizer Co. v. Exchange National Bank,* 877 F.2d 1333, 1339 (7th Cir. 1989)).

when a lithium-ion battery cell was attacked by fire or when it was the cause of the fire. (Eskra II, p. 63-64). As it happens, the subjective criteria used by Eskra to tell the difference between a cell that is the cause and one that is attacked by fire are identical. *Id.*

> **Q      Now, all of those different criteria that you utilize, all of them can be evidence of a cell that's been attacked by fire, right?**
> **A      Individually, yes.**
> **Q      And all of them can be evidence of a cell that's the cause of the fire, according to you?**
> **A      Correct.**
> **. . . .**
> **Q      Sir, the scientific method has to be repeatable, right?**
> **A      Correct.**
> **Q      By somebody other than you?**
> **A      Correct.**
> **Q      And has to rely on data, correct?**
> **A      Correct.**

(Eskra II, pp. 63:19 to 64:15).

The lack of support for these opinions is not in dispute. Eskra admits that he knows of no scientific peer-review methodology that exists to determine whether a lithium-ion battery cell was the cause of the fire or a victim of the fire. (Eskra II, pp. 28-31). Further, he has never conducted any testing to validate any of his theories. *Id.* Of the six conditions which he claimed must exist in a cell that is the cause of the fire, Eskra admitted that each element is also indicative of a cell that has been attacked by fire. (Eskra II, pp. 63-64). These admissions render his "analysis" meaningless from a scientific perspective. Even Eskra admits his methodology is not "provable and repeatable". (Eskra II, p. 29). Thus, Eskra's opinions literally violate all of the hallmarks for reliability under Rule 702.

> **Q      Have you done any testing to establish that your methodology is provable and repeatable?**
> **A      No.**

(Eskra II, pp. 29:6 to 29:8).

Drilling down on any one of Eskra's "criteria" and it becomes obvious that they are simply untested theories that only he can appreciate. For example, Eskra claims he examines cells for rounded ends and elongation of the roll crimp. (Eskra I, p. 34). What he or others should be looking for is unknown and not subject to any quantification or objective test.

> **Q.** **Have you quantified how much rounding or what the, I guess, the percentage or – have you given any quantification to the rounding to determine whether it's attacked by fire or been a cause of the fire?**
> **A.** **No.**
> **Q.** **Okay. Have you performed any testing to validate this statement?**
> **A.** **No.**
> **Q.** **Okay. Have you authored any scientific peer-reviewed articles to evaluate this theory of the rounded end of a call being indicative of an attack as opposed to the cause of the fire?**
> **A.** **Not peer-reviewed.**
> **Q.** **Okay. Or published in any scientific journal?**
> **A.** **No.**

(Eskra I, pp. 28:15 to 29:13).

> **Q.** **Okay. So on the longitudinal stretch, have you performed any measurements to show how much of a stretch was necessary for a causal set?**
> **A.** **No.**
> **Q.** **Have you done any testing – have you done any testing to prove this theory?**
> **A.** **No.**
> **Q.** **Okay. Have you authored any peer-reviewed articles that have been published in any scientific journal with this theory espoused.**
> **A.** **No.**

(Eskra I, pp. 33:19 to 34:04).

Eskra similarly failed to perform testing to validate his theories on identifying causative battery cells, including theories on gas venting patterns, arcing and formation of crater, location of current collector, and venting. (*See* Eskra I, pp. 29, 33, 40-41, 44, 52, 59, 66, 68, 152).

Despite claiming to have a methodology for evaluating battery cells and being able to inexplicably, determine which cell is causative of a fire, he agrees that the same methodology for

14

determining whether a cell were causative could also be used to describe a cell that was attacked by fire.

> **Q.    Okay. And would you agree with me that each one of those criteria can also be used to describe a cell that has been attacked by fire?**
> **A.    They can be used, yes.**
> **Q.    And do you know of any peer-reviewed methodology that has been published in any scientific journal that allows an individual to objectively identify a lithium-ion battery cell that is the cause of the fire?**
> **A.    No.**
> **Q.    Have you ever published such an article?**
> **A.    No, . . . .**

(Eskra I, pp. 73:05 to 73:20).

He has done no testing because it cannot be performed. With no written procedure and no guides other than "Eskra will know it when Eskra sees it", his method is nothing more than *ipsi dixit*. Even Eskra agrees that for his methodology to be rooted in science it has to be repeatable—by someone other than him.

> **Q.    For a methodology to be scientific, it has to be repeatable, right?**
> **A.    Yes.**
> **Q.    Okay.  And it has to be objective, doesn't it?**
> **A.    Yes.**
> **Q.    Okay.  So meaning that your methodology has to be something that some other scientist with equal skill and knowledge can follow and then come to the exact same conclusion.**
> **A.    Yes.**

(Eskra I, pp. 152:2 to 152:12).

Of course, no peer scientific article has ever been prepared to validate his subjective theory and he has conducted no testing, to provide guidance to other professionals necessary to validate his theory. (Eskra I, pp. 29-30). Thus, if his opinions are admitted, Defendants, the scientific community, this Court and, potentially the jury, will just have to accept Eskra's "say so".

> **Q.    Have you done any testing -- have you done any testing to prove this theory?**
> **A.    No.**

15

**Q.     Okay.  Have you authored any peer-reviewed articles that have been published in any scientific journal with this theory espoused?**

**A.     No.**

(Eskra I, pp. 33:23 to 34:4).

Along these same lines, Eskra also acknowledged that you cannot rely on speculation and assumption in utilizing the scientific method and when forming his opinions. (Eskra I, p. 150). He must have facts that are provable and verifiable under some scientific methodology. (Eskra I, p. 151). The Court cannot simply take an expert's word for a specific proposition in an effort to advance the Plaintiff's case. *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert").

**D.     *The Lack of a Defect that Caused or Contributed to Cause the Fire:***

In terms of how this alleged fault was allowed to occur, Eskra testified that he has no knowledge information concerning any manufacturing, design or warning defect that caused or contributed to cause this fire.

**Q     Okay.  Am I still correct that you have no opinion about any manufacturing or design defects in any Makita product that caused or contributed to cause this fire?**

**A     Correct.**

(Eskra II, pp. 53:2 to 53:6).

However, Eskra claims the battery management system ("BMS") for the Makita battery packs (which he never identified) suffers from a design defect. (Eskra I, pp. 191-193). Specifically, the  BMS will allow the voltage in a cell dip below 2V when attached to a drill whose trigger is zip tied closed for hours after it stops working. (Eskra I, pp. 174-175).  When this undervoltage is forced to occur, Eskra believes damage can occur to the SEI layer or the current collector. (Eskra I, p. 210). Of course, Eskra has never tested this theory nor has he examined any cells to ascertain

16

whether the intentional depletion of voltage will cause damage to the SEI layer after he forced this condition. *Id.*

> Q.    If it's allowed to go below 2.5 volts, that will create SEI layered degradation; is that right?
>
> A.    Correct.
>
> Q.    Okay.  Have you done any testing to establish that?
>
> A.    No.

(Eskra I, p. 210:9 to 210:15)

In order to claim the artificial condition he created presented a fire risk, Eskra testified under oath that there were numerous peer reviewed articles concluding that allowing lithium ion batteries to fall below 2V causes an increased risk of fire. (Eskra I, p. 205).  Naturally, we requested copies of these peer reviewed papers to validate Eskra's testimony and went through them in painstaking detail. (*See generally* Eskra III).  Having gone through each report we were able to conclude that not one reached the conclusion forcing batteries to go below 2V increased risk of fire. *Id.*

All of the articles addressed issues of longevity and battery life and not fire risk or hazard. (*See generally* Eskra III).  Once confronted with this fact, Eskra then claimed that the articles were prepared by academics and universities who are puppets of the battery industry and that is why they failed to reach conclusions relating to increased risk of fire or fire hazards he testified were contained in the articles. (Eskra III, pp. 22-25). Thus, there is no scientific basis for Eskra's claim that allowing a battery to fall below 2V will cause an increased risk of fire. Neither he nor anyone else has tested, conducted a study or written an article that was peer reviewed to support the conclusion that the modification Eskra created would increase the risk of fire. Thus, we are left to take his word that the condition he assumed existed in the battery pack actually causes an increased risk of fire hazard. At its core this is nothing more than inadmissible *ipsi dixit*. What is of greater

17

concern is the fact that Eskra has no problem making wild intellectually dishonest statements about what technical papers hold in an attempt to give scientific credence to his *ipsi dixit*.

### E.    The Purchase, Use and History of the Makita Products at Issue.

Eskra has no knowledge of the history or usage of the battery cell at issue. He does not know how old it was, what tools it was used with, whether it ever was modified or repaired, or any other information to aid in his evaluation.

> **Q**    **Okay.  And am I correct that you still have no information concerning the history or use of the Makita products that are allegedly at issue in this case?**
>
> **A**    **That's correct.**

(Eskra II, pp. 28:2 to 28:6).

Further, as noted above, Eskra does not know where the cell he believes to have caused this fire was found or, indeed, how many obstacles it had to overcome to escape the tool crib.

> **Q.**    **Okay. The cell that you claim to be the cause of the fire, was it attached to a tool?  Was it just loose on the desk?  Was it attached to a charger? Do you know?**
>
> **A.**    **I don't know.**
>
> **Q.**    **The cell that you claim to be the cause of the fire, was it in a drawer? Was it on top of the desk?  Was it on a shelf?  Do you have any clue?**
>
> **A.**    **I don't know.**
>
> **Q.**    **Okay.  The cell that you claim was the cause of this fire, do you know the last time it was used or how often it was used?**
>
> **A.**    **No.**
>
> **Q.**    **All right.  And I think you already established, this cell that you believe to be the cause of this fire, you don't know what the state of charge[12] was at the time the fire erupted, right?**
>
> **A.**    **Correct.**

(Eskra I, pp. 155:24 to 156:16).

---

[12] According to Eskra, the higher the state of change the more damage he would expect to see in the cell. (Eskra I, p. 31). The fact that he  does not know and has not endeavored to learn this information is important to understanding the value and reliability of his opinions—particularly when coupled with the other omissions and assumptions.

Here, the uninformed opinions and speculation proffered by Eskra concerning the products at issue do not rise to the level of relevance or even expertise.  Further, Plaintiff is unable to meet the burden of proof establishing the admissibility requirements are met. *See Lewis v. CITGO Petroleum Corp*., 561 F.3d 698, 704 (7th Cir.2009). Eskra's opinions are irrelevant and must be stricken as they will not "assist the trier of fact to understand the evidence or to determine a fact in issue." *Ervin v. Johnson & Johnson, Inc*., 492 F.3d 901, 904 (7th Cir.2007).  Relevant evidence is evidence that has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Daubert*, 509 U.S. at 587 (citing Fed.R.Evid. 401).

## VII.   ARGUMENT

The analysis conducted by Eskra in formulating his opinions and ultimate conclusion on which Plaintiff's cause of action relies fails to meet the standard of reliability pertaining to "scientific knowledge."  *Rogers v. Ford Motor Co.,* 952 F. Supp. 606, 613 (N.D. Ind. 1997); see also *Cummins*, 93 F.3d at 368 (citing *Daubert*, 509 U.S. at 594-95), *see also Fuesting,* 21 F.3d at 534–35.  Under the first prong in a *Daubert* analysis, four factors are used in determining the reliability of the expert's methodology: "(1) whether the proffered conclusion lends itself to verification by the scientific method through testing; (2) whether it has been subjected to peer review; (3) whether it has been evaluated in light of  the potential rate of error of the scientific technique; and (4) whether it is consistent with the generally accepted method for gathering the relevant scientific evidence."  *Cummins,* 93 F. 3d, 368 (citing *Daubert*, 509 U.S. at 594-95), *see also Fuesting*, 421 F.3d at 534-35.

Eskra's proffered methodology has not been subject to any testing or peer-reviewed and is well outside the generally accepted method for gathering the relevant scientific evidence.  (Eskra

19

I, pp. 29, 33, 40-41, 44, 52, 59, 66, 68, 152).  In addition to lacking a reliable methodology, Eskra's opinions are inconsistent with "the generally accepted method for gathering the relevant scientific evidence".  *Cummins, supra*.  Thus, Eskra's opinions fail to meet any of the reliability factors and are merely "unjustifiably extrapolated from an accepted premise" and a failure to "account for obvious alternative explanations."  *Gopalratnam*, No 13-CV-618-PP, 2017 WL 1067768, at *8-9 (E.D. Wis. Marc. 21, 2017), *aff'd*, 877 F.3d 771 (7th Cir. 2017) (*quoting Fuesting,*  421 F.3d at 534–35 ).

Courts do not allow unqualified and unscientific opinions to be presented to the trier of fact as they are irrelevant, prejudicial, and run the risk of confusing the jury. *See Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir.2010) ("Rule 702 does require, however, that the expert explain the 'methodologies and principles' that support his opinion; he cannot simply assert a 'bottom line'").  To be admissible, an expert's ultimate opinion "must be grounded in the scientific process and may not be merely . . . unsupported conjecture" designed to advance a cause. *Lewis*, 561 F.3d at 705.

### A. Eskra's Preconceived Opinions are Unsupported by any Scientific, Peer-Reviewed, Tested or Recognized Methodology and are therefore Unreliable and Inadmissible.

"Even if an expert is qualified," a court should not allow an expert to offer an opinion that does not "rely on proper methodologies" and is "therefore speculative." *Weir v. Crown Equip. Corp.*, 217 F.3d 453, 464 (7th Cir.2000).  Eskra's opinions are pure litigation constructs and unreliable as he uses no peer reviewed or scientific methodology to reach his conclusions.  As a result, no objective evaluation of his opinions can be conducted, and they are incapable of scientific scrutiny.

20

**Q.** **And do you know of any peer-reviewed methodology that has been published in any scientific journal that allows an individual to objectively identify a lithium-ion battery cell that is the cause of the fire?**

**A.** **No.**

**Q.** **Have you ever published such an article?**

**A.** **No…**[13]

(Eskra I, p. 73:14 to 73:21).

Further, neither he nor anyone else possesses a reliable scientific methodology for determining when a lithium-ion cell is the cause of a fire as opposed to when it is merely a victim—particularly in a vacuum. *See e.g.* Nagourney, T., Jordan, J., Marsh, L. et al., *The Implications of Post-Fire Physical Features of Cylindrical 18650 Lithium-Ion Battery Cells*. Fire Technol 57, 1707–1722 (2021). (https://doi.org/10.1007/s10694-020-01077-8 (last visited 9-5-2023). Indeed, the proliferation of subrogation actions created by Eskra's willingness to issue unsupported opinions has forced others to test and debunk the various theories he has espoused. *Id.* For purposes of this motion, however, it is important to note there are no peer reviewed or valid scientific methodology to support Eskra's opinions and self-proclaimed ability to discern a cell that was the cause of the fire from one that is merely a victim.

A central role of the Court when deciding a *Daubert* motion is to "examine the methodology the expert has used in reaching his [or her] conclusions." *Lemmermann*, 713 F. Supp. 2d at 806 (quoting *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir.2000)). The burden is on the expert and the party proffering the expert to "explain the methodologies and principles supporting the opinion." *Minix v. Canarecci*, 597 F.3d 824, 835 (7th Cir.2010). Here, it is undisputed that no such methodology exists and that the "principles supporting the opinion" are woefully inadequate or nonexistent. Thus, as to the four factors used in determining the soundness

---

[13] In his deposition, Eskra suggested that the only reason he has been unable, to date, to publish any peer-reviewed article is because during one Lithium Battery Safety Meeting, "they" wanted a paper submitted on a different topic. (*Id.*, at 73-74).

of the methodology under *Daubert*, Plaintiff is unable to satisfy its burden.  *Daubert*, 509 U.S. at

594-95.

>    **B.**    ***Eskra's Opinions are Devoid of any Case Specific Testing or Scientific Testing to Ensure Reliability and Acceptance within the Scientific Community.***

Setting aside the lack of a scientific peer reviewed methodology, Eskra's opinions do not

meet the standards required under Rule 702 to be admissible as they are devoid of testing.  It is

axiomatic that you cannot have a scientific methodology without testing.  Further, no peer review

of a proposed methodology can occur without testing, documented support and objective criteria

to ensure the experts' opinions are reliable. Indeed, it is "elementary" that Eskra's theory should

have been submitted to testing, whether by him or by others, to validate his opinions in this case—

preferably before he reached them. *Lemmermann v. Blue Cross Blue Shield of Wis.*, 713 F. Supp.

2d 791, 803 (E.D. Wis. 2010). Yet, Eskra's entire theory upon which his opinions in this case are

based is devoid of the requisite testing.

>    **Q.**    **…So in terms of testing to validate your theory of the six criteria that exist when a cell is attacked by fire and trying to figure out how to interpret and read that information to declare cause, you've not done any testing to validate that theory, right?**
>    **A.**    **Correct.**

(Eskra I, p. 167:14 to 167:20; *see also* pp. 29, 33, 40-41, 44, 52, 59, 66, 68, 152)

Eskra's theory of causation includes a belief that when Makita battery packs are run until

the tool stops by using a zip tie to hold the trigger down, the lithium-ion battery cells fall below

two volts and create[14] an increased risk of fire hazard.  (*See generally* Eskra Report; *see also* Eskra

I, p. 204).  Eskra obtained five ten-cell Makita battery packs to use in his experiment designed to

---

[14] As noted in the factual section of this brief, Eskra's personal belief about the increased risk of fire is not borne out by testing or any scientific evaluation or peer review.

force the voltage below two volts[15] by holding the drill trigger down after the drill stops operating. (Eskra I, pp. 207-208). After running this experiment, he chose not to inspect the cells for damage. (Eskra I, pp. 214-215). Of course, none of the cells caught fire during this abuse or at any time since. More importantly, there is no evidence the cells at issue in this case experience similar misuse or abuse. Even more confusing is the fact that this artificial condition created by Eskra to criticize is irrelevant by his own admission.

> Q.    **And if this cell never experienced voltage below 2.5 volts, what does that do to your opinion?**
> A.    **Well, it still failed.**
> Q.    **When you say it still failed, so it doesn't matter whether the condition which you claim to be the design defect occurred because you still believe this cell failed?**
> A.    **Yes.**
> Q.    **Regardless of whether it ever went below 2.5 volts or not?**
> A.    **Correct.**

(Eskra I, p. 263:2 to 263:12).

If the condition he manufactured did not matter to the analysis or his conclusion of why the battery failed, then we are back to what caused the failure in the battery cell, assuming it failed and was not attacked by fire, like the other cells in the tool crib. "Knowledge", must be more than a subjective belief or unsupported speculation. *Daubert*, 509 U.S. 579 at 590; *United States v. Lanzotti*, 205 F.3d 951, 956–957 (7th Cir.2000). Here, Eskra's opinions merely equate to the "subjective belief or unsupported speculation" which the Court must rule out. *Rogers,* 952 F. Supp. at 615 (N.D. Ind. 1997). The analysis (or lack thereof) conducted by Eskra in formulating his opinions and ultimate conclusion on which Plaintiff's cause of action relies fails to meet the standard of reliability pertaining to "scientific knowledge." *Rogers,* 952 F. Supp. at 613; *see also*

---

[15] Interestingly, when Eskra cuts the zip-tie the cells experience "rebound voltage" and return to levels above two volts. (Eskra I, p. 275).

*Cummins*, 93 F.3d at 368 (citing *Daubert*, 509 U.S. at 594-95), *see also Fuesting,* 421 F.3d at 534–35.

> Q.    And what is the scientific method?
> A.    **It is based on your hypothesis, your facts, your findings that would lead you to the potential probability.**
> Q.    And then utilizing the scientific method, can you rely on speculation or assumption?
> A.    **No, sir.**
> Q.    And using the scientific method, can you ignore facts that are inconsistent with your opinions?
> A.    **No, you cannot.**

(Hackett, p. 33:04 to 33:14).

**C.    *Eskra's Lack of Scientific and Peer-Reviewed Methodology, Decision to Reach Opinions Without Testing and Knowing Violation of the Scientific Method Makes him Unqualified as an Expert.***

In order for opinions to be admissible, "the witness must be qualified 'as an expert by knowledge, skill, experience, training, or education.'" *Ervin*, 492 F.3d at 904.  Experts need not necessarily have particular academic credentials to be "qualified," but rather "anyone with relevant expertise enabling him [or her] to offer responsible opinion testimony helpful to judge or jury may qualify as an expert witness." *Tuf Racing Prods., Ind. v. American Suzuki Motor Corp.*, 223 F.3d 585, 591 (7th Cir.2000).  Ultimately, "whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill experience, or education with the subject matter of the witness's testimony." *Carroll v. Otis Elevator Co.*, 896 F2d 210, 212 (7th Cir.1990).  In other words, the focus is not on whether the "expert is qualified in general, but whether his or her 'qualifications provide a foundation for [him or her] to answer a specific question." *Gayton v. McCoy,* 593 F3d 610, 617 (7th Cir.2010) (internal citations omitted).  Here, because Eskra lacks foundation to address the issues before this Court, he is not qualified.

Merely claiming to be a battery expert is insufficient to establish the foundation necessary for him to render opinions.

We proposed that this Court also strike Eskra's opinions on the basis that he lacks the qualification, knowledge, and skill to make his conclusions reliable. Indeed, Eskra has violated numerous tenants necessary to ensure a valid and reliable opinion. This Court must not dignify such efforts by declaring the proponent of uninformed opinion as a "qualified" expert under Rule 702. Even if this Court finds that Eskra is a "supremely qualified expert," and that he possesses the necessary knowledge to establish foundation for his opinions, he "cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method and are reliable . . .". *Clark v. Takata Corp.*, 192 F.3d 750, 759 n. 5 (7th Cir.1999). Because Eskra chose not to conduct a proper investigation, ignored the facts, uses no scientific peer reviewed methodology and has done no testing, his opinions fall outside the realm of science and lack any indicia of reliability and by knowingly proffering such opinions, Eskra is unqualified as an expert. *Lewis*, 561 F.3d at 705 (unsupported conjecture is inadmissible).

Inaccurate assumptions fueled by expectation bias and a lack of investigation does not satisfy the scientific rigor required of a fire investigator under Rule 702. *Dhillon*, 269 F.3d at 869 (noting the Court acts "as a 'gatekeeper' for expert testimony, only admitting such testimony after receiving satisfactory evidence of its reliability"). "An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process." *Smith v. Nexus RVs, LLC*, 472 F. Supp. 3d 470, 480 (N.D. Ind. 2020) (citing *Huey v. UPS*, 165 F.3d 1084, 1087 (7th Cir. 1999) ("Expertise is a necessary but not a sufficient condition of admissibility under Rule 702. [The opinion witness] may have specialized knowledge or skills, but he did not apply them to the analysis of [this] claim.").

WHEREFORE, Defendants respectfully request this Honorable Court to enter an order granting its Motion to Strike the Opinions and Testimony of Michael Eskra pursuant to Rule 702, and for such other and further relief the Court deems just.

Respectfully Submitted,

STANTON | BARTON LLC

By:    /s/ Jonathan T. Barton
       Jonathan T. Barton, *Admitted PHV*
       Megan M. Ratelle, *Admitted PHV*
       8000 Maryland Avenue | Suite 450
       St. Louis | Missouri | 63105
       (314) 455-6500
       jbarton@stantonbarton.com
       mratelle@stantonbarton.com

       *Attorneys for Defendant Makita Corporation of America and Makita U.S.A., Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been filed with the Clerk of the Court using the CM/ECF system on this 4th day of October 2023.  Notice of this filing will be sent to all counsel of record by operation of the Court's electronic filing system.

/s/ Jonathan T. Barton

26