

**Deposition of:**

# John Reagan

**Case:**

## AMERICAN HOME ASSURANCE CO.

## vs

## MAKITA CORPORATION OF AMERICA, et al.

**Date:**

## 5-10-2023



**360 Litigation Services**
10097 Manchester Rd, Ste 102
St. Louis, Missouri 63122
360LitigationServices.com
314-394-2206

USDC IN/ND case 3:21-cv-00252-DRL   document 86-4   filed 12/13/23   page 2 of 301
John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1

2          In the United States District Court

3             Northern District of Indiana

4                  South Bend Division

5

6          AMERICAN ASSURANCE COMPANY, as Subrogee

7     of FOREST RIVER, INC.,

8

9                     PLAINTIFF,

10

11       vs.      Cause No. 3:21-CV-00252-JD-MGG

12

13       MAKITA CORPORATION OF AMERICA and MAKITA

14    U.S.A., INC.,

15                  PLAINTIFF.

16

17             Videographic Zoom

18             Deposition of JOHN REAGAN

19             MAY 10, 2023

20

21             Margaret M. Perry, MO CSR

22              360 LITIGATION SERVICES

23                1332 Strassner Road

24             St. Louis, Missouri  63144

25                  (314) 394-2206

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1              In the United States District Court

2                 Northern District of Indiana

3                     South Bend Division

4

5         AMERICAN ASSURANCE COMPANY, as Subrogee

6    of FOREST RIVER, INC.,

7

8                       PLAINTIFF,

9

10        vs.        Cause No. 3:21-CV-00252-JD-MGG

11

12        MAKITA CORPORATION OF AMERICA and MAKITA

13   U.S.A. , INC.,

14

15                      PLAINTIFF.

16

17          Videographic Zoom Deposition of JOHN

18   REAGAN, taken on behalf of the PLAINTIFF, on MAY

19   10, 2023, between the hours of 9:00 a.m. and

20   3:53 p.m., before Margaret M. Perry, Missouri

21   CCR #948.

22

23

24

25

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

```
1    APPEARANCES OF COUNSEL:

2           For DEFENDANT:

3           Mr. Jonathan Barton

4           Ms. Megan Oliver Ratelle

5           Stanton Barton

6           8000 Maryland Avenue

7           Clayton, Missouri  63105

8           (314) 455-6500

9           jbarton@stantonbarton.com

10          moliver@stantonbarton.com

11

12          FOR PLAINTIFF:

13          Mr. Ben C. Lesnick

14          Denenberg Tuffley

15          28411 Northwestern Highway

16          Southfield, Michigan  48034

17          (248) 549-3900

18          blesnick@dt-law.com

19

20          ALSO PRESENT:

21          Ms. Molly Hodge, Videographer

22          360 Litigation Services

23          1332 Strassner Road

24          St. Louis, Missouri  63144

25          (314) 394-2206
```

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1

2                    **INDEX**

3

4                                    **PAGE**

5

6   Examination by Mr. Lesnick          7

7

8

9        PLAINTIFF'S EXHIBIT INDEX

10

11   Exhibit 1 - Deposition Notice    10

12   Exhibit 2 - Report               27

13   Exhibit 3 - Invoices             65

14   Exhibit 4 - E-mail               66

15   Exhibit 5 - Notes                77

16   Exhibit 6 - Lab 2 notes          85

17   Exhibit 7 - Lab Notes            86

18   Exhibits 8 & 9 - Lab Notes       90

19   Exhibit 10 - Lab Notes           96

20   Exhibit 11 - Lab Notes           96

21   Exhibits 12 & 13 -

22   Lab 3 Notes A & B                99

23   Exhibit 14 - Null depo excerpt  148

24   Exhibit 15 - Shaffer excerpt    152

25   Exhibit 17 - Hackett excerpt    217

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1   **Exhibit 18 - Samsung specs     256**

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1                    JOHN REAGAN,

2          of lawful age, having been first duly

3     sworn to testify the truth, the whole truth, and

4     nothing but the truth in the case aforesaid,

5     deposes and says in reply to oral

6     interrogatories propounded as follows, to-wit:

7                    EXAMINATION

8          QUESTIONS BY MR. LESNICK:

9          VIDEOGRAPHER:  We are on the record at

10    8:59 a.m. Central Standard Time.  Today's date is

11    May 10th, 2023.  All parties are attending remotely

12    via Zoom videoconferencing.  We are here for the

13    deposition of John Reagan in the case of American

14    Home Assurance Company, as Subrogee of Forest River

15    Incorporated versus Makita Corporation of America,

16    in the United States District Court, Northern

17    District of Indiana, South Bend Division, Cause

18    Number 3:21-CV-00252-JD-MGG.  My name is Molly

19    Hodge.  I'm here today as the legal videographer,

20    and we are joined by Peggy Perry.  We both

21    represent 360 Litigation Services in St. Louis,

22    Missouri.  Will counsel please state their

23    appearances for the record beginning with the

24    noticing party?

25          MR. LESNICK:  Ben Lesnick on behalf of the

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1   plaintiff.

2           MR. BARTON:  Jon Barton and Megan Oliver

3   on behalf of Makita.

4           VIDEOGRAPHER:  Will the Court Reporter

5   please swear in the witness?

6           MR. BARTON:  Ben, before we get going, is

7   there anybody else in the room with you or

8   monitoring on your end?

9           MR. LESNICK:  No, there's not.  Is there

10  anybody else in the room with you or monitoring on

11  your end?

12          MR. BARTON:  Just Megan, John and myself.

13  You're in a big room, I couldn't see you, so I

14  wasn't sure, but thank you.

15      Q.   Mr. Reagan, can you please state your name

16  for the record?

17      A.   John Reagan.

18      Q.   Your understanding you're here to have

19  your deposition taken?

20      A.   Correct.

21      Q.   Where are you currently located?

22      A.   In St. Louis at Stanton Barton's office.

23      Q.   Great.  Have you ever had your deposition

24  taken before?

25      A.   I have.

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1      Q.    I'll briefly go over some ground rules

2   just so we're on the same page.  I will try not to

3   talk over you and I would just ask you try not to

4   talk over me; is that understood?

5      A.    That's understood.

6      Q.    If I ask you a question you don't

7   understand, just please let me know and I will do

8   my best to rephrase it in a different manner, okay?

9      A.    Okay.

10      Q.    If you need a break at any time, feel free

11   to take one.  I would just ask that if I have a

12   question posed to you, you answer that question

13   before we take the break, okay?

14      A.    Understand.

15      Q.    All right.  And before we get started, I

16   just wanted to make a note for the record that we

17   received two hard drives of your file, Mr. Reagan,

18   one Friday afternoon, one Monday of this week,

19   containing over 500 gigabytes of material that is

20   alleged to have contained Mr. Reagan's entire file

21   materials.  Given the short time, we haven't had --

22   we're placing an objection that we haven't had

23   adequate time to thoroughly review these documents

24   and that we may request additional time to continue

25   the deposition once all the documents on these hard

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    drives have been adequately reviewed.

2          MR. BARTON:  For the record, that's not

3    all the materials you received that compose Mr.

4    Reagan's file, but regardless, you've had adequate

5    and ample time to review the materials.  The

6    information contained on the hard drive is either

7    material that you already possess, which is general

8    and common knowledge in the case, including

9    depositions and exhibits or CT scans, which your

10   experts failed to take on their own despite having

11   years and opportunity to do so, and testified under

12   oath that they don't need CT scans of all of the

13   cells and they elected not to CT scan the cell, and

14   in fact, made their analysis based on x-rays of 20

15   cells and then lost the x-rays or never procured

16   them, and then selected four cells, which they

17   elected to CT, and that was sufficient for them and

18   that's all that they needed.  So, make whatever

19   motion you need to after Mr. Reagan's deposition

20   and the lawyers will, I'm sure, fight that issue.

21   Thank you.

22      Q.   All right.  John, I'm going to pull up --

23   or Mr. Reagan, I'm going to -- would you prefer I

24   call you John?  Mr. Reagan?  Does it matter?

25      A.   No, it doesn't matter.  Either is fine.

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    Q.    All right.  Mr. Reagan, I'm going to be

2  pulling up documents throughout this deposition I'm

3  going to be marking as exhibits.  Obviously we're

4  doing this not in person, but over Zoom, so if you

5  have any technical difficulties like you can't see

6  the item I've pulled up, if you can't hear me when

7  I'm talking, any of those types of things, please

8  let me know and we'll get that all figured out,

9  okay?

10    A.    Okay.

11    Q.    All right.  I'm going to pull up and we're

12  going to mark this as Exhibit 1.

13          (Plaintiff's Exhibit 1 marked for

14                  identification.)

15    Q.    You let me know when you've seen the item

16  I pulled up on my screen.

17    A.    Okay.  I have that, yes.

18    Q.    Okay.  This is a document entitled Notice

19  of Deposition Duces Tecum of John Reagan.  Do you

20  recognize this document?

21    A.    I do.

22    Q.    Okay.  I'm going to scroll down to Page

23  3 -- let me ask you this.  Did you receive this

24  exhibit here, Exhibit 1?

25    A.    Yes.

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    Q.    When did you receive this exhibit?

2    A.    It was e-mailed to me, but I also -- I

3  received a printed copy yesterday.

4    Q.    Okay.  I'm going to scroll down to Page 3,

5  which is Exhibit A, Schedule of Requested

6  Documents.  Have you seen this list before --

7    A.    I believe so.

8    Q.    -- of items that was requested of you --

9  I'm sorry.  Of items that was requested of you to

10  bring to this deposition?

11    A.    Yes, I believe so.

12    Q.    Did you bring anything with you to this

13  deposition today?

14    A.    Not printed copies.  The only printed

15  thing I have in front of me is the Schaefer

16  Engineering report.  I also have a hard drive with

17  me.

18    Q.    What's on the hard drive?

19    A.    It contains the file materials.

20    Q.    All those file materials, were they

21  produced to your attorney?

22    A.    Yes, that's correct.

23    Q.    Do you know if those file materials were

24  produced to us?

25    A.    I believe they were.  I mean, it's been

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    reported to me that they were.

2        Q.   On this exhibit here, I just want to go

3    over this list real quick to make sure that we've

4    got everything that we've requested.  The first

5    one, the first item here requests internal

6    inspection report, root cause failure analysis

7    report, investigation reports, et cetera.  Have you

8    produced all documents responsive to this request?

9        A.   I believe so.

10       Q.   And we received just one report from you,

11   are there any other reports you've authored in this

12   matter related to the fire?

13       A.   There are not.

14       Q.   Request 2 asks for all statements obtained

15   by you from any witness.  Did you obtain any

16   statements from any witnesses in this case?

17       A.   I have some witness statements that were

18   produced in file materials from Midwest.  I also

19   have deposition transcripts from the witnesses that

20   were deposed in this matter.

21       Q.   Other than those file materials, any other

22   file -- I'm sorry.  Any other -- besides those

23   witness statements, any other witness statements?

24       A.   Not that come to mind, but obviously, I

25   have a list of all the documents I've reviewed in

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1  the procedure section of my report on Pages 3 and

2  4.

3       Q.   Okay.  I didn't see in that section that

4  you actually obtained any yourself from any

5  witnesses, any statements; is that correct?

6       A.   I did not interview anyone directly,

7  that's correct.

8       Q.   Request 3 asks for all internal

9  memorandum, correspondence and e-mail communication

10 regarding this incident.  Have you produced all of

11 that information to us?

12      A.   I believe so, yes.

13      Q.   I saw in your file materials that was

14 provided to us a folder called Miscellaneous

15 Correspondence.  Do you know what folder I'm

16 talking about?

17      A.   I do.

18      Q.   Do you know why it's called Miscellaneous

19 Correspondence?

20      A.   That's what I titled it as.  It was a

21 place holder where I could drag all the

22 communications into.

23      Q.   Okay.  Other than the communications in

24 the Miscellaneous Correspondence folder that we

25 saw, and I think there were a few others randomly

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1  throughout your file, any other correspondence that
2  you have related to this matter that wasn't
3  produced to us?
4       A.    Not that I can think of, no.
5       Q.    Do you know if any communications were
6  withheld on the basis of privilege?
7       A.    No, I don't believe there was.
8       Q.    Request Number 4 asks for all documents
9  removed by you or at your direction from the
10  premises after the incident in question.  Do you
11  have any documents responsive to this request?
12       A.    It's not clear to me what's meant by
13  premises.  If you mean the premises where the fire
14  occurred, I have no documents from that, from those
15  premises.
16       Q.    Number 5 asks for all photographs or
17  videos of the premises five years before the
18  incident in question.  Do you have any of those
19  items?
20       A.    I do not.  Other than -- other than what's
21  produced in my report.  I mean, I have some aerial
22  images from Google Earth, things of that nature,
23  but I don't have any photographs from the building
24  in question, other than what I could obtain from
25  the internet over Google Earth or Google Street

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    Maps.

2        Q.    Okay.  Number 6 asks for all documents

3    evidencing the sale and/or purchase of any Makita

4    battery-powered tools, batteries, battery charges

5    that were inside the members at the time of the

6    incident in question.  Do you have any documents

7    responsive to that in your file?

8        A.    I believe there are.  It was in the

9    production from Forest River.

10       Q.    So besides those documents, do you have

11   any others?

12       A.    I can't think of any others.

13       Q.    Did you ever speak with Makita about

14   obtaining such type documents?

15       A.    No.

16       Q.    Request 7 asks for all documents

17   concerning any inspections, tests or examinations

18   of the products at issue after the incident in

19   question.  What inspections were performed by you

20   or some other third party, did you produce all of

21   those documents that are responsive to that to us?

22       A.    I believe so, yes.

23       Q.    Number 8 says produce all documents

24   evidencing the manufacturer, date, sales or

25   purchase of all battery-powered products or

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1  batteries, chargers located in the tool crib at the

2  time of the incident in question.  Do you have any

3  documents responsive to that?

4      A.   That would be the same Forest River

5  production that I sent back to you.

6      Q.   Number 9 asks for copies of all x-ray

7  imaging and CT scans performed on the battery cells

8  recovered from the premises.  Aside from the

9  imaging from Mr. Eskra and Mr. Hackett, is there

10 any other imaging that you have in your possession

11 that's responsive to this request?

12     A.   Yes, and we arranged to have all of the --

13 all of the complete batteries imaged and that

14 imaging was provided to you.

15     Q.   That's the hard drive that we received

16 Friday afternoon?

17     A.   I can't comment on when you received it,

18 but there was a separate hard drive created for

19 that purpose.

20     Q.   When did you provide that?  Did you

21 provide that hard drive to your attorney?

22     A.   I believe it was provided to them directly

23 from the imaging facility.

24     Q.   Do you know when they received that hard

25 drive?

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1      A.   No, you'll have to ask them.

2      Q.   Do you know when that imaging -- the

3   imaging facility created the hard drive?

4      A.   In a general sense, yes.

5      Q.   Okay.  What's your general sense on that?

6      A.   As soon as the scans were completed.

7      Q.   Sorry?

8      A.   As soon as the imaging scans were

9   completed.

10      Q.   Do you know what date that was?

11      A.   No, not specifically.  It was over

12   multiple days.

13      Q.   Was that in the month of April?

14      A.   I believe so.

15      Q.   Did you review the hard drive that was

16   sent to us before we received it regarding all of

17   the CT scans?

18      A.   I did not review that particular hard

19   drive.  I reviewed a second version of the hard

20   drive that was sent to my office.

21      Q.   The CT scans we received, they didn't come

22   from you, they came from a third party?

23      A.   Well, the imaging was done by a third

24   party, that's correct.

25      Q.   All right.  Number 10 asks for all

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    communications between you and any attorneys

2    representing Makita Corporation, Makita USA, Inc.,

3    in this matter, including but not limited to any

4    attorneys at Stanton & Barton.  Did you provide all

5    communications responsive to this request?

6         A.   I believe so, yes.

7         Q.   I don't want to nitpick, you said you

8    believe so, are there something.  Is it -- are you

9    100 percent certain you did or --

10        A.   I produced everything that I have in my

11   possession.

12        Q.   Okay.  Number 11, similar communications

13   and correspondence between you and any agents,

14   representatives of Makita concerning the product at

15   issue and the incident in question.  Did you

16   produce all documents responsive to that?

17        A.   I don't believe there are any, but if I

18   had anything along those lines, I would have

19   produced it.

20        Q.   Okay.  Number 12, communications between

21   you and fire or police departments concerning the

22   incident in question.  Do you have any documents

23   responsive to that request?

24        A.   I have the fire and police department

25   documents that were produced.  Those were obtained

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    by others and provided to me.

2        Q.   So nothing you've communicated with

3    between those entities, correct?

4        A.   Not directly, that's correct.

5        Q.   Copy of all peer-reviewed scientific

6    articles published by you that contain your

7    methodology for determining when a lithium-ion

8    battery cell is a cause of a fire as opposed to

9    having been attacked by a fire.  Do you have any

10   documents responsive to this request?

11       A.   No, I do not.

12       Q.   Copy of any other published document,

13   whether peer-reviewed or not, that contains your

14   methodology for determining whether a battery cell

15   is the cause of the fire or has been attacked by

16   the fire.  Do you have any documents responsive to

17   this request?

18       A.   Other than my report, no.

19       Q.   15 asks for all photographs, videotapes,

20   reports, et cetera, generated by you or your staff,

21   received by you or your staff, in connection with

22   employment in this case.  Did you produce all

23   documents responsive to Number 15?

24       A.   Yes.

25       Q.   16, computer print-outs, diagrams, graphs,

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1   photographs, animations, images or videos prepared

2   by you or at your request or by you or that have

3   been or will be used by you in connection with any

4   aspect of this case.  Have you produced all

5   documents responsive to this request?

6       A.   Yes.

7       Q.   17 asks for any exemplars used that were

8   relied upon in connection with your opinions,

9   including any documents evidencing your acquisition

10  of any exemplars.  Do you have any documents or

11  items responsive to this request in your file?

12      A.   Yes.  So I did examine the exemplar items

13  that were available at Midwest, and documentation

14  is included in the file materials produced.

15      Q.   The documentation, your notes from that

16  inspection?

17      A.   Notes and photographs.

18      Q.   Besides notes and photographs, anything

19  else?

20      A.   No.

21      Q.   18, copies of any reports including drafts

22  prepared by you or furnished to counsel.  Do you

23  have any -- other than the report we received, any

24  other documents responsive to that request?

25      A.   No.

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    Q.   19, copies of work sheets, schedules or

2    questionnaires completed by the defendants, that's

3    Makita, their representatives or any other

4    individuals, which was provided to you in

5    conjunction with this matter.  Do you have any

6    documents responsive to that request?

7    A.   I don't believe so.

8    Q.   Okay.  I think we've talked about 20.  21,

9    is asking for all documents in the file you

10   maintained.  You've produced all of those

11   documents, correct?

12   A.   That's correct.

13   Q.   22, asks for all -- any and all notes,

14   calculations or other data prepared by you or

15   others in your office that were used in formulating

16   your opinions that were relied upon in connection

17   with this case.  Did you produce all documents

18   responsive to that request?

19   A.   Yes.

20   Q.   Okay.  23, payment records, time sheets,

21   invoices and billing records indicating the time

22   spent on your work in this case and the hourly

23   charge.  Did you produce those documents?

24   A.   I believe so, yes.

25   Q.   So we received invoices, I didn't receive

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    any time sheets or billing records.  Do you keep

2    time sheets or billing records for your work?

3        A.   Not separate from the invoices, no.  It's

4    all contained in one system.

5        Q.   Is it -- I guess, how is it contained in

6    one system?  Do you just type it into an invoice

7    and then move on to the next line item?

8        A.   I enter it into the database and the

9    invoices are generated from the database.

10       Q.   And what database is that?

11       A.   I believe it's called Virtual Project

12   Management, VPM.

13       Q.   And then how is time entered into that

14   database?

15       A.   In tenths increments, if that's what you

16   mean.

17       Q.   Is there a description of the work that's

18   done that you have to enter?

19       A.   Any descriptors that are in the program

20   are contained on the invoices.

21       Q.   You have to enter the descriptor when

22   you're entering your time?

23       A.   No, so it's a pull-down menu.  For

24   example, you might see -- you might see a line item

25   in there 202.  Line item 202 gets you bench

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    examination, for example, or laboratory

2    examination.

3        Q.    And how do you keep track of the time that

4    you enter into the time sheet -- or into the

5    database?

6        A.    I enter it as I go.

7        Q.    There's no written notes that say, "Hey, I

8    worked .5 on this today.  I worked .3 on something

9    else"?

10       A.    Well, there is, but it's contained in

11   the -- I mean, I put that into the database as it

12   occurs, so for example, if I were to travel today

13   to Indiana to do an examination, when I return

14   tomorrow, I would first thing in the morning put

15   that into the system.

16       Q.    You keep it all up in your head in order

17   to remember how much time you spent on something?

18       A.    Well, yeah, I mean, for the 24-hour

19   period, sure.

20       Q.    Number 24 asks for reports of any other

21   experts which you have read and used in formulating

22   any opinions in connection with this matter.  Did

23   you read any reports of any experts that you used

24   in formulating any opinions in this matter?

25       A.    I read the plaintiff experts Johnson,

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    Hackett and Eskra prior to authoring my report.

2        Q.   Other than those, any other reports that

3    you relied on?

4        A.   No.

5        Q.   25 asks for any publications, treatises,

6    textbooks, manuals or other documents used as

7    reference by you in connection with this case, not

8    limited to any peer-reviewed article setting forth

9    criteria for determining when a lithium-ion battery

10   cell has been attached by a fire as opposed to

11   causing a fire.  Did you produce all responsive

12   documents to this request?

13       A.   No.  I mean, for example, I have NFPA-921

14   is a document that I reference in my report.  I've

15   not produced to you a copy of NFPA-921, so there

16   are some documents like that that are not produced

17   because they really aren't in my file.  They're on

18   my shelves.

19       Q.   What other documents besides that,

20   NFPA-921?

21       A.   For example, Kirk's Fire Investigation

22   Handbook, which is a document that's readily

23   available, Linden's Handbook of Batteries.  Some of

24   these other reference materials that I have on my

25   shelves, I've not sent those books to you.

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1      Q.    You're reading off the list that's in Page

2    4 of your report under "other"?

3      A.    Correct.

4      Q.    Is there specific sections of some of

5    these reference documents that you relied upon?

6      A.    Well, it certainly depends what questions

7    are asked, but to prepare the report, from the

8    other lists, let me look through that quickly.  No,

9    I don't believe so.  I don't think I have any

10   specific reliance on any of those items for the

11   opinions in my report.

12     Q.    Okay.  So then what type of reliance do

13   you have on those items?

14     A.    Well, they contribute to my general

15   knowledge that was used in formulation of the

16   opinions in this matter.

17     Q.    Okay.  And how so?  What's in them -- what

18   sections contribute to your general knowledge?

19     A.    Well, for example, Linden's Handbook of

20   Batteries, which is the third item on the list, has

21   a large section on lithium-ion batteries, for

22   example.

23     Q.    Okay.  What's contained in that section

24   that's relevant to this case?

25     A.    Well, relative to my opinions that are

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1  contained in my report, I don't believe any, but

2  relative to my general knowledge of lithium-ion

3  batteries, it provides a kind of a history of the

4  development of the battery and some of the design

5  features that are included in the battery.

6      Q.   Is the history of the development of the

7  battery relevant to your opinions in this case?

8      A.   I don't believe so, not directly, not as

9  contained in my report.  However, it depends on

10  what questions are asked of me.

11      Q.   Okay.  I can only ask you questions about

12  what's in your report, so you're saying there's

13  nothing in your report that makes any reference to

14  that document in any sense, Linden's Handbook of

15  Batteries?

16          MR. BARTON:  Object to form.  Misstates

17  his testimony.  Go ahead.

18      A.   Again, as I said, it provides a general

19  knowledge, my general knowledge of the products

20  that are being discussed in this matter.

21      Q.   (By Mr. Lesnick) So?

22      A.   So depending on what questions are asked

23  will dictate what, if any, of those portions of

24  those documents I'll refer to.

25      Q.   All right.  Let me pull up that report

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1   real quick.  We're going to mark it as Exhibit 2,

2   your report.

3           (Plaintiff's Exhibit 2 marked for

4                   identification.)

5       Q.   You let me know when you're seeing the

6   document I've just pulled up.

7       A.   I can see the cover page.

8       Q.   Okay.  263 pages, correct?

9       A.   That appears to be correct.

10      Q.   Okay.  This is the report you authored and

11  produced in this case; is that correct?

12      A.   It appears to be, yes.

13          MR. BARTON:  Hey, Ben, can you blow up

14  that window or enlarge the window?  The far right.

15  Far right.  Keep going up.  Up.  Up.  Up.  To the

16  far, you know, make it fill the whole screen, yes.

17      Q.   (By Mr. Lesnick) Are you able to see this?

18  My problem is I can't see you now, so give me a

19  second.

20          MR. BARTON:  I promise, I'm not doing

21  anything bad.

22          MR. LESNICK:  Give me a second here.  Give

23  me a second, sorry.  Let me try sharing that again.

24  Is that better?

25          MR. BARTON:  Yes.

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1      Q.   (By Mr. Lesnick) Okay.  We're marking this

2    as Plaintiff's Exhibit 2 for Mr. Reagan's

3    deposition.  I'm going to scroll down here to Page

4    4, which is the area I think we were talking about,

5    right?  This "other" section?

6      A.   Right.

7      Q.   And this "other" section contains what?

8      A.   And above it, you know, I mentioned -- I

9    mentioned the codes and standards, for example, I

10   don't -- I didn't send you a copy of NFPA-921,

11   which is in J above.

12     Q.   Okay.  So the codes and standards and

13   others, none of this was produced to us?  None of

14   these documents?

15     A.   I did not send you copyrighted material

16   such as NFPA-921, that's correct.

17     Q.   But under Section K, "other", none of this

18   was produced to us as well, correct?

19     A.   I don't believe so.  That's correct.

20     Q.   I think we talked about Number 3 here,

21   which is Linden's handbook of batteries, that you

22   generally relied on that, but you can't point me to

23   a specific section of that book that you

24   specifically relied on; is that fair?

25          MR. BARTON:  Object to form.  Misstates

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1 | his testimony on multiple occasions, and compound.
2 | Go ahead.
3 |     A.   So what I said about that book is that it
4 | contributes to my general knowledge regarding some
5 | of the products that are being discussed in this
6 | matter.  I don't believe I have any specific -- I
7 | don't have any specific reference to it in my
8 | report other than it's listed as a document that
9 | contributes to my general knowledge of lithium-ion
10 | batteries.
11 |     Q.   (By Mr. Lesnick) Why do you need a general
12 | knowledge of lithium-ion batteries for this matter?
13 |     A.   Well, the plaintiff experts have alleged
14 | that a lithium-ion battery was the ignition -- both
15 | the ignition source and cause for this fire.
16 |     Q.   Is there anything on here that provides a
17 | specific knowledge of your understanding of
18 | lithium-ion batteries as alleged by plaintiff's
19 | experts in this matter?
20 |         MR. BARTON:  Object to form.  Vague.
21 | Compound.
22 |     A.   I don't understand the question either.
23 |     Q.   (By Mr. Lesnick) So you're saying this
24 | provides a general knowledge, that Linden's
25 | Handbook, because of the allegations made by

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1   plaintiff's expert regarding lithium-ion batteries,

2   correct?

3       A.    Correct.

4       Q.    Okay.  So is there any item that's listed

5   here that provides more specific information about

6   your knowledge -- or let me rephrase that.  Is

7   there any document on here that provides more

8   specific information that relates to your opinions

9   in this matter?

10          MR. BARTON:  Object to form.  Vague and

11   compound.  Go ahead.

12      A.    Again my opinions in this matter will be

13   dictated by what questions are asked.  I have not

14   referenced specifically in the text of my report

15   any of these items, in part, because there are no

16   batteries in the area of origin, and so we'll get

17   to those opinions, I'm sure, but because there are

18   no batteries in the area of origin, some of these

19   details really aren't relevant and don't deserve a

20   deep dive, but if at some point there are questions

21   asked where we do need to do a deep dive on some of

22   these issues, then I may refer to some of those

23   reference materials as needed.

24      Q.    (By Mr. Lesnick) If I'm asking you a

25   question that refers to some of these -- that you

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1  need to refer to some of these reference material,

2  they haven't been produced to us, though, for us to

3  see if what you're referring to is accurate, right?

4      MR. BARTON:  Objection.  Vague.  Compound.

5  Argumentative.  Go ahead.

6      A.   You're correct.  I did not send you a copy

7  of Linden's Handbook of Batteries, but it's a

8  commercially available book that is copyrighted.  I

9  can't -- I'm not going to buy you a copy.

10      Q.   (By Mr. Lesnick) Okay.  What about this

11  first one, Lithium Ion Batteries Safety For

12  Consumers, National Fire Protection Association,

13  what's that document?

14      A.   It is a document produced by NFPA and you

15  can go -- I give the website reference there,

16  NFPA.org/education.  If you go to that

17  NFPA.org/education, you'll find that document

18  there.

19      Q.   Okay.  DeHaan's Kirk's Fire Investigation,

20  what is this document?

21      A.   It's a common reference that's used in the

22  fire investigation industry.  I reference the

23  Seventh Edition there.

24      Q.   Okay.  Number 4, this Lithium Ion Battery

25  Hazard and Use and Assessment, what type of

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1  document is that?

2      A.   That's a -- it's a paper put out by the

3  Fire Protection Research Foundation.

4      Q.   Is that publicly available?

5      A.   It is.

6      Q.   Number 5, Examination of Arc Beads, what

7  type of document is that?

8      A.   That is a trade -- it's an article in a

9  trade publications.

10     Q.   Okay.  And why is that article referenced

11  in your report?

12     A.   I'm sure we'll get to my opinions in the

13  matter, but if you -- Number 5 is a method that was

14  at one point hypothesized as being a valid method

15  for determining which arc on a particular wire was

16  the cause of a fire and which one was the result of

17  the fire, similar to -- similar to Mr. Eskra's

18  hypothesized methodology where you can decipher one

19  from the other, and this particular methodology,

20  this Auger Spectroscopy was actually ultimately

21  determined to be an invalid hypothesis.

22     Q.   Is that document publicly available

23  online?

24     A.   It is.

25     Q.   Okay.  I want to go back to Number 4,

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1   though.  I forgot to ask.  Lithium Ion Batteries

2   Hazard and Use Assessment, what is that article

3   about?

4        A.   I think we covered that, but that is --

5   it's a Fire Protection Research Foundation-funded

6   endeavor to look at some of the hazards associated

7   with use and transportation of lithium-ion

8   batteries.

9        Q.   What is the relevance of that article to

10  this case?

11       A.   Well, it has some nice excerpts in it

12  regarding the design and abuses of lithium-ion

13  batteries.

14       Q.   What excerpts are helpful for your

15  purposes, I guess, of this case?

16       A.   Specific to the opinions contained in my

17  report, none, but to my general knowledge of

18  lithium-ion batteries, it provides a basis for

19  that.

20       Q.   Okay.  Number 6, article by Mr. Hoffman,

21  Beyond Tea Leaves Using Arc Mapping to Pinpoint

22  Origin and Cause of a Fire.  What's that document?

23       A.   Just what it says.  It discusses arc

24  mapping and the reliability determining what

25  anomalies on wires are arcs and which ones aren't.

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1   Similar use to Number 5 on that list.

2       Q.   Is that a publicly available document?

3       A.   Yes.

4       Q.   Number 7, Finnegan, In-Operandi High-Speed

5   Tomography of Lithium Ion Batteries During Thermal

6   Runaway.  Is that a peer-reviewed article?

7       A.   I believe it is, yes.

8       Q.   Okay.  What's the contents -- let me ask

9   it differently.  What's the relevance of that

10  article to this matter?

11      A.   Again, it contributes to my general

12  knowledge of lithium-ion batteries.

13      Q.   Is there anything specific in that article

14  that you're thinking about that contributes to your

15  general knowledge?

16      A.   No.

17      Q.   What's that article about?

18      A.   It's a -- some testing that was done by

19  Finnegan and it shows thermal runaway of a

20  lithium-ion battery.

21      Q.   Does it show what causes thermal runway?

22      A.   No.  It shows what happens to the battery

23  internally when one is artificially created.

24      Q.   Number 8, Ignition Handbook, Fire and

25  Science Publishers.  What is the relevance of that

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1  document to this matter?

2      A.   That's about a four-inch thick book.  It

3  costs about 700 bucks.  It's commercially available

4  and it provides a broad range of topics.  It's

5  probably the largest single collection of fire

6  investigation topics that I'm aware of.

7      Q.   Is there any specific portion of that

8  handbook that you relied upon for this matter?

9      A.   None that are referenced in my report.

10     Q.   Any that are not referenced in your report

11  that you relied upon?

12          MR. BARTON:  Objection.  Vague.

13     A.   It depends on what questions are asked of

14  me.  If I need to refer to that book, I may, but in

15  order to -- in order to discuss the opinions that

16  are contained in my report, I do not need to

17  reference that document.

18     Q.   (By Mr. Lesnick) For all of these other

19  documents that are listed here, none of them are

20  referenced anywhere in your report other than this

21  section, correct?

22          MR. BARTON:  Objection.  Vague.  Go ahead.

23     A.   Not that I recall.

24     Q.   (By Mr. Lesnick) Is that because your

25  opinions in your report, I'm not talking about

1  questions I'm asking you now, but the opinions in

2  your report don't utilize these documents to form

3  your opinions?

4      A.   Again, my general knowledge of batteries,

5  some of that is formed from the knowledge and data

6  that's contained in these documents.  To that end,

7  some of the opinions in my report from my general

8  knowledge may reflect from those documents, but

9  again, the specific opinions don't rely on any

10  particular section of these documents.

11     Q.   Any other documents other than what's

12  listed under J and K that provided you general

13  knowledge to form your opinions in this matter?

14     A.   I don't believe so.

15     Q.   Let's go back to -- we were on Exhibit 1.

16  Let me know when you see this document back up on

17  your screen.

18     A.   Okay.

19     Q.   Number 26 requested for any and all

20  testing relied upon by you to establish criteria

21  for determining when a lithium-ion battery cell has

22  been attacked by a fire as opposed to causing the

23  fire.  Did you produce any documents responsive to

24  that request?

25     A.   I don't believe so.  I don't have any.

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    Q.   Do you have any?

2    A.   I don't believe I have any.

3    Q.   Did you do any testing of any of the

4  products in this matter?

5    A.   I did visual examination of many of the

6  products in this matter and I also did some testing

7  of the exemplars that were produced for my

8  examination at Midwest.

9    Q.   Number 27 asks for any memorandum which

10 was prepared by the attorney engaging you,

11 investigator or paralegal in connection with the

12 case upon which you rely in forming your opinions.

13 Do you have any documents responsive to this

14 request?

15   A.   Let me read that again, please.  No, other

16 than transmittals, I can't think of any and I've

17 produced all of those to the extent that I -- yeah,

18 to the extent that I received any transmittals,

19 many of the documents I received were from a share

20 file site.

21   Q.   Okay.  28, any other document or writing

22 of any kind or description which you have viewed in

23 formulating your opinion or opinions in connection

24 with this case.  Did you produce all documents

25 responsive to that request?

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1      A.   I believe so, yes.

2      Q.   You produced your resume with your report,

3  correct?

4      A.   I did, yes.

5      Q.   You produced all of your notes that you

6  took while contemplating or reaching your opinions

7  in this case; is that correct?

8      A.   I believe so, yes.

9      Q.   Did you take any notes during any meetings

10  with Makita or your attorneys?

11      A.   There were no meetings with Makita, and I

12  did not have any notes from any meetings with

13  Stanton Barton.

14      Q.   You provide a listing of all the cases

15  that you've given testimony in deposition or trial

16  in the last four years; is that correct?

17      A.   Correct.

18      Q.   Any documents you're aware of being

19  withheld on the basis of privilege that were in

20  your file?

21      A.   I don't believe so.

22      Q.   Okay.  Let me go back to Exhibit 2, which

23  is your report.  I'm going to scroll far down to

24  Page 254.  Do you see Page 254 on the screen?

25      A.   I do.

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1      Q.   So this says Professional Resume of John

2   T. Reagan.  If I scroll down to Page 255 of Exhibit

3   2, it looks like this is your resume; is that

4   correct?

5      A.   That's correct.

6      Q.   It's five pages; is that correct?

7      A.   That's correct.

8      Q.   It's dated January 2023.  Have you made

9   any edits to your resume since January of 2023?

10     A.   Yes.

11     Q.   You said yes?

12     A.   Yes.

13     Q.   What edits to your resume have you made

14  since that time?

15     A.   Additional training.

16     Q.   Is that -- under which section would that

17  be under, continuing education?

18     A.   Correct.

19     Q.   What additional training have you

20  undergone since that time?

21     A.   I'm required to take an annual asbestos

22  and operations refresher and that was completed.

23     Q.   Other than that, any other additional

24  training?

25     A.   Not that I can think of.

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1      Q.   Other than that addition, any other

2   additions or changes that you need to make to your

3   resume since January 2023?

4      A.   Not that I'm aware of.

5      Q.   It said you've worked at Schaefer

6   Engineering since 2003; is that correct?

7      A.   That's correct.

8      Q.   You haven't had any other jobs since then?

9      A.   No.

10     Q.   You haven't worked two jobs at once since

11   you've been at Schaefer Engineering?

12     A.   No.

13     Q.   Page 3 of your resume under continuing

14   education, 2021, it says you attended the IAAI-CFI

15   Trainer Lithium Ion Batteries Fires, do you see

16   that item there?

17     A.   I do.

18     Q.   What was that continuing education about?

19     A.   Just like the title says, it's a general

20   overview of lithium-ion battery fires.

21     Q.   Is it -- did it discuss -- did it involve

22   how to analyze lithium-ion batteries?

23     A.   I don't recall the content, all content of

24   that.

25     Q.   What do you recall from that one?

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1      A.    As I sit here, not much.

2      Q.    Okay.  Underneath it has the DRI Advance

3   Failure Analysis of Lithium Ion Batteries.  What

4   does DRI stand for?

5      A.    Defense Research Institute.

6      Q.    Who puts on the Defense Research -- what

7   is the Defense Research Institute?  What type of

8   group is that?

9      A.    I believe it's a group of defense-oriented

10  folks.

11     Q.    Defense-oriented, you mean, like, defense

12  attorneys?

13     A.    Defense attorneys, experts, yes.

14     Q.    And this Advanced Failure Analysis of

15  Lithium Ion Batteries, what was this continuing

16  education about?

17     A.    It was about considerations that deal with

18  when you're looking at battery fires.

19     Q.    Did it involve the analysis of lithium-ion

20  battery cells themselves?

21     A.    I don't recall all the content --

22  actually, I don't recall much content of it.  That

23  was two years ago.

24     Q.    And then, if I keep scrolling down here,

25  at the top of Page 4, in 2021, there's an ASM 3-D

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    Imaging of Lithium Ion Batteries; do you see that?

2        A.    I do.

3        Q.    What does ASM stand for?

4        A.    I don't recall.  I don't know if it's

5    ASTM, that may be a typo there, which used to have

6    an acronym to it, but this was a program just

7    really highlighting the value of conducting a 3-D

8    imaging.

9        Q.    What about it -- the value did it

10   highlight?

11       A.    If you want to know, for example, the

12   condition of the inner workings of the battery,

13   whether or not it had a mandrel, whether it, you

14   know, does it have a mandrel, does it not have a

15   mandrel.  Does it have a CID.  Does it not have a

16   CID.  It went through the value of having that to

17   understand what battery inner workings are.

18       Q.    It has a number of -- sorry.  I did not

19   mean to exit out of that.  It has under CV that you

20   taught a number of courses here from 2000 all the

21   way down to 2018.  Have any of these courses ever

22   been about lithium-ion battery cell fire

23   investigations?

24       A.    No, not specifically that topic, no.

25       Q.    Is says you're a license professional

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    engineer in a number of states.  Let me find that

2    section here.  Missouri, Illinois, Indiana,

3    Arkansas, Alabama, Kansas, Michigan, Kentucky,

4    Tennessee.  Is that license active in all those

5    states?

6         A.    I believe so.

7         Q.    And these certifications here, are these

8    all current certifications?

9         A.    They are.

10        Q.    Let's go down to 260, which is Attachment

11   5, your testimony history.  I'll show you that.

12   It's a two-page document that shows your deposition

13   testimony history from March 2019 to March 2023,

14   correct?

15        A.    Correct.

16        Q.    Any depositions or trials in April before

17   this deposition, or May?

18        A.    I believe there's one more, yes.  I'm

19   trying to remember the -- I'm trying to remember

20   the matter that it involved.  Yes, there was one

21   more.

22        Q.    Was it trial testimony or deposition

23   testimony?

24        A.    It was deposition testimony, and the --

25   what do you want to know about it?

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1     Q.    What type of case was that?

2     A.    It was an investigation involving a

3  vehicle making contact with an overhead cable and

4  an electrical distribution line.

5     Q.    Do you know what the attorney was who

6  hired you for that case?

7     A.    I don't -- as I'm sitting here, I don't.

8     Q.    It wasn't Mr. Barton's office, was it?

9     A.    No, it was not.

10     Q.    Okay.

11     A.    I believe it was Brown & James, which is

12  another law firm in St. Louis, but I could be

13  mistaken on that.

14     Q.    There's a number of cases listed on here,

15  obviously one pops out, stood out to me.  This is

16  Auto Owners versus Teva Properties and Makita USA.

17  Who retained you for that case?  Which one of these

18  defendants or parties?  Sorry.

19     A.    I was retained on behalf of Makita USA.

20     Q.    Okay.  And was it Mr. Barton that retained

21  you on that file?

22     A.    I believe so, yes.

23     Q.    Did you come to any conclusions in that

24  matter?

25     A.    Yes.

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1     Q.    And did you conclude -- what did you
2   conclude in that matter?
3     A.    I don't remember all of the details of my
4   opinions.  This was two years ago.  But in general,
5   that the cause of the fire was a lithium-powered RC
6   car battery.
7     Q.    Did you rule out a Makita product as a
8   cause of the fire?
9     A.    I did, yes.
10    Q.    I'll get more into some of these here, but
11  I see your trial testimony, the only one you listed
12  is from March of this year, no other trials in the
13  last four years that you've given testimony at?
14    A.    That's correct.
15    Q.    Did the judge qualify you as an expert in
16  this trial?
17    A.    Which trial?
18    Q.    The one -- the only one that's listed on
19  your list here.
20    A.    I wasn't clear what you meant by "this".
21         MR. BARTON:  I'll just object to form.
22  Vague as to qualification.
23    A.    Yes, so I did testify at trial in that
24  matter and the judge qualified me to testify in
25  that matter, yes.

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1     Q.   (By Mr. Lesnick) Okay.  Other than this

2   matter here that we're talking about -- I'm sorry.

3   This March matter that you testified in that trial,

4   how many other times have you testified at trial?

5     A.   A handful.  I don't know the exact number.

6     Q.   Has your testimony ever been stricken

7   either at trial or in a motion before trial?

8     A.   I'm aware of one incident of that.  I

9   don't have a copy of the order, but it was an

10   administrative -- it was an administrative issue

11   where an attorney adopted -- an attorney who was

12   not my client adopted a couple of my opinions and

13   discarded the others and they were written off as

14   being challenged and not defended.

15     Q.   What type of case was that?

16     A.   It was a fire case.

17     Q.   Did it involve a product?

18     A.   It did.

19     Q.   Was it a lithium-ion battery-powered

20   product?

21     A.   No, it was a clothes dryer.

22     Q.   It was a what?  I'm sorry.

23     A.   A clothes dryer.

24     Q.   Were you retained as an expert in that

25   case?

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1      A.    I was by the plaintiff.

2      Q.    And what was the basis for your testimony

3  getting stricken?

4      A.    There were multiple parties involved and

5  my client, the plaintiff, accepted a settlement

6  from the manufacturer of the product and were no

7  longer participating in the matter, and one of the

8  other defendants in the matter, who was an

9  installer of the product adopted some of my

10  opinions, but not all of them.

11     Q.    And so which testimony was stricken?  All

12  of your opinions or the ones that were -- I guess

13  I'm a little confused as to what was stricken.

14     A.    The only thing that was stricken were the

15  opinions that that particular party needed -- or

16  did not need, so for example, I -- this just a for

17  example, I don't know the exact because I don't

18  have the copy of the order, he needed opinions --

19  say, I had five opinions.  He needed opinions 1 and

20  5, and he didn't need 2, 3 and 4, and the defendant

21  said I will -- I'm going to strike those three

22  opinions.  I said I don't care.  Strike them.  I

23  don't need them, I only need opinions 1 and 5.

24     Q.    Do you know if the testimony was

25  challenged on the basis of a reliability?

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    A.    Again I don't have the order.

2    Q.    And do you know what case that was?

3    A.    I only remember that it involved

4  Whirlpool.  That's all I remember about it.  This

5  was more than 10 years ago.

6    Q.    How many times have you been qualified as

7  an expert at trial?

8    A.    I don't know how to answer that question.

9  At trial?

10        MR. BARTON:  I'll just object on vague.

11    Q.    (By Mr. Lesnick) I guess maybe a broader

12  question.  How many times -- you may have already

13  answered this.  How many times have you testified

14  at trial?

15    A.    A handful.  I don't know the exact number.

16    Q.    When you testified at trial, what was your

17  expertise that you were testifying on behalf of?

18        MR. BARTON:  Objection.  Vague and

19  compound.  Go ahead.

20    A.    It depends on the matter.  I don't

21  remember all of the cases that I testified at trial

22  sitting here, but in general, I can tell you that

23  it was more likely than not either fire origin and

24  cause or electrical engineering issues.

25    Q.    (By Mr. Lesnick) Any time you've testified

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    at trial, the case involved a failure of a

2    lithium-ion battery?

3        A.    I don't believe so, not at trial.

4        Q.    How many cases that you've given

5    deposition testimony at have involved failures of

6    lithium-ion batteries?

7        A.    In the past four years, I can only think

8    of one and that's the Teva case that we already

9    discussed.

10       Q.    Prior to the past four years, any others

11   that you can think of?

12       A.    I don't remember which ones went to trial

13   or which ones went to deposition phase and which

14   ones didn't, as I'm sitting here.

15       Q.    In your job at Schaefer Engineering, let

16   me just go back up here.  It says -- it lists your

17   job duties here.  Does your job solely entail

18   forensic investigations?

19       A.    No.

20       Q.    Of the percentage -- what percentage of

21   your job entails forensic investigations and which

22   percentage entails other types of work?

23       A.    So I don't use the term forensic

24   investigations to describe my job, so that makes it

25   a little bit difficult to answer.  As you can tell,

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    that's not listed there in my CV.  I don't use the

2    word forensic investigations, so I do evaluations,

3    whether it's related to some legal issue or not,

4    more often than not there is no legal issue

5    involved.  It's a general investigation to advise

6    someone on whatever questions they have.

7        Q.    How much of your work involves litigation?

8    What percentage of your work involves litigation?

9        A.    That same answer to the prior question is,

10   first of all, I don't always know when we start a

11   project whether or not litigation is going to be an

12   issue or whether a matter is going to be litigated,

13   so I think the potential is that most of them could

14   be at some point in time, but at the outset of a

15   project, more often than not, it's go out and do an

16   investigation to determine what happened, and so

17   it's not really geared towards litigation.  Very

18   few cases do I take where they're already in

19   litigation.

20       Q.    Your job duties don't involve designing

21   electronics, correct?

22       A.    Not in terms of new products, but

23   evaluating them, yes.  Evaluating the design of

24   products, I do that on a regular basis.

25       Q.    I'm talking about creating new products,

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1   though.  There's no, you know, your duties don't

2   include creating new electrical products, right,

3   designing those?

4       A.   I think some of the work that we do does

5   entail, ultimately end up creating new products or

6   modifications to existing products and some of the

7   work that we do is geared towards that.

8       Q.   Have you ever been hired specifically that

9   your scope of work is to design a new product or

10  electrical system?

11      A.   Indirectly, yes.  I have been asked to

12  evaluate a product and determine why they're having

13  the issue they're having and that's happened on a

14  few different occasions and --

15      Q.   Right.  But to create a brand new --

16      A.   -- and the purpose of that is so that they

17  can then make a modification either to the design

18  or manufacturing processes to result in a better

19  product.

20      Q.   Is that specifically a company hires you

21  to evaluate their products already in existence to

22  help modify or better the design, is that what

23  you're saying?

24      A.   Correct.

25      Q.   What are your -- who are your clients in

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    the past when it comes to that?

2        A.    That's all confidential.

3        Q.    Is Makita one of your clients when it

4    comes to those types of projects?

5        A.    No, not directly, no.

6        Q.    What percentage of your work do you work

7    for defense counsel?

8        A.    I don't keep a statistic like that.

9        Q.    If I go to all the depositions you had

10   here in the last four years, they all are for

11   defense that are listed here, correct?

12       A.    That appears correct.

13       Q.    I mean, you haven't given depositions on

14   behalf of a plaintiff, have you?

15       A.    I have.

16       Q.    In the last four years?  In the last four

17   years?  I apologize.

18       A.    In the last four years, no.

19       Q.    Okay.  How many cases do you have right

20   now where you're representing a plaintiff?

21       A.    That's a difficult question to answer, but

22   I can tell you several, but how many is difficult

23   to answer because I don't know the status of most

24   of the cases that I have on my desk, you know, we

25   bring things to a point.  We provide information to

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1   the client, and what they're going to do with it

2   after that, we just never know.

3        MR. BARTON:  Let me just insert an

4   objection to the vague nature of the question.  Let

5   the record reflect the witness answered before I

6   could insert my objection.  Go ahead.

7        Q.   (By Mr. Lesnick) The cases that you

8   currently have in litigation, do you know how many

9   that totals?

10       A.   The same answer kind of applies there

11  because I don't know what my client has done with

12  the information I've given them, whether it's in

13  litigation or not, they may not have advised me of

14  that.

15       Q.   So of cases you're aware that are in

16  litigation, that you've been advised of, how many

17  do you have right now that you're working on?

18       A.   Well, I have no idea.  I have to go

19  back --

20       Q.   More than 10?

21       A.   I'm not sure.  I mean, I would have to go

22  to my desk and look.

23       Q.   You don't know how many cases you're

24  working that are in litigation?  That's your

25  answer.

```
 1          MR. BARTON:  Objection.  Asked and
 2   answered.  Now argumentative.  Go ahead.
 3       A.   That's correct.  That's my answer.  I
 4   don't know.  I can't give you a number, not without
 5   going to my desk and looking around my desk and
 6   seeing what I'm working on.  Additionally, as I
 7   mentioned, I don't know necessarily which ones are
 8   in litigation and which ones aren't.  I'm not
 9   always advised of that.  Things get resolved and we
10   never hear about it.
11       Q.   What percentage of your work do you work
12   for defendants?
13          MR. BARTON:  Asked and answered.  Go
14   ahead.
15       A.   Again I don't keep a statistic like that.
16   Over my career, it's probably been pretty balanced
17   between defense and plaintiff.
18       Q.   (By Mr. Lesnick) You say "pretty
19   balanced," do you mean 50/50?  Is that what you're
20   saying?
21       A.   Pretty balanced over my career, that's
22   correct.
23       Q.   Is that close to 50/50?  Is that 60/40?
24   What does -- I don't know what pretty balanced
25   means?
```

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1      A.   To me pretty balanced is just what I'm

2  saying.  It's just pretty even.  I can't say 50/50,

3  60/40.  You're asking me to give you a statistic

4  now and I told you I don't have a statistic like

5  that to give you.

6      Q.   I just want to make sure I understand.

7  When you say "pretty balanced," you don't know

8  exactly a percentage, you just use the term "pretty

9  balanced".

10          MR. BARTON:  Is that a question?

11          MR. LESNICK:  Yes.

12          MR. BARTON:  Objection.  Argumentative.

13  Asked and answered in parts.  Vague in other parts

14  and is a statement, not a question.  Go ahead if

15  you understand.

16      A.   Sure.  Pretty balanced to me means that I

17  have gotten pretty equal amounts of work from

18  plaintiffs and from defendants.  Pretty equal, I

19  can't give you a number on that.

20      Q.   (By Mr. Lesnick) Definitely not equal,

21  though, right?

22      A.   I have no idea.  It could be exactly

23  equal.  I mean, I wouldn't know because that's not

24  a statistic I keep.

25      Q.   Who retained you in this matter?

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1      A.    Stanton Barton law firm.

2      Q.    Okay.  Other than this case and the Makita

3 case we were talking about before that's up here on

4 the Teva Properties matter, how many times have you

5 been retained by Stanton Barton in the past?

6      A.    A handful.

7      Q.    What does handful mean?

8      A.    In terms of a number, I'm sure it's

9 probably more than 10.  How much more, I don't

10 know.

11     Q.    And how many of those cases that Stanton

12 Barton retained you on involve Makita products?

13     A.    I don't have a count of that.

14     Q.    Well, we have a few here, correct?

15     A.    Yeah, probably less than 10.

16     Q.    More than nine?

17     A.    I don't think there's much between nine

18 and 10, so less than 10 means something less than

19 that.  More than two, but less than 10.  I don't

20 know the exact number.

21     Q.    It could be nine.  It could be eight.  It

22 could be seven.  It could be six.  It could be

23 five.  It could be four.  It could be three.  But

24 less than 10?

25     A.    I believe less than 10, yes.  Again that's

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    without going through and trying to make a count of

2    it, which would be a challenge, but...

3        Q.   It's possible it's more than 10 if you

4    went back and did a count of it?

5            MR. BARTON:  Objection.  Argumentative.

6    Go ahead.

7        A.   I don't think so.  Not from my

8    recollection.

9        Q.   (By Mr. Lesnick) How many times was Makita

10   a defendant in a case that they retained you on?

11           MR. BARTON:  Asked and answered.

12       A.   I can only think of a couple where they've

13   been named as a defendant where something's gone to

14   litigation.

15       Q.   (By Mr. Lesnick) We have two here, right?

16   So do you know how many more than the two that

17   we're talking about, the one that's listed here and

18   the one we're participating in now?

19       A.   I can think of one other.

20       Q.   How many of those cases that you were

21   retained on behalf of Mr. Barton working on Makita

22   files did those cases involve lithium-ion battery

23   failures?

24       A.   Well, you know, do you mean alleged

25   lithium-ion battery failures or do you mean actual

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    lithium-ion battery failures?

2        Q.    Sure.  Alleged.

3        A.    Alleged?

4        Q.    Alleged lithium-ion battery failures.

5        A.    I can think of -- I can think of, again

6    the two that we talked about, plus one other.

7        Q.    So the other Makita cases that you worked

8    on for them, those didn't involve alleged

9    lithium-ion battery failures?

10       A.    What other cases are you talking about?

11       Q.    You said there was -- you said less than

12   10, more than two, so now are you saying the number

13   is three that you know for sure that you've worked

14   on?

15            MR. BARTON:  Objection.  Argumentative.

16   Misstates his testimony at various points in the

17   compound nature of the question.  Go ahead if you

18   understand.

19       A.    No, I don't understand.

20       Q.    (By Mr. Lesnick) You've previously

21   testified that you've worked on at least 10 -- or

22   less than 10 Makita cases with Mr. Barton's firm,

23   didn't you just testify to that?  Somewhere between

24   two and 10?

25            MR. BARTON:  Objection.  Misstates his

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1   testimony at the end, but the first part of the

2   question, which is compound, was asked and

3   answered.  Go ahead.

4       A.   Yeah, I believe that's correct, yes.

5       Q.   (By Mr. Lesnick) Right.  So I'm asking you

6   how many of those cases involved alleged

7   allegations of Makita products and lithium-ion

8   battery failures?

9            MR. BARTON:  Objection.  Asked and

10  answered.  Go ahead again.

11      A.   I'm only aware of three where an

12  allegation was made.

13      Q.   (By Mr. Lesnick) Okay.  Were cases where

14  allegations weren't made, were lithium-ion

15  battery-powered Makita products involved?

16           MR. BARTON:  Objection.  Vague.

17      A.   I don't know what you mean.  I don't

18  understand your question.

19      Q.   (By Mr. Lesnick) Well, in the other cases,

20  the three that -- there's only three where

21  allegations were made.  The other ones where

22  allegations weren't made.  Why was Makita involved

23  in those files --

24           MR. BARTON:  Objection --

25      Q.   (By Mr. Lesnick) -- as far as you know?

1           MR. BARTON:  Objection.  Vague.  Compound.

2    Parts of it calls for speculation.  Go ahead if you

3    know.

4        A.    So for me to remember the nature of every

5    investigation as I'm sitting here.  I can't do

6    that.  But what I can tell you generally, this is

7    very general.  What I can tell you generally is

8    that occasionally we're called out to conduct an

9    investigation where there might be 10 parties

10   placed on notice.  There's 10 different products

11   that are potentially in this particular building or

12   structure that needs to be looked at, and so

13   there's never been, you know, of these other cases

14   that's not one of the three are cases where we

15   arrive and, A, it's possible there's no Makita

16   product there, B, the product that someone thought

17   was Makita is actually not Makita, it's another

18   brand.  Or C, it's not a Makita product, it's a

19   knock-off Makita product, meaning it's made by --

20   it's made by a copycat company.  So there's all

21   kinds of possibilities and, you know, it's across

22   the gamut of possibilities.  So those are some

23   possibilities of what might happen when we arrive

24   and ultimately, there's no allegation made against

25   Makita.

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    Q.   How many cases are you working on right

2  now, aside from this one, that you were retained on

3  behalf of Mr. Barton for a Makita allegation?

4    A.   Again, I can't -- I can only think of the

5  three where it's been alleged that Makita had an

6  issue.

7       MR. BARTON:  Hey, Ben, when you get to a

8  breaking spot, we've been going well over an hour

9  here, so just when you get to a natural spot, we

10  can take a quick break.

11       MR. LESNICK:  Sure.  No problem, Jon.

12    Q.   (By Mr. Lesnick) Any of the times that

13  you've been involved -- retained, I'm sorry, by Mr.

14  Barton related to Makita products where the

15  allegation is made and the Makita product caused

16  something or not, how many cases did you conclude

17  that a Makita product caused a fire?

18    A.   I can't think of any.

19    Q.   Have you ever had any case, whether

20  retained by Mr. Barton or somebody else, where you

21  determined that a Makita product caused a fire?

22    A.   I can't think of any.

23    Q.   Have you ever concluded that, in any case

24  you've been hired on, have you ever concluded that

25  a lithium-ion battery-powered tool caused a fire?

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1      A.   When you say tool, I'm not sure what you

2   mean by tool.  Does that include E cigarettes, just

3   for clarification?  I don't know if you consider E

4   cigarette's a tool or not, but I've concluded that

5   there was a lithium-ion E cigarette fire before,

6   yes.

7      Q.   No cigarette is something that you smoke.

8   I don't think you can use that as a tool, at least

9   my understanding of E cigarettes.

10     A.   Again I'm just trying to clarify your

11  question to make sure I'm answering the right

12  question.

13     Q.   So you're right.  So E cigarettes are not

14  tools in how I'm asking this question.  I'm asking

15  about tools, something you use to construct a home

16  or work on something outside of the home.  I didn't

17  think tool was such a vague thought, but if you

18  can't answer it, let me know.

19     A.    Yes, so in terms of now how you've defined

20  tool, I can think of a couple of instances where

21  there were some knock-off batteries, and knock-off

22  mean non-OEM batteries, that I believe probably

23  were responsible for the fire, but weren't fully

24  investigated.  In other words, I arrived at the

25  conclusion that the product was not a genuine part

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1  from that manufacturer and then stepped away from

2  the investigation and did not go further to

3  ultimately prove that that was the one and only

4  thing that could have caused the fire, but that

5  there was a knock-off product there, which was

6  suspected of causing the fire, but stepped away

7  because it was not the client who retained these

8  product.  Those are the only instances that I can

9  think of that.

10     Q.   Okay.  Well, what steps weren't conducted

11  in that case or cases you're talking about that you

12  think needed to go further?

13     A.   Well, I didn't do a complete

14  investigation.  I stopped -- as soon as my client's

15  product was -- as soon as the product was

16  identified as not being of my client, I no longer

17  had an interest and my client had no longer had an

18  interest in that investigation, so we stepped away.

19     Q.   Other than those knock-off battery cases,

20  any other time that you may have concluded that a

21  lithium-ion powered -- battery-powered tool caused

22  a fire?

23     A.   Not that I can think of.

24     Q.   How many cases have you worked on where

25  someone's made an allegation that a lithium-ion

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    battery-powered tool caused a fire?

2        A.   Again only these three that I can think of

3    right -- well, I mean, there are many that were

4    investigated, but where someone actually ultimately

5    reached a conclusion and made that allegation

6    formally, just the three that we've talked about.

7    I'm, you know, just to be clear, I've been involved

8    in many others where ultimately it was concluded

9    that it was other things that caused the fire, for

10   example, a non battery-powered tool or an extension

11   cord or a discarded cigarette, those types of

12   things, so...

13       Q.   On cases that Mr. Barton's firm has hired

14   you on, how many times have you determined that Mr.

15   Barton's client was responsible for causing the

16   damage alleged?

17           MR. BARTON:  Objection.  Vague.  Go ahead.

18           THE WITNESS:  Could the Court Reporter

19   read that one back?

20       (Whereupon, the requested portion of the

21          transcript was read for the record.)

22           MR. BARTON:  Same objection.  Go ahead.

23       A.   I can't think of any.

24       Q.   (By Mr. Lesnick) Let's take a break here.

25   Five minutes?

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1      A.   Great.

2           MR. BARTON:   Sure.

3           VIDEOGRAPHER:   We are off the record at

4    10:16 a.m.

5                       (Recess.)

6           VIDEOGRAPHER:   We are back on the record

7    at 10:27 a.m.

8      Q.   (By Mr. Lesnick) Mr. Reagan, I'm going to

9    pull back up what was marked as Exhibit 2 for your

10   deposition.   Are you seeing your report back up on

11   the screen?

12     A.   Yes, the addendums on the screen.

13     Q.   Yes.  All right.  I'm going to go up to

14   Page 253.  This is Attachment 3, your fee schedule.

15   It's 325 per hour regardless of the type of

16   activity.  That's what you are charging for this

17   deposition today; is that correct?

18     A.   That's what Schaefer Engineering charges

19   for my time.

20     Q.   Let me pull up what we're going to mark as

21   Exhibit 3.

22           (Plaintiff's Exhibit 3 marked for

23                   identification.)

24     Q.   Let me know when you see this document up

25   on your screen.

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1      A.    Okay.  I see the top portion of it.  Okay.

2      Q.    Okay.  So this is a 17-page document.

3  These are all the invoices you produced to us.

4  They're in reverse chronological order.  That's how

5  I put them together.  I'm going to zoom in here to

6  Page 17, which is an invoice -- well, let me ask

7  you this.  Do you recognize this document?

8      A.    Sure.  It looks like an invoice.

9      Q.    Okay.  And all of these documents here are

10 invoices, as I scroll through them.  Did you

11 produce to us all of your invoices in this matter?

12     A.    I believe so.

13     Q.    Okay.  Let me go to Page 17, which, like I

14 said, is dated October 9th, 2020.  It says here on

15 September 11th, there was client contact.  Was this

16 the first day you were contacted about this file?

17     A.    Approximately, yes.

18     Q.    Let me pull up another document that maybe

19 will refresh your memory a little bit better.  We

20 are going to mark this as Exhibit 4.

21           (Plaintiff's Exhibit 4 marked for

22                   identification.)

23     Q.    Let me scroll down to Page 2 of Exhibit 4.

24 It's an e-mail from Megan Oliver on Thursday,

25 September 3rd, 2020.  This is the end of that

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    string, but it looks like it's an e-mail to you.

2    Do you know if September 3rd, 2020, was the first

3    day you were contacted about this file?

4        A.   Approximately.

5        Q.   Did you take any notes on the day that you

6    were contacted about this file?

7        A.   No.

8        Q.   Who first contacted you about this matter?

9        A.   The Stanton Barton law firm.

10       Q.   Was it a phone call?

11       A.   More likely than not.

12       Q.   Okay.  I see on Page 5, these were

13   documents produced to us with your file.  There's

14   an e-mail from you to attorneys at Stanton Barton

15   saying, "Attached is an engagement letter for the

16   subject investigation," and then if I scroll down

17   to Page 6, there's a letter dated September 29,

18   2020, to Mr. Barton.  Do you recognize this letter?

19       A.   I do.

20       Q.   This is your engagement letter for this

21   matter?

22       A.   That's the Schaefer Engineering engagement

23   letter.

24       Q.   Okay.  Page 7 and 8 here on Exhibit 4, do

25   you recognize these documents?

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1       A.    They're part of the engagement letter,

2    yes.

3       Q.    Okay.  It says your scope of the project

4    is fire and engineering analysis.  What does that

5    mean?

6       A.    Just what it says.  Fire analysis and

7    engineering analysis.  It's both.

8       Q.    What are you analyzing about a fire?  I'm

9    trying to get a little more specific here.

10      A.    Well, all facts and features of the fire

11   in the documents that are available that document

12   the conditions that were present at the time.

13      Q.    Were you asked to form any conclusions in

14   this analysis?

15      A.    Ultimately.

16      Q.    Does that mean you were asked to or you

17   ultimately did?

18      A.    Both.

19      Q.    What types of conclusions were you asked

20   to form in your analysis?

21      A.    If you go to Page 2 under project summary,

22   scope of project, it says, "Specifically Schaefer

23   Engineering was requested to render professional

24   opinions regarding what role, if any, the

25   battery-powered tools and related

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1   chargers/batteries had in the cause of this fire.

2   Additionally, Schaefer Engineering was requested to

3   provide an analysis of the fire investigation

4   methodology demonstrated and opinions offered by

5   the plaintiff expert team."

6       Q.   So that was the scope of the project as of

7   this date, September 29th, 2020?

8       A.   No.

9       Q.   The scope changed over time?

10      A.   Well, the scope was just general fire and

11  engineering analysis.  That was what was the

12  initial request.  Ultimately, I was asked to

13  provide opinions relative to what's in the scope of

14  the project stated in the Schaefer Engineering

15  report.

16      Q.   Is fire and engineering analysis defined

17  anywhere in your report?

18      A.   I'm not aware where there's a specific

19  definition of that, no.

20      Q.   Okay.  So can you define for me as we're

21  talking here what fire and engineering analysis

22  means as it relates to this scope of the project

23  here?

24      A.   Well, I mean, fire analysis is just that.

25  Analysis of the fire in accordance with accepted

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    industry methods.  And that includes everything

2    that's covered by the scientific method, by 921, by

3    Kirk's Fire Investigation Handbook, all those other

4    documents that we talked about, and the engineering

5    analysis are some of the engineering features that

6    might support or refute the portions of the fire

7    analysis.

8        Q.   Does the fire analysis include an

9    investigation into the area of origin?

10       A.   It does.

11       Q.   Does it include an investigation into the

12   cause of the fire?

13       A.   It does.

14       Q.   If we go back to Exhibit 3.  Okay.  We're

15   looking back at Page 17 here, which is your invoice

16   dated 10/9/2020.  It has a note on 9/15 and 9/21 of

17   reviewed documents, photos, for both of those

18   entries.  What documents and photos are being

19   discussed here?

20       A.   Whatever documents they had in the Stanton

21   Barton possession that they shared with me at that

22   time, and I don't remember --

23       Q.   Do you remember what those were?

24       A.   I don't remember as I'm sitting here which

25   of those that was.

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    Q.   If I go up to Page 16 here, it's another

2    invoice from 12/7/2020.  There's a name here of

3    Fischer.  Who is Fischer?

4    A.   Fischer is Ben Fischer.  He's an employee

5    of Schaefer Engineering.

6    Q.   And what work did Mr. Fischer do on this

7    file?

8    A.   Sure.  He spent some time pulling out

9    photographs of various products that were collected

10   from the incident scene.

11   Q.   Did he take notes during his work?

12   A.   No.

13   Q.   How did -- you said he was pulling out

14   photographs of various products.  Did he organize

15   that in some way for you?

16   A.   You should have a folder of the

17   photographs that he pulled out from other

18   investigator photographs.  If I had --

19   Q.   What is that folder called?

20   A.   I think it's Fire Scene Artifacts or

21   something to that effect.  It would have the word

22   artifacts in it.  It would be a collection of

23   photographs from the fire scene.

24   Q.   You asked him to do this work?

25   A.   I asked him to pull out photographs of the

1   artifacts that were collected from the incident

2   scene.  In other words, separate out -- separate

3   out from the general overall photographs,

4   photographs of the artifacts that we were about to

5   go examine at Midwest facility.

6       Q.   This was related -- that scope of work was

7   related to the artifact exam at Midwest?

8       A.   Well, it wasn't related to that exam.  It

9   was related to prepping for the exam.  In other

10  words, I asked him to go in and find in the set of

11  photographs that I had available at that time

12  photographs that depict the artifacts that were

13  collected so I could get a preview of what it was

14  we were going to be looking at when we went to

15  Midwest.

16      Q.   If I scroll up here to the 15th page,

17  invoice dated 2/8/2021, there's a couple of notes

18  in here from you the service of exhibit

19  preparation.  What is that in reference to?

20      A.   I don't recall specifically.  I can tell

21  you what possibly it could be, but again it would

22  just be possibly it could be related to.  It could

23  be related to an artifact examination protocol.  It

24  could be related to imaging protocol, you know,

25  some form of a protocol is what I might use that

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    code for.

2        Q.    Did you draft a protocol in this matter?

3        A.    I believe I did a couple of them actually,

4    if I'm recalling correctly.

5        Q.    Let me go back to Exhibit 4.  Do you see

6    Exhibit 4 up on the screen?

7        A.    I do.

8        Q.    All right.  I'm going to go to Page -- if

9    I can get there.  I guess I have to do it the old

10   fashioned way right now, I'm going to go to Page 69

11   of Exhibit 4, if I could just type it in.  It's

12   having an issue.  Do you recognize this document

13   I'm putting up on the screen as Page 69?

14       A.    I do.  That looks like a protocol that I

15   would have drafted.

16       Q.    Is this the protocol you drafted for the

17   February 2021 exam?

18       A.    I think it was for all of the exams

19   actually.  This was just -- I mean, it was for all

20   of the -- all of the -- examination of all of the

21   artifacts that were in possession of Midwest.

22       Q.    Let me go back to Exhibit 3.  If I go up

23   to Page 13 here, this is from a 3/5/2021 invoice.

24   On 2/12/2021, there's a few entries with a Rackers

25   B.  Who is Rackers B?

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1      A.   Ben Rackers is an employee of Schaefer

2   Engineering.

3      Q.   Okay.  And what work did Mr. Rackers do in

4   this matter?

5      A.   He assisted me with some document

6   evaluation in preparation.

7      Q.   What document evaluation are you referring

8   to?

9      A.   Well, for example, he -- some of the

10  graphics that are depicted in my report, he

11  created.  If you go to, for example, if you go to

12  Page 16, 17, and 18, he created those video frame

13  excerpts.

14     Q.   Okay.  What was he told about creating

15  those video frame excerpts?

16     A.   I'm sorry.  What was the question?

17     Q.   Let me -- I said what was he told about

18  those video frame excerpts.  Let me ask it a

19  different way.  Why did he create those video frame

20  excerpts?

21     A.   Because I asked him to.

22     Q.   And what was the purpose of you asking him

23  to do that?

24     A.   To include them in my report.  You know,

25  again, I asked what work he did, so that's an

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    example of some of the work he did for me.  He

2    also -- also we used his machine and some of his,

3    some of his talent to create some of the other

4    figures, for example, Figure 16 where we show some

5    details of the features of some of the batteries in

6    this pack, so at my request, he created some

7    snapshot images of some of the batteries using the

8    CT scans and then put some dimensional data on

9    there at my request.

10        Q.    How did you provide those requests to Mr.

11   Rackers?

12        A.    More often than not, just verbally.  I

13   might have sent him -- I think at one point in

14   time, I might have sent him an e-mail saying, "Hey,

15   are you getting this done or not" kind of a thing,

16   but other than that, other than that, normally it's

17   just a verbal request.

18        Q.    Do you know if Mr. Rackers created any

19   notes while he worked on this matter?

20        A.    He did not.  Everything that he has is

21   what's produced in the report and in the file.

22        Q.    On Exhibit 3 here, it talks further down

23   that there was a lab disassembly and examination

24   beginning on 2/16 and ending on 2/17.  Do you see

25   those notations there on your invoice?

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1      A.    I do.

2      Q.    Okay.  What are those notations in

3   relation to?

4      A.    I expect those -- I don't have all my

5   notes in front of me, but I expect those are two of

6   the days that we were at Midwest.

7      Q.    Do you remember if you attended a lab exam

8   at Midwest Forensics in February of 2021?

9      A.    Again, like I said, I don't recall the

10  dates of all of those.  You have the file with my

11  notes in them.  I know I was there in February of

12  2021, whether it was exactly the 16th and the 17th,

13  I can't comment on that sitting here without

14  pulling up file material, which would take some

15  time to do.  If you'd like me to do that, I can

16  pull those open.

17     Q.    No, I mean, so the invoice doesn't provide

18  you the information to know what days you attended

19  the lab exam?

20     A.    It's certainly intended to.  Yes, it's

21  certainly intended to.

22     Q.    Okay.  And what this is showing us is the

23  intention of the invoice as to what dates you

24  attended a lab exam in Midwest Forensics?

25     A.    Correct.  On 2 --

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    Q.   On which dates?  I just want to make sure
2  I'm reading this correctly.
3    A.   Sure.  On 2/16 of 2021, it had 10 and a
4  half hours for labs, assembly and examination.  I'm
5  fairly confident that line item is for work done in
6  examination of items at Midwest Forensics.  Same
7  for 2/17/2021, where there's 8.5 hours.
8    Q.   And then other than this invoice, you
9  think the notes would be the best place to know
10  what days you were doing items that are reflected
11  in your invoice?
12    A.   That's correct.
13    Q.   Okay.  Let me pull up what we'll mark as
14  Exhibit 5.
15        (Plaintiff's Exhibit 5 marked for
16              identification.)
17    Q.   You let me know when you see the item I've
18  pulled up on my screen.
19    A.   Correct.  That's a set of my notes, that's
20  correct.
21    Q.   This is a 22-page document that was in
22  your file called lab notes 1, 2/16 and 17, 2021.
23  Do you recognize this document?  This 22-page
24  document?
25    A.   If you go to the end for me, I would

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1   appreciate that.  Yes, those are my notes from

2   those two days.

3       Q.   Any other notes from those two days that

4   we should know about?

5       A.   No.

6       Q.   Did you take any notes after the exam

7   related to this two-day inspection?

8       A.   I don't believe so, no.

9       Q.   I'm going to go up to --

10      A.   I mean, related -- your question was

11  related to those two days of inspections, right?

12  Because there were subsequent days of inspections

13  that I have additional notes for, but --

14      Q.   I'm referring to related to those two

15  days.

16      A.   -- for those two days, that's the totality

17  of my notes, that's correct.

18      Q.   I want to go up to Page 11 here.

19      A.   Actually it's not.  Now that you went to

20  the end, if you go to the last page of that.  If

21  you would please go to Page 22.  Scroll up a little

22  bit.  Go to Page 21, maybe.

23          MR. BARTON:  Can you see that?

24          THE WITNESS:  Barely.  That's why I'm

25  leaning in.

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1          MR. BARTON:  Would you blow that up a

2    little bit?  Thank you.

3      A.   Yes.  So I think that is correct, yes.

4    That is all the notes, it looks like.

5      Q.   (By Mr. Lesnick) This is the last page

6    right here, Page 22.

7      A.   Right, right, right.

8      Q.   These are all the notes, is that correct?

9      A.   I believe that is correct, yes.  I wanted

10   to make sure that the battery -- I was making sure

11   that the battery notes were included in that set,

12   and they are.

13     Q.   I want to go to Page 11, there's a number

14   of items discussed on this page.  I wanted to

15   figure out what you're talking about here on Page

16   11, what's being discussed?

17     A.   Sure.  So that is the start of notes

18   related to my first physical examination of the

19   artifacts that were set aside as batteries.

20     Q.   You have a note "Murata?"  Why did you

21   write that down?

22     A.   I believe that was from the -- from the

23   designator US 18650 VTC5.  That would be a, I

24   believe, a Murata battery printing.

25     Q.   There's a Number 1 here, a Number 2, a

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    Number 3, what are those designations for?

2        A.   Those are the artifact numbers as they

3    exist on the Midwest artifact listing.

4        Q.   And what are you writing down about these

5    artifacts?  This Number 1 artifact, what type of

6    information?

7        A.   Just some general observations as I'm

8    going through and looking at each of the artifacts.

9        Q.   Like for example --

10       A.   For example, out to the right, you can see

11   in brackets I've got one cell, so item 1 was 1

12   cell.

13       Q.   Right.  So for example, here, you have

14   bowed anode, right?  That's correct that that's

15   what that says?

16       A.   That's what that says, that's correct.

17       Q.   Why did you make that observation?

18       A.   Just general observations about the

19   batteries.

20       Q.   Is bowed anode relevant to analysis you

21   were performing?

22       A.   Again, it's just a data point.

23       Q.   Is it -- what type of data point were you

24   attempting to collect during your visual

25   observation?

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1      A.   Data points relative to the artifacts.

2   What's the condition of the artifacts that we're

3   looking at, were they fire damaged or not, for

4   example.  How many were there?  And this was a

5   first pass through those artifacts.

6      Q.   Underneath bowed anode, it says material

7   partial ejected out ap/vent, correct?  That's what

8   that says?

9      A.   Correct.

10      Q.   Why did you put that as an observation?

11      A.   Because that's what existed with the

12   artifact.

13      Q.   Was that a type of data point you utilized

14   when examining whether or not cells collected from

15   the scene were caused or attacked by the fire in

16   this matter?

17      A.   Not necessarily.  It's just a data point

18   about the artifact.

19      Q.   Narrow crimp.  What does narrow crimp

20   mean?

21      A.   Well, at the top of the battery, there's a

22   rolled crimp and it was not a crimp that was

23   expanded or pushed out.

24      Q.   What does that tell you?

25      A.   Again, it's a data point.  In and of

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1   itself, it doesn't tell me anything.

2      Q.   Okay.  And then you have -- does it say

3   multiple dents?

4      A.   Yes.

5      Q.   Is that what that says?

6      A.   Yes.

7      Q.   What does that mean?

8      A.   Just what it says.  That the steel case

9   was dented.  It looked like it had been walked on

10  or driven over.

11     Q.   If I go down to Page 19, there's a note

12  here that says 3-B-17, and then there's a highlight

13  that says x-ray first.  Why is that highlighted?

14     A.   That was nomenclature that was on the bag

15  itself.

16     Q.   Okay.  And then 3-B-18 is highlighted.

17  Why is 3-B-18 highlighted?

18     A.   Again, easy recall of which ones were

19  being imaged so you could see there where there's

20  notation on the bag in green that says CT scan and

21  also had, I believe, CT plates.

22     Q.   Let me go to Page 20, we have a 3-C-01,

23  why is that highlighted?

24     A.   Same reason.  If you look out to the

25  right, it says "x-ray first, CT."  Those are

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1   nomenclatures that were written on the bags.

2       Q.   This last line here, what does that say?

3   I was having trouble reading it as I'm scrolling

4   over on the 2 cell.

5       A.   Sir, if you could hit the plus sign one

6   more time for me, I'd appreciate it.  Both had

7   pressure relief with push -- hit it one more time.

8   There you go, thank you.  I can't tell.  Push out.

9   So it looks like that some of the -- some of the

10  contents had been ejected.

11      Q.   With regard to how this February exam was

12  conducted, you don't have any critiques of the

13  exam, do you?

14          MR. BARTON:  Objection.  Vague.

15      A.   I don't have any critiques of the February

16  exam, no.  February 2021, no.

17      Q.   (By Mr. Lesnick) Did you draw any

18  conclusions after this exam occurred?

19      A.   No.

20      Q.   Were you able to eliminate any ignition

21  sources after this exam?

22      A.   Would I have been able or did I?  What's

23  the question?

24      Q.   Did you?

25      A.   Did I?  No.

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    Q.   Would you have been able to?

2    A.   It depends.  It's not a --

3    Q.   What --

4    A.   It's not a piece of work I did at that

5  point in time.  It would be improper to do so

6  because at that point in time, I didn't have all

7  the data points collected.

8    Q.   Let me go back to Exhibit 3 for your

9  invoices.  Page 13 where we're at, it says on 2/19,

10  client contact, one hour.  What does client contact

11  mean?

12    A.   Client contact means I had a conversation

13  with the Stanton Barton law firm.

14    Q.   Did you take any notes during that

15  conversation?

16    A.   I doubt it.  If I did, I would have

17  produced it to you --

18    Q.   Do you know --

19    A.   -- I do not recall.

20    Q.   Do you know who was on that phone call?

21    A.   I do not.

22    Q.   Do you remember what was said?

23    A.   No.

24    Q.   If I go up to Page 12, this is the invoice

25  dated 4/8/2021.  On 4/8 -- I'm sorry.  On 3/8/'04,

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    it says -- on 3/4/'21 and 3/8/'21, it says special

2    photography model, B. Rackers.  Is this more of

3    the -- is this -- what is being discussed here?  I

4    guess let me just ask you that.

5        A.   Again it's work that Ben Rackers did on

6    the file.

7        Q.   Okay.  And do you remember what specific

8    work related to these invoices?

9        A.   I can't tell you exactly what he did on

10   those days, but I can tell you the totality of what

11   he did.  We have talked about some of that already.

12       Q.   If I go to Page 9 of this exhibit, which

13   is the invoice from 7/8/2022, there is entries in

14   your invoice of lab disassembly and examination on

15   6/27, 6/28, and 6/29.  Do you recall attending an

16   exam at Midwest Forensics on those three days?

17       A.   I believe that is correct, yes.

18       Q.   Did you take notes during those days

19   during the exam?

20       A.   I expect I did.

21       Q.   Let me pull up what we'll mark as Exhibit

22   6.

23            (Plaintiff's Exhibit 6 marked for

24                 identification.)

25       Q.   Let me know when you see the item I've

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1   brought up on my screen.

2        A.   Right.  So I see -- can you go to the very

3   top of the page?  Okay.

4        Q.   This is a 26 page document that was in

5   your file as lab 2 battery notes 6/27/2022, do you

6   recognize these notes?

7        A.   Yes, those look like notes that I would

8   have prepared.

9        Q.   And then there was another item in your

10  file that was called lab.  So this one that --

11  Exhibit 6, we were looking at was lab 2 battery

12  note 6/27/2022, and then there was another one, lab

13  2 notes 6/27/2022, we're going to mark this as

14  Exhibit 7.

15            (Plaintiff's Exhibit 7 marked for

16                  identification.)

17       Q.   Do you see that document on my screen?

18       A.   I do.

19       Q.   Is there -- is this -- is Exhibit 7 a

20  continuation of your Exhibit 6?

21       A.   No, they're separate documents.

22       Q.   It said lab continued here, and then it's

23  titled 6/27, so I'm just trying to figure out what

24  the difference of Exhibit 6 and Exhibit 7 were.

25       A.   Sure, Exhibit 7 is the continuation of the

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    work that was started in February of 2021.  So we

2    started --

3        Q.   Okay.

4        A.    Let me make sure I got that date, yeah,

5    February of 2021 was the first part of the lab.  We

6    continued it -- I hope those dates are right.  I

7    guess they are right.  It looks like it was a year

8    plus that we got back to going and looking at the

9    rest of the items.  It's over a year later, but I'm

10   assuming I got those dates right on there, but yes,

11   that's quite a long time to wait to get going on

12   the rest of the artifacts, but yes, it's a

13   continuation of that lab.  The Item 6, to further

14   clarify, separately, there was a separate -- a

15   separate examination that not all of the

16   participants were interested in going through where

17   Tim Johnson and I went through the battery

18   artifacts, front to back again.

19       Q.   Okay.  So I'm just trying to wrap my head

20   around what you're saying.  Exhibit 6 is titled in

21   your file lab 2 battery notes 6/27/2022.  Exhibit 7

22   was titled lab 2 notes, 6/27/2022.  Are these notes

23   that you took during your examination on 6/27/2022?

24       A.    Yes, both are.  Yes, that's correct.

25       Q.    Okay.  Right.  So Exhibit -- there's two

1    documents, but Exhibit 7 is a continuation of

2    Exhibit 6 or do you know what order these are

3    supposed to be written in?

4        A.    Well, I mean --

5             MR. BARTON:  Asked and answered.  Go

6    ahead.

7        A.    The order is not important.  What's

8    important is the data that is on it, but anyway,

9    Exhibit 7 is a continuation from February, right?

10   So February of 2021, we started going through Mr.

11   Hackett's artifact list and we picked up on 6/27

12   with that list and started with Number 4 on that

13   particular day.  Exhibit 6, there was a separate

14   examination conducted on that same day where we

15   went back, Tim Johnson and I both, went back and

16   pulled out all the battery artifacts again and went

17   through those.  The first time I went through

18   those, I went through them again with permission of

19   folks at Midwest, I went through them on my own,

20   and Tim Johnson continued looking at other items on

21   those days in February of 2021.  And then we went

22   through all of the battery artifacts separately,

23   but, for example, Mr. Kaps, who was there during

24   most of the exam, did not participate in this exam.

25   Mr. Hackett, who was there for part of the exam, in

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

 1   and out, did not participate in that piece of work.

 2       Q.   Got it, okay.  So if I go to Exhibit 7,

 3   there's a note here on the first page, it says

 4   possible, I believe it says, charger, am I wrong?

 5       A.   No, that's what my note says.

 6       Q.   Do you know which grid this was found in?

 7       A.   Number 4 is on the artifact list, so if we

 8   went to the artifact list, it would tell us what

 9   grid that was.  Those notations exist on the

10   artifact list.

11       Q.   Do you know if -- did you ever determine

12   if this was a charger?

13       A.   There was no further work done on it.  We

14   examined it that day to the extent that we did and

15   moved on.

16       Q.   Did you ever ask to do additional work

17   related to determining whether that was a charger?

18       A.   I did not.

19       Q.   Exhibits 6 and 7, while they're -- one's a

20   continuation of the February exam and the other is

21   a re-looking at the batteries, are these all of the

22   notes on Exhibits 6 and 7 that you took on June 27,

23   2022?

24       A.   I believe that is correct.  Again, you

25   have all of my notes.  If there's a Part 2,

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    sometimes my note-taking device would get -- the

2    file would get a little large, so I would have to

3    split it up.  That might have existed on some of

4    the days, but on 6/27, that's probably all of them,

5    but again I've produced all of my notes to you,

6    so...

7        Q.   I'm going to pull up and mark as Exhibit

8    8, and I'm going to bring up Exhibit 9, too, we'll

9    go back and forth.

10       (Plaintiff's Exhibits 8 and 9 marked for

11                  identification.)

12       Q.   All right.  We're going to mark this

13   document as Exhibit 8.  It was in your file as lab

14   2 notes, 6/28/2022-A.  Do you recognize this

15   31-page document?

16       A.   I believe so, yeah.  Could you scroll --

17   could you just hit control end, it will go all the

18   way to the end.  Not on your machine apparently.  I

19   apologize.  I just want to make sure what the last

20   page looks like.  Yeah, that looks correct, yes.

21   So I think this is an example, if it's got the A

22   designation on it, this is an example of where

23   maybe the file started to get too big, so I broke

24   it up into two parts.

25       Q.   Okay.  So let me pull up what we marked as

John Reagan - May 10, 2023

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1   Exhibit 9.  This was in your file as lab 2 notes,

2   6/28/'22-B.  Is that what you're talking about?

3       A.   Correct.  So I split that day up into two

4   different documents.

5       Q.   On Exhibit A -- Exhibit 8, which is

6   6/28/'22-A, let me go to Page 3 and ask you a quick

7   question.  Do you know where the item on this

8   bottom right photograph here was found at the

9   scene?

10      A.   Again, if you go up, if you scroll up just

11  a little bit to the top of that page, and if you

12  hit the plus sign for me, zoom in just a little

13  bit.  So it's Number 13, again I could go to the

14  artifact list, Mr. Hackett's artifact list would

15  tell us where that came from.

16      Q.   Okay.  On this bottom right photograph

17  here on Page 3, it says -- I believe it says KO

18  present; is that correct?

19      A.   KO, right.

20      Q.   What does that stand for?

21      A.   Knock-out.

22      Q.   What do you mean by knock-out present?

23      A.   So, device boxes and junction boxes have

24  pre-stamped knock-outs for cables and/or conduits

25  to attach to the box, so I'm noting that there was

1    an open knock-out at that location.

2         Q.   If I go to Page 26, zoom out a little bit

3    so you can see the full page.  There's two

4    photographs at the top here and it says DC

5    something.  Can you tell me what that says?

6         A.   DC motor, I believe it says.

7         Q.   Is this photograph in the bottom right

8    just a zoom in of the arrow in the upper left

9    photograph?

10        A.   We lost something there.  All right.

11   We're back.  Your question again?  I apologize.  I

12   missed the question there.

13        Q.   Yeah.  Is this photograph in the bottom

14   right a zoom in of where the arrow is pointing on

15   the top left photograph?

16        A.   Well, I think it's a second -- I think

17   it's a second image with the scale ended.

18        Q.   What were you trying to -- I guess, why

19   were you having a marking through it?  Are you just

20   identifying that it was a motor?

21        A.   That this was a DC motor, correct.

22        Q.   Do you know what that DC motor went to?

23        A.   I do not.

24        Q.   Page 29, you have some yellow markings in

25   this photograph here.  What does this say next to

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1   these yellow indications on the top in blue?

2       A.   Sure.  That says tool chuck and motor, so

3   that's just a --

4       Q.   What are you --

5       A.   Again I'm just flagging.  I'm just

6   flagging what is in the image.

7       Q.   Do you know what this tool chuck and motor

8   went to?

9       A.   Probably a tool of some sort, but other

10  than that, no.

11      Q.   If we go to Exhibit 9, which is your

12  6/28/2022-B notes, these are the continuation of

13  your notes from that day, right?  We already said?

14      A.   Correct.

15      Q.   And the first page here, I see an x-ray

16  signature, why did you write x-ray here?

17      A.   If we were going to do further examination

18  of those items, I would want an x-ray of them.

19      Q.   Did you ask for those items to be x-rayed

20  at any point?

21      A.   I did not.

22      Q.   Why not?

23      A.   Ultimately, I ended up not needing to.

24      Q.   If we go to Page 4, in this top

25  photograph, what is this item; do you know?

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1      A.   It's item 9.7 -- actually it's 19.7.  So

2   the .7 was something that, by agreement with Tim

3   Johnson, because there were so many items and some

4   of the items we decided to put some additional

5   designators on there, so we could later on talk

6   about 19.7 as opposed to 19 bag number whatever

7   because they didn't have bag numbers on them, so

8   those designators were added during the course of

9   the examination for tracking purposes, and that

10  item appears to be a drill.

11     Q.   Did you ever identify the manufacturer of

12  this drill?

13     A.   It's not legible.  The data on it is not

14  legible.  It certainly could be a Makita product

15  based on its color, but again that could be, but

16  the markings are not legible.

17     Q.   Let me go down to Page 12.  I saw here, I

18  think it says after market plug; is that correct?

19     A.   That's correct.

20     Q.   How did you determine that this was an

21  after market plug?

22     A.   Because the manufacturers don't put extra

23  terminals on their cord terminations at the male

24  blades.

25     Q.   Do you know what this cord was utilized

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1  with?

2      A.   No.

3      Q.   If I go to Page 26, it says here on this

4  photograph impact tool inside box, and it says

5  copper foil adhered to box.  What kind of impact

6  tool did you find?

7      A.   Can you scroll down so I can see the top

8  of the -- I don't recall, as I'm sitting here.  I

9  would have to go through all of my photographs from

10  that day.  Keep in mind, these are just my notes

11  that include kind of an overview and that I would

12  have additional detailed photographs, companion

13  photographs that went with these notes, and so from

14  my notes I can't tell you what kind of impact tool

15  that was.

16      Q.   Where would I find those -- I guess how

17  would I know what's the companion photograph for

18  these photographs?

19      A.   Well, it's my intention when I start

20  photographing an item is I would take an image of

21  the bag itself and so you'd have to scroll through

22  them to find the bag marking that matched the note.

23  So for example, if you scroll up on this one a

24  little bit, please?  This is Item Number -- it

25  appears to be Item Number 22, so if you went to my

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    photographs, complete set of photographs, you

2    would -- the first photograph for this item would

3    be an image of the bag or the tote or whatever it

4    was that it was contained in, the packaging in

5    general, and then the subsequent photographs would

6    be what's contained inside are with that particular

7    item.

8        Q.   Okay.  I'm going to pull up what we're

9    going to mark as Exhibit 10.

10           (Plaintiff's Exhibit 10 marked for

11                  identification.)

12       Q.   This is a document in your file.  This was

13   a document in your file titled lab 2 note

14   6/29/2022-A.  I'm going to pull up and we're going

15   to mark as Exhibit 11 as well because I believe

16   it's the companion we've been discussing.

17           (Plaintiff's Exhibit 11 marked for

18                  identification.)

19       Q.   Are you seeing what I've pulled up here

20   that we're going to mark as Exhibit 11?

21       A.   Yeah, but we have so many open that I

22   can't tell what the numbers are anymore, but that's

23   okay.  I'll take your word for it you're marking

24   that one as 11.

25       Q.   Sure.  I will exit out so you can see.

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1      A.   So 10 looks like the first part of the

2   note and 11 looks like -- Exhibit 11 looks like the

3   second part for that day.

4      Q.   And that day is 6/29/2022, right?

5      A.   Both of those sets, 10 and 11, appear to

6   be 6/29/2022, that's correct.

7      Q.   These are all the notes you took on

8   6/29/2022?

9      A.   I believe that is correct.

10     Q.   The lab exam ended, that portion of the

11   lab exam ended on 6/29/2022, correct?

12     A.   That sounds correct.

13     Q.   Did you have any critiques of how that

14   portion of the lab exam was conducted?

15     A.   No.

16     Q.   Did you draw any conclusions about this

17   case after that exam on those days?

18     A.   No.

19     Q.   Did you eliminate any ignition sources

20   after the exam on those days?

21     A.   No.

22     Q.   Let me go back to Exhibit 3, which are

23   your invoices.  If I go up to Page 7, it's an

24   invoice dated 10/5/2022.  There is an entry on

25   9/7/2022 and 9/8/2022, for lab disassembly and

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1   examination.  What are those entries referencing?

2       A.   I believe those are two additional days of

3   exams at Midwest.

4       Q.   Okay.  Did you attend lab exams at Midwest

5   on those days?

6       A.   I did, yes.

7       Q.   Let me ask, the June lab exam we were just

8   talking about, you followed the same protocol from

9   the February lab exam, correct?

10      A.   Correct.  I don't believe there was a new

11  protocol developed.

12      Q.   For this September exam, was that same

13  protocol followed as well?

14      A.   I believe that's correct.

15      Q.   Quick question.  It says you purchased a

16  tool for battery disassembly, and I just wanted to

17  make sure because I remember, I think, there was an

18  issue getting opened some of the batteries, right?

19  That's not -- that was a tool used for the lab

20  exam, not an exemplar-type tool, correct?

21      A.   No, that was -- are you asking -- is your

22  question related to the tool or the artifact?

23      Q.   The tool for battery disassembly.

24      A.   All right.  But what was your question

25  again?  Was it related to the tool or the artifact

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1  we were looking at?

2      Q.   Well, my recollection is we had a purchase

3  of tool, the experts had to purchase a tool to get

4  into some of the batteries or something like that

5  that wasn't onsite at the lab, and I was just

6  curious what this -- if this entry related to you

7  purchasing something.  I don't remember if that's

8  what you did or not.  I can ask it a different way.

9  That's what I initially asked.

10     A.   Yes, I went and purchased -- I had to go

11 out and try to purchase something to enable

12 disassembly of exemplars, some of the artifact

13 exemplars that were presented.

14     Q.   You didn't go out and purchase a Makita

15 tool, right?

16     A.   No.  No, sir.

17     Q.   Okay.  I just wanted to clarify that.  All

18 right.  Did you take notes from your lab exam on

19 9/7 and 9/8?

20     A.   I expect so.

21     Q.   I'll pull up what we're going to mark as

22 Exhibit 12 and Exhibit 13.

23        (Plaintiff's Exhibit 12 and 13 marked for

24                identification.)

25     Q.   Are you seeing the document I pulled up

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1   that we're going to mark as Exhibit 12?

2       A.   Yes.

3       Q.   I'm going to zoom out a little bit.  This

4   is a 20-page document.  It was in your file titled

5   lab 3 notes 9/7/'22-A, and then I'm going to pull

6   up what we're going to mark as Exhibit 13, which

7   was also in your file, and it was labeled lab 3

8   notes, 9/7/'22-B.  Do you recognize both of these

9   documents?

10      A.   I do, yes.  The pages that you've shown

11  me.

12      Q.   What are these documents?

13      A.   Those are notes that I've made at Midwest.

14      Q.   Are these all of the notes you took on

15  September 7th, 2022 and September 8th, 2022?

16      A.   I believe that's correct.

17      Q.   With regard to how this exam, this portion

18  of the exam went, do you have any critiques?

19          MR. BARTON:  Objection.  Vague.

20      A.   No.  The artifacts were presented for

21  examination and I examined them to the extent I

22  needed to on those dates.

23      Q.   (By Mr. Lesnick) Did you draw any

24  conclusions after this exam?

25      A.   I did not formalize any conclusions at

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    that point.

2        Q.   Were you able to eliminate any ignition

3    sources after this exam?

4        A.   I did not formulate any conclusions either

5    way on those dates.

6        Q.   Let me go back to the invoice, which is

7    Exhibit 3, and I am going to scroll up to Page 4.

8    Invoice dated 2/7/2023.  I had a question.  On

9    1/19/2023, it says witness other person contact.

10   What is that entry about?

11       A.   It looks like I contacted somebody other

12   than -- other than the Stanton Barton law firm.

13       Q.   Okay.  Who was that?

14       A.   I don't recall, as I sit here.

15       Q.   What information did you learn during that

16   contact?

17       A.   I don't recall.  I don't recall that I

18   learned anything.  It might have just been a

19   scheduling call.

20       Q.   Page 2 here, it says -- I'm sorry.  Let me

21   scroll up to Page 2.  There's a Markiewicz on here.

22   Who is Markiewicz?

23       A.   Jack Markiewicz is an employee of Schaefer

24   Engineering.

25       Q.   It says he traveled on 1/30 and 1/31, what

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    travel is that related to?

2         A.    It's related to retrieving the battery

3    artifacts from Midwest and delivering them to the

4    imaging facility.

5         Q.    What imaging facility is that?

6         A.    Safety Engineering Labs.

7         Q.    And why was the evidence transferred to

8    Safety Engineering Labs for imaging?

9         A.    That's the CT scans that are on that drive

10   that you received.

11        Q.    Okay.  And why did you decide to have SEL

12   scan that evidence?

13        A.    I'm not clear on what your question is.

14        Q.    Why did you have SEL perform CT scans on

15   the evidence?

16        A.    Well, SEL is a pretty good reputable firm

17   and I thought that they had quality equipment and

18   could do a good job of it.

19        Q.    Okay.  Putting aside the quality of their

20   work, what was the reason you had CT scans

21   performed of the battery cells?

22        A.    For data points.

23        Q.    Okay.  What data points were you trying to

24   obtain?

25        A.    The condition of the remaining cells that

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    the plaintiff experts did not scan.

2         Q.   What work did SEL perform?

3         A.   They imaged the batteries and sent the

4    images to us on a flash drive -- or on a hard

5    drive.  Hard drive.

6         Q.   What type of imaging did they perform?

7         A.   CT scans.

8         Q.   Did they do any x-rays?

9         A.   No, I don't believe so.

10        Q.   Did you ask anyone to x-ray any of the

11   cells collected in this matter?

12        A.   No, I don't recall that we -- I think they

13   did.  They may have -- they may have -- again, it's

14   not an x-ray that I reviewed or relied upon, but

15   they may have done a quick x-ray to determine if

16   there was anything inside one of the cells before

17   spending the money to CT scan it.  I think the

18   initial -- I remember some discussion with the

19   operator saying, "Hey, this cell looks and feels

20   like it's empty, there's not going to be anything

21   inside of it.  Do you want me to spend the money on

22   doing a CT scan?"  He said I could just do a quick

23   x-ray of it.  I think the answer, we ultimately did

24   not get a CT scan of that particular device.  I

25   think we note in our report, which those are.

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1      Q.    Did you do any x-rays?

2      A.    If he x-rayed it, it was only to determine

3  if there was anything worth CT scanning in there,

4  and I don't know if he provided those x-rays or

5  not.  It's not something I used in my analysis of

6  this matter.

7      Q.    So he was utilizing the x-ray to determine

8  whether or not a CT scan was necessary?

9          MR. LESNICK:  Object to form.  Vague.  Go

10  ahead.

11      A.    That's not what I said.  What I said was

12  he was -- he said, "If I run a quick x-ray to see

13  if there's anything inside and there's nothing

14  inside, do you still want me to provide a CT scan

15  of it?"  I said, "No, if it's empty, don't worry

16  about it," and I make note of that in my report.

17      Q.    So you used an x-ray to determine whether

18  or not a CT scan was needed?

19          MR. BARTON:  Object to form.

20  Mischaracterizing the witness' statement a second

21  time.  Go ahead.

22      A.    So I did not do that.  I've never seen

23  that x-ray.  It may be on that drive, I don't know.

24  I was only interested in CT scans of the batteries.

25      Q.    (By Mr. Lesnick) Are there x-rays that

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    you're not -- some that you don't know for certain

2    if SEL took any x-rays of the cells?

3        A.   As I mention in my report, we conducted

4    scans of most of the battery artifacts that were

5    shipped from Midwest to SEL or delivered by Mr.

6    Markiewicz.  I received a call from the lab asking

7    if I wanted to have an x-ray of an empty canister

8    and my answer was probably not.  It won't be of any

9    value because there's nothing inside to see.  He

10   said, "Well, if I make a quick x-ray of it to see

11   if it's empty," this to one cell, "If that canister

12   is empty, do you still want me to spend the money

13   to CT scan it," and I said, "Don't do that," and

14   that was discussed in my report.

15       Q.   Are you aware of any other x-rays that

16   were performed or not performed?

17       A.   Yes, so the plaintiff experts made x-rays,

18   relied on those x-rays.  I've asked for them on

19   numerous times and I have not received.

20       Q.   You asked for x-rays of your own -- of the

21   cells in this matter that you sent to SEL?

22           MR. BARTON:  Object to form.  Misstates

23   the witness' testimony.  Go ahead.

24       A.   What is your question again?

25       Q.   (By Mr. Lesnick) The question is; did you

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    ask for x-rays of the cells that you sent to SEL?

2         A.    No, I did not.  I sent them --

3         Q.    Is there a reason why?

4         A.    Because I was going to have them CT scan,

5    which is a much better image.

6         Q.    You do not feel that x-ray was necessary,

7    I guess, you said -- let me rephrase.  You said you

8    feel CT scan is a much better image, right?  That's

9    what you said?

10        A.    Correct.  It provides more information

11   than an x-ray.

12        Q.    Do you know if any information can be

13   taken from an x-ray to help evaluate cells?

14             MR. BARTON:  Objection.  Vague.

15        A.    I believe there is information that's

16   contained in other data points, x-rays provided a

17   data point.

18        Q.    (By Mr. Lesnick) Is there a reason why you

19   didn't utilize x-rays to obtain additional data

20   points in your evaluation in this case.

21             MR. BARTON:  Objection.  Asked and

22   answered.  It misstates parts of his testimony.  Go

23   ahead.

24        A.    Because I was getting them CT scanned,

25   which again is a better image, has more

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

 1    information.

 2        Q.    (By Mr. Lesnick) So other than the CT

 3    scans that you directed to have performed, can --

 4    was it you that directed to have the CT scans

 5    performed?

 6        A.    It was done at my request, yes.

 7        Q.    Other than those CT scans, did you direct

 8    any other imaging to be performed on any of the

 9    cells in this matter?

10        A.    No.

11        Q.    Other than the laboratory examinations we

12    talked about in February of 2021, June 2022 and

13    September of 2022, did you perform any other

14    laboratory examinations during your analysis of

15    this matter?

16        A.    I don't believe so, no.

17        Q.    You didn't participate in the evidence

18    collection process from the scene, did you?

19        A.    That's correct, I did not.

20        Q.    How did you gather information related to

21    that process?

22        A.    From file materials from -- I have

23    photographs from the scene that were taken by Mr.

24    Sacco and photographs from the scene that were

25    taken by Mr. McGinley.  Subsequently, I received

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    file materials from Mr. Hackett and from Mr.

2    Johnson.

3         Q.   Other than those photographs from Mr.

4    McGinley and Mr. Sacco.  Did you receive any other

5    information from Mr. McGinley and Mr. Sacco?

6         A.   I believe two diagrams may have been

7    included with the McGinley, and these aren't

8    diagrams that he had produced, they were diagrams

9    that he was provided by Mr. Hackett, or I should

10   say, Mr. Hackett or Mr. Kaps.  Basically it's the

11   grid --

12        Q.   Did you have any information -- sorry.  Go

13   ahead.

14        A.   Basically it was the grid diagram of what

15   grid 3-C meant relative to the grid.

16        Q.   And what Grid 3-C meant?

17        A.   Right.  So as you know, we've been talking

18   at different points during this deposition about

19   you asked where something came from, what grid it

20   came out of.  So there was an agreed upon map of

21   the area that was processed that had, for example,

22   grid 1 through 8 and then it went through A through

23   D, I believe, or something along those lines.  I

24   don't have it in front of me, something to that

25   effect.

1    Q.   Do you know who -- you said it was an

2   agreed upon map.   Agreed upon between who?

3    A.   The experts that were present for the site

4   investigation.   This is the way we're going to do

5   it.   There were survey tape flag lines put out and

6   it was processed grid by grid.

7    Q.   Have you ever had any phone conversations

8   with Mr. McGinley about this case?

9    A.   Other than scheduling, I can't think of

10   any, no.

11    Q.   Did SEL, how did SEL provide to you the

12   imaging that they took?

13    A.   They provided a hard drive that was

14   shipped to me.

15    Q.   Do you know if a receipt of that hard

16   drive is found anywhere on your invoice?

17    A.   So I did not pay for any of those.   I did

18   not directly pay for any of those shipping charges

19   with the exception of Mr. Markiewicz' time to

20   deliver those items to SEL from Midwest, that's the

21   only --

22    Q.   Is there any --

23    A.   Those are the only line items that should

24   be on the invoices, in other words, I didn't direct

25   any --

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1       Q.   Is there any --

2       A.   I did not directly pay SEL.

3       Q.   Who paid SEL?

4            MR. BARTON:  Objection to form.  Calls for

5  speculation.

6       A.   I don't know who wrote the check.

7       Q.   (By Mr. Lesnick) Is there any indication

8  on your invoice when you first began reviewing the

9  CT scans that SEL created?

10       A.   No, I don't have an indicator like that.

11       Q.   Did you take any notes upon your review of

12  the CT scans that SEL created?

13       A.   I had some images created and those are in

14  the report.  Those are the extent of my notes.

15       Q.   Extent of your notes are the images

16  created?

17       A.   The extent of my notes regarding those

18  images are those that exist in my report.

19       Q.   Okay.  And which figures in your report

20  are the ones you're referring to?

21       A.   So on Page 44, Figure 16, for example, it

22  shows a sectional view of two battery cells that

23  were in a bag marked 3-B.15 and there are some

24  notations marked on those images.

25       Q.   But you said, I think, Rackers put those

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1  notations on, right?

2     A.   At my direction, that's correct.

3     Q.   Are there any --

4     A.   Just to be clear --

5     Q.   -- any photographs that --

6     A.   Just to be clear --

7          MR. BARTON:  Wait --

8     A.   Just to be clear --

9     Q.   -- any images that were --

10         MR. BARTON:  Ben, the witness is trying to

11  speak, please.

12     A.   Just to be clear, he's the one that put

13  the mark on the paper and saved the image because

14  we used his -- he has a very -- he has a custom

15  built machine that's good at processing large files

16  like this.  Not every computer -- not every

17  computer out there can handle this kind of data

18  very efficiently.  They can all handle -- it's not

19  very efficiently, but this machine that he built

20  himself is very good at handling this type of data,

21  so we used his machine and he and I sat together

22  and created these documents.

23     Q.   Are there any other images that contain

24  notes on the images, whether it was created by Mr.

25  Rackers or yourself, that are not included in your

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    report?

2         A.   If they were, they were in the file

3    production, so I've copied everything off of my --

4    off of my project file into -- onto either the

5    share file or the hard drive that was sent to you.

6         Q.   That's the hard drive I received on

7    Friday?

8         A.   I can't comment on when you received it,

9    but it's a hard drive that I shipped out,

10   certainly.  You would have gotten it from my

11   office, I don't know when that got there.

12        Q.   If I didn't see any other images in your

13   hard drive that had notations on it, you know, as

14   we were just looking at Figure 16, that means the

15   notations on those photos don't exist, right?

16             MR. BARTON:  Object to form.  Speculation.

17   Compound in different parts, and vague.  Go ahead.

18        A.   So the images in my report are the

19   notations that I created for use in preparing the

20   report.  If there are others, and there certainly

21   could be, they would be contained on those -- on

22   that drive or in the share file, so they would have

23   been produced to you.  If they're not there, they

24   don't exist.  I'm not hiding anything.  I'm not

25   holding anything back.  I've got no reason to do

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    that.

2        Q.    (By Mr. Lesnick) I'm going to bring back

3    up this Exhibit 3.  All right.  This page here on

4    Page 1, it ends on 3/21/2023.  Before today, is

5    that the last time you worked on this file?

6        A.    Is your question have I worked on the file

7    since 3/31?

8        Q.    Yes.

9        A.    Well, I expect I have.  I got prepped for

10   today.

11       Q.    When did your prep occur?

12       A.    Well, it was after 3/31 and before today.

13   Exactly what days I prepped, I don't recall.

14       Q.    Did it happen yesterday?

15       A.    I did some prep yesterday, yes.

16       Q.    With Mr. Barton?

17       A.    We did meet for a little while yesterday,

18   yes.

19       Q.    So you're saying other than yesterday

20   there were additional times you met with -- I'm

21   sorry, not met, but prepped for this deposition?

22       A.    Yes, yeah, I probably spent a little time

23   on it Monday.  Other than that, I can't recall any,

24   but there certainly could be.

25       Q.    Was your report finalized as of 3/31/2023?

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1      A.    I think it was finalized on April 6th,

2   2023, the date issued -- the date of the report is

3   April 6,2023.

4      Q.    Did you work on the report between 3/31

5   and April 6th, 2023?

6      A.    It's possible.  I would have to look.

7      Q.    So it's possible that it was finalized on

8   3/31/2023, right?

9           MR. BARTON:  Object to form.

10  Argumentative.  Go ahead.

11     A.    It's possible, yes.

12     Q.    (By Mr. Lesnick) Do you know what day you

13  finalized your opinions in this matter?

14     A.    April 6th, 2023, when the report was

15  issued.

16     Q.    Let me just pull up Exhibit 4 again.  I'm

17  going to go to Page 144.  This is an e-mail between

18  Benjamin Rackers and you on January 5th, 2023.  I

19  think you made mention of this e-mail before.  It

20  says, "Ben in mid-December, we discussed you doing

21  work on this matter completing by mid-January,

22  checking on your availability to complete the

23  work."  And he said, "John, don't worry.  I haven't

24  forgotten."  Do you know what is being referenced

25  here in this e-mail?

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1      A.    Not -- generally, yes.  I mean, he was

2   helping me with some of the imaging.  At this point

3   in time, we didn't have our own CT scanner, so he

4   might have been -- he might have -- I might have

5   gotten other scans -- I think actually you provided

6   some scans to Mr. Barton's office and he shared

7   those with me.  I think you probably have in the

8   share file that I sent to you or in the -- on the

9   hard drive, a folder called Lesnick scans or shared

10  scans or something to that effect, so he might have

11  been looking at those, the couple of scans that Mr.

12  Eskra had arranged or requested, however you want

13  to put that.  It certainly could be that.  It could

14  be that he was helping me with some other work on

15  the matter.

16          MR. BARTON:  Are we frozen?

17          MR. LESNICK:  Do you guys want to take a

18  five-minute break here real quick.

19          THE WITNESS:  If you don't mind my asking,

20  and I'm not trying cut you short.  If you're going

21  to go to 3:00 or 4:00 o'clock, I'm going to eat

22  some lunch.  If you're not --

23          VIDEOGRAPHER:  We are off the record at

24  11:42 a.m.

25                    (Recess.)

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1              VIDEOGRAPHER:  We are back on the record

2      at 11:54 a.m.

3         Q.  (By Mr. Lesnick) Mr. Reagan, there were

4      two files in the -- two folders in the file

5      materials that we received titled PG1 4.2 to 4.5.

6      Another PG2, 5.6 to 5.10.  Do you know what folders

7      I'm discussing?

8         A.   Possibly.  Could you show me one of them

9      or not?  No?

10        Q.   I can.

11        A.   I mean, I'm guessing that those are Pat

12     McGinley photographs from the site exam.

13        Q.   And that's what I was trying to figure

14     out, if those were Pat McGinley's photographs?

15        A.   I think that's probably correct.

16        Q.   All right.  Since April -- or I'm sorry.

17     March 31st, do you know how many more costs you've

18     incurred in this matter?

19        A.   No.  It's something I could find out, but

20     I don't have that number.

21        Q.   Do you know how many more hours you've

22     worked on this matter?

23        A.   Well, that would be the same answer.  I

24     mean, the hours and the costs are synonymous, so I

25     don't know the answer, no.  It's a number I can

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    get.  It's certainly a number I can get.

2        Q.   I saw, when I totaled up the invoices that

3    were produced to us, it was more than $90,000 in

4    costs.  Does that sound right to you?

5        A.   I don't know.  I haven't added it up

6    myself.

7        Q.   Since March 31st, 2023, did you ever speak

8    with Lawrence Sacco about this file?

9        A.   No.

10       Q.   Other than the photographs, Mr. McGinley's

11   photographs that you have in your file, is there

12   any other information you relied upon in this

13   matter that Mr. McGinley created?

14       A.   No.

15       Q.   Since March 31st, 2023, have you spoken

16   with Mr. McGinley at all?

17       A.   Yes.

18       Q.   Okay.  When?

19       A.   I saw him on a site exam up in North

20   Dakota.

21       Q.   I mean, about this?  Did you speak to him

22   about this case?

23       A.   No.

24       Q.   All right.  Let me go back to Exhibit 2,

25   which is your report.  All the way to the top.

1    There we go.  Okay.  Let me zoom out a bit.  As we

2    talked about, this 260-page document, this is your

3    report in this matter?

4        A.    That's correct.

5        Q.    Okay.  And as we were just discussing

6    before, it's dated April 6th, 2023.  That's the

7    date you finalized your report?

8        A.    That's correct.

9        Q.    Does this report contain all of your

10   opinions in this matter?

11       A.    It contains all my core opinions.  It

12   depends on what questions I'm asked, but yes, sir,

13   I could offer other opinions if I'm asked certain

14   questions, but it just depends on what questions

15   I'm asked.

16       Q.    So you have opinions in this matter that

17   may not be contained in this report depending on

18   what questions I ask you during the testimony

19   today; is that what you're saying?

20       A.    No.  What I'm saying is these are my core

21   opinions, opinions I've formalized and put to

22   writing, but if there's any other questions that

23   are asked that I can answer, I will certainly

24   answer them and some of those may be in the form of

25   an opinion.

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1     Q.    Do you expect to testify at trial about

2   anything other than what is contained in this

3   report?

4     A.    I don't have plans to.

5     Q.    Do you have any plans on drafting any

6   additional reports?

7     A.    I do not.

8     Q.    You were engaged by Mr. Barton's law firm

9   in this matter; is that correct?

10         MR. BARTON:  Asked and answered.

11    A.    That is correct.

12    Q.    (By Mr. Lesnick) Okay.  And I think we

13  talked about this a little bit, but this scope here

14  on Page 3 of the PDF, but 2 of your report, does

15  that accurately describe the scope of work as you

16  understand that this report is addressing?

17    A.    That's correct.

18    Q.    Were you asked to address any other topics

19  other than what's described in this scope of work

20  in informing your opinions?

21    A.    Well, I mean, there's steps to the process

22  that aren't discussed there.  But there's a lot of

23  steps in the process that need to be done in order

24  to fulfill that scope of the project.

25    Q.    Okay.

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1      A.   So, for example, if you're asking was I

2   asked to do an origin and cause investigation,

3   well, in order to do the work that is in the scope

4   there, I had to do an origin and cause

5   investigation.  Was I asked to -- was I asked to

6   evaluate witness information?  Yes, I was asked to

7   do that.  It's not in the scope, but it's necessary

8   steps in the process to reach reliable conclusions.

9      Q.   And I guess that is one of the things I

10  was going to ask about was; did you -- did your

11  scope of work include determining an area of origin

12  for this fire?

13     A.   It did, yes.

14     Q.   The third page of your report here is

15  entitled Procedures.  What does that heading mean?

16     A.   It's the general activity that I undertook

17  on the project.

18     Q.   Okay.  And your opinions, when you

19  formulate them, they were based upon those general

20  activities that you conducted in this matter?

21     A.   I think that's true, yes.

22     Q.   And the information that you received came

23  through the course of you conducting those

24  activities in this matter?

25     A.   I believe that's correct, yes.

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1      Q.   And after you conducted all of those

2   activities listed here in this procedure page, you

3   formed your opinions in this matter; is that

4   correct?

5      A.   Yes, I think that's probably correct.

6      Q.   Pages 3 and 4 list the number of

7   activities you perform, is there anything not

8   listed on here that you conducted in your work in

9   this matter?

10      A.   I'm not clear on what your question is.

11      Q.   There's a number of -- it says you

12   conducted the following tasks right here on Page 3.

13   It lists all of your tasks, that you reviewed the

14   following documents.  Anything not listed in either

15   of those two sections in this matter that you

16   relied upon to form your opinions?

17          MR. BARTON:  Object to form.  Vague.  What

18   two sections?

19      A.   So the documents that are listed in

20   procedures are intended to be a listing of the

21   documents that I reviewed as part of my work in

22   this matter.  That's the purpose of that list

23   there.  Here's what I've reviewed in this matter,

24   and after review of that, I've drafted this report.

25      Q.   (By Mr. Lesnick) This contains all of the

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1  documents you reviewed in this matter?

2      A.   It's intended to, yes.  I'm not aware --

3  I'm not aware of anything that's not on the list

4  that I've reviewed for this matter.

5      Q.   We were talking before about this "other"

6  section and your codes and standards, but

7  specifically this "other" section.  Do you know if

8  there's any peer-reviewed literature out there that

9  tells you the steps you can take on how to

10  determine whether a cell is causal in a fire or has

11  been attacked by a fire?

12      A.   I'm not aware of any peer-reviewed

13  documents out there like that.

14      Q.   Are there scenarios -- well, your scope of

15  work in this matter was fire analysis, right?

16  You've testified to that.

17      A.   I don't think that's what I said.  I think

18  I said fire and engineering analysis is the general

19  scope at the outset of the project, and that was

20  later refined, as indicated on Page 2, where it

21  says scope of project.

22      Q.   During investigations where fire analysis

23  is performed that you performed, have you ever

24  encountered a scenario where examination of a

25  battery cell is required to complete your analysis?

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1          MR. BARTON:  Objection.  Vague.  Improper

2    hypothetical.  Go ahead.

3       A.   I've evaluated battery cells on prior

4    projects in order to reach my conclusions, yes.

5       Q.   (By Mr. Lesnick) Are there any

6    peer-reviewed documents that describe the actions

7    that must be taken under those -- when you have had

8    to do that previously?

9       A.   Well, first, you've got to go back to the

10   bigger picture of NFPA-921 and the scientific

11   method and how you first arrive at the area of

12   origin, an ignition source and first fuel ignited

13   and a cause for the fire, so you've got to follow

14   that process, the scientific that's outlined in

15   NFPA 921, that's first and foremost, and then

16   depending on what you find within your area of

17   origin that needs to be evaluated, then you have to

18   go through and examine each of those artifacts and

19   what materials are available to support an opinion

20   about each of those artifacts.

21      Q.   So, if you have a cell found in your area

22   of origin that's a potential ignition source, is

23   there any peer-reviewed literature out there that

24   describes how to evaluate that cell as an ignition

25   source or not for the fire?

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1        A.    I'm not aware of a peer-reviewed document

2    that says, "This is the criteria and the method to

3    do that."

4        Q.    Okay.  Page 5 here is discussion

5    background.  What's the purpose of this background

6    section in your report?

7        A.    Just that, to give a general background.

8        Q.    Of the facility?  Of the fire?  Of what?

9    General background of what?

10        A.    Just what it says here.  It's about the

11    building where the fire occurred and the fire

12    department response, how it was discovered, when it

13    was discovered.

14        Q.    Okay.  These two photographs here, Figure

15    2 and Figure 3, why do you have these in your

16    report?

17        A.    So Figure 2 is an overall plan.  It's not

18    a photograph.  It's a plan view of the plant that I

19    understand this came from the folks at Forest

20    River.  Figure 3 is an aerial image of the

21    post-fire condition of the overall building.

22        Q.    On Page 7, there's a section called data

23    collection.  What's this section supposed to tell

24    us?

25        A.    Again, that's part of the scientific

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    method, so I explained above what my methodology

2    is.  I'm going to follow the scientific method, and

3    then I have a collection data section where I go

4    through, I identify all the data that I was

5    collecting in order to conduct my investigation, so

6    I go through public agency information, witness

7    information and video information on the date of

8    collection in addition to review of all

9    photographs.

10        Q.   Under the public agency information

11   heading, there's an Elkhart Fire Department

12   heading.  At the top of this second paragraph here,

13   it says, "The Elkhart Fire Department reports were

14   reviewed.  The NFIRS-1 basic report indicated an

15   alarm, et cetera, et cetera."  The -- and then at

16   the second paragraph here, which you're still

17   talking about the NFIRS, this is on Page 8 now of

18   your report, you say that, "The basic report

19   concluded the fire heat source and item first

20   ignited were undetermined.  The cause of ignition

21   was indicated as cause undetermined after

22   investigation."  That came from that document,

23   correct?

24        A.   I believe so, yes.

25        Q.   When coming to those conclusions, do you

1    know what steps the fire department took to make

2    those conclusions?

3        A.   I know some of the steps.  I don't know

4    all of the steps.  So some of the steps are that

5    they were there during the process of the fire

6    scene, for example.  So they have -- I have fire

7    department photographs that show that they were

8    there at various stages during the fire scene

9    processing, but I know that they were there because

10   I have their photographs.  So they were there when

11   the, for example, when the -- when the parts and

12   shipping area was reconstructed, when the tool crib

13   area was reconstructed, so I know that much.  I

14   don't know anything beyond what's contained in the

15   report or photographs.

16       Q.   Do you know if the author of that NFIRS-1

17   basic report conducted the -- do you know who the

18   author is of that?

19       A.   I believe, I thought it was Assistant

20   Chief Dale wrote the report, because the chief was

21   on vacation or in training or something like that.

22       Q.   So there's a difference between the

23   NFIRS-1 basic report and then the incident report,

24   correct?

25       A.   Yes, I believe there are two reports,

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    right.

2        Q.    Okay.  So do you know who authored the

3    NFIRS-1 basic report?

4        A.    If you pull up the document, I can tell

5    you, but offhand I would expect it to be Chief Dale

6    or Assistant Chief Dale, but I don't know that for

7    a fact.

8        Q.    Do you know the author, if the author of

9    the NFIRS report conducted an investigation in

10   accordance with NFPA-921?

11           MR. BARTON:  Objection.  Calls for

12   speculation.  Go ahead.

13       A.    Again I don't know all the steps that he

14   took, so to say he did or did not comply would be

15   overstepping.

16       Q.    (By Mr. Lesnick) Page 8 here underneath,

17   you start talking about the Elkhart Fire Department

18   official law enforcement report authored by

19   Assistant Chief Rodney Dale.  Mr. Dale, he was the

20   lead investigator for the Elkhart Fire Department

21   for this fire, correct?

22       A.    I think That is correct, yes.

23       Q.    Do you know if he testified if he had any

24   prior experience examining collapsed fire scenes

25   like this before?

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1      A.   I don't recall all of his testimony as I

2   sit here.  Certainly we can go through that, if

3   you'd like.

4      Q.   Well, he testified he had no experience as

5   a lead fire -- I'm sorry, with collapsed buildings.

6   Do you know if he testified if he had ever utilized

7   an excavator in any investigation he conducted

8   previously?

9           MR. BARTON:  Object to the representations

10  about counsel to the extent it misstates the

11  witness' testimony.  Go ahead.

12     A.   Again, his deposition will speak for

13  itself.  I don't remember every detail of every

14  deposition I've read in this matter.  We certainly

15  can go to the record and look at that, if you'd

16  like me to answer that question in more detail.  If

17  you want me to take the time to go through that

18  deposition, I will do that.

19     Q.   (By Mr. Lesnick) That's okay.  Do you

20  believe the investigation you performed in this

21  matter was a complete investigation?

22     A.   I believe it was, yes.

23     Q.   Do you believe you took all the necessary

24  steps to form your opinions in this matter?

25     A.   I took every step I could, every step

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    possible.

2        Q.    Okay.  And in that investigation, you

3    determined an area of origin, correct?

4        A.    I did, yes.

5        Q.    And that was based off of all of the data

6    you reviewed in this matter; is that correct?

7        A.    That's correct.

8        Q.    And there was nothing else you could have

9    done to -- or performed to reach your area of

10   origin opinion, could you?

11       A.    I don't know what the question is asking.

12       Q.    Was there anything else you could have

13   done to determine your area of origin in this

14   matter?

15           MR. BARTON:  Object to form.  Vague.

16   Calls for speculation.  Go ahead, if you know.

17       A.    I don't know how to answer that question

18   other than I did everything I could with the

19   available resources and documents that I had.

20       Q.    (By Mr. Lesnick) You examined the evidence

21   that was collected from the loss site, correct?

22       A.    I did.

23       Q.    If you had not examined that evidence

24   collected from the loss site, would you have been

25   able to form your area of origin conclusions in

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1   this matter?

2          MR. BARTON:  Object to form.  Vague.

3   Improper hypothetical.  Calls for speculation.

4   Lacks foundation.  Go ahead, if you can imagine.

5      A.   If you could give me that question again?

6      Q.   (By Mr. Lesnick) Yes.  If you hadn't

7   examined the evidence collected from the loss site

8   in this matter, would -- would you -- I'm sorry.

9   Would you have been able to form your area of

10  origin opinion?

11         MR. BARTON:  Same objections.

12     A.   So again, I considered all the data that I

13  collected through the methodology that was applied.

14  To take away some piece of it now and say could I

15  have -- what could I have done with that data, that

16  would have been a different analysis that I haven't

17  done.  I've not sat down and gone through, if you

18  take this piece away, what would your analysis look

19  like?  I would have to sit down and do that

20  analysis and I'm not going to do that on the fly.

21     Q.   That's because you have to have all the

22  data before you -- available to you before you can

23  come to your conclusions, right?

24     A.   That's the general process, correct.  If

25  you're going to formulate opinions, you get the

1  data in front of you and then you formulate your

2  hypothesis, tests those hypotheses against all of

3  the known data and you select the hypothesis, a

4  viable hypothesis that fits the data.

5      Q.   Mr. Dale didn't form his opinion after the

6  evidence collection exams that you participated in

7  this matter, did he?

8          MR. BARTON:  Object to the extent it calls

9  for speculation.  Go ahead.

10     A.   I believe his report probably predates

11  some of those, some, if not all, of those

12  examinations, and so he would not have had the

13  benefit of my examinations' artifacts.  However, he

14  was there at the fire scene when those artifacts

15  were collected, I believe, because they show up --

16  many of those artifacts show up in his photographs,

17  so it's not that he hasn't seen those artifacts

18  because he was there at the fire scene on multiple

19  days.

20     Q.   (By Mr. Lesnick) But he didn't participate

21  in any of the lab exams of the collected evidence

22  that you did, correct?

23     A.   I don't believe he was present at any of

24  the lab exams at Midwest, that's correct.

25     Q.   So his causal -- I'm sorry.  Area of

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    origin determination, that was made without having

2    participated in those lab exams, correct?

3            MR. BARTON:  Object to form.  That

4    misstates his opinions.  Go ahead.

5        A.   Yeah, he was not present.  He was not

6    present for those exams.  Again, what all he

7    included in his analysis, you'll have to ask him.

8    I don't have -- I'm not privy to everything that

9    he's done in this matter.

10       Q.   (By Mr. Lesnick) Right.  My question to

11   you was; he formed his opinions without having

12   participated in the lab exams that you were present

13   at, correct?

14           MR. BARTON:  Object to form.  Vague.

15   Calls for speculation.  Go ahead.

16       A.   I can only say that he was not present at

17   those lab exams.

18       Q.   (By Mr. Lesnick) Right.  So if he was not

19   present at the lab exams that you were present at,

20   he did not form his opinions based off the evidence

21   found at the lab exams that you were at, correct?

22           MR. BARTON:  Object to form.  Vague.

23   Asked and answered now three times.  Calls for

24   speculation.  And what opinion are you talking

25   about, Ben?  This witness -- Mr. Dale provided

USDC IN/ND case 3:21-cv-00252-DRL    document 86-4    filed 12/13/23    page 134 of 301
John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    opinions in his testimony that occurred after these

2    examinations, so your question is vague.  Go ahead,

3    Mr. Reagan, if you can answer.

4        A.   Again he wasn't present.  Yeah, I don't

5    know what information he had.  Again you've got to

6    ask him whether he had any benefit of any of the

7    knowledge that was obtained through those

8    examinations.  I have no way of knowing.

9        Q.   (By Mr. Lesnick) But you had said before,

10   right, that his report was done before the exam

11   occurred, correct?

12       A.   I think that's probably true.

13       Q.   Okay.  So his opinions in his report were

14   formed prior to any of the evidence exams that you

15   attended in this case, isn't that correct?

16           MR. BARTON:  Say that question again, Ben.

17   You broke up at one part.

18           MR. LESNICK:  Yes.

19       Q.   (By Mr. Lesnick) The opinions in his

20   report were formed prior to any of the evidence

21   exams that you attended in this case, correct?

22       A.   The dates or the days, I don't have all

23   those documents in front of me.  My recollection is

24   his report did predate some, if not all, of those

25   examinations at Midwest.

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1      Q.   Did the laboratory exams that you

2   participated in provide you with data that you

3   relied upon in forming your conclusions in this

4   matter?

5      A.   Yes.

6      Q.   With regard to Mr. Dale's investigation,

7   do you know the exact steps he took to come to his

8   conclusions?

9      A.   I do not.

10     Q.   So if I were to say -- if I were to ask

11  you if his investigation conformed with NFPA-921,

12  would you be able to tell me that it did?

13          MR. BARTON:  Objection.  Asked and

14  answered.  Calls for speculation again.

15     A.   I've already answered that question, as

16  you know, you've asked me that already.  I have no

17  idea whether he did or did not.  I don't know what

18  all the steps or methods or processes that he used.

19  I've not had that conversation with him.

20     Q.   (By Mr. Lesnick) Do you know if -- I'm

21  sorry.  Go ahead.

22     A.   I'm done.

23     Q.   Do you know if he interviewed each of the

24  eye witnesses that were deposed in this matter?

25          MR. BARTON:  Object to forms.  Calls for

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    speculation again.  Go ahead.

2        A.   Same answer.  I don't know what all steps

3    he took as part of his investigation.

4        Q.   (By Mr. Lesnick) In your investigation,

5    without relying on those witness statements that

6    were found in the deposition testimony, and let me

7    rephrase this.  For your investigation, without

8    having the deposition testimony at your disposal to

9    review, were you able to determine an area of

10   origin?

11            MR. BARTON:  Objection.  Calls for

12   speculation.  Improper hypothetical and vague.  Go

13   ahead.

14       A.   So the hypothetical you're asking me is

15   to, if I had a different set of data that I had,

16   would my opinions be the same?  And the answer is I

17   haven't done that analysis.  Again I operate by

18   taking the data set that I have available to me.  I

19   try to make that data set as comprehensive as

20   possible, and then evaluate the data.  Now you're

21   asking me a hypothetical, if we exclude some of the

22   data, what my analysis would be and that's an

23   analysis I'm not going to do on the fly, so you'd

24   have to give me a list of here's what -- I would

25   have to have a list, here's what you do know and

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    you don't know and then I would go do that

2    analysis.  That's not something I'm going to sit

3    here and do in a two-minutes conversation or in

4    answer to a question.

5            MR. BARTON:  Hey, Ben, our lunch has

6    arrived, so whenever you come to a natural stopping

7    point, let us know and we'll take a 15 or 20 minute

8    break to have lunch, but please continue until you

9    get to that natural spot.

10           MR. LESNICK:  Yeah, not a problem.

11   Thanks, Jon.

12       Q.   (By Mr. Lesnick) In your area of origin

13   opinions in this matter, was there any physical

14   evidence you relied upon to create that -- to make

15   that opinion?

16       A.   I relied on all the data I collected, so

17   including physical evidence, photograph evidence,

18   witness testimony evidence.  All the data that's

19   listed, I relied on all of that.

20       Q.   Did any of the physical evidence that you

21   relied upon indicate to you a specific area of

22   origin in the building?

23       A.   It provided information that the -- the

24   physical data, physical evidence provided data

25   about the building, about the contents of the

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1  building, that inputted into my analysis.

2     Q.   Did any physical data indicate a specific

3  place in the building where the area of origin was

4  located?

5          MR. BARTON:  Objection.  Vague.  Go ahead.

6     A.   Yeah, I don't know what data point you

7  want me to talk about and what each data point

8  means in and of itself.  That's not the way

9  investigations are done.  You don't take one data

10  point and say, "Okay.  Based on this one data

11  point, what's my opinion?"  You take all the data,

12  and why you would ever ask anybody to formulate an

13  opinion based on part of the data, I have no idea,

14  but you take all of the data.  That's the process.

15  And when you get all the data in front of you, you

16  say what hypotheses should I formulate based on

17  this data and test those hypotheses against the

18  data.  So, I'm not sure what you're asking.

19     Q.   (By Mr. Lesnick) What physical data did

20  you consider in this matter that -- to help you

21  formulate your hypotheses?

22          MR. BARTON:  Object to form.  Vague.

23  Asked and answered.  Go ahead.

24     A.   I considered all of the data that was

25  available to me, so I didn't formulate --

1    Q.   (By Mr. Lesnick) Specifically is what I'm

2   asking you.  I'm asking what specifically.

3    A.   All the data.  You want me to list every

4   item in my report?  Because it's all the data.

5         MR. BARTON:  Asked and answered as to the

6   data Mr. Reagan relied on in forming his opinions

7   in this case.  Go ahead.

8    A.   So my answer --

9    Q.   (By Mr. Lesnick) Yes, please --

10    A.   It's all the data.

11    Q.   -- list -- go ahead and list it out for

12   me.  What's all of the physical data you relied

13   upon?

14    A.   Everything that's contained in my report.

15   Everything that's contained in the documents

16   referenced in my report.

17    Q.   I'm sorry.  Treat me like a toddler here

18   and I don't understand what's in your report, which

19   is why I'm here deposing you to ask you questions

20   about what I'm not understanding.  So tell me what

21   physical data you're talking about that you relied

22   upon to help form your opinion as to where the area

23   of origin was in this fire.

24         MR. BARTON:  Objection.  Vague.  Compound.

25   Asked and answered.  Nobody is treating you like a

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1   toddler, Ben, and it is insulting for you to --

2           MR. LESNICK:  I'm asking him to treat me

3   like --

4           MR. BARTON:  Let me finish speaking and do

5   not speak over me.  No one is treating you like a

6   toddler.  You are asking the same question multiple

7   times.  I don't know why, but that's what you've

8   chosen to with your time here today.  He's already

9   answered you with respect to what he has reviewed

10  in formulating his opinions, not only in

11  formulating his opinions, but in formulating his

12  opinions as to the area of origin as you have asked

13  him.  He has gone through in painstaking detail --

14          MR. LESNICK:  Jon, come on, man.

15          MR. BARTON:  He has pointed out in his

16  report those details and you are asking him again.

17  That is not us treating you like a toddler, as you

18  suggest improperly.  It is us asking your

19  questions.  Mr. Reagan is free to do so once again

20  as it has been asked and answered.  If you

21  understand his question, Mr. Reagan, please answer

22  it.

23          MR. LESNICK:  Jon, you didn't listen to

24  what I said.  Hold on, Jon.  You didn't listen to

25  what I said because I said treat me like a toddler.

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    I didn't say he was treating me like a toddler.

2    Okay?  So I just want to make sure that that's

3    clear for the record.  Nobody's saying anybody was

4    calling anybody a toddler, okay?  I'm asking him to

5    do that and explain to me exactly in his report

6    what -- where it says what physical evidence he

7    relied upon to determine his area of origin.

8    That's what I'm asking.  I don't think I've gotten

9    an answer.

10          MR. BARTON:  Fair enough.  We will treat

11   you like a product liability company who is suing

12   our client for seven million dollars who is taking

13   the deposition of his expert witness, nothing less.

14       A.   I'm going to go to the area of origin

15   section in the report, and if you look on Page 19

16   under the area of origin, area of fire origin

17   methodology, it says that, "Determiners of the area

18   of origin of the fire involves coordination of

19   information derived from one or more of the

20   following.  Witness information and/or electronic

21   data," which is contained in my report.  I looked

22   through all the witness -- available witness

23   information that was in depositions.  Interview

24   notes that were contained in the Midwest file,

25   interview information that was contained in the

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1   fire department report, I looked up all that

2   witness information, and the video, which I'm

3   considering another witness to the fire, the video

4   information.  I looked at fire patterns and the

5   extent to which fire pattern exist and the extent

6   to which fire patterns would be a reliable

7   indicator of where the fire started, and I

8   considered fire dynamics in terms of fire chemistry

9   and physics and what was present in the area of

10  origin that would have contributed to the fire

11  spread in the manner in which it spread.  So those

12  are the types of data that I looked at.

13  Specifically those are the types of data.  If you

14  want something more specific, ask me a more

15  specific question, I can do that.

16      Q.   (By Mr. Lesnick) Is witness information

17  physical data?

18      A.   It's data that's included in your area of

19  origin.

20      Q.   Right.  But I mean, physical data, that's

21  something you can feel and touch, right?  Witness

22  data?

23          MR. BARTON:  Objection.  Vague.

24      A.   I don't know what you're definition of

25  physical data is, but for example, I just indicated

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1   that part of the witness information is a video

2   that was shot by Mr. Tanner and that's part of the

3   witness information, that I would consider that

4   electronic data that gives a good indication of the

5   area of origin of this fire.

6        Q.   (By Mr. Lesnick) Do fire patterns, do the

7   fire patterns in this matter give you any idea of

8   where the fire originated?

9             MR. BARTON:  Objection.  Vague.  Go ahead.

10       A.   I'm not sure what pattern you're referring

11  to, but I don't believe there was any usable fire

12  patterns contained on the physical evidence

13  remaining at the fire scene that would give you a

14  reliable area of origin.  However, the fire

15  patterns that I see in the video certainly tell you

16  a lot about where the fire was and where the fire

17  wasn't.

18       Q.   (By Mr. Lesnick) Fire dynamics, the

19  physics and chemistry of the fire, do you consider

20  that physical data?

21            MR. BARTON:  Objection.  Form.  Misstates

22  his testimony.

23       A.   Again, we looked at a lot of artifacts

24  that were retained from the area of origin of this

25  fire, including dozens of containers of flammable

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    materials, and so those materials that were present

2    in that area of the building certainly would have

3    contributed to the dynamics of the fire spread.

4        Q.   (By Mr. Lesnick) Any other physical data

5    that you can point me to?

6            MR. BARTON:  Objection.  Vague.

7        A.   I can't give you any other answer than

8    what I've already given in terms of a general

9    sense.  If you've got a more specific question, I

10   can certainly try to answer that.

11       Q.

12           MR. LESNICK:  Okay.  You want to take the

13   20-minute break here for your lunch?

14           MR. BARTON:  Yes.  Thank you.

15           VIDEOGRAPHER:  We are off the record at

16   12:27 p.m.

17                   (Recess.)

18           VIDEOGRAPHER:  We are back on the record

19   at 12:53 p.m.

20       Q.   (By Mr. Lesnick) All right.  Mr. Reagan,

21   I'm going to pull back up Exhibit 2 and go to Page

22   11 of your report.  This is a discussion in the

23   Elkhart Police Department's findings in this

24   matter.  There's a statement here that you wrote

25   saying, "The report primarily narrates an arson

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    investigation with reports of occupants in the

2    building intentionally igniting flammable materials

3    starting the fire."  Other than mention of this in

4    the report, did you, during your investigation,

5    find any other data that this fire was the result

6    of an arson?

7        A.    Not any hard data points, no.

8        Q.    Any soft data points?

9        A.    Well, I mean, it's certainly -- it's

10   certainly a consideration when you have layoffs

11   whether or not any of those employees may have been

12   disgruntled because of the layoff.  It's my

13   understanding that one of the employees actually

14   made his way into that particular building to ask

15   why he was being laid off or to complain about

16   being laid off.  That was Tommy McGuffey, and that

17   that particular individual was seen by one witness

18   leaving the building smoking, so you know, is it

19   something that needs to be addressed and evaluated?

20   Certainly.  They stopped their investigation.  They

21   suspended their investigation at the end of the

22   day, so that's as far as it went.

23       Q.    So other than the McGuffey discussion and

24   the report, any other data that would support that

25   there was an arson that caused this fire?

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1      A.   Well again, it's certainly something that

2   needs to be considered because of the nature of the

3   day.  Because of the -- because of the layoffs and

4   whether or not somebody was disgruntled and had an

5   issue with their position being terminated.

6      Q.   So other than the understanding that

7   people were laid off that day, Mr. McGuffey having

8   been in the facility after being laid off, in the

9   police report, any other data that supports that

10  there could have been an arson that caused this

11  fire?

12     A.   In some of the deposition transcripts,

13  there's discussion of another video that -- I think

14  we might have lost you.  We lost something.

15     Q.   Yeah, I don't know what that is.

16     A.   I didn't know.  You're back.  Let me start

17  that answer over, just so we have it all.  There

18  certainly was some deposition testimony and

19  investigation into another video that existed, and

20  it's also mentioned in the police department

21  report, and whether or not that video exists or

22  ever existed or somebody misinterpreted it, again I

23  don't have enough information on it one way or the

24  other, but certainly that other data is out there,

25  that there was potentially another video of folks

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    playing with aerosol cans.

2         Q.   You never saw that video, did you?

3         A.   I have not seen the video.  There's plenty

4    of aerosol cans that are in evidence that were in

5    that corner, but I never saw that video, that's

6    correct.

7         Q.   So other than the deposition testimony

8    about a second video, Mr. McGuffey, people being

9    laid off and the police report, any other data

10   points that support potentially an arson as being

11   the cause of the fire?

12        A.   Not that come to mind.

13        Q.   And you guys saw us having some technical

14   difficulties with my system, which I still have.

15   What the hell just happened?

16             MR. LESNICK:  Can we go off the record for

17   a second?

18             MR. BARTON:  Yes.

19             VIDEOGRAPHER:  We are off the record at

20   12:57 p.m.

21                     (Off the record.)

22             VIDEOGRAPHER:  We are back on the record

23   at 1:09 p.m.

24        Q.   (By Mr. Lesnick) Great.  I'm going to pull

25   up what we were just looking at, which is

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1   Plaintiff's Exhibit 2, and here we go.  All right.

2   We were on discussing the Elkhart Police Department

3   report.  I think we've finished those questions.

4   Let me go to Page 12 here of your report.  Mr.

5   Reagan, are you seeing Page 12 of your report on

6   the screen?

7       A.   I am, yes.

8       Q.   Okay.  What is the heading witness

9   information for?

10      A.   Well, it's just, that's off the -- starts

11  off the section about the witness statements and

12  depositions, so it's a section heading for that

13  section.

14      Q.   All right.  Paragraph 6 here, you discuss

15  Derek Null's testimony, correct?

16      A.   Correct.

17      Q.   I guess here this section underneath

18  witness information, this is regarding the location

19  of the fire first observed.  That means where these

20  witnesses saw the fire, is that what that means?

21      A.   Generally, yes.

22      Q.   Okay.  You have a -- Derek Null, you have

23  a statement here, "He was not certain whether or

24  not there was fire inside of the tool crib."  I

25  want to bring up what we're going to mark as

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    Exhibit 14.

2            (Plaintiff's Exhibit 14 marked for

3                    identification.)

4            MR. LESNICK:  Are you guys there?  Can you

5    hear me?

6            MR. BARTON:  Yes.

7            THE WITNESS:  Yes.

8            MR. LESNICK:  Okay.  I just wanted to make

9    sure.

10       Q.   (By Mr. Lesnick) I imagine I'm still

11   sharing my screen window.  Why can't I get out of

12   this now?  Let me disconnect this.  I'm trying to

13   pull up what I want to pull up.  I continue to have

14   difficulties.  All right.  Okay.  I'm going to pull

15   up what we'll mark as Exhibit 14.  Let me know when

16   you see that on your screen.

17       A.   Okay.  I see an excerpt from a deposition.

18       Q.   Okay.  This is an excerpt from Derek

19   Null's deposition from August 3rd, 2022.  I want

20   you to read this page and the next page, which are

21   Pages 46 and 47 from his deposition, and tell me

22   when you've read it.

23       A.   Can you make it just a skosh bigger?

24       Q.   Yes.  If you want me to scroll down, just

25   tell me to scroll down.

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    A.    Okay.  Scroll down.  I've gone through

2  Line 15.  Okay.

3    Q.    I'm sorry.

4    A.    Okay.  Let's see here.  Hold on there.

5  Hold there.  Okay.  I'm through 15.  Okay.  I'm

6  through 25.

7    Q.    Okay.  So on Page 46 here at the bottom,

8  it says, "So actually inside the tool crib?"  He

9  said, "There was definitely fire inside there,

10  yeah.  I don't know if it was just running over

11  from the left side or if it was already in there."

12  To me that seems like he's saying there's fire

13  inside the tool crib, is he not?

14        MR. BARTON:  Object to form.  The

15  testimony speaks for itself.  Go ahead.

16    A.    And so you're taking one excerpt out of it

17  and not the totality of what he said.  There's

18  another section in his testimony where he says,

19  "You know, I'm not really sure about inside, but

20  I'm sure it was outside," and it was outside from,

21  like, from the door to the tool crib over to the,

22  what he calls the 14-inch door, I think he really

23  means the 14-foot door, the overhead door, so later

24  on he clarifies that further.

25    Q.    (By Mr. Lesnick) So he was asked a

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1   question once.  He said he was definitely -- it was

2   definitely inside there.  He's asked the question

3   again and he's not as sure.  That's what you're

4   saying?

5           MR. BARTON:  Object to form.  You

6   misstated the testimony of Mr. Null.  It's been

7   asked and answered to the second part of your

8   compound question.  Go ahead.

9       A.   Again I took the totality of his testimony

10  and summarized it here where he is not certain

11  whether or not there was fire inside the tool crib.

12      Q.   And you ignored this sentence here, right?

13  This response where he says it was definitely

14  inside there, and you're using some other

15  testimony?

16          MR. BARTON:  Objection.  Argumentative.

17  Asked and answered.  Misstates Derek Null's

18  testimony, specifically the "I don't know" part of

19  the sentence that you're choosing not to read, as

20  well as the totality of his testimony.  Go ahead.

21      A.   Again I didn't ignore anything.  I

22  reviewed the entire transcript and put in my report

23  some excerpts from it where he's just not certain

24  whether or not the fire was inside the tool crib,

25  so you are correct that my report does not contain

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    all the pages from his transcript because it would

2    be ridiculous to do that, but I put in here the

3    high points from each of these particular witnesses

4    that first observed the fire.

5        Q.    (By Mr. Lesnick) This wasn't considered a

6    high point for you, correct?

7            MR. BARTON:  Object to form.

8    Argumentative.  Misstates the witness' testimony,

9    the report and the document.  Go ahead.

10       A.    Again I looked at the totality of his

11   statements, the witness statement that's contained

12   in this transcript, and the totality of what he's

13   saying is, "You know, I'm really not sure whether

14   it was in the crib or not, but I'm sure -- I'm sure

15   it was outside the crib."

16       Q.    (By Mr. Lesnick) If I go to Page -- let's

17   see here, 13 of your report, there's a heading

18   that's titled, and I'll share it back up on the

19   screen.  There's a heading entitled appearance and

20   features of the first fire observed, is that

21   telling us -- is this section supposed to tell us

22   how the fire looked in layman's terms?

23       A.    It's what they had to say about it.  What

24   they had to say about the appearance of the fire

25   and the features of it.  How big was it.  Where was

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    it.  Specifically, besides in a physical location

2    of the building, where was it relative to the

3    contents, what did it look like.  How big was it.

4        Q.   Under Mr. Shaffer here, this last sentence

5    says, "The canisters just kept blowing up like

6    popcorn as he left.  Let me pull up Mr. Shaffer's

7    testimony section of that.  We're going to mark it

8    as Exhibit 15.

9             (Plaintiff's Exhibit 15 marked for

10                    identification.)

11       Q.   This is Pages 29 through 32 of Mr.

12   Shaffer's testimony.  I would like you to read

13   these four pages when you get a chance.  Let me

14   zoom out for you.  It runs from left to right along

15   the top and bottom.  Can you just tell me when you

16   want me to move it.

17       A.   Okay.  Hold on.  If you could scroll down

18   a little bit so I can get the first part -- the

19   last part of 29.  Okay.  Back up to the top of 30.

20   All right.  The bottom of 30.  Okay.  31, please.

21   Bottom of 31.  Okay.  Top of 32.  Okay.  Bottom of

22   32.  Okay.  What's the question?  Because I may

23   need to reread this based on whatever question

24   you're asking about it.

25       Q.   Sure.  Page 30 here discusses about what

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    Mr. Shaffer -- what boxes were outside of the tool

2    crib that he saw on fire and he says the brake

3    cleaner, the spray glue.  I think spray paint even,

4    okay.  Did he testify that those items were, you

5    know, further on here, were supposed to be stored

6    inside fire cabinets?

7        A.   I don't remember his entire testimony.

8    I'm sure I read it, but I don't remember everything

9    about his testimony.

10       Q.   Items that are supposed to be stored

11   inside fire cabinets, what's the purpose of a fire

12   cabinet?

13       A.   The purpose of them is to isolate them

14   from potentially viscous sources is one purpose of

15   them.

16       Q.   Is that because they're --

17       A.   It's also to contain whatever those items

18   are, so it's to separate them from heat sources so

19   they're in protective cabinets and they're pretty

20   heavy wall cabinets and they have lockable doors.

21       Q.   In essence, those items are flammable,

22   correct?

23       A.   Yes.

24       Q.   Okay.  And canisters filled with flammable

25   solvent, can they explode in a fire?

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1      A.    Certainly.

2      Q.    Solvents within those canisters, can they

3  expel flames when that occurs?

4      A.    It depends on what the contents of the

5  canister are, but certainly I've seen -- I've seen

6  canisters of -- that have material in them that

7  would create a flame jet.

8      Q.    Okay.  Mr. Shaffer testified that a

9  canister exploded and he could feel the concussion,

10  correct?

11      A.    Yes.

12      Q.    Okay.  Isn't it true that canisters filled

13  with flammable solvents when they expel that flame

14  jet you were talking about, they can spread fire to

15  other locations when they explode, correct?

16          MR. BARTON:  Objection.  Vague.  Go ahead.

17      A.    It depends, again on the contents, how

18  full they are and whether or not -- they may even

19  become projectiles and we saw that in some of the

20  video where some of those -- some of those aerosol

21  containers are actually flying across the -- across

22  the plant floor as is shown in that video.  That

23  video being the video taken by Mr. Tanner.

24      Q.    (By Mr. Lesnick) Okay.  So you would just

25  say it's possible for them to spread fire, is what

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1   your answer is, right?  I'm not saying it happened

2   here, but it's possible?

3          MR. BARTON:  Object to the extent it

4   misstates his testimony.  Go ahead.

5      A.    It depends again what the contents of the

6   canisters are, but it is possible they contributed

7   to the fire in that area and spread beyond that

8   area.

9      Q.    (By Mr. Lesnick) You also discuss Mr.

10  Zimmer's testimony on Page 13 here.  You read Mr.

11  Zimmer's deposition testimony?

12     A.    I did.

13     Q.    And all these witnesses.  Larry Shaffer,

14  David Whisler, Brandon Tanner, Adam Zimmer, Gary

15  Horton, Derek Null, each of those witnesses, you

16  read their deposition testimony, correct?

17     A.    I did.

18     Q.    On the day of the fire, do you know if Mr.

19  Zimmer walked to the prototype area from the front

20  of the building before the fire?

21          MR. BARTON:  Object to form.  Go ahead.

22     A.    Well, I mean, he testified that he was

23  near the prototype area.  I'm going to stick to the

24  assumption there, I'm going to assume he walked

25  there, that he didn't go by car or golf cart or

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1   some other means, but yeah, he probably walked to

2   that area.

3        Q.   (By Mr. Lesnick) Yeah, I think he

4   testified that he did.  And didn't he testify that

5   that walk occurred about 15 to 20 minutes before

6   the fire?

7        A.   You're asking me to remember everything in

8   every deposition, I don't recall that, exactly what

9   time it was, but...

10       Q.   Did you note in your report anywhere how

11  long it was before the fire that Mr. Zimmer walked

12  to the prototype area?

13       A.   No, but he and -- you know, it's my

14  understanding he and Mr. Whisler were originally in

15  the office area and both ended up at the prototype

16  unit, so that's information --

17       Q.   Did --

18       A.   -- that's information I have available to

19  me.

20       Q.   Did Mr. Zimmer testify that he -- that

21  there was anything memorable about the tool crib on

22  his walk from the office area to the prototype area

23  before the fire?

24       A.   No, I don't believe he did.

25       Q.   Did he testify that he smelled smoke

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    before the fire?

2         A.   One of the witnesses did.  I would have to

3    go through the report testimony, but there was a

4    witness that thought they might have smelled

5    something.

6         Q.   Okay.  Did Mr. Zimmer?

7         A.   Again I don't remember the details of all

8    of these depositions.

9         Q.   If he had, would you have found that to be

10   an important data point in your assessment of this

11   case?

12             MR. BARTON:  Object to form.  Vague.

13        A.   It depends.  I would have to see the

14   context of it.

15        Q.   (By Mr. Lesnick) Okay.  Did he testify he

16   saw smoke at any point, Mr. Zimmer, before the

17   fire?

18        A.   Again, I don't remember everything that

19   Mr. Zimmer said.  I brought forward some summary of

20   what he saw and what he -- and what he observed

21   about the fire.  When he first saw smoke --

22        Q.   He testified that he didn't smell -- go

23   ahead.

24        A.   Go ahead.  You've got another question

25   coming, let's hear it.

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    Q.   He testified that there was nothing

2    memorable about the tool crib when he walked past

3    it 15 to 20 minutes before the fire, that he didn't

4    smell smoke and he didn't see any smoke.  Did you

5    take that testimony into consideration when you

6    formed your opinions in this matter?

7              MR. BARTON:  Object to the extent it

8    misstates the testimony of Mr. Zimmer.

9    A.   I took all the testimony into

10   consideration and the path by which he arrived from

11   Point A to Point B, both he and Mr. Whisler, David

12   Whisler, the plant manager.  That was laid out also

13   in those depositions, so he didn't walk by it.  He

14   walked -- he walked through an area of the plant

15   that was parallel to it, but again, that's some 50

16   feet away.

17   Q.   That was the same path Mr. Zimmer took to

18   get to the prototype section during his walk before

19   the fire.  That's the same location where he saw

20   the fire when he first viewed it, didn't he?

21   A.   That sounds correct, but without looking

22   at all the testimony again, again it sounds

23   correct.  I don't dispute that that's probably

24   true.

25   Q.   So I just want to know why where he walked

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    on his way before the fire, the distance, makes a

2    difference versus where he was when he first saw

3    the fire?

4        A.    I don't understand your question.

5            MR. BARTON:  I'm going to say it was

6    argumentative and vague.  Go ahead.

7        Q.   (By Mr. Lesnick) You're saying you

8    wouldn't expect him to notice -- you said you

9    wouldn't expect him to notice anything about the

10   tool crib based on the distance he was from the

11   tool crib when he walked past it to get to the

12   prototype section?

13           MR. BARTON:  Object to form.  Misstates

14   the witness' testimony.

15       A.    No, I did not say that.  What I said was

16   he was some 50 -- 40, 50 feet away from the tool

17   crib on that path back to the prototype area, both

18   him and Mr. Whisler.  There's a distance, it's

19   misleading to say he walked past the tool crib.  He

20   said he walked through the plant parallel to the

21   tool crib, again it's 50 feet away.  That pathway

22   is 50 feet away from the far edge of the tool crib.

23   There's another 20 feet to the back edge of the

24   tool crib.

25       Q.    Do you know if there were any obstructions

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1   between him and the tool crib when he walked that

2   path that we're discussing?

3          MR. BARTON:  Objection.  Vague.  Calls for

4   speculation.  Go ahead.

5      A.   We can see in the video that there are

6   some obstructions, yes.

7      Q.   (By Mr. Lesnick) What obstructions?

8      A.   Well, there's ladders.  There's carts.

9   There's a, what I'll call like a large bin.  I

10  don't know if that's a scrap bin or a parts bin.

11  I'm not sure what they use it for in this plant.

12  And it's also a build-out area.  It's also a

13  build-out area for the slide ins and slide outs,

14  slide ins, slide outs, what they use for the RV

15  industry.

16     Q.   We were talking about Mr. Whisler.  Mr.

17  Whisler walked on a similar path as Mr. Zimmer

18  prior to the fire, correct, to get to the prototype

19  location?

20     A.   Similar in that they were both in the

21  office and both at the prototype area, that's

22  correct.

23     Q.   Do you remember if Mr. Whisler smelled any

24  smoke before the fire occurred?

25         MR. BARTON:  Asked and answered.

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1      A.   Mr. Whisler, I don't believe had observed

2   or saw anything until he was alerted to the fire on

3   his way back towards the office area.

4      Q.   (By Mr. Lesnick) I'm going to go back to

5   Exhibit 2.  I'm going to go to Page 14 and scroll

6   this way, at the paragraph here that starts Hackett

7   4133, you say in the last sentence, "This data

8   contradicted the testimony of Larry Shaffer when he

9   testified that his initial observation was fire on

10  top of cardboard boxes stacked outside of the tool

11  crib south of the tool crib door."  Why did you put

12  that contradiction in here?  What's the purpose of

13  that?

14      A.   Let me read the paragraph first.  I have a

15  copy on the table here, so let me look at the hard

16  copy.  It's the same thing you have on the screen.

17  I'm comparing what is in the Hackett notes versus

18  what Mr. Whisler conveyed, so it's a contradiction.

19  What do you want to know about it?  Why am I

20  pointing out a contradiction?  Because there's a

21  contradiction in the information, so part of the

22  analysis process, any time that you -- first of

23  all, you collect all the data, right?  And then you

24  have to rationalize that data and if there's any

25  contradiction in the data, you have to rationalize

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

 1  those contradictions to the extent you can, and so

 2  I am discussing that in my report, that there's a

 3  contradiction.

 4      Q.   Later on in your report, I think you

 5  discuss that Mr. Shaffer is the only one that sees

 6  fire in this location as compared to the other

 7  witnesses, correct?

 8      A.   Well, Mr. Shaffer is the only one that

 9  says there is.  There's a contradiction there also,

10  yeah, and again, you have to rationalize those

11  contradictions in your analysis, and so you don't

12  accept them at face value.  You have to rationalize

13  them and say what makes sense based on all the

14  data, and so when you look at all the data, Mr.

15  Shaffer seeing fire south of the door on top of

16  boxes near the tool crib room door does not make

17  any sense because, first of all, there wasn't --

18  there's no evidence of any stored materials south

19  of the tool crib door, and also when you look at

20  the video, the fire appears to be more towards the

21  right of the tool crib door than it is to the left

22  of the tool crib door.  And you can see to the left

23  of the tool crib door, you can see this eight-foot

24  bench that was laid out in that area that had a

25  grinder and a light fixture above it, so there

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1   really is no place for boxes to be stacked, so

2   there's a contradiction in where he believes -- he

3   says he sees fire on those boxes, on top of those

4   boxes, but there's a contradiction about whether

5   they're on the north or south side of that door.

6       Q.   Was he the first person to see the fire in

7   this matter?

8       A.   Was who?

9       Q.   Mr. Shaffer.

10      A.   I believe Larry Shaffer saw it at the

11  smallest stage, that's correct.

12      Q.   He was the first eyewitness to the fire,

13  correct?

14          MR. BARTON:  Object to form.  Misstates

15  his testimony.

16      A.   What I said was he was the one that

17  describes the fire in its smallest stage.

18      Q.   (By Mr. Lesnick) Do you know if there's

19  any other witnesses in this case that saw the fire

20  before Mr. Shaffer?

21      A.   I'm not aware of any other witnesses that

22  see it at a smaller stage of fire.  Mr. Shaffer was

23  the first one to leave the prototype area.

24      Q.   Do you believe there are witnesses that

25  saw the fire -- do you have evidence that there's

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    witnesses that saw the fire before Mr. Shaffer?

2            MR. BARTON:  Object to the extent it calls

3    for speculation.  Go ahead.

4        A.    So we already talked about the fact that

5    there was an ongoing investigation regarding arson,

6    so certainly if there was an arson, some act that

7    caused this fire to occur, then those people that

8    were involved in that matter would have been the

9    first ones to see it occur.

10       Q.    (By Mr. Lesnick) Is there any evidence --

11   other than that evidence, besides that, is there

12   any other evidence that there was somebody else who

13   saw -- who actually saw the fire before Mr.

14   Shaffer?

15       A.    Of the six employees that were in the

16   plant area, you know, excluding the two individuals

17   that were in the office area and never left the

18   office area, but of the six employees, I believe

19   Mr. Shaffer was probably the first to see it, of

20   the six witnesses that were in the plant at the

21   time this fire was discovered.

22       Q.    And when he saw the fire, he said the fire

23   was about a foot tall and one to two feet wide on

24   top of cardboard boxes, correct?

25       A.    That's -- one foot tall and one to two

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

 1  feet wide.  A pretty small fire.

 2      Q.   I'm going to pull up what we're going to

 3  mark as exhibit -- I'm sorry.  What was previously

 4  marked as Exhibit 4-H. Have you seen this exhibit

 5  before?

 6      A.   Yes, I have.

 7      Q.   Okay.  Do you know what this exhibit is?

 8      A.   Without comparing it in my entire file, it

 9  certainly looks like the exhibit that was attached

10  to Mr. Shaffer's testimony, so it's a depiction of

11  where he -- where he originally was and where he --

12  his exit path out of the building and where he saw

13  different features as he's exiting.

14      Q.   And this purple X above the parts shipping

15  area, let me zoom in on it so there's no

16  misunderstanding which purple X I'm talking about.

17  So the parts shipping area, that's where he

18  testified he was when he first saw the fire in this

19  matter, right?

20      A.   No.  No.

21      Q.   Okay.

22      A.   As he's coming around the corner, he sees

23  a glow on the ceiling which he assumed at that

24  point in time was the tool crib, the tool crib

25  manager.  The maintenance guy, Lanny Kistler.  He

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    assumed it was him over there welding, that's what

2    was causing the glow on the ceiling of the

3    building, so that's the first place that he had

4    indication that there was something going on.  As

5    he rounded the corner --

6        Q.   But the first place that he had -- I asked

7    the first place where he saw fire was at this

8    purple X that we're looking at above the parts

9    shipping area, correct?

10       A.   Well, no, I believe he saw a glow on the

11   ceiling, is what he refers to in his testimony.  He

12   saw a glow on the ceiling, which he assumed was

13   Lanny Kistler welding in the parts shipping area,

14   and as he rounds the corner around the southeast

15   corner of the tool crib, he discovers that there

16   is, in fact, a fire on top of the boxes.

17       Q.   So the first time that he discovers the

18   fact that there's a fire on top of the boxes,

19   that's where the X is located, right here, correct?

20       A.   That's my understanding, yes.

21       Q.   Okay.  Do you know how far away -- let me

22   ask this.  This red square, this is where he

23   testified that he saw the fire, correct?

24       A.   I don't remember that detail of it.  I

25   would have to go back and look through his

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    testimony, but it certainly could be.  He said

2    south of the tool crib door, and I believe the

3    green -- the green square is the tool crib door, so

4    it makes sense.

5        Q.   I'll represent --

6        A.   It makes sense that the red square would

7    be that.

8        Q.   It makes sense because that's what he

9    testified to.  Do you know what the distance is

10   between the purple X and the red square is?

11           MR. BARTON:  Objection to the

12   argumentative statement at the beginning of the

13   question, and the compound nature.  Go ahead.

14       A.   Precisely, no.  About, yeah, it's probably

15   five or six feet.

16       Q.   (By Mr. Lesnick) It was about five or six

17   feet when he first discovered that there was

18   actually a fire on top of boxes in that location;

19   correct?

20       A.   Boxes that don't appear to have been there

21   because there's no stored materials that were ever

22   indicated to be there.  Additionally, when you

23   compare the information to what is shown in the

24   video, there is no fire in that corner of the tool

25   crib, either inside or outside.  All the fire is

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1   coming from the other side of the tool crib door.

2        Q.   Was any witness, eyewitness whose

3   testimony was taken in this case or that you

4   reviewed, did any other witness testify that they

5   were closer to observing the fire than Mr. Shaffer?

6        A.   Of the six witnesses that were inside the

7   plant at the time of the fire's discovery, I

8   believe Mr. Shaffer testified that he was probably

9   the closest to that area.

10       Q.   Was it probably the closest or that he was

11   the closest?  I just want to clarify for the

12   record.

13       A.   I think they're the same.  He probably was

14   the closest of those.

15       Q.   Is there a doubt that he wasn't?

16       A.   Again, based on his testimony, he probably

17   was the closest.

18       Q.   Page 15 of your report, you discuss a

19   section called video information, and there's a

20   discussion about a video contained in Hackett

21   000830.  How many videos have you viewed of this

22   fire from inside of the building?

23       A.   I viewed two versions of the same video.

24   I had a low resolution version that I got at one

25   point in time, and then I believe the video in the

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    Hackett file was actually a higher resolution

2    version, and by higher resolution, I mean, it had

3    more frames per second.

4        Q.    Down towards the bottom of the second --

5        A.    Let me rephrase that.  There's -- well,

6    there's a small ten second video from the fire

7    department, but that's external to the -- that's

8    external to the building.  I thought you were

9    talking about the one internal to the building.  So

10   I have two versions of the one internal to the

11   building and then we had that short ten second

12   video that was obtained from the fire department.

13       Q.    That's fair.  My question was about

14   internal video, though, but I appreciate you

15   elaborating on that.

16       A.    Okay.

17       Q.    In the second paragraph here, southwest

18   corner of the tool crib was not burning during most

19   of the video.  And you've talked about this a

20   little bit, but what do you mean by most of the

21   video?

22       A.    Sure.  At one point in time during the

23   course of the video, and I address that, I address

24   that in figure 9.  So video frame 469 is included

25   in figure 9, so the 469th frame of that video, and

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    so it's 15.6 seconds from the start of the

2    recording, so 15 seconds in, we can see a flame jet

3    near that southwest corner of the tool room.

4        Q.   You know, I noticed in your photographs

5    you have on Pages 16, 17, 18, that's figures 7, 8,

6    9, you have this blue wall that's put up, correct?

7        A.   It's not put up.  It's marking,

8    delineating the area of the exterior of the tool

9    crib, and in front of that -- in front of that is

10   the ladder and, for example, I'm looking at figure

11   7 on Page 16, in front of that is the ladder that

12   you can clearly see in the video, which I've

13   outlined there.  There's a bin that's on the

14   right-hand side that's blocking a portion of that

15   corner that's formed by the tool crib and the north

16   wall, and you can see there's an outline of a cart

17   and then there's the outline of that eight-foot

18   table there.  So all those items are highlighted

19   from the original video image on the left.

20       Q.   Is there a reason why in all of these --

21   well, let me ask -- yeah.  Is there a reason why

22   you didn't put the tool crib door on any of these

23   photographs?

24       A.   It's not clearly visible on the video.

25       Q.   So it could be to the right of where

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1  you're seeing flames in the video or to the left?

2  You're just not sure?

3       A.   No, that's not true because we know where

4  the video -- we know the lay of the land there.

5  We've got sketches that show that eight-foot table,

6  that eight-foot steel table, and we know that the

7  tool crib door is to the north of that.

8       Q.   When I'm looking at figure 7, I mean,

9  let's try to figure this out.  I'm trying to orient

10  myself to your discussion.  Figure 7, I see a cart

11  in the middle of the screen, correct?  And then to

12  the left of that, there's, like, a thin line.  I'm

13  assuming that's supposed to be the workbench,

14  correct?

15       A.   That is the workbench, yes.

16       Q.   That's what that's supposed to annotate,

17  the workbench, correct?

18       A.   Not supposed to --

19       Q.   The location of that?

20       A.   It does annotate the eight-foot workbench

21  that's there.

22       Q.   Okay.  And you're saying how far away from

23  the workbench is the tool crib door supposed to be?

24       A.   I just said north of it.  It's about --

25       Q.   So --

1      A.   So the whole tool crib is 20 feet, right?

2   So we can see that near that -- near that southeast

3   corner on the exterior side, there's an eight-foot

4   table, right?  So that leaves an additional 12

5   feet.  We know the tool crib door dimensions.  I

6   don't have them in front of me, so let's just say

7   for talking purposes that's three feet.  Now, we're

8   at 11 feet.  So that leaves an additional nine feet

9   on the other side of the door, so that door is

10  roughly centered so it would be roughly behind --

11  behind that four-wheeled cart that you see there.

12     Q.   Is that drawing of the workbench, is that

13  to scale?

14     A.   It's an outline of the image that we see

15  in the video on the left, the frame on the left.

16     Q.   Okay.  So what I'm trying to get at, I'm

17  trying to figure out, that is the exact distance of

18  the workbench along the north -- the east wall of

19  the tool crib?

20     A.   It is an outline of what I can see in the

21  video frame which is -- which happens to be the

22  outline of that eight-foot bench that's there.

23     Q.   So then it is to scale is the answer,

24  right?

25          MR. BARTON:  Object to form.  Misstates

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1   his testimony.

2       A.   Again we're looking at an angle.  I don't

3   know what you mean by to scale.  There's no scale

4   on here.  There's no scale bar that would indicate

5   a scale, you know, for example, an eighth inch

6   equals one foot.  There's no scale bar here, so to

7   say that I've drawn that to be exactly eight feet,

8   I've drawn the outline of what I see in the video

9   frame image, which is the raw image, which is the

10  raw image that's shown on the left, and I've

11  outlined that and included that in the right.

12      Q.   (By Mr. Lesnick) On your left image here,

13  when I look under where you've outlined as a

14  workbench, do you see fire underneath the workbench

15  in that screenshot?

16      A.   On the right edge of it, I do.

17      Q.   Okay.  And then, like we said, you haven't

18  shown where the door is on this, right?  We have an

19  approximation, I think you said it's approximately

20  behind the cart that you drew into the right

21  photograph, correct?

22          MR. BARTON:  Asked and answered and

23  compound.  Go ahead.

24      A.   Again, the cart, I didn't draw in.  I'm

25  outlining what is shown in the left video frame, so

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    I'm not adding anything to this image other than

2    outlining what's there, and so we know that the

3    door is to the right of that eight-foot table.

4        Q.   (By Mr. Lesnick) Is there fire located on

5    the walls behind where that cart is located?  Can

6    you tell?

7        A.   There is fire behind that cart, yes.  On

8    the walls, I wouldn't agree with that, but there is

9    fire behind there.

10       Q.   Do you know where that fire is?

11       A.   Yes, it's behind the cart.

12       Q.   Do you know what is on fire there?

13       A.   Well, you have -- now you're talking about

14   one clip, one frame.  Remember, we're at frame --

15   this is video frame 159, so if you look at every

16   frame and watch the progression of the fire, you

17   can tell that there's a fire coming from the right

18   to the left, and you can tell that it is -- it's

19   ventilation affected and it's lapping up over the

20   top of the -- over the top of the tool crib, and so

21   it's lapping up the wall and over the top of the

22   tool crib, so what is burning?

23       Q.   I guess my question is; do you know what

24   is burning?  Yeah, that was my question, right.

25       A.   What is burning?  We know that there are

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    stored boxes of materials there and some of those

2    materials were still present during the dig-out of

3    the fire scene, you know, for example, we had

4    evidence of brake cleaner containers that were in

5    that area.  We had evidence of other aerosol

6    containers that were in that area.  We had evidence

7    of rolls of tape.  Those were items that were

8    testified that was there and stored in that corner

9    in cardboard boxes.

10        Q.   I'm trying to clarify what area we're

11   talking about because I'm talking about the area

12   behind the cart.  I'm asking what is burning in

13   this frame in the area behind the cart that you see

14   in this frame you've chosen for your report.

15             MR. BARTON:  Objection.  Asked and

16   answered.  Go ahead.

17        A.   Well, there's -- all of what is burning,

18   we've covered some of the contents that are in that

19   area.  We've got boxes, cardboard boxes of tape,

20   aerosol containers with spray paint, brake cleaner,

21   I believe it's brake cleaner that are in some of

22   the cans.  We've got a rubber floor mat, I think,

23   that's in front of that door, so any or all of

24   those items are involved in the fire at that point.

25   Probably some of those are from the glue and

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1  adhesives, those large five-gallon containers of

2  adhesives are involved because you can tell when

3  you watch the video from start to finish and go

4  through the hundreds of frames that we had created,

5  you can tell that there is multiple flare-up events

6  and each of those flare-up events is another fuel

7  package that's being added to the fire.

8      Q.   (By Mr. Lesnick) So everything you just

9  said you're saying is potentially stored behind

10  this, and I'm just wanting to make sure I'm on the

11  same page.  I'm talking about the space between the

12  east wall and the cart, okay?  I'm not talking

13  about the northeast corner of the tool crib where

14  the north wall is.  I'm talking about when you're

15  looking at this photograph, what you see behind the

16  cart.  We discussed something appears to be on

17  fire.  You're saying we know that there were items

18  stored in that location that are flammable, that's

19  what you're testifying to?

20          MR. BARTON:  Objection.  Vague.  Compound.

21  Asked and answered in parts of the question.  Go

22  ahead.

23      A.   Again, we know what's stored in that

24  northwest corner that's formed by the tool crib

25  wall, the east tool crib wall and the north wall of

USDC IN/ND case 3:21-cv-00252-DRL    document 86-4    filed 12/13/23    page 178 of 301
John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    the plant, we know what is stored there.  And what

2    the fire that you're seeing, I'm not saying that

3    those boxes are stored in front of the tool crib

4    door.  The only thing in front of the tool crib

5    door that could be contributing directly that was

6    there before the fire would be the rubber floor mat

7    that was existing that one of the witnesses

8    testified was sitting there, but as the fire is

9    progressing -- now, keep in mind, Mr. Tanner

10   testified that this video was taken several minutes

11   after discovery of the fire, so everybody else is

12   hauling it out the doors of the plant, but he and

13   Mr. Null decided to stay back and watch this fire a

14   little longer, and so this video that he took

15   wasn't at the discovery of the fire.  This video he

16   took was several minutes later.  He says five to

17   10, okay, so three or four, five, six, who knows

18   exactly how many it was because people's perception

19   of fire can be, during that exciting time can be

20   off a little bit, but he says 5 to 10 minutes, so

21   it's probably somewhere in that range after

22   discovery of the fire.  So we've got a fire that's

23   in a significantly advanced state that started on

24   top of some cardboard boxes, and those cardboard

25   boxes contain flammable materials, and like I said,

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1   you can see from the video that we've got several

2   flare-up events, each of those flare-up events that

3   occur in that video is another fuel package that's

4   being introduced to the fire.

5       Q.   (By Mr. Lesnick) I guess my question was,

6   because I'm not sure in any sense you answered what

7   I was asking.  Do you know what's between the east

8   wall of the tool crib in this photograph in that

9   cart that's burning in this picture frame that

10  you've chosen?

11          MR. BARTON:  Object to form.  Asked and

12  answered.  Argumentative.  Compound.  Go ahead.

13      A.   I did just answer that question very

14  clearly.

15      Q.   (By Mr. Lesnick) Was it a yes, do you

16  know?  I mean, I'm asking in a yes or no form.  Is

17  it a yes or is it a no?

18          MR. BARTON:  Object to form.  Misstates

19  your question.

20      A.   You asked me what was burning not --

21      Q.   (By Mr. Lesnick) No, I asked you if you

22  know -- I asked you if you know what is burning

23  between the cart and the photograph and the still

24  frame you chose and the east wall of the tool crib

25  directly behind it.  Do you know what is burning in

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    that figure that we're looking at?

2            MR. BARTON:  Asked and answered.  Go

3    ahead.

4        A.   We know what fuel load packages were

5    present in that area.

6        Q.   (By Mr. Lesnick) Okay.  Fair enough.  Fair

7    enough.  The fuel load packages that we've

8    discussed were present in that area, correct?

9        A.   Not directly in front of the tool crib

10   door, but to the north of the tool crib door.

11       Q.   How would they have gotten from that area

12   north of the tool crib door to where we see in this

13   photograph here which is south of the tool crib

14   door?

15           MR. BARTON:  Object to form.  Misstates

16   the evidence.  Go ahead.

17       A.   We've got five-gallon pods of glue that

18   are on fire and exploding.  We've got aerosol cans

19   that are on fire and exploding.  We've got brake

20   cleaner that's stored in that area, that is full

21   containers of -- this is stuff that's not used yet,

22   so this is stored materials that they're going to

23   use, and so all that's going to add fuel and cause

24   the fire to spread.  Some of those are liquids.

25   Some of them are aerosols, and that's going to add

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    to that fuel load in that corner and that's what's

2    creating the flames that we see in that corner.

3    The only thing --

4         Q.    (By Mr. Lesnick) And --

5         A.    -- the only thing that's sitting in front

6    of that door, that we know of, before the fire is

7    a -- that we know of a rubber floor mat that's

8    there.  There's also a container of rags.  We don't

9    know where that container was, but we know there

10   was a container of rags somewhere just outside the

11   tool crib area.

12        Q.    I'm going to pull up the video that we've

13   been discussing that was previously marked as

14   Exhibit 20.  I'm going to have you watch it quickly

15   here.  Give me a second and I will share my screen.

16   Are you seeing the video I pulled up?

17        A.    I see a still image.

18        Q.    Okay.  I will start it in a second.  I

19   just wanted to make sure you're seeing what I'm

20   seeing.  There's no audio on this, I don't believe.

21   This was previously marked as Exhibit 20.  I'm

22   going to play this real quickly and I'm going to

23   try to stop it at the 15-second mark.  So right

24   about here, right, is where your photos -- it's

25   probably not exactly the same.  I mean, I don't

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    have it down to the millisecond, but this says 15

2    seconds on the video, so it's right about here

3    you're discussing?

4        A.    Discussing where?

5        Q.    Page -- Figures 7, 8 and 9, right?

6        A.    No, no, only.

7        Q.    Or just 9.  Just 9, okay.

8        A.    Right.  So approximately -- what you show

9    on the screen now approximately replicates what is

10   contained in figure 9, and I'm not sure if what

11   you're showing me is the -- is the higher

12   resolution version of this or the lower resolution.

13   I'm not sure as I sit here.  It would take some

14   analysis to look at the actual file, but keep in

15   mind that there is a version that has about four

16   times the number of frames per second.  I'm not

17   sure which version you have.

18       Q.    That's fair.  You say in your report that

19   at approximately 15 seconds past the start of the

20   video, a flame jet was visible near the exterior of

21   the southwest corner of the tool crib.  What do you

22   mean by flame jet?

23       A.    I'm talking about a canister of some

24   material that is venting and is on fire.

25       Q.    Got it, okay.  What causes a flame jet?

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1      A.   Well, you can -- I mean, using the term

2   loosely, there's a lot of things that cause a flame

3   jet, but using it relative to a pressurized

4   container is when the flammable material in the

5   container vents and is ignited --

6      Q.   Is it --

7      A.   -- and it's no different than -- I don't

8   know if you've ever seen a kid take a lighter and

9   ignite some propellant, for whatever reason.  I've

10  seen -- I've seen that happen in videos before, so

11  you can certainly -- it's a pressurized release in

12  the presence of a flame that causes the material

13  that's leaving the canister to ignite.

14     Q.   When a canister like this, like we see in

15  this photograph has this flame jet sensation, is it

16  possible that that flame jet can spread the fire to

17  other locations?

18         MR. BARTON:  Objection.  Vague.  Calls for

19  speculation.  And previously asked and answered.

20  Go ahead.

21     A.    It depends.  In some instances, the flame

22  jet, because there's no other easily flammable

23  materials, it's just going to burn out.  It depends

24  on what other materials are present when that

25  occurs.

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1      Q.   (By Mr. Lesnick) All right.  I'm going to

2    go to Page 20 of your report.  I'll scroll down to

3    Page 20.  We talked about Page 19 a bit here,

4    right -- and actually, let me just ask you quickly

5    here.  You've talked about this section at the top,

6    "Determination of the origin of fire involved these

7    topics here," right?  And this comes from NFPA-921;

8    is that correct?

9      A.   Yes, the 2021 edition.

10     Q.   Right, okay.  All right.  As I scroll down

11   to area of origin data evaluation, you say here,

12   "One of the witnesses" -- "None of the witnesses,"

13   I apologize, "reported seeing fire anywhere else."

14   We talked about Derek Null's testimony a bit,

15   correct --

16     A.   We talked about --

17     Q.   -- is that a more accurate statement?

18     A.   We talked about what he's sure of and not

19   sure of, correct.

20     Q.   Okay.  Right.  So is there a reason why

21   you didn't add in that he may have seen fire in the

22   inside of the tool crib in this section here?

23     A.   I did include that in my report earlier

24   where I said he may have.  I said he's not sure,

25   you know, let's go back and look at exactly what I

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    wrote down because that's apparently what you want

2    to quote, so let's go back and see what he said.

3        Q.   We're on the page here, on Page 20, right?

4    And you say here, "One of the witnesses mentioned

5    seeing fire inside the tool crib, but was not

6    certain."  Are you discussing Derek Null right

7    there?

8        A.   I am, yes.

9        Q.   Okay.  You say in the next paragraph, you

10   discuss again the contrast between Shaffer's

11   testimony and other witnesses indicating the stored

12   materials were present on the north of the tool

13   crib and not the south of the tool crib.  Did any

14   witness say there was not stored material where Mr.

15   Shaffer said there was?

16       A.   The video does not show any stored

17   material there.  You can see the outline of the --

18   you can see the outline of the bench and, you know,

19   that that area was stacked with boxes, you wouldn't

20   be able to see the outline of that bench, so from

21   that perspective, yeah, I think the video, the

22   information contained in that video, which is like

23   having an another witness to the fire, certainly

24   would help us with that assessment.

25       Q.   No, I appreciate that's like having

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    another witness to the fire.  I totally understand

2    it's a video, like eyes, but I'm asking if any of

3    the witnesses that were deposed, if any of them

4    said that there was not material stored in that

5    location that Mr. Shaffer said there was material

6    stored?

7        A.    Again, I don't remember the details of

8    every deposition.  I don't specifically remember

9    that, whether it was there or not.  I don't know.

10       Q.    You go on to say here in this next

11   paragraph, "Of the six witnesses, Shaffer's

12   description of the fire indicated that he observed

13   the fire in a very early stage."  Very early stage

14   seems like a term of art.  I don't know if there

15   wasn't a better way to describe it or not, but what

16   do you mean by very early stage?

17       A.    Well, his description of the fire, as you

18   recall, is one foot wide by one to two feet high

19   compared to others who report the fire being as

20   high as and beyond the height of the fire cabinets,

21   for example, so his observation is that of a much

22   earlier state than the other witnesses, so it's a

23   very early stage to the point we see it starting is

24   fire on top of those boxes.

25       Q.    In your opinion, did you conclude that Mr.

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    Shaffer did not actually see fire in the location

2    he testified to seeing fire?

3           MR. BARTON:  Objection.  Vague and

4    compound.

5        A.   Well, he saw what he saw and he testified

6    the way he testified about what he saw.  But I

7    think his -- his observations don't match some of

8    the physical data that we have, including the video

9    and including where the material -- where the

10   physical evidence showed those materials were

11   stored.

12       Q.   (By Mr. Lesnick) You put more weight into

13   the physical data than into his testimony is what

14   you're saying?

15       A.   I'm not putting more weight on either of

16   them.  I'm balancing the two, which is what the

17   scientific method requires you to do is to balance

18   out the witness testimony and the physical evidence

19   together.

20       Q.   In this last -- second to last paragraph,

21   you say, "It is clear that the early portion of the

22   video does not show any fire at the southeast

23   exterior of the corner -- exterior corner of the

24   tool crib."  You believe that later portions of the

25   video show that, right?

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1      A.   Well, I referred -- again I refer to that

2   flame jet that appears to be a pressurized

3   container releasing pressure under fire, and so at

4   that point in time, there is something burning at

5   that southeast corner, but prior to that --

6      Q.   You say --

7      A.   -- prior to that flame jet occurring,

8   there is no fire at that southeast corner.

9      Q.   Okay.  I want to make sure when you say

10  southeast corner, are you talking about the area --

11  the entire area south of the tool crib door?

12     A.   No, I said the southeast corner, the

13  southeast corner.

14     Q.   How many --

15     A.   So you can --

16     Q.   How many feet along the eastern wall

17  encapsulates the southeast corner?

18         MR. BARTON:  Object to form.  I'm not sure

19  I'm following that.

20         THE WITNESS:  I'm trying to understand

21  what he's saying.

22         MR. BARTON:  Yeah, Ben, can you rephrase?

23         MR. LESNICK:  Yes.

24     Q.   (By Mr. Lesnick) You said southeast

25  corner, I'm trying to get the -- what the

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    dimensions of the southeast corner mean.  Does it

2    mean the area between, just for example, the tool

3    crib door and the south portion of the east wall

4    all the way to the corner, is that part of the

5    southeast corner?

6        A.    Let's go back and talk about the video and

7    what we talked about earlier.  We can see in the

8    video the out -- I can see in the video and I've

9    outlined location of the eight-foot table, and

10   during portions of that video, the early portions

11   of that video, most of that table with the

12   exception of the very north end had no fire going

13   on anywhere around the table, and so from -- if we

14   call the exact southeast corner reference point

15   zero and when we say that door, that door of the

16   tool crib is about center, right?  So it's about

17   center, so we've got a foot and a half of that door

18   that's on the south half, right?  So that leaves us

19   with -- that leaves us with 10 and a half feet,

20   eight of that is the table, and so we can -- the

21   only place we see fire is at the north end of that

22   table, maybe the first two feet, the north two feet

23   of that table had fire, so there was about six

24   feet, and I can't tell exactly if the table was

25   lined up with the south exterior wall or not or if

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1   it's inset a little bit, but we know at least six

2   feet of that has no fire in it.

3       Q.   Okay.  So when you say southeast corner,

4   that's the area you're referring to, right?

5   Without, that you didn't see fire?

6       A.   I don't see fire at that southeast corner,

7   right.

8       Q.   You say here, "The view angle of the video

9   did not show the entire north wall area between the

10  tool crib wall and the overhead Number 2 door."

11  Can you see any of the north wall between that

12  location in the video?

13      A.   Well, I'm talking about angle, so the

14  angle of the video, we can't tell what's going on

15  beyond the right door frame of the break room door.

16      Q.   Right.  But you know, it says here, "The

17  view of the angle of the video does not show the

18  entire north wall between the tool crib wall and

19  the overhead door Number 2," which would insinuate

20  some of the north wall is seen in the video in that

21  location, and I'm asking you, do you see any of

22  the -- I didn't see any of the north wall in

23  between the tool crib wall and the overhead door

24  Number 2, so if you can point me to where in the

25  video we see some of that wall, I can -- that's

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    what I'm trying to figure out is where do you view

2    that?

3         A.    So because there is -- because there's a

4    large volume of fire at the time of this video, we

5    can't physically see the wall, but there are

6    portions of the video where the -- where the angle

7    is taking -- taken with the viewpoint further to

8    the left of the break room door and he moves a

9    little bit to the right, then he moves a little bit

10   left, so he moves back and forth changing the view,

11   so I would expect that at portions of that, that

12   you would be able to see that north corner where

13   the -- where the crib, exterior wall of the crib

14   meets that north wall, however, because of the

15   volume of fire, all you can see is fire.

16        Q.    In the video, there's a lot of smoke and

17   fire and flame directionally going over the top of

18   the tool crib; is that correct?

19        A.    It's lapping up over the top of the tool

20   crib, that's correct.

21        Q.    Okay.  If there was a fire inside of

22   the tool -- what was the tool crib made of?

23        A.    Well, from witness testimony and from some

24   of the physical evidence, we know that it was a

25   wood framed wall that had an exterior covering of

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1   some wood material.  Some of that material was

2   particle board.  I'm not saying all of it was

3   particle board, but some of the exterior was either

4   particle board or plywood material based on the

5   testimony and based on the physical evidence.

6       Q.   There's a ceiling on the tool crib, right?

7       A.   There is, and the north wall is the

8   concrete block wall, so we've got three walls that

9   are wood frame with a wood, 2x4 wood sill plate,

10  and then we've got an exterior covering of wood

11  material that enclosed the walls and then it had a

12  ceiling.

13      Q.   Did the wall go all the way down to the

14  floor?

15      A.   Yes.

16      Q.   And the only opening to get into the tool

17  crib was the door, correct?

18      A.   That's my understanding, yes.

19      Q.   And the top of the tool crib, that was a,

20  I think you said, heavy gauged wire, correct?

21      A.   The tool crib door?

22      Q.   Yes, the tool crib door.  Apologies.  Yes.

23      A.   The tool crib door was -- had a metal

24  frame and had a heavy gauged wire mesh and

25  depending --

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    Q.   Was the --

2    A.   And depending on what testimony you look

3  at, it may or may not have a wood covering over the

4  bottom half of the door.

5    Q.   If there was a fire inside of the tool

6  crib, how would the smoke escape from the tool

7  crib?

8         MR. BARTON:  Object to form.  Vague.

9  Calls for speculation.  Go ahead.

10   A.   What fire are you talking about?

11   Q.   (By Mr. Lesnick) I'm asking, if there was

12  a fire inside that tool crib that's enclosed and

13  four walls on the sides going all the way down.

14  There's a ceiling on the top, isn't it true the

15  only place for the smoke to vent out of that tool

16  crib or the biggest place for the smoke to vent out

17  of that tool crib would be the metal gauged door?

18         MR. BARTON:  Object to form.  Improper

19  hypothetical.  Assumes facts not in evidence.

20  Contradicts facts in evidence.  Calls for

21  speculation.  Go ahead if you know.

22   A.   It depends is my answer.  It depends.

23   Q.   (By Mr. Lesnick) In a fire in a home, if a

24  window is open, does smoke ventilate out of the

25  window?

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1          MR. BARTON:  Objection.  Improper

2     hypothetical.  Go ahead.

3          A.   It depends.

4          Q.   (By Mr. Lesnick) So there would be a

5     situation potentially where it wouldn't ventilate

6     out of a window?

7          MR. BARTON:  Same objections.  Calls for

8     speculation.  Improper hypothetical.  Go ahead.

9          A.   It depends.

10         Q.   (By Mr. Lesnick) Okay.  So when we see the

11    smoke in the video and the flames in the video, you

12    don't believe that any of that fire is coming out

13    of the top of the door of the tool crib, do you?

14         A.   I see no evidence of that.

15         Q.   Okay.  On Page 21, the section called fire

16    patterns, I think this is part of the NFPA-921

17    investigation discussion we talked about before,

18    correct?

19         A.   Well, this is not 921.  This is my

20    applying the scientific method to the facts of this

21    case.

22         Q.   Right.  But that's fire patterns is

23    supposed to be considered under 921 fire

24    investigation, right?

25         A.   There -- that is one data point.

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    Q.    Right.   That's one data point, and you say

2    at the end of Paragraph 1, "Burn pattern analysis

3    provided no reliable indication of the area of

4    origin."   Did you review Mr. Atkins' report?

5        A.    I did.

6        Q.    Did you read any of the sections where he

7    discussed burn patterns in his report?

8        A.    I did.

9        Q.    Okay.   And do you agree with his ability

10   to conclude that there was evidence of burn

11   patterns in his report?

12           MR. BARTON:   Objection.   Vague and

13   compound.   Go ahead.

14       A.    I'm going to review a copy of the report

15   real quick.

16           THE WITNESS:   Do you have a copy?

17           MR. LESNICK:   Is your attorney providing

18   you information for you to review right now?

19           THE WITNESS:   No, I asked him for a copy

20   of the report.   Do you want to provide a copy of

21   his report for me so I can review it?

22           MR. BARTON:   I don't mind having you do

23   it, Ben.

24       A.    If you want to provide the report, I'm not

25   going to answer that question without looking at

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1   what he says in his report.  I don't recall the

2   details of everything in his report as I sit here.

3       Q.   (By Mr. Lesnick) If you don't recall -- if

4   you don't recall, I mean, that's the answer.

5   That's what I was asking.

6           MR. BARTON:  If you --

7       Q.   (By Mr. Lesnick) If you don't know, we can

8   move on.

9       A.   Well, here's what I do recall.  I recall

10  him talking about making an issue out of one

11  pattern he sees.  The one pattern I recall him

12  talking about is a pattern on a file cabinet.

13  We're talking about a pattern that's documented

14  weeks after this fire occurred, after this evidence

15  has been sitting out in the weather, and so we've

16  got a metal file cabinet that has an oxidation

17  pattern that he's trying to elude to as being a

18  directional burn pattern that could have originated

19  only in one place and that's at the desk, which is

20  a false statement.  First of all, if, in fact, that

21  pattern is a valid fire pattern, I don't believe it

22  is, but if, in fact, it is a valid pattern that

23  needs to be considered, then that pattern does

24  nothing more than tell us we have a fire moving

25  from east to west.  That doesn't stop us -- because

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    we're talking about one pattern here.  It doesn't

2    stop us at the desk.  It tells us we've got a fire

3    that's moving from east to west, including a fire

4    that could have and did originate outside the tool

5    crib and burn into the tool crib and create the

6    same pattern, so any pattern that's there that's

7    showing a pattern from east to west could be on

8    either side of that tool crib wall or even further

9    east of the tool crib and have their same net

10   results, because what you're talking about is total

11   consumption of nearly all combustible materials

12   that were in that area, and when that happens, it's

13   not going to be an origin pattern, it's going to be

14   a fuel load pattern, and once you collapse the

15   structure and metal panels on top of it, and let

16   those burn underneath the steel, any pattern that

17   was there is going to be obliterated by that

18   continuing to burn while they try to get the

19   pressure water under the steel case.

20       Q.   Under fire dynamics, you talk about fuel

21   sources present in this area and that's the area of

22   all the other witnesses, where they observed fire,

23   correct?  Not where Mr. Shaffer said he observed

24   fire?

25           MR. BARTON:  Object to the extent it

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    misstates the report.  Go ahead.

2         A.   So I'm listing out what -- it's a listing

3    of fuel load packages that were stored north of the

4    tool crib door based on census prepared by Midwest

5    and based on deposition testimony and based on the

6    physical evidence after the fact that shows that we

7    had boxes stored in that area, so it's a

8    combination of -- it's a combination of all that

9    information, you know, when they did the dig-out,

10   you could see that we had rolls of tape still

11   sitting in that north corner formed by the east

12   tool crib door and the north wall of the plant.

13   You can see that we had --

14        Q.   So this doesn't --

15        A.   Go ahead.

16        Q.   Sorry.  So this doesn't include anywhere

17   south of the tool crib door is what you're

18   describing, though, right?

19        A.   I'm not sure what your question is.

20        Q.   You say the fuel source is present in this

21   area, right?  I'm just clarifying, this area means

22   north of the tool crib door, not south of the tool

23   crib door, right?

24        A.   We have no physical evidence or video

25   evidence that material was south of the tool crib

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    door.  The only person that had anything to say

2    about storage on the south side was Mr. Shaffer.

3        Q.   Okay.  You say in the last paragraph on

4    Page 21, "Following the fire, very little

5    combustible materials remained in the area where

6    the fire was first witnessed."  You say very little

7    combustible materials, what combustible materials

8    did remain in that area?

9        A.   Well, you had some along that east wall of

10   the tool crib.  We have evidence of some rolls of

11   tape that were still present.  We had some solvent

12   containers.  I think there were brake cleaner

13   containers that had paper labels on them.  We had

14   the base plate, the sill plate of the tool crib

15   wall that was still present, and in some areas on

16   the east wall, you could see the wood material

17   attached to that base plate on the exterior of the

18   wall.

19       Q.   Okay.  You say the fire damaged remains of

20   several containers believed to be glue pods were in

21   the debris in front of the fire cabinets.  Remnants

22   of brake cleaner containers were observed in the

23   corner formed by the east wall of the tool crib."

24   Then you say, "Additionally, numerous aerosol

25   containers in degraded condition were present in

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    that area."  You're talking about the corner formed

2    by the east wall and the north wall, correct?

3        A.    I believe that's correct, yes.

4        Q.    Page 22, we have area of origin hypothesis

5    evaluation.  Are these the three hypotheses that

6    you formed in this case?

7        A.    Yes.

8        Q.    Did you form any other hypotheses other

9    than these three hypotheses?

10       A.    Relative to the area of origin, no, these

11   are the three.

12       Q.    Okay.  For hypothesis 1, why did you

13   hypothesize that the area of origin was inside of

14   the tool crib?

15       A.    It's a hypothesis that needs to be

16   considered and evaluated.

17       Q.    Why did it need to be considered and

18   evaluated?

19       A.    Fair question.  Well, first of all, the

20   plate, it's the plaintiff's experts' opinion, so it

21   needed to be evaluated from that perspective.  Mr.

22   Hackett's opinion that the fire was inside the tool

23   crib, and so that needed to be evaluated to see is

24   it true against the data?  When you compare it

25   against the data, that hypothesis is easily

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1   excluded.

2       Q.   This wasn't a hypothesis you came up with

3   then?  It sounds like this was something you came

4   up with because somebody else did?

5       A.   No, it's a hypothesis that I include in my

6   analysis here.  What a reasonable hypotheses is

7   based on everything we know about this fire.

8       Q.   So this was reasonable to hypothesize

9   based off everything you knew about the fire?

10      A.   It's certainly something you would want to

11  consider, yeah.  It's reasonable to include it as a

12  hypothesis, but it's certainly not reasonable to

13  conclude that the hypothesis should be selected

14  based on the available data.

15      Q.   Bullet Point 3 says, "Larry Shaffer

16  reported seeing a glow on the ceiling as he walked

17  from the rear of the plant toward the east.  The

18  tool crib had a solid ceiling and the fire was

19  initially observed to be a small fire.  The glow of

20  a small fire inside the tool crib would not create

21  a glow in the ceiling."  With regard to that, did

22  Mr. Shaffer ever testify whether he was able to see

23  the -- whether the wall behind the boxes where he

24  saw fire was on fire, do you know?

25      A.   Again, consistent with what I've said all

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1  day, I don't remember every detail of every

2  deposition as I sit here.  I don't remember him

3  saying that.  But I don't -- again, the position of

4  those boxes is called into question based on the

5  totality of the evidence and the physical evidence

6  would suggest that there were no boxes stored there

7  and the video of the fire would suggest that there

8  were no boxes there.

9      Q.    Okay.  So the answer to my question was

10  you don't remember if he testified to that,

11  correct?

12      A.    I don't remember his -- every detail of

13  his testimony as I sit here.  We certainly can go

14  through it if you'd like to.

15      Q.    This hypothesis, it says witness in the

16  first bullet point, says witness in the second

17  bullet point, you say Larry Shaffer's witness

18  testimony in the third bullet point, Gary Horton's

19  witness testimony in the fourth bullet point.  Was

20  there any physical evidence other than witness

21  testimony that you relied on to exclude hypotheses

22  Number 1?

23          MR. BARTON:  Objection.  Vague.  Go ahead.

24      A.    I took the totality of all of the evidence

25  into consideration.

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1      Q.   (By Mr. Lesnick) Okay.  So these four

2   bullet points aren't a complete summation of why

3   you excluded it, they're just some of the reasons

4   why?

5      A.   Let me think about that for a minute.  I'm

6   trying to think if there's anything else and I

7   can't think of anything else, you know, knowing the

8   construction details of what was there and

9   comparing that against some of the other issues

10   that we have, you know, for example, you know,

11   knowing the details of construction of the tool

12   crib factor into that because certainly --

13   certainly an OSB wall is not going to sustain shape

14   and form very long when there's a fire burning

15   inside, so it's really considering all of the data

16   including the construction of that tool crib.

17      Q.   Hypothesis 2, origin outside the tool crib

18   south of the tool crib door.  Why did you create

19   this hypothesis?

20      A.   Because Mr. Shaffer's testimony where

21   he -- that's where he's pointing to seeing the

22   fire, but again, we've discussed ad nauseam why I

23   don't believe that's true.

24      Q.   Hypothesis 3 is origin north of the tool

25   crib door in the corner formed by the east tool

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    crib and the north wall of the plant.  You had a

2    drawing in your report, which page is that?  On

3    Page 24, is that the area you're referring to here

4    when you say the corner formed by the east tool

5    crib wall and the north wall of the plant, that

6    highlighted area on Page 24, the top picture?

7        A.    The yellow box, right.

8        Q.    Yeah, the yellow box.  That's what you're

9    talking about?

10       A.    Yes, the not-to-scale sketch, right.

11       Q.    Okay.  In this -- let me go to that figure

12   10 real quickly on Page 24.  Where would the door

13   for the tool crib fit in on this sketch?  Let me

14   ask it differently.  Would it be in -- sorry.  I

15   apologize.  Would it be within the yellow

16   highlighted area or on the outside of it?

17       A.    It would probably overlap the south end of

18   that highlighted area.

19       Q.    So it would be within the yellow

20   highlighted area?

21            MR. BARTON:  Object to form.  Misstates

22   his testimony and the diagram.  Go ahead.

23       A.    It would be roughly centered -- again

24   that's what all the testimony is, it's roughly

25   centered on the east wall of the tool crib wall, so

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    it's roughly centered north and south on that east

2    wall of the tool crib, and it would be roughly at

3    that -- it would straddle, I believe, that south

4    edge of that L-shaped area, so I believe that L

5    shape would capture part of the door.

6         Q.    (By Mr. Lesnick) What ignition sources

7    were located in that area that we're looking at?

8         A.    I don't go through that analysis.  Mr.

9    Sacco evaluated all the electrical items in that

10   area, and so I'll defer to him on what electrical

11   things were there, but we can talk about some of

12   the other possibilities that are contained in the

13   other documents that we've been discussing.  Some

14   human action or inaction in that area.  We know

15   we've got improperly stored flammable materials.

16   We know we have Mr. -- the disgruntled --

17   potentially disgruntled employee leaving out

18   through that area, Tommy McGuffey, we know he's

19   smoking in that area.  We know Lanny Kistler had

20   been welding in that area earlier in the day.  All

21   those things would need to be further vetted.  I

22   have not done that, so we have other potential

23   ignition sources there, plus anything electrical

24   that Mr. Sacco would have testified to.

25        Q.    You're not going to testify, are you, as

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    to any other potential ignition sources to this

2    fire other than what's found in your report, are

3    you?

4        A.    I just listed out several possibilities,

5    but I don't go into detail to further analyze any

6    of those.

7        Q.    You didn't come to any causal -- any

8    conclusions as to -- with regards to any other

9    ignition sources, right?

10            MR. BARTON:  Objection.  Vague.

11       A.    I just listed for you other possible

12   sources of ignition that we know were present in

13   that area on the day of the fire.

14       Q.    (By Mr. Lesnick) And of the ones you

15   listed out.  And just all of them in general,

16   besides the ones listed in your report, you're not

17   anticipating testifying to any of those causing the

18   fire in that matter, are you?

19       A.    I will not -- I will not be testifying

20   that I can conclude that one of those items was

21   indeed in fact the cause of this fire, that's

22   correct, but that they were possible ignition

23   sources that were not fully vetted or explained.

24       Q.    Your Hypothesis 3 is the one that you

25   determined was the correct one of your three

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1  hypotheses in your report, correct?

2      A.   My Hypotheses 3 was the selected

3  hypotheses, that's correct.

4      Q.   Fire analysis.  What's this section about?

5      A.   I think you cut out, we only got a couple

6  of words.

7      Q.   Fire cause analysis, what is this section

8  about?

9      A.   This is about ignition sources, potential

10  ignition sources and causes for the fire.

11      Q.   Battery and battery-related artifacts

12  evaluations, those are the only ignition sources

13  you, as we discussed, fully evaluated in this

14  matter, correct?

15      A.   Those are the ones that I was specifically

16  asked to discuss in my report, that's correct.

17      Q.   Besides addressing them in your report,

18  did you fully evaluate any other ignition sources?

19      A.   I took them into consideration and I just

20  listed for you several of those that were taken

21  into consideration.

22      Q.   Did you fully evaluate those taken into

23  consideration?

24      A.   I did not.

25          MR. BARTON:  Asked and answered.

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    Q.   (By Mr. Lesnick) In the middle of Page 27

2    here, you provide a description of the tool crib

3    and its contents.  If I scroll down, tool crib is

4    constructed of this, et cetera, et cetera.  Do you

5    know if the tool crib contained any combustible

6    materials?

7        A.   There were plenty of flammable materials.

8    I don't know what you mean by combustible.  So the

9    packaging, cardboard, all those things would be

10   combustible.  The walls of the tool crib would be

11   combustible.

12       Q.   There was a desk in the southeast corner

13   of the tool crib, correct?

14       A.   That's correct.

15       Q.   Do you know how far away that desk was

16   from where Mr. Shaffer indicates he first saw fire

17   in this matter?

18       A.   It was on the opposite side of the -- it

19   was on the opposite side of the east tool crib

20   wall.

21       Q.   Okay.  Was the wall that was between those

22   two items combustible?

23       A.   Yes.

24       Q.   You say in the bottom of Page 27, the

25   battery -- I'll skip that question.  Page 29, we're

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    running out of time here so I'm trying to get

2    everything I can.  29, there's a big heading that

3    says fire cause hypothesis evaluation, and then

4    there are three hypotheses listed.  Are these all

5    the hypotheses that you came up with in this matter

6    as far as your fire cause hypotheses evaluation

7    went?

8        A.   No.  So we talked about, again we talked

9    about others that I did not fully dive into.  It

10   was beyond the scope of what I was asked to write a

11   report on, but these are the three related to the

12   subject matter of a battery or battery-powered

13   tools and equipment.

14       Q.   So the reason you focused on battery

15   chargers, thermal run-away and internal battery

16   results of an ignition is because you were told to?

17       A.   No, not because I was told to.  It's what

18   they -- it's what I was asked to address.  So they

19   didn't give me any hypotheses.  I formulated a

20   hypothesis on my own.  Nobody gave me hypotheses to

21   evaluate.  If you go back to the scope, these are

22   what I formulated in response to the scope that I

23   was asked to focus on.

24       Q.   Which was what role, if any, the

25   battery-powered tools and related chargers and

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1  battery had in the cause of this fire?

2      A.    That's correct.

3      Q.    -- limited on what you were looking at in

4  this matter?

5      A.    I didn't catch all that question.  I

6  apologize.

7      Q.    It was limited in what you were looking

8  at?

9          MR. BARTON:  Object to the

10  characterization.

11      A.    Again, the scope, it's the general scope

12  that I was asked to address and to get there

13  requires a lot of other data analysis and I did

14  conduct all that other analysis.

15      Q.    (By Mr. Lesnick) Why did you choose -- is

16  the only reason you chose to focus on these

17  ignition sources because these fit your scope that

18  you were working on?

19          MR. BARTON:  Objection.  Vague.

20      A.    I don't know what you mean by fit.  These

21  are reasonable hypotheses that would need to be

22  addressed if one were to consider, for example, a

23  battery-powered tool having a role in causing the

24  fire, so these are the ones that would need to be

25  evaluated.

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    Q.   (By Mr. Lesnick) Your first and second

2    hypotheses appear to exclude -- be excluded on the

3    basis that no evidence of the ignition --

4    A.   We lost you.

5         MR. BARTON:  Yeah, you broke up.

6         MR. LESNICK:  Can you guys hear me?

7         MR. BARTON:  We can now.

8         MR. LESNICK:  Do you want me to repeat?

9         MR. BARTON:  Yes.  You're coming in and

10   out right now, Ben.  I'm not sure what changed.

11        MR. LESNICK:  I don't know what changed,

12   but of course, it's something.  Can you hear me

13   now?

14        MR. BARTON:  Yes, yes.

15   A.   Yes.

16   Q.   (By Mr. Lesnick) Okay.  Your first and

17   second hypotheses both appear to be excluded on the

18   basis that no evidence of the ignition source in

19   your hypotheses were found in your area of origin.

20   Is that not a correct characterization of what

21   happened there?

22   A.   No, I would say that's short-sighting

23   what's stated there.  For example, in hypothesis 1,

24   we had the video, which shows no fire near the

25   southeast corner of the tool crib door, so you're

1    kind of short-sighting what I'm stating there.

2    There is no fire near the southeast corner of the

3    tool crib.

4         Q.   If your potential ignition source is found

5    outside of your area of origin, can it still be

6    considered an ignition source?

7         A.   It depends.

8         Q.   And Hypotheses 3, scroll down here, which

9    is thermal runway -- thermal run-away internal to a

10   battery resulting in ignition of combustible

11   materials remote from the battery location.  In

12   bullet 2 -- I'm sorry.  Bullet 3 you say the

13   first -- where is that?  Here we go.  The first

14   person to observe the fire condition was Larry

15   Shaffer and Mr. Shaffer first observed the glow on

16   the ceiling and observed the small --

17             MR. BARTON:  You broke up.

18             MR. LESNICK:  Can you hear me?

19             MR. BARTON:  We can now.

20             MR. LESNICK:  I don't know what keeps

21   happening.

22             MR. BARTON:  Ben, is this a good time for

23   a five-minute break because I think you're getting

24   a little technical issue here?

25             MR. LESNICK:  I guess, but I'm running out

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    of time.

2             THE WITNESS:  We lost him again.

3             MR. BARTON:  We lost you.

4             MR. LESNICK:  I prefer not to because I

5    think we're running out of time here.

6             MR. BARTON:  We're not running out of time

7    at all.  Whatever you want to do, that's up to you.

8    The problem is whatever is going on on your end,

9    we're not able to hear your questions because

10   you're breaking up, so I would suggest to use it as

11   an opportunity to reset it so you can moving along,

12   but go ahead.

13        A.   Yeah, go ahead.  What's the next question?

14        Q.   (By Mr. Lesnick) Okay.  Under Hypothesis

15   3, you said a battery thermal run-away event often

16   includes a noticeable sound when the battery vents.

17            MR. BARTON:  We heard you read part of the

18   statement and then it broke up.

19            MR. LESNICK:  All right.  Let me take two

20   minutes here.  I'll reset this and see what's going

21   on and we'll come back.

22            MR. BARTON:  Okay.

23            VIDEOGRAPHER:  We are off the record at

24   2:37 p.m.

25                      (Recess.)

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1          VIDEOGRAPHER:  We are back on the record

2    at 2:43 p.m.

3          Q.  (By Mr. Lesnick) Mr. Reagan, we were

4    talking about Page 21 of your report under your

5    Hypothesis 3, bullet point 3, you say, "A battery

6    thermal run-away event often includes a noticeable

7    sound when the battery vents."  What do you mean by

8    noticeable sound?

9          A.   Well, it depends on the way it vents, but

10   you'll hear a hiss and sometimes a pop, some form

11   of a --

12         Q.  (Inaudible) -- that you have?

13         A.   Again that depends on the amount of energy

14   in the battery when it vents.

15         Q.   You say at the bottom, "No explosion was

16   heard prior to earliest fire being observed."  Are

17   you saying an explosion is a noticeable sound?

18         A.   An explosion is a noticeable sound, yes.

19         Q.   Bullet point 4 here, you say, "Under some

20   scenarios, a cell will separate from the battery

21   pack and travel a few feet or until it hits some

22   obstruction."  Are you talking about a cell that

23   initially failed?  I'm sorry.  A cell that's in

24   thermal run-away?

25         A.   No, for any reason, a cell that is --

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    could be under fire attack or a cell that is for

2    some reason in thermal run-away, yes.

3         Q.   You say, "In some scenarios, it will

4    travel a few feet or until it hits an obstruction."

5    Can it travel more than a few feet under other

6    scenarios?

7              MR. BARTON:   Object to form.   Improper

8    hypothetical.   Go ahead.

9         A.   So I've seen and documented battery travel

10   10 to 15 feet, so I don't know what you mean by a

11   few feet, but to me a few feet means it's going to

12   travel -- a few to me is 10 to 15.   I imagine there

13   are some batteries under some charge conditions can

14   go further than that, but keep in mind, they are

15   contained within -- first of all, they're attached

16   with bussing to form a pack and then they're

17   contained within a plastic housing, so it depends

18   on the construction of the product that you're

19   talking about also.

20        Q.   You conclude on this bullet, "The

21   witnesses reported seeing fire in only one

22   location."   It's true that one of the witnesses

23   reported seeing fire in a different location, isn't

24   that correct?

25              MR. BARTON:   Objection.   Vague.

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1     A.    There was a witness that reported seeing a

2   fire at a different location, but they all saw it

3   in one location and his location was called into

4   question because of the lack of any evidence of

5   stored material in that area.

6     Q.    (By Mr. Lesnick) Bullet 5, you say, "The

7   tool crib was cramped and congested.  Accordingly,

8   it was difficult to move around.  Several

9   obstructions existed between the reported location

10  of the batteries and the area of origin."  What

11  were the obstructions that existed?

12    A.    The desk itself.  The shelving that was

13  just inside the tool crib door, and then the steel

14  cage construction of the tool crib door, and if the

15  bottom half of the door was enclosed by wood as

16  some witnesses said it was, then only the top half

17  of the door would have been available as a

18  passageway from the inside of the tool crib and the

19  outside, and then you've got tool crib walls

20  itself, which are made of, we know for sure in some

21  areas OSB.

22    Q.    Section 32 is analysis of plaintiff expert

23  opinions and the heading on top.  What is this

24  section supposed to be about?

25    A.    Exactly what the title says, analysis of

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    the plaintiff's expert opinions.

2        Q.   Are you discussing all of the plaintiff's

3    expert opinions in this section?

4        A.   I'm addressing all those that I took

5    exception to.

6        Q.   Correct.  So this is just those that you

7    took exception to in this section, not those you

8    agreed with, correct?

9            MR. BARTON:  Objection.  Vague.

10       A.   I would have to read through it in its

11   entirety to see if there's anything in there that I

12   agree with, but these are generally the flawed

13   methodology.

14       Q.   (By Mr. Lesnick) Section 1, you have,

15   "Hackett expert opinion review."  You discuss how

16   Zimmer contradicted himself -- I see what you're

17   basically saying here, the data contradicted --

18   Zimmer contradicted himself in his deposition three

19   years after the fire as compared to what the 911

20   call reported in the Midwest report, correct?

21   That's what you're discussing in this section?

22           MR. BARTON:  Object to form.  Misstates

23   the documents, the evidence in the case and his

24   report.  Go ahead.

25       A.   It identifies what Mr. Hackett included

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    was only that to which supported his opinion, where

2    Mr. Zimmer testified later where he saw the fire

3    clearly was not in the tool crib, even though

4    that's what someone transcribed on the other end of

5    the 911 call.

6        Q.    (By Mr. Lesnick) You believe what was

7    transcribed was not accurate?

8        A.    Does not accurately align with what Mr.

9    Zimmer and all of the other witnesses stated.  No

10   one testified that they saw fire -- for sure saw

11   any fire inside the tool crib, and for example,

12   Horton, when he was asked, "Did you see any fire

13   inside the tool crib?"  "Absolutely not."

14       Q.    Exhibit 2, Section 1-B, you say that, "Mr.

15   Hackett's testimony indicated that the area of

16   origin opinion was reached on May 14th, 2019, and

17   you cite to Page 150 of his deposition."  I'm going

18   to go to Page 150 of his deposition.  We're going

19   to mark that as Exhibit 17.

20           (Plaintiff's Exhibit 17 marked for

21                   identification.)

22       Q.    So it says here, this is the section

23   you're quoting, "As of May 14th" -- let's see here.

24   "Had you already decided your area of origin by May

25   14th, 2019?"  And he says, "Yes," right?  That's

1  the section you're quoting?

2       A.    That's the answer I'm quoting, correct.

3       Q.    Okay.  Do you know what his area of origin

4  was as of that date?

5       A.    Yeah, the next line down says -- the next

6  question, "As of May 14th, what was the area of

7  origin that you identified or that you decided?"

8  Answer, Line 17, "In the tool crib area."

9       Q.    Keep reading.

10      A.    "Did that include the tool crib?"  "In and

11  around the tool crib."  Again I also point out that

12  Mr. Hackett's report and his testimony are

13  internally inconsistent.  His report says in the

14  tool crib, and then all over his report, he changes

15  from inside the tool crib, outside the tool crib,

16  the area of the tool crib, but in the tool crib, so

17  his testimony is very unclear on his opinion.

18      Q.    So the question on Line 20 is, "So it

19  included inside and also included outside" and the

20  answer on Line 22 is what, Mr. Reagan?  Can you

21  read it for me?

22      A.    "It included an area identified

23  approximately 30 by 90, I believe."

24      Q.    And that was the area that was gridded out

25  in this matter for the investigation; is that

1    correct?

2        A.    Correct.

3        Q.    On Page 32 -- actually, give me one second

4    here to get my questions in order.  Let me go to

5    Page 34, Section -- make sure I have it right.

6    B-1, I'll pull that back up for you.  You say in

7    this section, "Several witnesses reported the fire

8    in an early stage and described a small fire that

9    appeared controllable."  Which witnesses are you

10   describing?

11       A.    I believe Whisler and one other.  I can't

12   remember who it was, but I know Whisler for sure.

13   He said we've got a one foot by one -- I'm sorry.

14   Shaffer says we've got a one-foot wide by two-foot

15   high fire, and the plant manager, Whisler, said,

16   yeah, it looked controllable.  I went to get a fire

17   extinguisher to try to put it out.

18       Q.    With regard to Mr. Shaffer, how long after

19   Mr. Shaffer first witnessed the fire did the

20   canisters explode?

21       A.    Well, the first explosion occurred while

22   he was still there, still in that area, but moving

23   away, so he saw the fire, backed up about four

24   feet, is my recollection, and then that was when

25   the first canister exploded.

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1      Q.   And then after Mr. Whisler first saw the

2    fire, when he went to go get the fire extinguisher,

3    I believe he testified it doubled or tripled in

4    size by the time he went to go get it.  Do you know

5    how long it was between when he first saw it and

6    when it doubled and tripled in size?

7      A.   From when -- when you say he, make sure

8    I've got the right question.  Who are you talking

9    about?  When Whisler saw --

10     Q.   Whisler.

11     A.   And where did I testify -- when did I

12   testify about doubling and tripling in size?

13     Q.   He testified to that and I do think you

14   quoted that and --

15     A.   Let's me se.

16     Q.   -- or at least discussed that in your

17   report.

18          MR. BARTON:  Can you point us to it?

19          MR. LESNICK:  Yes, give me a second.  It's

20   on your report, Page 13 under Whisler.

21     A.   Right.  So there I state, this is from

22   him, "The fire appeared to be manageable.  Mr.

23   Whisler testified that in the early stages, he was

24   thinking they could still battle the blaze.  He

25   left to find a fire extinguisher.  When he

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    returned, the fire doubled or tripled in size."

2    Correct.  That's what he said.  I didn't testify to

3    that.  He did.

4        Q.    (By Mr. Lesnick) I never said that.  I

5    asked you; do you know how long it was between the

6    time when he first viewed the fire and how long it

7    was between then and when it doubled or tripled in

8    size.  Do you know the time?

9        A.    Not in terms of seconds, no.

10       Q.    Let me go to Page 36 of your report.

11   Eskra opinion review.  This section is your issues

12   with Mr. Eskra's report, correct?

13       A.    Pointing out deficiencies in his analysis.

14       Q.    Okay.  Section 1-B, you state, "The ETP

15   report battery cell evaluation methodology is an

16   approach similar to the evaluation of electrical

17   arc sites on electrical conductors at fire scenes."

18   What is the evaluation of electrical arc sites on

19   electrical conductors that you're describing?

20       A.    As we discussed a little earlier, probably

21   about 9:30 this morning, there was a -- there was a

22   long string of attempts to determine if an arc on a

23   conductor was the cause or a result of a fire, and

24   there were many hypotheses formed that were

25   attempts to evaluate is this arc a cause or result

1  of a fire, and ultimately, every one of those

2  hypotheses that were formed were tested and

3  determined to ultimately be unreliable.  The same

4  thing is true here.  We have an untested

5  hypothesis, which is yet to be tested to be proven,

6  similar to what was done with electrical arc beads

7  in the nineties and late and early 2000s.

8      Q.   That's where I was getting confused at.

9  Are you saying the steps Mr. Eskra outlined in

10  coming to his methodology that he utilized to come

11  to his conclusions are literally similar to the

12  steps utilized in this methodology related to arc

13  mapping or are you just saying they're analogous

14  because neither of them are provable?

15      A.   They're analogous.  And what is analogous

16  is we had -- relative to electrical arcing and

17  shortages, we had untested hypotheses that when

18  they were put to the test, the scientific rigors of

19  testing those hypotheses, they're ultimately

20  determined to be invalid, and at this point in

21  time, Mr. Eskra's analogy or methodology has not

22  been put through the scientific rigors of proving

23  that it has any validity.  Right now it's just it

24  is because he says it is.

25      Q.   Section 3-B here, you talk about his

USDC IN/ND case 3:21-cv-00252-DRL    document 86-4    filed 12/13/23    page 224 of 301
John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1   analysis.  "The ETP report and analysis skipped
2   steps that are a part of the systematic
3   methodology.  Appendix B stated that the
4   investigation needs to be performed in a systematic
5   manner.  Skipping steps could lead to erroneous
6   conclusions."  And then some examples of the
7   skipped steps are, you said, "The analysis did not
8   take into account the artifact location at the fire
9   scene."  I think this one is self-explanatory.  You
10  said, "The analysis did not carefully examine the
11  data from the fire scene, including the condition
12  of the battery-powered tools."  What data did he
13  not carefully consider from the fire scene other
14  than the condition of the battery-powered tools?
15          MR. BARTON:  Objection to form.  Compound.
16  Combines two sections.  Go ahead.
17      A.   So Mr. Eskra has no idea where the
18  batteries he evaluated were at the fire scene,
19  whether they were in the tool crib, outside the
20  tool crib.  He can't correlate -- did not correlate
21  the evidence to the fire scene.
22      Q.   (By Mr. Lesnick) Right.  That's what you
23  say in Section A, and then Section B says, "The
24  analysis did not carefully examine the data from
25  the fire scene, including the condition of the

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    battery-powered tools," so my question is; other

2    than him not considering to carefully examine --

3    I'm sorry, the data from the fire scene including

4    the condition of the battery-powered tool, what

5    other data are you talking about when you say data?

6        A.    So the data is, for example, we have in

7    evidence a drill with a drill bit in the Chuck.  We

8    looked at that photograph in my notes earlier this

9    morning, and he did not correlate what he's saying

10   about a battery being the ignition source for the

11   fire to a tool that was recovered from that area,

12   so if that -- you know, again, we've got two

13   batteries that are reportedly in the area of the

14   desk.  There were probably more than that based on

15   the physical evidence, but we have two that Mr.

16   Lanny Kistler says were on the desk, one in the

17   charging cradle and one on the tool, so he made no

18   analysis of comparing where these batteries -- what

19   these batteries were attached to, including the

20   drill and the charger, as part of his analysis, in

21   comparing the damage between the two.  We've got a

22   drill that's in pretty good shape, considering the

23   condition of this building, and if that battery

24   that was on that drill was the ignition source of

25   that fire, I wouldn't expect that battery-powered

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    tool to be in the condition it was in.  If that --

2        Q.   What type of condition would you expect it

3    to be in?

4        A.   I would expect it to be -- all of the

5    combustible materials consumed, which they were

6    not.

7        Q.   Section 3-C stating the analysis does not

8    address if the alleged failed battery was connected

9    to a charger, connected to a tool or was in

10   storage.  What -- why should he have considered

11   whether the failed battery was connected to a

12   charger?

13       A.   Well, certainly based on the timing of

14   when Mr. Kistler left, he leaves around noontime,

15   and his indication was that he has one battery on

16   the charger and one on the tool, so that we know

17   from that information that the one on the tool,

18   unless he just swapped them as he was leaving,

19   would be in a somewhat depleted state of charge,

20   and that the charged state of the one on the

21   charger would be fully charged, because the charge

22   time on either the BL1830 or through an 1850, which

23   I think are the ones which are alleged to possibly

24   be in this area, would be less than an hour, so

25   those would have a full state of charge.

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    Q.   Why did that state -- why does the state

2    of charge matter in this scenario, in this

3    analysis?

4    A.   Well, it matters in the analysis because

5    it's going to impact the ability of -- the state of

6    charge is going to impact the ability of it to be

7    an ignition source.  Zero state of charge, it's no

8    longer a potential ignition source.

9    Q.   Is there any literature that supports what

10   you're discussing about zero state of charge not

11   being an ignition source?

12   A.   Directly, I don't believe so, not that I

13   can think of.  It would be, like, it would be

14   equivalent to saying is there any literature out

15   there that says that a table lamp that's turned off

16   could not be an ignition source for a fire.  Well,

17   if there's no energy available in it, then it

18   wouldn't be an ignition source.

19   Q.   How does one know that a battery is

20   completely out of energy in the first place?

21   A.   How would one know that?  Is that your

22   question?

23   Q.   Well, let me ask you differently.  It was

24   a poor question.  Do batteries -- power tool

25   batteries, battery packs, do they lose a complete

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1  state of charge when they've been -- at any point?

2  I mean, can they do that after use?

3        MR. BARTON:  Objection to the question.

4     A.   So I don't -- I believe there's a cut-off

5  that they're going to stop functioning, and that

6  cut-off will be an indication to the user to let go

7  of the trigger and put it on the charger.

8     Q.   (By Mr. Lesnick) So it never loses --

9  completely loses its state of charge?

10    A.   It would be in a very low state of charge,

11 right.

12    Q.   Section D, top of Page 38, you say, "Eskra

13 opinion -- the Eskra opinion that the fire at

14 Forest River was most probably caused by the

15 failure of Makita tool battery is not adequately

16 identifying an ignition sequence, that it connected

17 to the fire scene data and the witness statements."

18 What do you mean by did not adequately identify an

19 ignition sequence?

20    A.   Well, his opinion is I can look at this

21 battery and tell you this was the one -- well,

22 which opinion?  So his -- at one point, he says it

23 was the cause of the fire.  At other points he says

24 it's the probable cause of the fire.  I have not

25 seen Deposition Number 2 yet, but he says it was

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    most probably caused, you know, most probable, most

2    probably caused by the failure of the Makita tool

3    battery, so when he makes that statement, it's

4    quoted, so it must have been quoted somewhere.  To

5    make that statement, you would have to identify an

6    ignition sequence, which is what 921 tells you you

7    would need to do, so you say, okay, I've got an

8    ignition source, what was the first material

9    ignited and how did that fire get to be what it

10   grew to be, and how does that align with the

11   witness data that we have.  So in a vacuum he makes

12   an analysis, I looked at the battery, I can tell

13   you this one caused the fire based on these

14   features, but he doesn't tie that back to anything

15   else relative to the fire scene and the witness

16   data.  How does that battery account for what the

17   witnesses saw, so it's an incomplete -- incomplete

18   evaluation.

19       Q.   Page 39, Section 7-A, "The ETP report

20   opinions are not supported by the available data.

21   The ETP report included the allegation that the

22   battery management system was designed in such a

23   manner that the cell became unstable due to normal

24   intended use.  The report further alleged that the

25   battery management system caused damage to the

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    battery cell's solid electrolyte interface," and

2    then you say, "The allegation is made without

3    knowledge of the age, charge history, state of

4    charge, historical use and historical potential

5    misuse/abuse of the battery."  And then it's your

6    testimony that he had no knowledge of the history

7    and use of the Makita produce.  In Mr. Eskra's

8    opinions, did the history of the product matter at

9    all based on his understanding of the defects in

10    the battery management system?

11          MR. BARTON:  Object to the extent it calls

12    for speculation, and misstates Mr. Eskra's

13    testimony.

14    A.    So his testimony about the defect in the

15    battery management system suggests that the battery

16    can be damaged by what he alleges is a defect in

17    the charging system of the battery and the battery

18    management system, but he has not demonstrated that

19    any of those conditions existed on the subject --

20    on any of the batteries that were present at the

21    Forest River plant, and so, there's a huge leap.

22    He says, well, I did some testing and I believe

23    that this testing causes damage.  A, he's not

24    proven that that testing causes damage, and B, to

25    say that that's what caused this particular battery

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    to be in the condition it is is made without any

2    prior knowledge of what else has happened to that

3    battery throughout its life, you know, if he's

4    right that there was damage to that battery, then

5    the user of it would have noticed some performance

6    change in the battery and the user of the battery

7    did not indicate any performance change in the

8    battery and as a matter of fact, still purchases

9    Makita products to use today, so he's not tying it

10   back to anything relative to this case other than,

11   "I've done some testing and I think this is what

12   happens.  I've not been able to prove that that's

13   what happened, but I think this is what happens and

14   I think that applied to the battery in question"

15   without knowing anything about the history of the

16   battery in question.

17       Q.   (By Mr. Lesnick) So in Part B, you say,

18   "The allegation does not take into consideration

19   the battery pack parts found in the tool crib

20   desk."  Did you believe that those battery pack

21   parts provided evidence that the tools -- that a

22   cell caused a fire?

23       A.   No, the battery pack parts in the tool

24   crib desk certainly provide a suggestion that Mr.

25   Kistler was repairing or at least disassembling

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    battery packs.

2         Q.    And did he testify he did that?

3         A.    No, he said he has done that in the past,

4    but he didn't do it -- he hasn't done it at this

5    facility, and yet we find in the desk drawer, we

6    find battery component parts, for example, printed

7    circuit boards that were loose in the drawer.

8         Q.    You say in Section C, "The available data

9    does not support any prior reported issue with

10   battery performance."  Are you talking about

11   battery performance of Mr. Kistler's Makita

12   products that were located in the tool crib that he

13   testified were located in the tool crib?

14        A.    Correct.  Mr. Kistler did not report that

15   he had any problems with that Makita tool, and if

16   the battery was damaged in the manner which Mr.

17   Eskra says it was, then he would have noticed

18   performance problems with that product.

19        Q.    Okay.  D, "The allegation is based on

20   testing of Makita products that have not been

21   established to be substantially similar to the

22   battery that is alleged to have failed."  What

23   products did he test that were not substantially

24   similar to the battery that's alleged to have

25   failed?

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1      A.    This relates to the brand of the cell.

2  His testing, I believe, was performed on Sony, Sony

3  batteries, and he says the batteries that were in

4  the alleged failure were made by what he refers to

5  as Tepin, T-E-P-I-N, is what's in his testimony.

6      Q.    Section F, "None of the batteries

7  subjected to testing by ETP never failed."  Is that

8  a requirement for the analysis to take a battery to

9  failure?

10     A.    If you're going to make the allegation

11  that when you -- when you subject a battery to the

12  testing that he subjected -- to use the testing

13  that he subjected them to, if you're going to make

14  the allegation that when you do that, it's going to

15  cause the battery to fail, I find it interesting

16  that none of the testing he performed caused the

17  batteries to fail.  None of those ever resulted in

18  a fire condition, so to say that this condition

19  occurs and results in fires, and yet he's done this

20  testing and none of them have ever failed or caught

21  on fire, so there's no proof there with that

22  testing that that actually is a fire ignition

23  scenario.

24     Q.    You say, "There's no supporting research

25  referenced by Eskra that identifies damage to the

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1   SEI layer being causal to the fire."  Did you read

2   all the references in his report?

3          MR. BARTON:  Object to form.  Vague.

4     A.    Yeah, I looked over his entire file

5   materials, so if there's references in his report

6   that were not there, I can't say I've read -- again

7   I'd have to look at the list to answer that

8   question, to look at all of the references and tell

9   you which ones I did and didn't do.

10     Q.    (By Mr. Lesnick) Right.  But you say you

11   did because you said there's no supporting research

12   referenced by Eskra that identifies damage to the

13   SEI layer as being causal, so I assume that means

14   you read all of the supporting research referenced

15   by Dr. Eskra, right?

16     A.    No.  What I'm saying there is his own

17   testimony says, "No, I don't have a document to

18   point to that says this."  That's his testimony

19   about his research.  His own research has not

20   identified one, it's just his opinion that his

21   testing that he has done demonstrates damage to the

22   SEI layer, and furthermore, nor has he ever

23   disassembled a cell to demonstrate that that damage

24   to the SEI layer exists.  Again it's a hypothesis

25   that he's not tested and he can point to no

1  referenced research where anyone has made that

2  connection.

3      Q.   Mr. Eskra's report contained a number of

4  references to research papers, correct?

5      A.   It did.

6      Q.   Did you read all of the research papers

7  that he referenced?

8      A.   I don't recall.  I would have to look at

9  the list again, but whether I read them or not is

10 not what I'm commenting on here in G.  I'm

11 commenting on Mr. Eskra's own testimony -- I'm

12 commenting on Mr. Eskra's own testimony about the

13 research he's conducted and he says, "I have not

14 found any that contain that information."

15     Q.   I get that.  But your testimony is you

16 don't remember if you read all of his research

17 papers that he referenced?

18          MR. BARTON:  Misstates his testimony.

19     A.   I would have to look at the list again.

20          MR. BARTON:  Are these the research papers

21 you withheld after his deposition?

22          MR. LESNICK:  That's not really relevant

23 to what I'm asking here.

24          MR. BARTON:  It is if this witness is

25 supposed to read them and you withheld them from

1  production.  You only gave them to me after, I

2  don't know, the second deposition.

3          MR. LESNICK:  Was there an objection

4  there, Jon?

5          MR. BARTON:  No, I was just pointing out a

6  fact of misconduct.

7          MR. LESNICK:  Got you.

8      Q.   (By Mr. Lesnick) All right.  So some basic

9  questions I want to ask you, Mr. Reagan.  What

10  materials make up a lithium-ion battery cell?

11          MR. BARTON:  Objection.  Vague.

12      A.   Are you talking about what materials are

13  included in the construction of a lithium-ion

14  battery or what is the general construction

15  features?  I'm not clear on what your question is.

16      Q.   (By Mr. Lesnick) Yeah.  What materials

17  make up a lithium-ion battery cell?

18      A.   Well, you've got --

19          MR. BARTON:  Same objection.  Vague.  Go

20  ahead.

21      A.   It is vague, but to try to answer so we

22  can move on, you know, you've got a steel case

23  that, in most cases, has a nickel coating to it.

24  You've got a copper current collector with a

25  coating material on it, referred to the SEI layer.

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    You've got an aluminum layer and it's wrapped with

2    a separator between the two, the copper and the

3    aluminum, and it's filled with an organic solvent.

4    If you go to specifics, if you go to the Makita

5    production, there are material data sheets in there

6    that will give you specifics and percentages of

7    each of those materials, steel, copper, the

8    electrolyte solution and some of the other

9    materials we just talked about.

10        Q.    (By Mr. Lesnick) You know --

11        A.    It varies --

12        Q.    -- I'm looking at your references of

13    documents back on Page 3, documents that have been

14    reviewed.  You've put in here various discovery

15    materials, including but not limited to the Makita

16    production.  Are you talking about all the Makita

17    documents that were produced in this matter and

18    that's what you're referencing when you're saying

19    the Makita production?

20        A.    In the Makita production, there are

21    material -- they used to call them MSDS, now they

22    just call them material data sheets, so those data

23    sheets include various percentages of the different

24    materials that are included in the -- in each of

25    the batteries.  It's a little bit different from

1    battery vendor to battery vendor, but even amongst

2    the battery vendors, they have different -- some

3    variations between different cell IDs, so even, for

4    example, the Sony energy batteries cells, those

5    cells can have different chemical make-up depending

6    on which version you have.

7        Q.    Lithium-ion battery cells contain a

8    cathode, right?

9        A.    A cathode, anode, cathode, right.

10       Q.    What material are cathodes made of?

11            MR. BARTON:  Objection.  Vague, but go

12   ahead.

13       A.    Those would be aluminum sheet primarily

14   with a coating on it.

15       Q.    (By Mr. Lesnick) Lithium ion batteries

16   contain anodes, right?

17       A.    Correct.  That would be your copper sheet,

18   your copper layer.

19       Q.    My question would be; what material is an

20   anode made of?

21       A.    The copper layer with an SEI coating on

22   it.

23       Q.    How does a lithium-ion battery operate?

24       A.    It's an energy -- it's an electrical

25   energy storage device, so after it's manufactured

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    and assembled.  There's an additional charge put on

2    it.  It's shipped as a cell and then it goes to a

3    manufacturing facility where they assemble it into

4    a battery pack with a battery management system

5    attached.

6        Q.    How does it provide power?  Like, how do

7    you get power from a lithium-ion battery cell?

8        A.    It's electric.

9        Q.    Is there a chemical reaction that needs to

10   occur or anything like that?

11       A.    It's an electrical chemical reaction

12   inside the cell.

13       Q.    Other than copper, are there any other

14   materials that an anode can be placed on?

15            MR. BARTON:  Objection.  Vague.

16       A.    I believe, in this matter, what is

17   indicated in the -- in the safety, the material

18   data sheets is that they're copper anodes.

19       Q.    What material are you talking about?

20       A.    The Makita production.

21       Q.    Did you ever -- did you ever determine if

22   any -- if the cells that Mr. Eskra -- the cell that

23   Mr. Eskra determined was causal was a Makita cell

24   that was used in Makita power tools?  Did you ever

25   come to a conclusion on that issue?

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    A.   The tabbing -- again there's some

2  confusion in Mr. Eskra's file about what cell he's

3  actually talking about.  I discuss that in my

4  report, so if we go to that portion of the report,

5  just to make sure we're clear, he refers to the

6  battery as being marked 3-C.

7    Q.   What page are you on?  Sorry.

8    A.   Yeah, let's get there.  I'm on Page 37,

9  Item 2, where he has Exhibit 267.  Are you with me

10  on 2-A?

11    Q.   Yes.  This is in answer to the -- if you

12  addressed whether or not the cells were Makita

13  cells, right?  Cells that would be from Makita

14  power tools?

15    A.   Right.  Because one of the -- one portion

16  of your question says the Makita battery that Mr.

17  Eskra said was the cause of this fire, and there's

18  some confusion in that, in that if you look at his

19  suspect cell analysis, which is Exhibit 267

20  included in his file, he identifies a pair of

21  batteries coming from area 3-C, and actually if you

22  look at 3-C, 3-C is actually a bag that contains

23  five cells, not a pair of cells, so what was

24  actually scanned and attached to his 3-C analysis

25  turned out to be, when we compared his imaging to

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    our imaging, was that that bag was actually from

2    3-B, not from 3-C, and that battery was not -- that

3    bag was not a bag of five cells, it was a bag of

4    two cells, so I think there's a little confusion in

5    there in his analysis as to which cells he's

6    actually referring to.  However, if you look at --

7    if you look at the tabbing on 3-D, 18, tabbing

8    would be consistent with a Makita, with Makita

9    battery tabbing.

10        Q.   Let me ask you about SEI layers.  What is

11   a solid electrolyte interface?

12        A.   So it's the interface between -- so

13   there's -- between the separator and between the

14   layers, there's an SEI layer and that's what helps

15   with the chemical reaction with the organic

16   solvents.

17        Q.   And what does an SEI layer do on the

18   anode?

19            MR. BARTON:  Objection.  Vague.

20        A.   It's part of the chemical make-up of the

21   battery and part of the chemical process that

22   occurs when you charge and discharge the battery.

23        Q.   (By Mr. Lesnick) Does it have a chemical

24   interaction, the SEI layer, with the anode?

25        A.   It's electrical chemical reaction between

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1   a solid --

2       Q.   It has a similar -- does it have a similar

3   reaction with the cathode?

4           MR. BARTON:  Were you done with your

5   answer?

6       A.   The two have different -- the two have

7   different coatings on them, on the current

8   collector.  So the aluminum current collector has a

9   coating and the copper current collector has a

10  coating.  One is graphite or carbon-based and the

11  other -- I can't remember the other one, but I

12  would have to look at the safety data sheets or the

13  material data sheets to see what these particular

14  batteries are using on different layers.

15      Q.   Have you ever designed a battery cell

16  before?

17      A.   No.

18      Q.   Have you ever designed a battery pack

19  before?

20      A.   No.

21      Q.   Have you ever tested a battery cell to

22  failure before?

23          MR. BARTON:  Objection.  Vague.

24      A.   I'm not clear about how you would test a

25  battery to failure.  So I've done some battery

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1   testing, but I'm not sure what you mean by testing

2   it to failure.

3        Q.   (By Mr. Lesnick) I thought you wrote in

4   here that Mr. Eskra had never tested a battery cell

5   to failure before, right?  Didn't -- isn't that the

6   words you used in your report?

7        A.   I don't recall that.  If you want to point

8   me to it, we can talk about it.

9        Q.   Okay.  Where were we?  Page 38.  Page 37.

10  We were just talking about how he didn't test it.

11  I want to find it.  This is on Page 39, F here,

12  7-F, "None of the batteries subjected -- subject to

13  testing by ETP ever failed."  So in your definition

14  of failed here, have you ever done similar type

15  testing to get a battery to fail?

16            MR. BARTON:  Objection.  It confuses and

17  misstates Paragraph 7-F.  Subject to that, go

18  ahead.

19       A.   And what I'm talking about, just so we're

20  clear, when I'm talking about F is that none of the

21  testing that he had done has he ever proven that

22  what he says existed in the battery after he

23  completes that test, in fact, exists, and that's

24  what that is talking about.  And even after abusing

25  these batteries during his testing, none of them

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    resulted in any fire condition and so, what

2    failure, you know, where has he proven that his

3    testing causes this damage to the SEI layer.

4         Q.    (By Mr. Lesnick) Well, what did you mean

5    by failed in Number F -- Letter F here?

6         A.    Well, none of the tests -- well, none of

7    them ever failed in a manner that he's alleging

8    that the particular battery in this case failed.

9    He's saying this battery after proper use sat there

10   and all of a sudden became an ignition source for

11   this fire.  He's abused these batteries in his lab

12   and has never replicated that condition.  That's

13   what I mean.

14        Q.    Have you ever tested batteries to cause

15   them to ignite to the point where they ignite?

16        A.    By exposing them to fire, yes, certainly.

17        Q.    Other than exposing them to the fire, any

18   other ways that you've ever tested them to cause

19   them to ignite?

20        A.    I've never had -- no, I have not.

21        Q.    How many different failure modes are there

22   for a lithium-ion battery cell?

23             MR. BARTON:  Objection.  Improper

24   hypothetical.  Vague.  Calls for speculation.  Go

25   ahead.

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1       A.    Yeah, there's many.  We'll leave it at

2    that.  You can have mechanical abuse, electrical

3    abuse, thermal abuse, any of those can lead to

4    failure of a battery.

5       Q.    (By Mr. Lesnick) Can you have an internal

6    short lead to the failure of a battery?

7       A.    Under some circumstances, I think that's a

8    very remote -- a very remote issue, but yes, you

9    could have that.

10       Q.    How would that occur under those

11    circumstances you're referencing?

12            MR. BARTON:  Objection.  Calls for

13    speculation.  Improper hypothetical.  Go ahead.

14       A.    How could that occur or how did that

15    occur?  Is this a hypothetical?

16       Q.    (By Mr. Lesnick) Yeah.  How could that?

17    You said under certain circumstances.  So give me

18    one of the circumstances you're talking about.

19            MR. BARTON:  Same objections.

20       A.    So this is -- this particular issue is

21    addressed in some context in part by the reference

22    document that I included under K on Page 4, where I

23    talk about the lithium-ion batteries hazard and use

24    assessment, K-4, so that's addressed to some extent

25    in that document where it talks about mechanical

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1   abuse, electrical abuse, thermal abuse to

2   batteries, and how that can cause an event.

3   Others, and it's a very small percentage, could be

4   manufacturing defects in the battery itself.

5       Q.   (By Mr. Lesnick) Can an electrical short

6   within a lithium-ion battery cause it to fail?

7           MR. BARTON:  Object to form.  Calls for

8   speculation.  Improper hypothetical.  Go ahead.

9       A.   An electrical short in a battery could

10  cause it to go into thermal run-away, that's

11  correct.  And there's a lot of ways to create that

12  electrical short, including an external fire.

13      Q.   (By Mr. Lesnick) I'm going to go to Page

14  40 here.  These Eskra cell elimination criteria,

15  E-1 through E-6, you say his causal cell criteria

16  are C-1 through C-6.  Did you test E-1 through E-6

17  and see C-1 and C-6 on all of the batteries you

18  examined in this matter?

19      A.   I'm not clear on what you mean by that.  I

20  don't understand your question.

21      Q.   Let me do it in a more succinct way here.

22  On Page 44 here, you say, "The following analysis

23  was performed by Schaefer Engineering.  When

24  measured, the relatively flat" -- you can read what

25  it says, "Due to the damage to and partial ejection

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    of the cell contents, the spacing between the jelly

2    roll and the negative end could not be measured.

3    The measured bowing of the negative end does not

4    indicate any difference."  So I see a few things

5    listed here.  You're talking about E-3, and in

6    parentheses E-1.  Did you examine, with regard to

7    battery pair 3-B 15, the E-1 through E-6 and the

8    C-1 through C-6 items that you reference?

9         MR. BARTON:  Object to form.  Compound.

10   Misstates the quotation of the report.  Go ahead.

11   A.   And so what I'm doing here is, first of

12   all, I am, as best as possible from Mr. Eskra's

13   testimony and report, I come -- I try to take and

14   help him formulate an organized criteria, so E-1

15   through E-6 is my best interpretation of what he's

16   saying both combined with his report and his

17   testimony in this case.  If I went to a different

18   case, it might be different, but again in this

19   case, this is what he's saying in terms of his

20   elimination criteria and his causal criteria, and

21   by the way, he also says that that criteria could

22   exist on a cell that was not causal to a fire.  For

23   example, you know, these six causal criteria, C-1

24   through C-6, these are things that I would look for

25   in the causal cell, but all of these, any one of

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    these or all of these things could exist on a

2    battery that was exposed to fire damage, so there

3    is that about it.  So the examples I'm giving on

4    the following pages after that discussion are

5    pointing out inconsistencies in the application --

6    when you apply his criteria and try to do some

7    quantitative analysis, for example, on the bowing

8    of the negative ends.  I'm trying to take this past

9    where he says a little bit bowed or somewhat bowed,

10   you know, he uses this soft terminology, so I'm

11   trying to pinpoint, you know, what is he really

12   saying here, so when I compare his cells, the

13   bowing of the negative end or lack of bowing in the

14   negative end and compare it to his cells and the

15   other cells, these other cells appear to be more

16   fit to the criteria than the cell he selected as

17   the causal cell.

18       Q.   (By Mr. Lesnick) So when you examined

19   battery 3-B 15, did you go through E-1 through E-6

20   as described in your report to analyze battery pair

21   3-B 15?

22       A.   Well, I'm only pointing out the items

23   that -- it's not in the report, it's not something

24   I evaluated on that particular cell for those

25   particular points.

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1      Q.   Okay.  So for battery pair 3-B 15, which

2   Eskra methodology points, whether it's E-1 through

3   E-6 or C-1 through C-6, did you utilize -- or I

4   guess is discussed here in your report?  Let's ask

5   it that way.

6      A.   Sure.  I mean, the report speaks for

7   itself.  If we look on Page 44, I talk about the

8   bowing at the negative end there on the second to

9   last paragraph, so there's no significant

10  difference between the two, so how -- yeah, we've

11  got how these pass the group cell with similar

12  appearance and the bowing negative end criteria, so

13  it's E-1 and E-3 that I'm talking about there,

14  appears to be subjectively defined by Eskra as he

15  simply cites external area difference, the bottom

16  is rounded outward versus relatively flat, so I'm

17  trying to come up with a measurable criteria by

18  which we can apply the analysis of the bowing of

19  the negative end and there just isn't any -- any

20  number that works, because when you look at other

21  cells and you compare group pairs of cells, I've

22  got flat and more bowed or more flat and less bowed

23  and those were ones that weren't evaluated.

24     Q.   Okay.  I got you on what you evaluated,

25  you talk about E-3 and E-1, and so you didn't

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    evaluate E-2, E-4, E-5 or E-6?

2        A.   Let's look.  Let me break this report

3    apart here so I can get the two in front of me.

4    For this pair, I'm talking about criteria E-1 and

5    E-3 of his elimination criteria.

6        Q.   Did you evaluate E-2, E-4, E-5 and E-6 for

7    this pair?

8        A.   I don't believe so.  It's not included

9    here in the analysis.

10       Q.   Okay.  You talk about -- let me ask you

11   this.  Did you evaluate C-1, C-2, C-3, C-4, C-5 or

12   C-6 for that battery pair 3-B 15?

13       A.   Some of these are corollaries to the

14   other, and to the extent that, for example, C-6 is

15   a corollary to E-3, to that extent, I did.  So I

16   compared it on the E-3 criteria, so the corollary

17   is C-6 where we got group cells with dissimilar

18   appearance, which is the corollary E-3, which is

19   group cells with similar appearance, so to that

20   extent, yes.

21       Q.   Page 46 here -- I'm sorry.  Not 46.  48

22   here, you analyzed cell pair 3-B 11, correct?

23       A.   On Page 46?

24       Q.   Sorry.  That's 48, I apologize.

25       A.   Yes, okay.  So I'm on Page 48.  Now what's

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    the question?  Cell pair 3-B 11.

2        Q.   You analyzed that cell pair, correct?

3        A.   I used that as a reference to where the --

4    his criteria does not work, correct.

5        Q.   Okay.  I see that there's a C-1, C-2 and

6    C-4 referenced here on the page.  Did you analyze

7    C-3, C-5 or C-6?

8        A.   I don't mention that.  I'm giving examples

9    here, so I don't mention that in my example, but

10   certainly I could go back and do that.  Again, I'm

11   pointing out examples as to how his criteria just

12   doesn't work.

13       Q.   Have you done that already?  Analyzed

14   those other three factors?

15       A.   I don't talk about it in the report, so I

16   would say that I have not done that analysis for

17   this pair of cells.

18       Q.   Page 50 talks about analysis of cell pair

19   3-B 16, and as I look at the top --

20       A.   I'm sorry?

21       Q.   -- of Page 51 --

22       A.   50, okay.

23       Q.   50 talks about cell pair 3-B 16, figure 23

24   and, any of 51, I think you discuss the analysis of

25   it and you cite to C-1, C-2 and C-4.  For that one,

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    did you address or analyze C-2, C-3, C-5 -- I'm

2    sorry.  C-3, C-5 or C-6?

3         A.   I have not given that analysis of that

4    pair of cells prior to today, but certainly I can

5    do that.

6         Q.   Page 52, you say the cell grouping meets

7    all of expert Eskra's causal criteria, C-3.01,

8    right?  That's what it says here?

9         A.   That's what it says.  In fact, he refers

10   to, in his suspect cell paper, he refers to 3-C,

11   but the scans that are attached to it are not C-3.

12        Q.   Where is the analysis that shows that it

13   met C-1 through C-6 for this grouping in this

14   report?

15        A.   What do you mean where is the analysis?

16        Q.   You say cell groupings meet all of Eskra's

17   causal criteria, C-1 through C-6, so is there an

18   analysis that accompanies that statement?  Maybe I

19   missed it.  I'm just trying to figure out where in

20   the report you discuss how it meets C-1 through

21   C-6.

22        A.   So I don't expound about that in a great

23   amount of detail, but we can do that if you'd like.

24        Q.   No, that's okay.  I was just asking where

25   to find it in the report.  It's not in the report?

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1        A.    No, but we can cover it right now, if

2    you'd like.  We show it, clearly, if you look at

3    the image in Figure 25 and the image in Figure 26,

4    it points out some of the details of those battery

5    cells.  For example, in Figure 25, looking at the

6    center cell, the center cell looks generally flat,

7    and the two outer cells look generally bowed, so

8    from a quick visual, that would be -- that would

9    cover C-1 where we got little to no bowing on the

10   negative end of that center cell, little to no

11   jelly roll extension to where the jelly roll hasn't

12   moved on that center cell, little to no primary

13   crimp extension applies.  If you look at the image,

14   the crimp is still there and intact and not pushed

15   out.  The jelly roll pushed to both the negative

16   and positive end.  There's some encroachment of the

17   jelly roll material into the head space near the

18   cap end, and there's also encroachment into the

19   head space at the negative end.  So it meets all

20   that criteria.  The outer layers intact compared to

21   the inner layers.  If you look at the material in

22   the image there, you can see that we've got melting

23   all the way into that center mandrel where we've

24   got alteration of the cell layer all the way into

25   the center mandrel with some of the outer layers

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    still intact, especially at the negative end.  And

2    then group cells with dissimilar appearance,

3    clearly we've got dissimilar appearance between the

4    three cells in that grouping, so it meets all the

5    criteria of C-1 through C-6 and yet --

6         Q.   Let me back up --

7         A.   -- that one was not --

8         Q.   I'm sorry.  Was there more?

9         A.   Yes.  And that one was not scanned by

10   Eskra and it was already eliminated, however, if

11   you go to his -- again if you go back to that

12   exhibit we talked about earlier, he starts talking

13   about 3-C being his suspect cell, but the images

14   that he attaches in his report are not of 3-C.

15        Q.   So on Page 48 and 49, we're talking about

16   3-B 11.  Did you find any -- in this section here,

17   did you find any distortion along the walls of the

18   cell in Figure 20?

19             MR. BARTON:  In 20?

20        A.   In Figure 20, we've got a cell pair and if

21   we call the cell on top the A battery and the cell

22   on the bottom of Figure 20, we have more distortion

23   in the B cell than we do in the A cell.

24        Q.   (By Mr. Lesnick) Did you address that in

25   your report anywhere?

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1       A.   No, it's obvious in the image, so I

2   address it by including the image to show what the

3   image shows.

4       Q.   In Figure 23 on Page 50, is there

5   distortion along the walls in the cells on Figure

6   23?

7       A.   Okay.  So you're on Figure 23 on 50?

8       Q.   Yes.

9       A.   Again so we've got two cells in Figure 23

10  called the top cell A and bottom cell B for

11  reference.  The top cell has some distortion along

12  the walls at various points and the bottom cell has

13  distortion towards the cap end or the positive end

14  in the bottom section.  You're not here so I can't

15  mark to show that distortion, but certainly there

16  are areas of distortion in that cell.

17      Q.   Let's go to Page 53.

18      A.   And it looks very similar to what's in

19  Figure 22.

20      Q.   Page 53 has CT cross-sections of group 3-B

21  12 and you have an analysis of that.

22      A.   What --

23      Q.   Did you analyze --

24      A.   What page are you on?

25           MR. BARTON:  53.

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1       Q.    (By Mr. Lesnick) 53.

2       A.    Yes.

3       Q.    53, there's a picture of 3-B 12, what

4    steps of the Eskra method you outlined did you

5    perform in your analysis of 3-B 12?

6       A.    Let me walk through this just for a

7    minute.  I'm comparing that grouping of cells to

8    3-B 15, and what we're really talking about there

9    is E-3, C-6, where you've got a grouping of cells

10   that externally are different that you want to do a

11   further deep dive on, and yet, what we see in 3-B

12   12 is we've got cells that are -- that have

13   combinations of ejected/not ejected, bulged

14   ends/not bulged ends, flat ends, various states of

15   condition of the jelly roll and two that appear to

16   be almost nearly ejected, so when you compare that,

17   when you compare those images to what we have in

18   3-B 15, the criteria wasn't applied to what has

19   been done in 3-B 12, that dissimilar material.

20      Q.    Other than addressing E-3 and C-6 that you

21   talk about, did you analyze the other Es and Cs

22   with these images?

23            MR. BARTON:  Asked and answered.  The

24   witness literally just testified to that.

25      A.    Yes, if you look at the left image of

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    Figure 27, there are five cells there and some of

2    those have flat anodes and some of them have bulged

3    anodes and flat and bulged is a subjective thing

4    because there's not a measurement that Mr. Eskra

5    can tell us fits his criteria, how flat and how

6    bowed is it that puts it into one category or the

7    other, and that's part of what we're seeing here in

8    this section of the report.  The other part is you

9    can see we've got various stages of pushing of the

10   jelly roll into the head space of the anode and

11   cathode ends to various degrees.  We've got a gas

12   pocket, for example, on the fourth cell down on the

13   left and no gas pocket on the third cell down, so

14   when you start applying all these criteria, you can

15   tell that 3-B 12 is one that fits his criteria for

16   requiring further analysis, and yet, there was no

17   further analysis done.  It was just skipped over

18   and when you compare that criteria to what he's

19   saying about 3-B 15, they're very similar in the

20   differences between the cells.  One of these things

21   is not like the other.

22       Q.   (By Mr. Lesnick) I'm going to pull up what

23   we're going to mark as Exhibit 18, and I promise

24   you.  I'm very close to being finished.

25            (Plaintiff's Exhibit 18 marked for

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1              identification.)

2       Q.   This was a document that was provided to

3   us last night called Samsung Specification of a

4   Product, supposedly it's in your file material.  Do

5   you recognize this document?

6       A.   Yes.

7       Q.   Okay.  What is this?

8       A.   Actually.  I didn't have it in the actual

9   project file one from -- one from -- it's based on

10  a spec sheet on a particular Samsung battery.  It

11  has one of the batteries that the Makita production

12  says they include in their battery packs.  So

13  they've got this battery from Samsung plus two

14  others from Sony or some later Sony company,

15  Murata.

16      Q.   Okay.

17      A.   So this is just one --

18      Q.   Did you find any Samsung battery -- did

19  you find any Samsung batteries at the site or

20  collected from the site when you gathered the

21  evidence?

22      A.   None of the cells had cell identification

23  markings on them that survived, with the exception

24  of the one that was in the parking lot, and we went

25  over that in my notes this morning.  I'd have to go

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

 1   back and look and see what that one says.  It's

 2   been a long time ago.

 3       Q.   Now, in terms of this matter, you've

 4   completed all the investigation and review of the

 5   materials that you're required in order to

 6   determine an area of origin, right?

 7       A.   Correct.

 8       Q.   Okay.  In this particular matter, you've

 9   completed all of the investigation review of

10   materials required in order to determine that a

11   battery or battery tool or battery charger did not

12   cause the fire, correct?

13       A.   Can you give that to me one more time?  It

14   was kind of a long question there.

15       Q.   Yeah.  In terms of this particular matter,

16   you've completed all of the investigation and

17   review of the materials you required in order to

18   determine that a battery or a battery tool or

19   battery charger was not the cause of the fire,

20   correct?

21       A.   That's correct.

22       Q.   Your ultimate opinion about the fire's

23   cause, you didn't come up with an opinion on that,

24   correct?

25           MR. BARTON:  Object to form.  Misstates

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1  the testimony today and his report.  Go ahead.

2      A.   Presently, it's undetermined.  The cause

3  is undetermined.  That is an --

4      Q.   (By Mr. Lesnick) That okay.  So your

5  present opinion is that it's undetermined?

6      A.   It's undetermined.

7      Q.   You didn't analyze any other ignition

8  sources, right?  Other than the ones we discussed

9  during this deposition, correct?

10          MR. BARTON:  Asked and answered.

11     A.   There's been a lot discussed, other

12  ignition sources discussed during this deposition,

13  so if you include all those, yes.  I've not done

14  anything other than what we've talked about.  I

15  gave you some examples of other potential ignition

16  sources.

17     Q.   (By Mr. Lesnick) Was there any material or

18  evidence that you weren't able to review that

19  hindered your conclusions in that matter or forming

20  of your conclusions in this matter?

21          MR. BARTON:  Objection.  Vague and

22  compound.  Calls for speculation and parts of it

23  were asked and answered earlier today.  Go ahead.

24     A.   I wasn't able to look at the x-rays that

25  form the bases of some of the opinions that have

1    been offered by the plaintiff expert team.  They

2    relied on those x-rays as part of their

3    investigation.  I have not seen those.  I have

4    requested them.  Other than that, I can't think of

5    anything else at this point.

6        Q.   All right.  Give me two minutes.  I may be

7    done.  I don't have any more questions for you, Mr.

8    Reagan, so thank you for your time today.  I know

9    this was really long, so I appreciate you sitting

10   through this whole thing.

11            MR. BARTON:  The witness will read and

12   sign.

13            VIDEOGRAPHER:  This deposition is

14   concluded at 3:53 p.m.

15

16

17

18

19

20

21

22

23

24

25

USDC IN/ND case 3:21-cv-00252-DRL    document 86-4    filed 12/13/23    page 262 of 301
John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1          STATE OF MISSOURI.

2

3                              SS.

4          CITY OF ST. LOUIS

5

6          I, Margaret M. Perry, qualified and

7     authorized to administer oaths and to certify to

8     depositions, do hereby certify that pursuant to

9     Notice in the civil cause now pending and

10    undetermined in the United States District Court,

11    Eastern District of Missouri, Eastern Division, to

12    be used in the trial of said cause in said court, I

13    was attended by the aforesaid witness; and by the

14    aforesaid attorneys; on MAY 10, 2023.

15          That the said witness, being of sound mind

16    and being by me first carefully examined and duly

17    cautioned and sworn to testify the truth, the whole

18    truth, and nothing but the truth in the case

19    aforesaid, thereupon testified as is shown in the

20    foregoing transcript, said testimony being by me

21    reported in stenotype and caused to be transcribed

22    into typewriting, and that the foregoing pages

23    correctly set forth the testimony of the

24    aforementioned witness, together with the questions

25    propounded by counsel and remarks and objections of

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1    counsel thereto, and is in all respects a full,

2    true, correct and complete transcript of the

3    questions propounded to and the answers given by

4    said witness; that the signature of the deponent

5    was not waived by agreement of counsel.

6                    I further certify that I am not of

7      counsel or attorney for either of the parties to

8      said suit, not related to nor interested in any

9      of the parties or their attorneys.

10           Witness my hand at St. Louis, Missouri,

11    this 16th day of May, 2023.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1             May 16, 2023

2             Mr. Jonathan Barton

3             Ms. Megan Oliver

4             Stanton Barton

5             8000 Maryland Avenue

6             Clayton, Missouri  63105

7             (314) 455-6500

8             jbarton@stantonbarton.com

9             moliver@stantonbarton.com

10

11        RE:  Deposition of John Reagan

12        Date:  May 10, 2023

13        Case:  American Assurance vs. Makita

14

15        Mr. Barton,

16

17            Your witness did not waive the right to

18    read and sign his/her deposition in the

19    above-referenced matter.  Enclosed is the copy

20    of the deposition you ordered, together with

21    errata sheets and additional signature page.

22    Please instruct your witness to read the

23    transcript, list any corrections (including page

24    and line number) On the errata sheets, sign and

25    date the errata sheets and signature page.

1
2          Within 30 days, please return the errata
3     sheets and signature page to our office for
4     further processing.  Your prompt cooperation
5     will be appreciated.
6
7      Sincerely,
8
9
10     360 Litigation Services
11     Production Department
12     10097 Manchester Road, Suite 102
13     St. Louis, Missouri  63122
14     (314) 394-2206 (main)
15     (314) 394-2287 (fax)
16     Office@360litigationservices.com
17
18
19
20
21
22
23
24
25

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1              E R R A T A

2

3    PAGE     LINE      CHANGE

4

5    ____     ____      _____

6

7    ____     ____      _____

8

9    ____     ____      _____

10

11   ____     ____      _____

12

13   ____     ____      _____

14

15   ____     ____      _____

16

17   ____     ____      _____

18

19   ____     ____      _____

20

21   ____     ____      _____

22

23   ____     ____      _____

24

25

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1

2    **PAGE    LINE    CORRECTIONS**

3

4    \_\_\_\_    \_\_\_\_    _____

5

6    \_\_\_\_    \_\_\_\_    _____

7

8    \_\_\_\_    \_\_\_\_    _____

9

10   \_\_\_\_    \_\_\_\_    _____

11

12   \_\_\_\_    \_\_\_\_    _____

13

14   \_\_\_\_    \_\_\_\_    _____

15

16   \_\_\_\_    \_\_\_\_    _____

17

18   \_\_\_\_    \_\_\_\_    _____

19

20   \_\_\_\_    \_\_\_\_    _____

21

22   \_\_\_\_    \_\_\_\_    _____

23

24   \_\_\_\_    \_\_\_\_    _____

25

1

2

3      **PAGE     LINE     CORRECTIONS**

4

5      \_\_\_\_      \_\_\_\_      _____

6

7      \_\_\_\_      \_\_\_\_      _____

8

9      \_\_\_\_      \_\_\_\_      _____

10

11     \_\_\_\_      \_\_\_\_      _____

12

13     \_\_\_\_      \_\_\_\_      _____

14

15     \_\_\_\_      \_\_\_\_      _____

16

17     \_\_\_\_      \_\_\_\_      _____

18

19     \_\_\_\_      \_\_\_\_      _____

20

21     \_\_\_\_      \_\_\_\_      _____

22

23     \_\_\_\_      \_\_\_\_      _____

24

25

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1        Comes now the witness, JOHN REAGAN, and

2    having read the foregoing transcript of the

3    deposition taken, acknowledges by signature

4    hereto that it is a true and accurate transcript

5    of the testimony given on the date hereinabove

6    mentioned.

7

8

9

10        _____

11        JOHN REAGAN

12

13

14        Subscribed and sworn to me before

15    this_____day of _____, 2023.

16

17

18        My Commission expires:

19

20

21

22

23    _____

24        Notary Public.

25

USDC IN/ND case 3:21-cv-00252-DRL    document 86-4    filed 12/13/23    page 270 of 301
John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

```
1       COURT REPORTER'S CERTIFICATE

2      FOR FILING OF ORIGINAL TRANSCRIPT

3

4

5     American Assurance vs. Makita

6     Deposition of John Reagan

7     May 10, 2023

8

9     Reported by:  Margaret M. Perry, CCR.

10

11

12    ATTORNEY HOLDING ORIGINAL TRANSCRIPT:

13

14    Mr. Ben Lesnick

15     Denenberg Tuffley

16     28411 Northwestern Highway

17     Southfield, Michigan   48034

18     (248) 549-3900

19     blesnick@dt-law.com

20

21

22    TAXING INFORMATION

23

24    Tax Behalf of PLAINTIFF

25    Mr. Ben Lesnick
```

USDC IN/ND case 3:21-cv-00252-DRL    document 86-4    filed 12/13/23    page 271 of 301
John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

```
 1    Denenberg Tuffley

 2    28411 Northwestern Highway

 3    Southfield, Michigan  48034

 4    (248) 549-3900

 5    blesnick@dt-law.com

 6    ORIGINAL/COPY          $

 7

 8    ATTENDANCE             $

 9

10    OTHER                  $

11

12    TOTAL TAX              $

13

14

15

16   TAX BEHALF DEFENDANT

17   Mr. Jonathan Barton

18    Ms. Megan Oliver

19    Stanton Barton

20    8000 Maryland Avenue

21    Clayton, Missouri  63105

22    (314) 455-6500

23    jbarton@stantonbarton.com

24    moliver@stantonbarton.com

25   COPY                    $
```

John Reagan - May 10, 2023

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

1

2    OTHER                        $

3

4    TOTAL TAX                    $

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

**$**

**$90,000** 117:3

**0**

**000830** 168:21

**1**

**1** 10:12,13,24 36:15
47:19,23 77:22
79:25 80:5,11
108:22 113:4 194:2
199:12 201:22
210:23 216:14

**1-B** 217:14 221:14

**1/19/2023** 101:9

**1/30** 101:25

**1/31** 101:25

**10** 17:25 48:5 53:20
56:9,15,18,19,24,25
57:3 58:12,21,22,24
60:9,10 77:3 96:9,
10 97:1,5 177:17,20
188:19 203:12
214:10,12 261:14
263:12

**10/5/2022** 97:24

**10/9/2020** 70:16

**100** 18:9

**10097** 264:12

**102** 264:12

**10:16** 65:4

**10:27** 65:7

**10th** 6:11

**11** 18:12 78:18
79:13,16 96:15,17,
20,24 97:2,5 143:22
172:8 249:22 250:1
253:16

**11:42** 115:24

**11:54** 116:2

**11th** 66:15

**12** 18:20 84:24
94:17 99:22,23
100:1 147:4,5 172:4
254:21 255:3,5,12,
19 256:15

**12/7/2020** 71:2

**12:27** 143:16

**12:53** 143:19

**12:57** 146:20

**13** 73:23 84:9 91:13
99:22,23 100:6
151:17 155:10
220:20

**14** 148:1,2,15 161:5

**14-foot** 149:23

**14-inch** 149:22

**144** 114:17

**14th** 217:16,23,25
218:6

**15** 19:19,23 136:7
149:2,5 152:8,9
156:5 158:3 168:18
170:2 181:1,19
214:10,12 246:7
247:19,21 248:1
249:12 255:8,18
256:19

**15-second** 180:23

**15.6** 170:1

**150** 217:17,18

**159** 174:15

**15th** 72:16

**16** 19:25 71:1 74:12
75:4 110:21 112:14
170:5,11 250:19,23
263:1

**16th** 76:12 262:11

**17** 20:7 66:6,13
70:15 74:12 77:22
170:5 217:19,20
218:8

**17-page** 66:2

**17th** 76:12

**18** 20:21 74:12
170:5 240:7 256:23,
25

**1850** 225:22

**18650** 79:23

**19** 21:1 82:11 94:6
140:15 183:3

**19.7** 94:1,6

**1:09** 146:23

**2**

**2** 12:14 27:1,3 28:2
38:22 39:3 47:20
65:9 66:23 68:21
76:25 79:25 83:4
86:5,11,13 87:21,22
89:25 90:14 91:1
96:13 101:20,21
117:24 119:14
122:20 124:15,17
143:21 147:1 161:5
189:10,19,24
202:17 211:12
217:14 227:25
239:9

**2-A** 239:10

**2/12/2021** 73:24

**2/16** 75:24 77:3,22

**2/17** 75:24

**2/17/2021** 77:7

**2/19** 84:9

**2/7/2023** 101:8

**2/8/2021** 72:17

**20** 9:14 21:8 82:22
136:7 156:5 158:3
159:23 172:1
180:14,21 183:2,3
184:3 218:18
253:18,19,20,22

**20-minute** 143:13

**20-page** 100:4

**2000** 42:20

**2000s** 222:7

**2003** 40:6

**2018** 42:21

**2019** 43:13 217:16,
25

**202** 22:25

**2020** 66:14,25 67:2,
18 69:7

**2021** 40:14 41:25
73:17 76:8,12 77:3,
22 83:16 87:1,5
88:10,21 107:12
183:9

**2022** 89:23 100:15
107:12,13 148:19

**2023** 6:11 39:8,9
40:3 43:13 114:2,5,
14,18 117:7,15
118:6 261:14
262:11 263:1,12
268:15

**21** 21:8 78:22
193:15 198:4 213:4

**22** 21:13 78:21 79:6
95:25 199:4 218:20
254:19

**22-page** 77:21,23

**23** 21:20 250:23
254:4,6,7,9

**24** 21:20 203:3,6,12

**24-hour** 23:18

**25** 24:5 149:6
252:3,5

**253** 65:14

**254** 38:24

**255** 39:2

**26** 36:19 86:4 92:2
95:3 252:3

**260** 43:10

**260-page** 118:2

**263** 27:8

**267** 239:9,19

**27** 37:9 89:22
207:1,24 256:1

**28** 37:21

**29** 67:17 92:24
152:11,19 207:25
208:2

**29th** 69:7

**2:37** 212:24

**2:43** 213:2

**2x4** 191:9

**3**

**3** 10:23 11:4 13:1,8
23:8 28:20 40:13
47:20 65:14,21,22
70:14 73:22 75:22
80:1 84:8 91:6,17
97:22 100:5,7 101:7
113:3 119:14 121:6,
12 124:15,20
200:15 202:24
205:24 206:2 211:8,
12 212:15 213:5
236:13

**3-B** 222:25 240:2
246:7 247:19,21
248:1 249:12,22
250:1,19,23 253:16
254:20 255:3,5,8,
11,18,19 256:15,19

**3-B-17** 82:12

**3-B-18** 82:16,17

**3-B.15** 110:23

**3-C** 108:15,16
225:7 239:6,21,22,
24 240:2 251:10
253:13,14

**3-C-01** 82:22

**3-D** 41:25 42:7
240:7

**3/21/2023** 113:4

**3/31** 113:7,12 114:4

**3/31/2023** 113:25
114:8

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

**3/4/'21** 85:1

**3/5/2021** 73:23

**3/8/'04** 84:25

**3/8/'21** 85:1

**30** 152:19,20,25
218:23 264:2

**31** 152:20,21

**31-page** 90:15

**314 394-2206**
264:14

**314 394-2287**
264:15

**314 455-6500**
263:7

**31st** 116:17 117:7,
15

**32** 152:11,21,22
215:22 219:3

**325** 65:15

**34** 219:5

**36** 221:10

**360** 6:21 264:10

**37** 239:8 242:9

**38** 227:12 242:9

**39** 228:19 242:11

**3:00** 115:21

**3:21-CV-00252-
JD-MGG** 6:18

**3:53** 260:14

**3rd** 66:25 67:2
148:19

___

**4**

**4** 13:2 14:8 25:2
28:4 31:24 32:25
41:25 47:20 66:20,
21,23 67:24 73:5,6,
11 88:12 89:7 93:24
101:7 114:16 121:6
213:19 244:22

**4-H** 165:4

**4.2** 116:5

**4.5** 116:5

**4/8** 84:25

**4/8/2021** 84:25

**40** 159:16 245:14

**4133** 161:7

**44** 110:21 245:22
248:7

**46** 148:21 149:7
249:21,23

**469** 169:24

**469th** 169:25

**47** 148:21

**48** 249:21,24,25
253:15

**49** 253:15

**4:00** 115:21

___

**5**

**5** 14:16 23:8 32:6,13
34:1 43:11 47:20,23
67:12 77:14,15
124:4 177:20 215:6

**5.10** 116:6

**5.6** 116:6

**50** 158:15 159:16,
21,22 250:18,22,23
254:4,7

**50/50** 54:19,23 55:2

**500** 8:19

**51** 250:21,24

**52** 251:6

**53** 254:17,20,25
255:1,3

**5th** 114:18

___

**6**

**6** 15:2 33:20 67:17
85:22,23 86:11,20,
24 87:13,20 88:2,13

**89:**19,22 147:14

**6,2023** 114:3

**6/27** 85:15 86:23
88:11 90:4

**6/27/2022** 86:5,12,
13 87:21,22,23

**6/28** 85:15

**6/28/'22-A** 91:6

**6/28/'22-B** 91:2

**6/28/2022-A** 90:14

**6/28/2022-B** 93:12

**6/29** 85:15

**6/29/2022** 97:4,6,8,
11

**6/29/2022-A** 96:14

**60/40** 54:23 55:3

**63105** 263:6

**63122** 264:13

**69** 73:10,13

**6th** 114:1,5,14
118:6

___

**7**

**7** 15:16 34:4 67:24
86:14,15,19,24,25
87:21 88:1,9 89:2,
19,22 94:2 97:23
124:22 170:5,11
171:8,10 181:5

**7-A** 228:19

**7-F** 242:12,17

**7/8/2022** 85:13

**700** 35:3

**7th** 100:15

___

**8**

**8** 15:23 34:24 67:24
90:8,10,13 91:5
108:22 125:17
127:16 170:5 181:5

**8.5** 77:7

**8000** 263:5

**8:59** 6:10

**8th** 100:15

___

**9**

**9** 16:6 85:12 90:8,10
91:1 93:11 169:24,
25 170:6 181:5,7,10

**9.7** 94:1

**9/15** 70:16

**9/21** 70:16

**9/7** 99:19

**9/7/'22-A** 100:5

**9/7/'22-B** 100:8

**9/7/2022** 97:25

**9/8** 99:19

**9/8/2022** 97:25

**90** 218:23

**911** 216:19 217:5

**921** 70:2 123:15
193:19,23 228:6

**9:30** 221:21

**9th** 66:14

___

**A**

**a.m.** 6:10 65:4,7
115:24 116:2

**ability** 194:9 226:5,
6

**above-referenced**
263:19

**Absolutely** 217:13

**abuse** 244:2,3
245:1

**abused** 243:11

**abuses** 33:12

**abusing** 242:24

**accept** 162:12

**accepted** 47:5
69:25

**accompanies**
251:18

**accordance** 69:25
127:10

**account** 223:8
228:16

**accurate** 31:3
183:17 217:7 268:4

**accurately** 119:15
217:8

**acknowledges**
268:3

**acquisition** 20:9

**acronym** 42:6

**act** 164:6

**action** 204:14

**actions** 123:6

**active** 43:4

**activities** 120:20,
24 121:2,7

**activity** 65:16
120:16

**actual** 57:25
181:14 257:8

**ad** 202:22

**Adam** 155:14

**add** 179:23,25
183:21

**added** 94:8 117:5
176:7

**addendums** 65:12

**adding** 174:1

**addition** 40:1
125:8

**additional** 8:24
39:15,19,23 78:13
89:16 94:4 95:12
98:2 106:19 113:20
119:6 172:4,8 238:1
263:21

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

**Additionally** 54:6
69:2 167:22 198:24

**additions** 40:2

**address** 119:18
169:23 208:18
209:12 225:8 251:1
253:24 254:2

**addressed** 144:19
209:22 239:12
244:21,24

**addressing** 119:16
206:17 216:4
255:20

**adequate** 8:23 9:4

**adequately** 9:1
227:15,18

**adhered** 95:5

**adhesives** 176:1,2

**administer** 261:7

**administrative**
46:10

**adopted** 46:11,12
47:9

**Advance** 41:2

**advanced** 41:14
177:23

**advise** 50:5

**advised** 53:13,16
54:9

**aerial** 14:21 124:20

**aerosol** 146:1,4
154:20 175:5,20
179:18 198:24

**aerosols** 179:25

**affected** 174:19

**aforementioned**
261:24

**aforesaid** 6:4
261:13,14,19

**afternoon** 8:18
16:16

**age** 6:2 229:3

**agency** 125:6,10

**agents** 18:13

**agree** 174:8 194:9
216:12

**agreed** 108:20
109:2 216:8

**agreement** 94:2
262:5

**ahead** 26:17 29:2
30:11 31:5 35:22
48:19 53:6 54:2,14
55:14 57:6 58:17
59:3,10 60:2 64:17,
22 88:6 104:10,21
105:23 106:23
108:13 112:17
114:10 123:2
127:12 128:11
129:16 130:4 131:9
132:4,15 133:2
134:21 135:1,13
137:5,23 138:7,11
142:9 149:15 150:8,
20 151:9 154:16
155:4,21 157:23,24
159:6 160:4 164:3
167:13 173:23
175:16 176:22
178:12 179:3,16
182:20 192:9,21
193:2,8 194:13
197:1,15 201:23
203:22 212:12,13
214:8 216:24
223:16 235:20
237:12 242:18
243:25 244:13
245:8 246:10 259:1,
23

**Alabama** 43:3

**alarm** 125:15

**alerted** 161:2

**align** 217:8 228:10

**allegation** 59:12
60:24 61:3,15 63:25
64:5 228:21 229:2
230:18 231:19
232:10,14

**allegations** 29:25
59:7,14,21,22

**alleged** 8:20 29:13,
18 57:24 58:2,3,4,8
59:6 61:5 64:16
225:8,23 228:24
231:22,24 232:4

**alleges** 229:16

**alleging** 243:7

**alteration** 252:24

**aluminum** 236:1,3
237:13 241:8

**America** 6:15

**American** 6:13
263:13

**amount** 213:13
251:23

**amounts** 55:17

**ample** 9:5

**analogous** 222:13,
15

**analogy** 222:21

**analysis** 9:14 12:6
41:3,14,19 68:4,6,7,
14,20 69:3,11,16,
21,24,25 70:5,7,8
80:20 104:5 107:14
122:15,18,22,25
130:16,18,20 132:7
135:17,22,23 136:2
137:1 161:22
162:11 181:14
194:2 200:6 204:8
206:4,7 209:13,14
215:22,25 221:13
223:1,7,10,24
224:18,20 225:7
226:3,4 228:12
232:8 239:19,24
240:5 245:22 247:7
248:18 249:9
250:16,18,24 251:3,
12,15,18 254:21
255:5 256:16,17

**analyze** 40:22
205:5 247:20 250:6
251:1 254:23
255:21 259:7

**analyzed** 249:22
250:2,13

**analyzing** 68:8

**and/or** 15:3 91:24
140:20

**angle** 173:2 189:8,
13,14,17 190:6

**animations** 20:1

**annotate** 171:16,
20

**annual** 39:21

**anode** 80:14,20
81:6 237:9,20
238:14 240:18,24
256:10

**anodes** 237:16
238:18 256:2,3

**anomalies** 33:25

**answering** 62:11

**answers** 262:3

**anticipating**
205:17

**anymore** 96:22

**ap/vent** 81:7

**Apologies** 191:22

**apologize** 52:17
90:19 92:11 183:13
203:15 209:6
249:24

**apparently** 90:18
184:1

**appearance**
151:19,24 248:12
249:18,19 253:2,3

**appearances** 6:23

**appeared** 219:9
220:22

**appears** 27:9,12
52:12 94:10 95:25
162:20 176:16
187:2 248:14

**Appendix** 223:3

**application** 247:5

**applied** 130:13
230:14 255:18

**applies** 53:10
252:13

**apply** 247:6 248:18

**applying** 193:20
256:14

**appreciated** 264:5

**approach** 221:16

**approximately**
66:17 67:4 173:19
181:8,9,19 218:23

**approximation**
173:19

**April** 17:13 43:16
114:1,3,5,14 116:16
118:6

**arc** 32:6,15 33:21,
23 221:17,18,22,25
222:6,12

**arcing** 222:16

**arcs** 33:25

**area** 28:4 30:16,18
70:9 108:21 120:11
123:11,16,21
126:12,13 129:3,9,
13,25 130:9 131:25
135:9 136:12,21
137:3 138:22
139:12 140:7,14,16,
17 141:9,18 142:5,
14,24 143:2 155:7,
8,19,23 156:2,12,
15,22 158:14
159:17 160:12,13,
21 161:3 162:24
163:23 164:16,17,
18 165:15,17 166:9,
13 168:9 170:8
175:5,6,10,11,13,19
179:5,8,11,20
180:11 183:11
184:19 187:10,11
188:2 189:4,9 194:3
196:12,21 197:7,21
198:5,8 199:1,4,10,
13 203:3,6,16,18,20
204:4,7,10,14,18,
19,20 205:13
210:19 211:5 215:5,
10 217:15,24 218:3,
6,8,16,22,24 219:22

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

224:11,13 225:24
239:21 248:15
258:6

**areas** 198:15
215:21 254:16

**argumentative**
31:5 54:2 55:12
57:5 58:15 114:10
150:16 151:8 159:6
167:12 178:12

**Arkansas** 43:3

**arranged** 16:12
115:12

**arrive** 60:15,23
123:11

**arrived** 62:24 136:6
158:10

**arrow** 92:8,14

**arson** 143:25
144:6,25 145:10
146:10 164:5,6

**art** 185:14

**article** 24:8 32:8,10
33:2,9,20 34:6,10,
13,17

**articles** 19:6

**artifact** 72:7,23
80:2,3,5 81:12,18
88:11 89:7,8,10
91:14 98:22,25
99:12 223:8

**artifacts** 71:20,22
72:1,4,12 73:21
79:19 80:5,8 81:1,2,
5 87:12,18 88:16,22
100:20 102:3 105:4
123:18,20 131:13,
14,16,17 142:23
206:11

**artificially** 34:23

**asbestos** 39:21

**asks** 12:14 13:8
14:8,16 15:2,16
16:6 17:25 19:19
20:7 21:13 23:20
24:5 37:9

**ASM** 41:25 42:3

**aspect** 20:4

**assemble** 238:3

**assembled** 238:1

**assembly** 77:4

**assessment** 31:25
33:2 157:10 184:24
244:24

**Assistant** 126:19
127:6,19

**assisted** 74:5

**Association** 31:12

**assume** 155:24
233:13

**assumed** 165:23
166:1,12

**Assumes** 192:19

**assuming** 87:10
171:13

**assumption**
155:24

**Assurance** 6:14
263:13

**ASTM** 42:5

**Atkins'** 194:4

**attach** 91:25

**attached** 24:10
67:15 165:9 198:17
214:15 224:19
238:5 239:24
251:11

**attaches** 253:14

**Attachment** 43:10
65:14

**attack** 214:1

**attacked** 19:9,15
36:22 81:15 122:11

**attempting** 80:24

**attempts** 221:22,
25

**attend** 98:4

**attended** 40:14
76:7,18,24 133:15,
21 261:13

**attending** 6:11
85:15

**attorney** 11:21
16:21 37:10 44:5
46:11 194:17 262:7

**attorneys** 18:1,4
38:10 41:12,13
67:14 261:14 262:9

**audio** 180:20

**Auger** 32:20

**August** 148:19

**author** 126:16,18
127:8

**authored** 12:11
27:10 127:2,18

**authoring** 24:1

**authorized** 261:7

**Auto** 44:16

**availability** 114:22

**Avenue** 263:5

**aware** 35:6 38:18
40:4 46:8 53:15
59:11 69:18 105:15
122:2,3,12 124:1
163:21

---

**B**

**B-1** 219:6

**back** 16:5 32:25
36:15,16 38:22
49:16 53:19 57:4
64:19 65:6,9,10
70:14,15 73:5,22
84:8 87:8,18 88:15
90:9 92:11 97:22
101:6 112:25 113:2
116:1 117:24 123:9
143:18,21 145:16
146:22 151:18
152:19 159:17,23
161:3,4 166:25
177:13 183:25
184:2 188:6 190:10

208:21 212:21
213:1 219:6 228:14
230:10 236:13
250:10 253:6,11
258:1

**backed** 219:23

**background**
124:5,7,9

**bad** 27:21

**bag** 82:14,20 94:6,7
95:21,22 96:3
110:23 239:22
240:1,3

**bags** 83:1

**balance** 186:17

**balanced** 54:16,19,
21,24 55:1,7,9,16

**balancing** 186:16

**bar** 173:4,6

**Barely** 78:24

**Barton** 7:2,6,12 9:2
18:4 26:16 27:13,
20,25 28:25 29:20
30:10 31:4 35:12,22
38:13 44:20 45:21
48:10,18 53:3 54:1,
13 55:10,12 56:1,5,
12 57:5,11,21
58:15,25 59:9,16,24
60:1 61:3,7,14,20
64:17,22 65:2 67:9,
14,18 70:21 78:23
79:1 83:14 84:13
88:5 100:19 101:12
104:19 105:22
106:14,21 110:4
111:7,10 112:16
113:16 114:9
115:16 119:10
121:17 123:1
127:11 128:9
129:15 130:2,11
131:8 132:3,14,22
133:16 134:13,25
135:11 136:5 137:5,
22 138:5,24 139:4,
15 140:10 141:23
142:9,21 143:6,14
146:18 148:6
149:14 150:5,16

151:7 154:16 155:3,
21 157:12 158:7
159:5,13 160:3,25
163:14 164:2
167:11 172:25
173:22 175:15
176:20 178:11,18
179:2,15 182:18
186:3 187:18,22
192:8,18 193:1,7
194:12,22 195:6
196:25 201:23
203:21 205:10
206:25 209:9,19
210:5,7,9,14
211:17,19,22 212:3,
6,17,22 214:7,25
216:9,22 220:18
223:15 227:3
229:11 233:3
234:18,20,24 235:5,
11,19 237:11
238:15 240:19
241:4,23 242:16
243:23 244:12,19
245:7 246:9 253:19
254:25 255:23
258:25 259:10,21
260:11 263:2,4,15

**Barton's** 7:22 44:8
58:22 64:13,15
115:6 119:8

**base** 198:14,17

**based** 9:14 94:15
120:19 129:5
132:20 137:10,13,
16 152:23 159:10
162:13 168:16
191:4,5 197:4,5
200:7,9,14 201:4
224:14 225:13
228:13 229:9
231:19 257:9

**bases** 259:25

**basic** 125:14,18
126:17,23 127:3
235:8

**basically** 108:10,
14 216:17

**basis** 14:6 33:18
38:19 47:2,25 50:24
210:3,18

USDC IN/ND case 3:21-cv-00252-DRL    document 86-4    filed 12/13/23    page 277 of 301
John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

**batteries** 15:4
16:1,13 24:23
25:20,21 26:3,15
28:21 29:10,12,18
30:1,16,18 31:7,11
33:1,8,13,18 34:5,
12 36:4 40:15,22
41:3,15 42:1 49:6
62:21,22 75:5,7
79:19 80:19 89:21
98:18 99:4 103:3
104:24 214:13
215:10 223:18
224:13,18,19
226:24,25 229:20
232:3,6,17 236:25
237:4,15 239:21
241:14 242:12,25
243:11,14 244:23
245:2,17 257:11,19

**battery** 15:4 16:7
19:8,14 24:9 26:4,5,
7 29:14 31:24
34:20,22 36:21
40:20 41:18,20
42:12,17,22 45:6
49:2 57:22,25 58:1,
4,9 59:8 63:19
79:10,11,24 81:21
86:5,11 87:17,21
88:16,22 98:16,23
102:2,21 105:4
110:22 122:25
123:3 206:11
207:25 208:12,14,
15 209:1 211:10,11
212:15,16 213:5,7,
14,20 214:9 221:15
224:10,23 225:8,11,
15 226:19,25
227:15,21 228:3,12,
16,22,25 229:1,5,
10,15,17,25 230:3,
4,6,8,14,16,19,20,
23 231:1,6,10,11,
16,22,24 232:8,11,
15 235:10,14,17
237:1,2,7,23 238:4,
7 239:6,16 240:2,9,
21,22 241:15,18,21,
25 242:4,15,22
243:8,9,22 244:4,6
245:4,6,9 246:7
247:2,19,20 248:1
249:12 252:4

253:21 257:10,12,
13,18 258:11,18,19

**battery-powered**
15:4,25 46:19 59:15
61:25 63:21 64:1,10
68:25 208:12,25
209:23 223:12,14
224:1,4,25

**battery-related**
206:11

**battle** 220:24

**beads** 32:6 222:6

**began** 110:8

**beginning** 6:23
75:24 167:12

**behalf** 6:25 7:3
44:19 48:17 52:14
57:21 61:3

**believed** 198:20

**believes** 163:2

**Ben** 6:25 7:6 27:13
61:7 71:4 74:1 85:5
111:10 114:20
132:25 133:16
136:5 139:1 187:22
194:23 210:10
211:22

**bench** 22:25
162:24 172:22
184:18,20

**Bend** 6:17

**benefit** 131:13
133:6

**Benjamin** 114:18

**big** 7:13 90:23
151:25 152:3 208:2

**bigger** 123:10
148:23

**biggest** 192:16

**billing** 21:21 22:1,2

**bin** 160:9,10 170:13

**bit** 49:25 66:19
78:22 79:2 91:11,13
92:2 95:24 100:3
118:1 119:13

152:18 169:20
177:20 183:3,14
189:1 190:9 224:7
236:25 247:9

**BL1830** 225:22

**blades** 94:24

**blaze** 220:24

**block** 191:8

**blocking** 170:14

**blow** 27:13 79:1

**blowing** 152:5

**blue** 93:1 170:6

**board** 191:2,3,4

**boards** 231:7

**book** 28:23 29:3
31:8 35:2,14

**books** 24:25

**bottom** 91:8,16
92:7,13 149:7
152:15,20,21 169:4
192:4 207:24
213:15 215:15
248:15 253:22
254:10,12,14

**bowed** 80:14,20
81:6 247:9 248:22
252:7 256:6

**bowing** 246:3
247:7,13 248:8,12,
18 252:9

**box** 91:25 95:4,5
203:7,8

**boxes** 91:23 153:1
161:10 162:16
163:1,3,4 164:24
166:16,18 167:18,
20 175:1,9,19
177:3,24,25 184:19
185:24 197:7
200:23 201:4,6,8

**brackets** 80:11

**brake** 153:2 175:4,
20,21 179:19
198:12,22

**brand** 51:15 60:18
232:1

**Brandon** 155:14

**break** 8:10,13
61:10 64:24 115:18
136:8 143:13
189:15 190:8
211:23 249:2

**breaking** 61:8
212:10

**briefly** 8:1

**bring** 11:10,12
52:25 90:8 113:2
147:25

**broad** 35:4

**broader** 48:11

**broke** 90:23 133:17
210:5 211:17
212:18

**brought** 86:1
157:19

**Brown** 44:11

**bucks** 35:3

**build-out** 160:12,
13

**building** 14:23
60:11 124:11,21
136:22,25 137:1,3
143:2 144:2,14,18
152:2 155:20
165:12 166:3
168:22 169:8,9,11
224:23

**buildings** 128:5

**built** 111:15,19

**bulged** 255:13,14
256:2,3

**bullet** 200:15
201:16,17,18,19
202:2 211:12 213:5,
19 214:20 215:6

**burn** 182:23 194:2,
7,10 195:18 196:5,
16,18

**burning** 169:18

174:22,24,25
175:12,17 178:9,20,
22,25 187:4 202:14

**bussing** 214:16

**buy** 31:9

---

**C**

**C-1** 245:16,17
246:8,23 248:3
249:11 250:5,25
251:13,17,20 252:9
253:5

**C-2** 249:11 250:5,
25 251:1

**C-3** 249:11 250:7
251:1,2,11

**C-3.01** 251:7

**C-4** 249:11 250:6,
25

**C-5** 249:11 250:7
251:1,2

**C-6** 245:16,17
246:8,24 248:3
249:12,14,17 250:7
251:2,13,17,21
253:5 255:9,20

**cabinet** 153:12
195:12,16

**cabinets** 153:6,11,
19,20 185:20
198:21

**cable** 44:3

**cables** 91:24

**cage** 215:14

**calculations** 21:14

**call** 9:24 67:10
84:20 101:19 105:6
160:9 188:14
216:20 217:5
236:21,22 253:21

**called** 13:14,18
22:11 60:8 71:19
77:22 86:10 115:9
124:22 168:19
193:15 201:4 215:3

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

254:10 257:3

**calling** 140:4

**calls** 60:2 110:4
127:11 129:16
130:3 131:8 132:15,
23 134:14,25
135:11 149:22
160:3 164:2 182:18
192:9,20 193:7
229:11 243:24
244:12 245:7
259:22

**canister** 105:7,11
154:5,9 181:23
182:13,14 219:25

**canisters** 152:5
153:24 154:2,6,12
155:6 219:20

**cans** 146:1,4
175:22 179:18

**cap** 252:18 254:13

**capture** 204:5

**car** 45:6 155:25

**carbon-based**
241:10

**cardboard** 161:10
164:24 175:9,19
177:24 207:9

**care** 47:22

**career** 54:16,21

**carefully** 223:10,
13,24 224:2 261:16

**cart** 155:25 170:16
171:10 172:11
173:20,24 174:5,7,
11 175:12,13
176:12,16 178:9,23

**carts** 160:8

**case** 6:4,13 9:8
12:16 19:22 20:4
21:17,22 24:7 25:24
26:7 27:11 33:10,15
37:12,24 38:7 44:1,
6,17 46:15,16,25
48:2 49:1,8 56:2,3
57:10 61:19,23
63:11 82:8 97:17

106:20 109:8
117:22 133:15,21
138:7 157:11
163:19 168:3
193:21 196:19
199:6 216:23
230:10 235:22
243:8 246:17,18,19
261:18 263:13

**cases** 38:14 44:14
48:21 49:4 50:18
52:19,24 53:7,15,23
56:11 57:20,22
58:7,10,22 59:6,13,
19 60:13,14 61:1,16
63:11,19,24 64:13
235:23

**catch** 209:5

**category** 256:6

**cathode** 237:8,9
241:3 256:11

**cathodes** 237:10

**caught** 232:20

**causal** 122:10
131:25 205:7 233:1,
13 238:23 245:15
246:20,22,23,25
247:17 251:7,17

**caused** 61:15,17,
21,25 63:4,21 64:1,
9 81:15 144:25
145:10 164:7
227:14 228:1,2,13,
25 229:25 230:22
232:16 261:21

**causing** 24:11
36:22 63:6 64:15
166:2 205:17
209:23

**cautioned** 261:17

**ceiling** 165:23
166:2,11,12 191:6,
12 192:14 200:16,
18,21 211:16

**cell** 9:13 19:8,14
24:10 36:21 42:22
80:11,12 83:4
103:19 105:11
122:10,25 123:21,

24 213:20,22,23,25
214:1 221:15
228:23 230:22
232:1 233:23
235:10,17 237:3
238:2,7,12,22,23
239:2,19 241:15,21
242:4 243:22
245:14,15 246:1,22,
25 247:16,17,24
248:11 249:22
250:1,2,18,23
251:6,10,16 252:6,
10,12,24 253:13,18,
20,21,23 254:10,11,
12,16 256:12,13
257:22

**cell's** 229:1

**cells** 9:13,15,16
16:7 41:20 81:14
102:21,25 103:11,
16 105:2,21 106:1,
13 107:9 110:22
123:3 237:4,5,7
238:22 239:12,13,
23 240:3,4,5
247:12,14,15
248:21 249:17,19
250:17 251:4 252:5,
7 253:2,4 254:5,9
255:7,9,12 256:1,20
257:22

**census** 197:4

**center** 188:16,17
252:6,10,12,23,25

**centered** 172:10
203:23,25 204:1

**Central** 6:10

**certifications**
43:7,8

**certify** 261:7,8
262:6

**cetera** 12:7 19:20
125:15 207:4

**challenge** 57:2

**challenged** 46:14
47:25

**chance** 152:13

**change** 230:6,7
265:3

**changed** 69:9
210:10,11

**changing** 190:10

**characterization**
209:10 210:20

**charge** 21:23
214:13 225:19,21,
25 226:2,6,7,10
227:1,9,10 229:3,4
238:1 240:22

**charged** 225:20,21

**charger** 89:4,12,17
224:20 225:9,12,16,
21 227:7 258:11,19

**chargers** 16:1
208:15,25

**chargers/
batteries** 69:1

**charges** 15:4 65:18
109:18

**charging** 65:16
224:17 229:17

**check** 110:6

**checking** 114:22

**chemical** 237:5
238:9,11 240:15,20,
21,23,25

**chemistry** 141:8
142:19

**chief** 126:20 127:5,
6,19

**choose** 209:15

**choosing** 150:19

**chose** 178:24
209:16

**chosen** 139:8
175:14 178:10

**chronological**
66:4

**chuck** 93:2,7 224:7

**CID** 42:15,16

**cigarette** 62:5,7
64:11

**cigarette's** 62:4

**cigarettes** 62:2,9,
13

**circuit** 231:7

**circumstances**
244:7,11,17,18

**cite** 217:17 250:25

**cites** 248:15

**CITY** 261:4

**civil** 261:9

**clarification** 62:3

**clarifies** 149:24

**clarify** 62:10 87:14
99:17 168:11
175:10

**clarifying** 197:21

**Clayton** 263:6

**cleaner** 153:3
175:4,20,21 179:20
198:12,22

**clear** 14:12 45:20
64:7 102:13 111:4,
6,8,12 121:10 140:3
186:21 235:15
239:5 241:24
242:20 245:19

**client** 46:12 47:5
53:1,11 63:7,16,17
64:15 66:15 84:10,
12 140:12

**client's** 63:14

**clients** 51:25 52:3

**clip** 174:14

**close** 54:23 256:24

**closer** 168:5

**closest** 168:9,10,
11,14,17

**clothes** 46:21,23

**coating** 235:23,25
237:14,21 241:9,10

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

coatings 241:7

code 73:1

codes 28:9,12
122:6

collapse 196:14

collapsed 127:24
128:5

collect 80:24
161:23

collected 71:9
72:1,13 81:14 84:7
103:11 129:21,24
130:7,13 131:15,21
136:16 257:20

collecting 125:5

collection 35:5
71:22 107:18
124:23 125:3,8
131:6

collector 235:24
241:8,9

color 94:15

combination
197:8

combinations
255:13

combined 246:16

Combines 223:16

combustible
196:11 198:5,7
207:5,8,10,11,22
211:10 225:5

comment 16:17
76:13 112:8

commenting
234:10,11,12

commercially
31:8 35:3

Commission
268:18

common 9:8 31:21

communicated
19:2

communication
13:9

communications
13:22,23 14:5 18:1,
5,12,20

companion 95:12,
17 96:16

company 6:14
51:20 60:20 140:11
257:14

compare 167:23
199:24 247:12,14
248:21 255:16,17
256:18

compared 162:6
185:19 216:19
239:25 249:16
252:20

comparing 161:17
165:8 202:9 224:18,
21 255:7

complain 144:15

complete 16:13
63:13 96:1 114:22
122:25 128:21
202:2 226:25 262:2

completed 17:6,9
21:2 39:22 258:4,9,
16

completely 226:20
227:9

completes 242:23

completing 114:21

comply 127:14

component 231:6

compose 9:3

compound 29:1,
21 30:11 31:4 48:19
58:17 59:2 60:1
112:17 138:24
150:8 167:13
173:23 176:20
178:12 186:4
194:13 223:15
246:9 259:22

comprehensive

135:19

computer 19:25
111:16,17

conclude 45:1,2
61:16 185:25
194:10 200:13
205:20 214:20

concluded 61:23,
24 62:4 63:20 64:8
125:19 260:14

conclusion 62:25
64:5 238:25

conclusions 44:23
68:13,19 83:18
97:16 100:24,25
101:4 120:8 123:4
125:25 126:2
129:25 130:23
134:3,8 205:8
222:11 223:6
259:19,20

concrete 191:8

concussion 154:9

condition 42:12
81:2 102:25 124:21
198:25 211:14
223:11,14,25 224:4,
23 225:1,2 230:1
232:18 243:1,12
255:15

conditions 68:12
214:13 229:19

conduct 60:8
125:5 209:14

conducted 63:10
83:12 88:14 97:14
105:3 120:20 121:1,
8,12 126:17 127:9
128:7 234:13

conducting 42:7
120:23

conductor 221:23

conductors
221:17,19

conduits 91:24

confident 77:5

confidential 52:2

conformed 134:11

confused 47:13
222:8

confuses 242:16

confusion 239:2,
18 240:4

congested 215:7

conjunction 21:5

connected 225:8,
9,11 227:16

connection 19:21
20:3,8 21:16 23:22
24:7 37:11,23 234:2

consideration
144:10 158:5,10
201:25 206:19,21,
23 230:18

considerations
41:17

considered 130:12
137:24 141:8 145:2
151:5 193:23
195:23 199:16,17
211:6 225:10

consistent 200:25
240:8

construct 62:15

constructed 207:4

construction
202:8,11,16 214:18
215:14 235:13,14

consumed 225:5

Consumers 31:12

consumption
196:11

contact 44:3 66:15
84:10,12 101:9,16

contacted 66:16
67:3,6,8 101:11

contained 8:20 9:6
22:4,5,20 23:10
25:23 26:1,9 33:16
35:16 36:6 96:4,6

106:16 112:21
118:17 119:2
126:14 138:14,15
140:21,24,25
142:12 151:11
168:20 181:10
184:22 204:12
207:5 214:15,17
234:3

container 180:8,9,
10 182:4,5 187:3

containers 142:25
154:21 175:4,6,20
176:1 179:21
198:12,13,20,22,25

contemplating
38:6

content 40:23
41:21,22

contents 34:8
83:10 136:25 152:3
154:4,17 155:5
175:18 207:3 246:1

context 157:14
244:21

continuation
86:20,25 87:13
88:1,9 89:20 93:12

continue 8:24
136:8 148:13

continued 86:22
87:6 88:20

continuing 39:17
40:13,18 41:15
196:18

contradicted
161:8 216:16,17,18

contradiction
161:12,18,20,21,25
162:3,9 163:2,4

contradictions
162:1,11

Contradicts
192:20

contrast 184:10

contribute 25:14,
18

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

**contributed** 141:10 143:3 155:6

**contributes** 29:4,9 34:11,14

**contributing** 177:5

**control** 90:17

**controllable** 219:9,16

**conversation** 84:12,15 134:19 136:3

**conversations** 109:7

**conveyed** 161:18

**cooperation** 264:4

**coordination** 140:18

**copied** 112:3

**copies** 11:14 16:6 20:21 21:1

**copper** 95:5 235:24 236:2,7 237:17,18, 21 238:13,18 241:9

**copy** 11:3 19:5,12 24:15 28:10 31:6,9 46:9 47:18 161:15, 16 194:14,16,19,20 263:19

**copycat** 60:20

**copyrighted** 28:15 31:8

**cord** 64:11 94:23, 25

**core** 118:11,20

**corner** 146:5 165:22 166:5,14,15 167:24 169:18 170:3,15 172:3 175:8 176:13,24 180:1,2 181:21 186:23 187:5,8,10, 12,13,17,25 188:1, 4,5,14 189:3,6 190:12 197:11 198:23 199:1 202:25 203:4

207:12 210:25 211:2

**corollaries** 249:13

**corollary** 249:15, 16,18

**Corporation** 6:15 18:2

**correct** 7:20 11:22 13:5,7 17:24 19:3,4 21:11,12 25:3 27:8, 9,11 28:16,18,19 30:2,3 31:6 35:21 38:3,7,16,17 39:4,5, 6,7,18 40:6,7 43:14, 15 45:14 50:21 51:24 52:11,12 54:3,22 56:14 59:4 65:17 76:25 77:12, 19,20 78:17 79:3,8, 9 80:14,16 81:7,9 85:17 87:24 89:24 90:20 91:3,18 92:21 93:14 94:18,19 97:6,9,11,12 98:9, 10,14,20 100:16 106:10 107:19 111:2 116:15 118:4, 8 119:9,11,17 120:25 121:4,5 125:23 126:24 127:21,22 129:3,6, 7,21 130:24 131:22, 24 132:2,13,21 133:11,15,21 146:6 147:15,16 150:25 151:6 153:22 154:10,15 155:16 158:21,23 160:18, 22 162:7 163:11,13 164:24 166:9,19,23 167:19 170:6 171:11,14,17 173:21 179:8 183:8, 15,19 190:18,20 191:17,20 193:18 196:23 199:2,3 201:11 205:22,25 206:1,3,14,16 207:13,14 209:2 210:20 214:24 216:6,8,20 218:2 219:1,2 221:2,12 231:14 234:4

237:17 245:11 249:22 250:2,4 258:7,12,20,21,24 259:9 262:2

**corrections** 263:23 266:2 267:3

**correctly** 73:4 77:2 261:23

**correlate** 223:20 224:9

**correspondence** 13:9,15,19,24 14:1 18:13

**costs** 35:3 116:17, 24 117:4

**counsel** 6:22 20:22 52:7 128:10 261:25 262:1,5,7

**count** 56:13 57:1,4

**couple** 46:12 57:12 62:20 72:17 73:3 115:11 206:5

**courses** 42:20,21

**court** 6:16 7:4 64:18 261:10,12

**cover** 27:7 252:1,9

**covered** 33:4 70:2 175:18

**covering** 190:25 191:10 192:3

**cradle** 224:17

**cramped** 215:7

**create** 51:15 74:19 75:3 136:14 154:7 196:5 200:20 202:18 245:11

**created** 16:18 17:3 34:23 74:11,12 75:6,18 110:9,12, 13,16 111:22,24 112:19 117:13 176:4

**creating** 50:25 51:2,5 74:14 180:2

**crib** 16:1 126:12

147:24 149:8,13,21 150:11,24 151:14, 15 153:2 156:21 158:2 159:10,11,17, 19,21,22,24 160:1 161:11 162:16,19, 21,22,23 165:24 166:15 167:2,3,25 168:1 169:18 170:9, 15,22 171:7,23 172:1,5,19 174:20, 22 176:13,24,25 177:3,4 178:8,24 179:9,10,12,13 180:11 181:21 183:22 184:5,13 186:24 187:11 188:3,16 189:10,18, 23 190:13,18,20,22 191:6,17,19,21,22, 23 192:6,7,12,16,17 193:13 196:5,8,9 197:4,12,17,22,23, 25 198:10,14,23 199:14,23 200:18, 20 202:12,16,17,18, 25 203:1,5,13,25 204:2 207:2,3,5,10, 13,19 210:25 211:3 215:7,13,14,18,19 217:3,11,13 218:8, 10,11,14,15,16 223:19,20 230:19, 24 231:12,13

**crimp** 81:19,22 252:13,14

**criteria** 24:9 36:20 124:2 245:14,15 246:14,20,21,23 247:6,16 248:12,17 249:4,5,16 250:4,11 251:7,17 252:20 253:5 255:18 256:5, 14,15,18

**critiques** 83:12,15 97:13 100:18

**cross-sections** 254:20

**Cs** 255:21

**CT** 9:9,12,13,17 16:7 17:17,21 75:8 82:20,21,25 102:9,

14,20 103:7,17,22, 24 104:3,8,14,18,24 105:13 106:4,8,24 107:2,4,7 110:9,12 115:3 254:20

**curious** 99:6

**current** 43:8 235:24 241:7,8,9

**custom** 111:14

**cut** 115:20 206:5

**cut-off** 227:4,6

**CV** 42:19 50:1

**D**

**Dakota** 117:20

**Dale** 126:20 127:5, 6,19 131:13 132:25

**Dale's** 134:6

**damage** 64:16 224:21 228:25 229:23,24 230:4 232:25 233:12,21, 23 243:3 245:25 247:2

**damaged** 81:3 198:19 229:16 231:16

**data** 21:14 36:5 75:8 80:22,23 81:1, 13,17,25 84:7 88:8 94:13 102:22,23 106:16,17,19 111:17,20 124:22 125:3,4 129:5 130:12,15,22 131:1, 3,4 134:2 135:15, 18,19,20,22 136:16, 18,24 137:2,6,7,9, 10,11,13,14,15,17, 18,19,24 138:3,4,6, 10,12,21 140:21 141:12,13,17,18,20, 22,25 142:4,20 143:4 144:5,7,8,24 145:9,24 146:9 157:10 161:7,23,24, 25 162:14 183:11 186:8,13 193:25

USDC IN/ND case 3:21-cv-00252-DRL    document 86-4    filed 12/13/23    page 281 of 301
John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

194:1 199:24,25 200:14 202:15 209:13 216:17 223:11,12,24 224:3, 5,6 227:17 228:11, 16,20 231:8 236:5, 22 238:18 241:12, 13

**database** 22:8,9, 10,14 23:5,11

**date** 6:10 15:24 17:10 69:7 87:4 114:2 118:7 125:7 218:4 263:12,25 268:5

**dated** 39:8 66:14 67:17 70:16 72:17 84:25 97:24 101:8 118:6

**dates** 76:10,23 77:1 87:6,10 100:22 101:5 133:22

**David** 155:14 158:11

**day** 66:16 67:3,5 88:13,14 89:14 91:3 93:13 95:10 97:3,4 114:12 144:22 145:3,7 155:18 201:1 204:20 205:13 262:11

**days** 17:12 76:6,18 77:10 78:2,3,11,12, 15,16 85:10,16,18 88:21 90:4 97:17,20 98:2,5 113:13 131:19 133:22 264:2

**DC** 92:4,6,21,22

**deal** 41:17

**debris** 198:21

**decide** 102:11

**decided** 94:4 177:13 217:24 218:7

**decipher** 32:18

**deep** 30:20,21 255:11

**defect** 229:14,16

**defects** 229:9 245:4

**defendant** 47:20 57:10,13

**defendants** 21:2 44:18 47:8 54:12 55:18

**defended** 46:14

**defense** 41:5,6,7, 11,13 52:7,11 54:17

**defense-oriented** 41:9,11

**defer** 204:10

**deficiencies** 221:13

**define** 69:20

**defined** 62:19 69:16 248:14

**definition** 69:19 141:24 242:13

**degraded** 198:25

**degrees** 256:11

**Dehaan's** 31:19

**delineating** 170:8

**deliver** 109:20

**delivered** 105:5

**delivering** 102:3

**demonstrate** 233:23

**demonstrated** 69:4 229:18

**demonstrates** 233:21

**dented** 82:9

**dents** 82:3

**department** 18:24 124:12 125:11,13 126:1,7 127:17,20 141:1 145:20 147:2 169:7,12 264:11

**Department's**

143:23

**departments** 18:21

**depending** 26:22 118:17 123:16 191:25 192:2 237:5

**depends** 25:6 26:9 35:13 48:20 84:2 118:12,14 154:4,17 155:5 157:13 182:21,23 192:22 193:3,9 211:7 213:9,13 214:17

**depict** 72:12

**depicted** 74:10

**depiction** 165:10

**depleted** 225:19

**deponent** 262:4

**deposed** 12:20 134:24 185:3

**deposes** 6:5

**deposing** 138:19

**deposition** 6:13 7:19,23 8:25 9:19 10:2,19 11:10,13 12:19 28:3 38:15 43:12,17,22,24 49:5,13 65:10,17 108:18 113:21 128:12,14,18 135:6, 8 140:13 145:12,18 146:7 148:17,19,21 155:11,16 156:8 185:8 197:5 201:2 216:18 217:17,18 227:25 234:21 235:2 259:9,12 260:13 263:11,18, 20 268:3

**depositions** 9:9 43:16 52:9,13 140:23 147:12 157:8 158:13 261:8

**Derek** 147:15,22 148:18 150:17 155:15 183:14 184:6

**derived** 140:19

**describe** 49:24 119:15 123:6 185:15

**describes** 123:24 163:17

**describing** 197:18 219:10 221:19

**description** 22:17 37:22 185:12,17 207:2

**descriptor** 22:21

**descriptors** 22:19

**deserve** 30:19

**design** 26:4 33:12 50:23 51:9,17,22

**designation** 90:22

**designations** 80:1

**designator** 79:23

**designators** 94:5, 8

**designed** 228:22 241:15,18

**designing** 50:20 51:3

**desk** 52:24 53:22 54:5 195:19 196:2 207:12,15 215:12 224:14,16 230:20, 24 231:5

**detail** 128:13,16 139:13 166:24 201:1,12 205:5 251:23

**detailed** 95:12

**details** 30:19 45:3 75:5 139:16 157:7 185:7 195:2 202:8, 11 252:4

**determination** 132:1 183:6

**determine** 50:16 51:12 89:11 94:20 103:15 104:2,7,17 122:10 129:13

**determined** 32:21 61:21 64:14 129:3 205:25 222:3,20 238:23

**Determiners** 140:17

**determining** 19:7, 14 24:9 32:15 33:24 36:21 89:17 120:11

**developed** 98:11

**development** 26:4,6

**device** 90:1 91:23 103:24 237:25

**diagram** 108:14 203:22

**diagrams** 19:25 108:6,8

**dictate** 26:23

**dictated** 30:13

**difference** 86:24 126:22 159:2 246:4 248:10,15

**differences** 256:20

**differently** 34:9 203:14 226:23

**difficult** 49:25 52:21,22 215:8

**difficulties** 10:5 146:14 148:14

**dig-out** 175:2 197:9

**dimensional** 75:8

**dimensions** 172:5 188:1

**direct** 107:7 109:24

**directed** 107:3,4

**direction** 14:9 111:2

**directional** 195:18

**directionally**

135:9 140:7 221:22 238:21 258:6,10,18

**determined** 32:21 61:21 64:14 129:3 205:25 222:3,20 238:23

**Determiners** 140:17

**determining** 19:7, 14 24:9 32:15 33:24 36:21 89:17 120:11

**developed** 98:11

**development** 26:4,6

**device** 90:1 91:23 103:24 237:25

**diagram** 108:14 203:22

**diagrams** 19:25 108:6,8

**dictate** 26:23

**dictated** 30:13

**difference** 86:24 126:22 159:2 246:4 248:10,15

**differences** 256:20

**differently** 34:9 203:14 226:23

**difficult** 49:25 52:21,22 215:8

**difficulties** 10:5 146:14 148:14

**dig-out** 175:2 197:9

**dimensional** 75:8

**dimensions** 172:5 188:1

**direct** 107:7 109:24

**directed** 107:3,4

**direction** 14:9 111:2

**directional** 195:18

**directionally**

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

190:17

**directly** 13:6 16:22 19:4 26:8 52:5 109:18 110:2 177:5 178:25 179:9 226:12

**disassembled** 233:23

**disassembling** 230:25

**disassembly** 75:23 85:14 97:25 98:16,23 99:12

**discarded** 46:13 64:11

**discharge** 240:22

**disconnect** 148:12

**discovered** 124:12,13 164:21 167:17

**discovers** 166:15, 17

**discovery** 168:7 177:11,15,22 236:14

**discuss** 35:15 40:21 147:14 155:9 162:5 168:18 184:10 206:16 216:15 239:3 250:24 251:20

**discussed** 26:20 29:5 49:9 70:19 79:14,16 85:3 105:14 114:20 119:22 176:16 179:8 194:7 202:22 206:13 220:16 221:20 248:4 259:8, 11,12

**discusses** 33:23 152:25

**discussing** 96:16 116:7 118:5 147:2 160:2 162:2 180:13 181:3,4 184:6 204:13 216:2,21 226:10

**discussion** 103:18 124:4 143:22 144:23 145:13 168:20 171:10 193:17 247:4

**disgruntled** 144:12 145:4 204:16,17

**disposal** 135:8

**dispute** 158:23

**dissimilar** 249:17 253:2,3 255:19

**distance** 159:1,10, 18 167:9 172:17

**distortion** 253:17, 22 254:5,11,13,15, 16

**distribution** 44:4

**District** 6:16,17 261:10,11

**dive** 30:20,21 208:9 255:11

**Division** 6:17 261:11

**document** 10:18, 20 19:12 24:14,22 26:14 27:6 29:8 30:7 31:13,14,17,20 32:1,7,22 33:22 34:2 35:1,17 36:16 37:21 43:12 65:24 66:2,7,18 68:11 73:12 74:5,7 77:21, 23,24 86:4,17 90:13,15 96:12,13 99:25 100:4 118:2 124:1 125:22 127:4 151:9 233:17 244:22,25 257:2,5

**documentation** 20:13,15

**documented** 195:13 214:9

**documents** 8:23, 25 10:2 11:6 12:8, 25 14:8,11,14 15:2, 6,10,14,16,21,23 16:3 18:16,22,25

19:10,16,23 20:5,9, 10,24 21:6,9,11,17, 23 24:6,12,16,19 25:5 26:24 28:14 35:19 36:2,6,8,10, 11,23 37:13,19,24 38:18 66:9 67:13,25 68:11 70:4,17,18,20 86:21 88:1 91:4 100:9,12 111:22 121:14,19,21 122:1, 13 123:6 129:19 133:23 138:15 204:13 216:23 236:13,17

**dollars** 140:12

**door** 149:21,22,23 161:11 162:15,16, 19,21,22,23 163:5 167:2,3 168:1 170:22 171:7,23 172:5,9 173:18 174:3 175:23 177:4, 5 179:10,12,14 180:6 187:11 188:3, 15,17 189:10,15,19, 23 190:8 191:17,21, 22,23 192:4,17 193:13 197:4,12,17, 22,23 198:1 202:18, 25 203:12 204:5 210:25 215:13,14, 15,17

**doors** 153:20 177:12

**doubled** 220:3,6 221:1,7

**doubling** 220:12

**doubt** 84:16 168:15

**dozens** 142:25

**draft** 73:2

**drafted** 73:15,16 121:24

**drafting** 119:5

**drafts** 20:21

**drag** 13:21

**draw** 83:17 97:16 100:23 173:24

**drawer** 231:5,7

**drawing** 172:12 203:2

**drawn** 173:7,8

**drew** 173:20

**DRI** 41:2,4

**drill** 94:10,12 224:7, 20,22,24

**drive** 9:6 11:16,18 16:15,18,21,25 17:3,15,19,20 102:9 103:4,5 104:23 109:13,16 112:5,6, 9,13,22 115:9

**driven** 82:10

**drives** 8:17 9:1

**dryer** 46:21,23

**Duces** 10:19

**due** 228:23 245:25

**duly** 6:2 261:16

**duties** 49:17 50:20 51:1

**dynamics** 141:8 142:18 143:3 196:20

---

**E**

**E-1** 245:15,16 246:6,7,14 247:19 248:2,13,25 249:4

**E-2** 249:1,6

**E-3** 246:5 248:13,25 249:5,15,16,18 255:9,20

**E-4** 249:1,6

**E-5** 249:1,6

**E-6** 245:15,16 246:7,15 247:19 248:3 249:1,6

**e-mail** 13:9 66:24 67:1,14 75:14 114:17,19,25

**e-mailed** 11:2

**earlier** 183:23 185:22 188:7 204:20 221:20 224:8 253:12 259:23

**earliest** 213:16

**early** 185:13,16,23 186:21 188:10 219:8 220:23 222:7

**Earth** 14:22,25

**easily** 182:22 199:25

**east** 172:18 176:12, 25 178:7,24 188:3 195:25 196:3,7,9 197:11 198:9,16,23 199:2 200:17 202:25 203:4,25 204:1 207:19

**eastern** 187:16 261:11

**easy** 82:18

**eat** 115:21

**edge** 159:22,23 173:16 204:4

**edition** 31:23 183:9

**edits** 39:9,13

**education** 39:17 40:14,18 41:16

**effect** 71:21 108:25 115:10

**efficiently** 111:18, 19

**eight-foot** 162:23 170:17 171:5,6,20 172:3,22 174:3 188:9

**eighth** 173:5

**ejected** 81:7 83:10 255:13,16

**ejected/not** 255:13

**ejection** 245:25

**elaborating**

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

169:15

**elected** 9:13,17

**electric** 238:8

**electrical** 44:4
48:24 51:2,10
204:9,10,23 221:16,
17,18,19 222:6,16
237:24 238:11
240:25 244:2 245:1,
5,9,12

**electrolyte** 229:1
236:8 240:11

**electronic** 140:20
142:4

**electronics** 50:21

**eliminate** 83:20
97:19 101:2

**eliminated** 253:10

**elimination** 245:14
246:20 249:5

**Elkhart** 125:11,13
127:17,20 143:23
147:2

**elude** 195:17

**employee** 71:4
74:1 101:23 204:17

**employees**
144:11,13 164:15,
18

**employment**
19:22

**empty** 103:20
104:15 105:7,11,12

**enable** 99:11

**encapsulates**
187:17

**enclosed** 191:11
192:12 215:15
263:19

**encountered**
122:24

**encroachment**
252:16,18

**end** 7:8,11 36:6

51:5 59:1 66:25
77:25 78:20 90:17,
18 144:21 188:12,
21 194:2 203:17
212:8 217:4 246:2,3
247:13,14 248:8,12,
19 252:10,16,18,19
253:1 254:13

**endeavor** 33:6

**ended** 92:17 93:23
97:10,11 156:15

**ending** 75:24

**ends** 113:4 247:8
255:14 256:11

**ends/not** 255:14

**energy** 213:13
226:17,20 237:4,24,
25

**enforcement**
127:18

**engaged** 119:8

**engagement**
67:15,20,22 68:1

**engaging** 37:10

**engineer** 43:1

**engineering** 11:16
40:6,11 48:24 49:15
65:18 67:22 68:4,7,
23 69:2,11,14,16,21
70:4,5 71:5 74:2
101:24 102:6,8
122:18 245:23

**enlarge** 27:14

**entail** 49:17 51:5

**entails** 49:21,22

**enter** 22:8,18,21
23:4,6

**entered** 22:13

**entering** 22:22

**entire** 8:20 150:22
153:7 165:8 187:11
189:9,18 233:4

**entirety** 216:11

**entities** 19:3

**entitled** 10:18
120:15 151:19

**entries** 70:18 73:24
85:13 98:1

**entry** 97:24 99:6
101:10

**equal** 55:17,18,20,
23

**equals** 173:6

**equipment** 102:17
208:13

**equivalent** 226:14

**errata** 263:21,24,25
264:2

**erroneous** 223:5

**Es** 255:21

**escape** 192:6

**Eskra** 16:9 24:1
115:12 221:11
222:9 223:17
227:12,13 231:17
232:25 233:12,15
238:22,23 239:17
242:4 245:14 248:2,
14 253:10 255:4
256:4

**Eskra's** 32:17
221:12 222:21
229:7,12 234:3,11,
12 239:2 246:12
251:7,16

**essence** 153:21

**establish** 36:20

**established**
231:21

**ETP** 221:14 223:1
228:19,21 232:7
242:13

**evaluate** 51:12,21
106:13 120:6
123:24 135:20
206:18,22 208:21
221:25 249:1,6,11

**evaluated** 123:3,
17 144:19 199:16,
18,21,23 204:9

206:13 209:25
223:18 247:24
248:23,24

**evaluating** 50:23

**evaluation** 74:6,7
106:20 183:11
199:5 208:3,6
221:15,16,18
228:18

**evaluations** 50:2
206:12

**event** 212:15 213:6
245:2

**events** 176:5,6
178:2

**evidence** 102:7,12,
15 107:17 129:20,
23 130:7 131:6,21
132:20 133:14,20
136:14,17,18,20,24
140:6 142:12 146:4
162:18 163:25
164:10,11,12 175:4,
5,6 179:16 186:10,
18 190:24 191:5
192:19,20 193:14
194:10 195:14
197:6,24,25 198:10
201:5,20,24 210:3,
18 215:4 216:23
223:21 224:7,15
230:21 257:21
259:18

**evidencing** 15:3,
24 20:9

**exact** 46:5 47:17
48:15 56:20 134:7
172:17 188:14

**exam** 72:7,8,9
73:17 76:7,19,24
78:6 83:11,13,16,
18,21 85:16,19
88:24,25 89:20
97:10,11,14,17,20
98:7,9,12,20 99:18
100:17,18,24 101:3
116:12 117:19
133:10

**examination** 6:7
23:1,2,13 32:6 37:5,

8 72:23 73:20 75:23
77:4,6 79:18 85:14
87:15,23 88:14
93:17 94:9 98:1
100:21 122:24

**examinations**
15:17 107:11,14
131:12 133:2,8,25

**examinations'**
131:13

**examine** 20:12
72:5 123:18 223:10,
24 224:2 246:6

**examined** 89:14
100:21 129:20,23
130:7 245:18
247:18 261:16

**examining** 81:14
127:24

**examples** 223:6
247:3 250:8,11
259:15

**exams** 73:18 98:3,
4 131:6,21,24
132:2,6,12,17,19,21
133:14,21 134:1

**excavator** 128:7

**exception** 109:19
188:12 216:5,7
257:23

**excerpt** 148:17,18
149:16

**excerpts** 33:11,14
74:13,15,18,20
150:23

**exciting** 177:19

**exclude** 135:21
201:21 210:2

**excluded** 200:1
202:3 210:2,17

**excluding** 164:16

**exemplar** 20:12

**exemplar-type**
98:20

**exemplars** 20:7,10
37:7 99:12,13

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

**exhibit** 10:12,13,24
11:1,5 12:2 27:1,3
28:2 36:15 38:22
39:2 65:9,21,22
66:20,21,23 67:24
70:14 72:18 73:5,6,
11,22 75:22 77:14,
15 84:8 85:12,21,23
86:11,14,15,19,20,
24,25 87:20,21,25
88:1,2,9,13 89:2
90:7,8,13 91:1,5
93:11 96:9,10,15,
17,20 97:2,22
99:22,23 100:1,6
101:7 113:3 114:16
117:24 143:21
147:1 148:1,2,15
152:8,9 161:5
165:3,4,7,9 180:14,
21 217:14,19,20
239:9,19 253:12
256:23,25

**exhibits** 9:9 10:3
89:19,22 90:10

**exist** 80:3 89:9
110:18 112:15,24
141:5 246:22 247:1

**existed** 81:11 90:3
145:19,22 215:9,11
229:19 242:22

**existence** 51:21

**existing** 51:6 177:7

**exists** 145:21
233:24 242:23

**exit** 42:19 96:25
165:12

**exiting** 165:13

**expanded** 81:23

**expect** 76:4,5
85:20 99:20 113:9
119:1 127:5 159:8,9
190:11 224:25
225:2,4

**expel** 154:3,13

**experience** 127:24
128:4

**expert** 30:1 45:15
46:24 48:7 69:5

140:13 215:22
216:1,3,15 251:7
260:1

**expertise** 48:17

**experts** 9:10 23:21,
23,25 29:13,19
41:13 99:3 103:1
105:17 109:3

**experts'** 199:20

**expires** 268:18

**explain** 140:5

**explained** 125:1
205:23

**explode** 153:25
154:15 219:20

**exploded** 154:9
219:25

**exploding** 179:18,
19

**explosion** 213:15,
17,18 219:21

**exposed** 247:2

**exposing** 243:16,
17

**expound** 251:22

**extension** 64:10
252:11,13

**extent** 37:17,18
89:14 100:21
110:14,15,17
128:10 131:8 141:5
155:3 158:7 162:1
164:2 196:25
229:11 244:24
249:14,15,20

**exterior** 170:8
172:3 181:20
186:23 188:25
190:13,25 191:3,10
198:17

**external** 169:7,8
245:12 248:15

**externally** 255:10

**extinguisher**
219:17 220:2,25

**extra** 94:22

**eye** 134:24

**eyes** 185:2

**eyewitness** 163:12
168:2

— F —

**face** 162:12

**facility** 16:23 17:3
72:5 102:4,5 124:8
145:8 231:5 238:3

**fact** 9:14 127:7
164:4 166:16,18
195:20,22 197:6
205:21 230:8 235:6
242:23 251:9

**factor** 202:12

**factors** 250:14

**facts** 68:10 192:19,
20 193:20

**fail** 232:15,17
242:15 245:6

**failed** 9:10 213:23
225:8,11 231:22,25
232:7,20 242:13,14
243:5,7,8

**failure** 12:6 41:3,14
49:1 227:15 228:2
232:4,9 241:22,25
242:2,5 243:2,21
244:4,6

**failures** 49:5 57:23,
25 58:1,4,9 59:8

**fair** 28:24 140:10
169:13 179:6
181:18 199:19

**fairly** 77:5

**false** 195:20

**fashioned** 73:10

**fax** 264:15

**features** 26:5
68:10 70:5 75:5
151:20,25 165:13
228:14 235:15

**February** 73:17
76:8,11 83:11,15,16
87:1,5 88:9,10,21
89:20 98:9 107:12

**fee** 65:14

**feel** 8:10 106:6,8
141:21 154:9

**feels** 103:19

**feet** 158:16 159:16,
21,22,23 164:23
165:1 167:15,17
172:1,5,7,8 173:7
185:18 188:19,22,
24 189:2 213:21
214:4,5,10,11
219:24

**feet along** 187:16

**fight** 9:20

**figure** 75:4 79:15
86:23 110:21
112:14 116:13
124:14,15,17,20
169:24,25 170:10
171:8,9,10 172:17
179:1 181:10 190:1
203:11 250:23
251:19 252:3,5
253:18,20,22 254:4,
5,7,9,19 256:1

**figured** 10:8

**figures** 75:4 110:19
170:5 181:5

**file** 8:17,20 9:4
11:19,20,23 12:18,
21,22 13:13 14:1
15:7 20:11,14 21:9
24:17 37:20 38:20
44:21 66:16 67:3,6,
13 71:7 75:21
76:10,14 77:22 85:6
86:5,10 87:21 90:2,
13,23 91:1 96:12,13
100:4,7 107:22
108:1 112:2,4,5,22
113:5,6 115:8 116:4
117:8,11 140:24
165:8 169:1 181:14
195:12,16 233:4
239:2,20 257:4,9

**files** 57:22 59:23
111:15 116:4

**fill** 27:16

**filled** 153:24 154:12
236:3

**finalized** 113:25
114:1,7,13 118:7

**find** 31:17 43:1
72:10 95:6,16,22
116:19 123:16
144:5 220:25 231:5,
6 232:15 242:11
251:25 253:16,17
257:18,19

**findings** 143:23

**fine** 9:25

**finish** 139:4 176:3

**finished** 147:3
256:24

**Finnegan** 34:4,19

**fire** 12:12 14:13
18:21,24 19:8,9,15,
16 24:10,11,21
29:15 31:12,19,22
32:3,16,17 33:5,22
34:24 35:5 36:22,23
42:22 45:5,8 46:16
48:23 61:17,21,25
62:5,23 63:4,6,22
64:1,9 68:4,6,8,10
69:1,3,10,16,21,24,
25 70:3,6,8,12
71:20,23 81:3,15
120:12 122:10,11,
15,18,22 123:13,25
124:8,11 125:11,13,
19 126:1,5,6,8
127:17,20,21,24
128:5 131:14,18
138:23 140:16,18
141:1,3,4,5,6,7,8,10
142:5,6,7,8,11,13,
14,16,18,19,25
143:3 144:3,5,25
145:11 146:11
147:19,20,24 149:9,
12 150:11,24 151:4,
20,22,24 153:2,6,
11,25 154:14,25
155:7,18,20 156:6,

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

11,23 157:1,17,21
158:3,19,20 159:1,3
160:18,24 161:2,9
162:6,15,20 163:3,
6,12,17,19,22,25
164:1,7,13,21,22
165:1,18 166:7,16,
18,23 167:18,24,25
168:5,22 169:6,12
173:14 174:4,7,9,
10,12,16,17 175:3,
24 176:7,17 177:2,
6,8,11,13,15,19,22
178:4 179:18,19,24
180:6 181:24
182:16 183:6,13,21
184:5,23 185:1,12,
13,17,19,20,24
186:1,2,22 187:3,8
188:12,21,23 189:2,
5,6 190:4,15,17,21
192:5,10,12,23
193:12,15,22,23
195:14,21,24 196:2,
3,20,22,24 198:4,6,
19,21 199:22 200:7,
9,18,19,20,24 201:7
202:14,22 205:2,13,
18,21 206:4,7,10
207:16 208:3,6
209:1,24 210:24
211:2,14 213:16
214:1,21,23 215:2
216:19 217:2,10,11,
12 219:7,8,15,16,
19,23 220:2,22,25
221:1,6,17,23 222:1
223:8,11,13,18,21,
25 224:3,11,25
226:16 227:13,17,
23,24 228:9,13,15
230:22 232:18,21,
22 233:1 239:17
243:1,11,16,17
245:12 246:22
247:2 258:12,19

**fire's** 168:7 258:22

**fires** 40:15,20
41:18 232:19

**firm** 44:12 56:1
58:22 64:13 67:9
84:13 101:12
102:16 119:8

**Fischer** 71:3,4,6

**fit** 203:13 209:17,20
247:16

**fits** 131:4 256:5,15

**five-gallon** 176:1
179:17

**five-minute** 115:18
211:23

**fixture** 162:25

**flag** 109:5

**flagging** 93:5,6

**flame** 154:7,13
170:2 181:20,22,25
182:2,12,15,16,21
187:2,7 190:17

**flames** 154:3 171:1
180:2 193:11

**flammable** 142:25
144:2 153:21,24
154:13 176:18
177:25 182:4,22
204:15 207:7

**flare-up** 176:5,6
178:2

**flash** 103:4

**flat** 245:24 248:16,
22 252:6 255:14
256:2,3,5

**flawed** 216:12

**floor** 154:22 175:22
177:6 180:7 191:14

**fly** 130:20 135:23

**flying** 154:21

**focus** 208:23
209:16

**focused** 208:14

**foil** 95:5

**folder** 13:14,15,24
71:16,19 115:9

**folders** 116:4,6

**folks** 41:10 88:19
124:19 145:25

**follow** 123:13
125:2

**foot** 164:23,25
173:6 185:18
188:17 219:13

**foregoing** 261:20,
22 268:2

**foremost** 123:15

**forensic** 49:18,21,
23 50:2

**Forensics** 76:8,24
77:6 85:16

**Forest** 6:14 15:9
16:4 124:19 227:14
229:21

**forgot** 33:1

**forgotten** 114:24

**form** 26:16 28:25
29:20 30:10 36:2,13
45:21 68:13,20
72:25 104:9,19
105:22 110:4
112:16 114:9
118:24 121:16,17
128:24 129:15,25
130:2,9 131:5
132:3,14,20,22
137:22 138:22
142:21 149:14
150:5 151:7 155:21
157:12 159:13
163:14 172:25
178:11,16,18
179:15 187:18
192:8,18 199:8
202:14 203:21
213:10 214:7,16
216:22 223:15
233:3 245:7 246:9
258:25 259:25

**formalize** 100:25

**formalized** 118:21

**formally** 64:6

**formed** 36:5 121:3
132:11 133:14,20
158:6 170:15
176:24 197:11
198:23 199:1,6
202:25 203:4

221:24 222:2

**forming** 37:12
134:3 138:6 259:19

**forms** 134:25

**formulate** 101:4
120:19 130:25
131:1 137:12,16,21,
25 246:14

**formulated**
208:19,22

**formulating** 21:15
23:21,24 37:23
139:10,11

**formulation** 25:15

**forward** 157:19

**found** 89:6 91:8
109:16 123:21
132:21 135:6 157:9
205:2 210:19 211:4
230:19 234:14

**foundation** 32:3
130:4

**Foundation-
funded** 33:5

**four-inch** 35:2

**four-wheeled**
172:11

**fourth** 201:19
256:12

**frame** 74:12,15,18,
19 169:24,25
172:15,21 173:9,25
174:14,15,16
175:13,14 178:9,24
189:15 191:9,24

**framed** 190:25

**frames** 169:3 176:4
181:16

**free** 8:10 139:19

**Friday** 8:18 16:16
112:7

**front** 11:15 76:5
87:18 108:24 131:1
133:23 137:15
155:19 170:9,11

172:6 175:23 177:3,
4 179:9 180:5
198:21 249:3

**frozen** 115:16

**fuel** 123:12 176:6
178:3 179:4,7,23
180:1 196:14,20
197:3,20

**fulfill** 119:24

**full** 92:3 154:18
179:20 225:25
262:1

**fully** 62:23 205:23
206:13,18,22 208:9
225:21

**functioning** 227:5

**furnished** 20:22

---

**G**

**gamut** 60:22

**Gary** 155:14 201:18

**gas** 256:11,13

**gather** 107:20

**gathered** 257:20

**gauged** 191:20,24
192:17

**gave** 208:20 235:1
259:15

**geared** 50:17 51:7

**general** 9:7 17:4,5
25:14,18 26:2,18,19
29:4,9,11,24 33:17
34:11,15 36:4,7,12
40:19 45:4 48:22
50:5 60:7 69:10
72:3 80:7,18 96:5
120:16,19 122:18
124:7,9 130:24
143:8 205:15
209:11 235:14

**generally** 28:22
60:6,7 115:1 147:21
216:12 252:6,7

**generated** 19:20
22:9

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

**genuine** 62:25

**get all** 137:15

**gigabytes** 8:19

**give** 27:18,22 31:15 54:4 55:3,5,19 124:7 130:5 135:24 142:7,13 143:7 180:15 208:19 219:3 220:19 236:6 244:17 258:13 260:6

**giving** 247:3 250:8

**glow** 165:23 166:2, 10,12 200:16,19,21 211:15

**glue** 153:3 175:25 179:17 198:20

**golf** 155:25

**good** 102:16,18 111:15,20 142:4 211:22 224:22

**Google** 14:22,25

**graphics** 74:10

**graphite** 241:10

**graphs** 19:25

**great** 7:23 65:1 146:24 251:22

**green** 82:20 167:3

**grew** 228:10

**grid** 89:6,9 108:11, 14,15,16,19,22 109:6

**gridded** 218:24

**grinder** 162:25

**ground** 8:1

**group** 41:8,9 248:11,21 249:17, 19 253:2 254:20

**grouping** 251:6,13 253:4 255:7,9

**groupings** 251:16

**guess** 22:5 33:15 47:12 48:11 73:9

85:4 87:7 92:18 95:16 106:7 120:9 147:17 174:23 178:5 211:25 248:4

**guessing** 116:11

**guy** 165:25

**guys** 115:17 146:13 148:4 210:6

---

**H**

**Hackett** 16:9 24:1 88:25 108:1,9,10 161:6,17 168:20 169:1 216:15,25

**Hackett's** 88:11 91:14 199:22 217:15 218:12

**half** 77:4 188:17,18, 19 192:4 215:15,16

**hand** 262:10

**handbook** 24:22, 23 25:19 26:14 28:21 29:25 31:7 34:24 35:8 70:3

**handful** 46:5 48:15 56:6,7

**handle** 111:17,18

**handling** 111:20

**happen** 60:23 113:14 182:10

**happened** 50:16 51:13 146:15 155:1 210:21 230:2,13

**happening** 211:21

**hard** 8:17,25 9:6 11:16,18 16:15,18, 21,24 17:3,15,18,19 103:4,5 109:13,15 112:5,6,9,13 115:9 144:7 161:15

**hauling** 177:12

**hazard** 31:25 33:2 244:23

**hazards** 33:6

**head** 23:16 87:19 252:17,19 256:10

**heading** 120:15 125:11,12 147:8,12 151:17,19 208:2 215:23

**hear** 10:6 54:10 148:5 157:25 210:6, 12 211:18 212:9 213:10

**heard** 212:17 213:16

**heat** 125:19 153:18

**heavy** 153:20 191:20,24

**height** 185:20

**hell** 146:15

**helpful** 33:14

**helping** 115:2,14

**helps** 240:14

**hereinabove** 268:5

**hereto** 268:4

**Hey** 23:7 27:13 61:7 75:14 103:19 136:5

**hiding** 112:24

**high** 151:3,6 185:18,20 219:15

**High-speed** 34:4

**higher** 169:1,2 181:11

**highlight** 42:10 82:12

**highlighted** 82:13, 16,17,23 170:18 203:6,16,18,20

**highlighting** 42:7

**hindered** 259:19

**hired** 44:6 51:8 61:24 64:13

**hires** 51:20

**his/her** 263:18

**hiss** 213:10

**historical** 229:4

**history** 26:3,6 43:11,13 229:3,6,8 230:15

**hit** 83:5,7 90:17 91:12

**hits** 213:21 214:4

**Hodge** 6:19

**Hoffman** 33:20

**Hold** 139:24 149:4, 5 152:17

**holder** 13:21

**holding** 112:25

**home** 6:14 62:15, 16 192:23

**hope** 87:6

**Horton** 155:15 217:12

**Horton's** 201:18

**hour** 61:8 65:15 84:10 225:24

**hourly** 21:22

**hours** 77:4,7 116:21,24

**housing** 214:17

**huge** 229:21

**human** 204:14

**hundreds** 176:4

**hypotheses** 131:2 137:16,17,21 199:5, 8,9 200:6 201:21 206:1,2,3 208:4,5,6, 19,20 209:21 210:2, 17,19 211:8 221:24 222:2,17,19

**hypothesis** 32:21 131:2,3,4 199:4,12, 15,25 200:2,5,12,13 201:15 202:17,19, 24 205:24 208:3,20 210:23 212:14 213:5 222:5 233:24

**hypothesize** 199:13 200:8

**hypothesized** 32:14,18

**hypothetical** 123:2 130:3 135:12, 14,21 192:19 193:2, 8 214:8 243:24 244:13,15 245:8

---

**I**

**IAAI-CFI** 40:14

**idea** 53:18 55:22 134:17 137:13 142:7 223:17

**identification** 10:14 27:4 65:23 66:22 77:16 85:24 86:16 90:11 96:11, 18 99:24 148:3 152:10 217:21 257:1,22

**identified** 63:16 218:7,22 233:20

**identifies** 216:25 232:25 233:12 239:20

**identify** 94:11 125:4 227:18 228:5

**identifying** 92:20 227:16

**IDS** 237:3

**ignite** 182:9,13 243:15,19

**ignited** 123:12 125:20 182:5 228:9

**igniting** 144:2

**ignition** 29:14,15 34:24 83:20 97:19 101:2 123:12,22,24 125:20 204:6,23 205:1,9,12,22 206:9,10,12,18 208:16 209:17 210:3,18 211:4,6,10 224:10,24 226:7,8, 11,16,18 227:16,19

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

228:6,8 232:22
243:10 259:7,12,15

**ignore** 150:21

**Illinois** 43:2

**image** 92:17 93:6
95:20 96:3 106:5,8,
25 111:13 124:20
170:19 172:14
173:9,10,12 174:1
180:17 252:3,13,22
254:1,2,3 255:25

**imaged** 16:13
82:19 103:3

**images** 14:22 20:1
75:7 103:4 110:13,
15,18,24 111:9,23,
24 112:12,18
253:13 255:17,22

**imagine** 130:4
148:10 214:12

**imaging** 16:7,9,10,
14,23 17:2,3,8,23
42:1,8 72:24 102:4,
5,8 103:6 107:8
109:12 115:2
239:25 240:1

**impact** 95:4,5,14
226:5,6

**important** 88:7,8
157:10

**improper** 84:5
123:1 130:3 135:12
192:18 193:1,8
214:7 243:23
244:13 245:8

**improperly** 139:18
204:15

**In-operandi** 34:4

**inaction** 204:14

**Inaudible** 213:12

**inch** 173:5

**incident** 13:10
14:10,18 15:6,18
16:2 18:15,22 46:8
71:10 72:1 126:23

**include** 51:2 62:2

70:8,11 74:24 95:11
120:11 183:23
197:16 200:5,11
218:10 236:23
257:12 259:13

**included** 20:14
26:5 79:11 108:7
111:25 132:7
141:18 169:24
173:11 216:25
218:19,22 228:21
235:13 236:24
239:20 244:22
249:8

**includes** 70:1
212:16 213:6

**including** 9:8 18:3
20:9,21 136:17
142:25 186:8,9
196:3 202:16
223:11,25 224:3,19
236:15 245:12
254:2 263:23

**incomplete** 228:17

**inconsistencies**
247:5

**inconsistent**
218:13

**Incorporated** 6:15

**increments** 22:15

**incurred** 116:18

**Indiana** 6:17 23:13
43:2

**indicating** 21:21
184:11

**indication** 110:7
142:4 166:4 194:3
225:15 227:6

**indications** 93:1

**indicator** 110:10
141:7

**Indirectly** 51:11

**individual** 144:17

**individuals** 21:4
164:16

**industry** 31:22
70:1 160:15

**information** 9:6
13:11 30:5,8 52:25
53:12 76:18 80:6
101:15 106:10,12,
15 107:1,20 108:5,
12 117:12 120:6,22
125:6,7,10 133:5
136:23 140:19,20,
23,25 141:2,4,16
142:1,3 145:23
147:9,18 156:16,18
161:21 167:23
168:19 184:22
194:18 197:9
225:17 234:14

**informing** 119:20

**initial** 69:12 103:18
161:9

**initially** 99:9
200:19 213:23

**inputted** 137:1

**ins** 160:13,14

**insert** 53:3,6

**inset** 189:1

**inside** 15:5 95:4
96:6 103:16,21
104:13,14 105:9
147:24 149:8,9,13,
19 150:2,11,14,24
153:6,11 167:25
168:6,22 183:22
184:5 190:21 192:5,
12 199:13,22
200:20 202:15
215:13,18 217:11,
13 218:15,19
238:12

**insinuate** 189:19

**inspection** 12:6
20:16 78:7

**inspections** 15:17,
19 78:11,12

**installer** 47:9

**instances** 62:20
63:8 182:21

**Institute** 41:5,7

**instruct** 263:22

**insulting** 139:1

**intact** 252:14,20
253:1

**intended** 76:20,21
121:20 122:2
228:24

**intention** 76:23
95:19

**intentionally**
144:2

**interaction** 240:24

**interest** 63:17,18

**interested** 87:16
104:24 262:8

**interesting** 232:15

**interface** 229:1
240:11,12

**internal** 12:5 13:8
169:9,10,14 208:15
211:9 244:5

**internally** 34:23
218:13

**internet** 14:25

**interpretation**
246:15

**interrogatories**
6:6

**interview** 13:6
140:23,25

**interviewed**
134:23

**introduced** 178:4

**invalid** 32:21
222:20

**investigated** 62:24
64:4

**investigation** 12:7
24:21 31:19,22 35:6
44:2 50:5,16 60:5,9
63:2,14,18 67:16
69:3 70:3,9,11
109:4 120:2,5

**investigations**
42:23 49:18,21,24
50:2 122:22 137:9

**investigator** 37:11
71:18 127:20

**invoice** 22:6 66:6,8
70:15 71:2 72:17
73:23 75:25 76:17,
23 77:8,11 84:24
85:13,14 97:24
101:6,8 109:16
110:8

**invoices** 21:21,25
22:3,9,20 66:3,10,
11 84:9 85:8 97:23
109:24 117:2

**involve** 40:21
41:19 46:17 50:20
56:12 57:22 58:8

**involved** 43:20
47:4 48:3 49:1,5
50:5 59:6,15,22
61:13 64:7 164:8
175:24 176:2 183:6

**involves** 50:7,8
140:18

**involving** 44:2

**ion** 31:11,24 33:1
34:5 40:15 41:3,15
42:1 237:15

**isolate** 153:13

**issue** 9:20 15:18
18:15 46:10 50:3,4,
12 51:13 61:6 73:12
98:18 145:5 195:10
211:24 231:9
238:25 244:8,20

**issued** 114:2,15

**issues** 30:22 48:24
202:9 221:11

125:5,22 127:9
128:7,20,21 129:2
134:6,11 135:3,4,7
144:1,4,20,21
145:19 164:5
193:17,24 218:25
223:4 258:4,9,16
260:3

**investigations**
42:23 49:18,21,24
50:2 122:22 137:9

**investigator** 37:11
71:18 127:20

**invoice** 22:6 66:6,8
70:15 71:2 72:17
73:23 75:25 76:17,
23 77:8,11 84:24
85:13,14 97:24
101:6,8 109:16
110:8

USDC IN/ND case 3:21-cv-00252-DRL    document 86-4    filed 12/13/23    page 288 of 301
John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

**item** 10:6,15 12:5 22:7,24,25 25:20 30:4 40:16 77:5,17 80:11 85:25 86:9 87:13 91:7 93:25 94:1,10 95:20,24,25 96:2,7 125:19 138:4 239:9

**items** 11:8,9 14:19 20:11,12 25:10,13 30:15 77:6,10 79:14 87:9 88:20 93:18,19 94:3,4 109:20,23 153:4,10,17,21 170:18 175:7,24 176:17 204:9 205:20 207:22 246:8 247:22

**J**

**Jack** 101:23

**James** 44:11

**January** 39:8,9 40:3 114:18

**jbarton@ stantonbarton. com** 263:8

**jelly** 246:1 252:11, 15,17 255:15 256:10

**jet** 154:7,14 170:2 181:20,22,25 182:3, 15,16,22 187:2,7

**job** 49:15,17,21,24 50:20 102:18

**jobs** 40:8,10

**John** 6:1,13 7:12, 17 9:22,24 10:19 39:1 114:23 263:11 268:1,11

**Johnson** 23:25 87:17 88:15,20 94:3 108:2

**joined** 6:20

**Jon** 7:2 61:11 136:11 139:14,23, 24 235:4

**Jonathan** 263:2

**judge** 45:15,24

**junction** 91:23

**June** 89:22 98:7 107:12

**K**

**K-4** 244:24

**Kansas** 43:3

**Kaps** 88:23 108:10

**Kentucky** 43:3

**kid** 182:8

**kind** 26:3 37:22 53:10 75:15 95:5, 11,14 111:17 211:1 258:14

**kinds** 60:21

**Kirk's** 24:21 31:19 70:3

**Kistler** 165:25 166:13 204:19 224:16 225:14 230:25 231:14

**Kistler's** 231:11

**knew** 200:9

**knock-off** 60:19 62:21 63:5,19

**knock-out** 91:21, 22 92:1

**knock-outs** 91:24

**knowing** 133:8 202:7,11 230:15

**knowledge** 9:8 25:15,18 26:2,19 29:4,9,12,17,24 30:6 33:17 34:12,15 36:4,5,8,13 133:7 229:3,6 230:2

**KO** 91:17,19

**L**

**L-SHAPED** 204:4

**lab** 75:23 76:7,19, 24 77:22 85:14 86:5,10,11,12,22 87:5,13,21,22 90:13 91:1 96:13 97:10, 11,14,25 98:4,7,9, 19 99:5,18 100:5,7 105:6 131:21,24 132:2,12,17,19,21 243:11

**labeled** 100:7

**labels** 198:13

**laboratory** 23:1 107:11,14 134:1

**labs** 77:4 102:6,8

**lack** 215:4 247:13

**Lacks** 130:4

**ladder** 170:10,11

**ladders** 160:8

**laid** 144:15,16 145:7,8 146:9 158:12 162:24

**lamp** 226:15

**land** 171:4

**Lanny** 165:25 166:13 204:19 224:16

**lapping** 174:19,21 190:19

**large** 25:21 90:2 111:15 160:9 176:1 190:4

**largest** 35:5

**Larry** 155:13 161:8 163:10 200:15 201:17 211:14

**late** 222:7

**law** 44:12 56:1 67:9 84:13 101:12 119:8 127:18

**lawful** 6:2

**Lawrence** 117:8

**lawyers** 9:20

**lay** 171:4

**layer** 233:1,13,22, 24 235:25 236:1 237:18,21 240:14, 17,24 243:3 252:24

**layers** 240:10,14 241:14 252:20,21, 25

**layman's** 151:22

**layoff** 144:12

**layoffs** 144:10 145:3

**lead** 127:20 128:5 223:5 244:3,6

**leaning** 78:25

**leap** 229:21

**learn** 101:15

**learned** 101:18

**leave** 163:23 244:1

**leaves** 33:21 172:4, 8 188:18,19 225:14

**leaving** 144:18 182:13 204:17 225:18

**left** 92:8,15 149:11 152:6,14 162:21,22 164:17 170:19 171:1,12 172:15 173:10,12,25 174:18 190:8,10 220:25 225:14 255:25 256:13

**legal** 6:19 50:3,4

**legible** 94:13,14,16

**Lesnick** 6:8,25 7:9 26:21 27:17,22 28:1 29:11,23 30:24 31:10 35:18,24 46:1 48:11,25 53:7 54:18 55:11,20 57:9,15 58:20 59:5,13,19,25 61:11,12 64:24 65:8 79:5 83:17 100:23 104:9,25 105:25 106:18 107:2 110:7 113:2 114:12 115:9,

17 116:3 119:12 121:25 123:5 127:16 128:19 129:20 130:6 131:20 132:10,18 133:9,18,19 134:20 135:4 136:10,12 137:19 138:1,9 139:2,14,23 141:16 142:6,18 143:4,12, 20 146:16,24 148:4, 8,10 149:25 151:5, 16 154:24 155:9 156:3 157:15 159:7 160:7 161:4 163:18 164:10 167:16 173:12 174:4 176:8 178:5,15,21 179:6 180:4 183:1 186:12 187:23,24 192:11, 23 193:4,10 194:17 195:3,7 202:1 204:6 205:14 207:1 209:15 210:1,6,8, 11,16 211:18,20,25 212:4,14,19 213:3 215:6 216:14 217:6 220:19 221:4 223:22 227:8 230:17 233:10 234:22 235:3,7,8,16 236:10 237:15 240:23 242:3 243:4 244:5,16 245:5,13 247:18 253:24 255:1 256:22 259:4, 17

**letter** 67:15,17,18, 20,23 68:1 243:5

**liability** 140:11

**license** 42:25 43:4

**life** 230:3

**light** 162:25

**lighter** 182:8

**limited** 18:3 24:8 209:3,7 236:15

**Linden's** 24:23 25:19 26:14 28:21 29:24 31:7

**lined** 188:25

USDC IN/ND case 3:21-cv-00252-DRL    document 86-4    filed 12/13/23    page 289 of 301
John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

**lines** 18:18 108:23 109:5

**liquids** 179:24

**list** 11:6 12:3,25 25:1,20 34:1 45:19 88:11,12 89:7,8,10 91:14 121:6,22 122:3 135:24,25 138:3,11 233:7 234:9,19 263:23

**listed** 29:8 30:4 35:19 36:12 44:14 45:11,18 50:1 52:11 57:17 121:2,8,14,19 136:19 205:4,11,15, 16 206:20 208:4 246:5

**listen** 139:23,24

**listing** 38:14 80:3 121:20 197:2

**lists** 25:8 49:16 121:13

**literally** 222:11 255:24

**literature** 122:8 123:23 226:9,14

**Lithium** 31:11,24 33:1 34:5 40:15 41:3,15 42:1 237:15

**lithium-ion** 19:7 24:9 25:21 26:2 29:9,12,14,18 30:1 33:7,12,18 34:12,20 36:21 40:20,22 41:19 42:22 46:19 49:2,6 57:22,25 58:1,4,9 59:7,14 61:25 62:5 63:21,25 235:10,13,17 237:7, 23 238:7 243:22 244:23 245:6

**lithium-powered** 45:5

**litigated** 50:12

**litigation** 6:21 50:7,8,11,17,19 53:8,13,16,24 54:8 57:14 264:10

**load** 179:4,7 180:1 196:14 197:3

**located** 7:21 16:1 137:4 166:19 174:4, 5 204:7 231:12,13

**location** 92:1 147:18 152:1 158:19 160:19 162:6 167:18 171:19 176:18 185:5 186:1 188:9 189:12,21 211:11 214:22,23 215:2,3,9 223:8

**locations** 154:15 182:17

**lockable** 153:20

**long** 87:11 156:11 202:14 219:18 220:5 221:5,6,22 258:2,14 260:9

**longer** 47:7 63:16, 17 177:14 226:8

**looked** 60:12 82:9 140:21 141:1,4,12 142:23 151:10,22 219:16 224:8 228:12 233:4

**loose** 231:7

**loosely** 182:2

**lose** 226:25

**loses** 227:8,9

**loss** 129:21,24 130:7

**lost** 9:15 92:10 145:14 210:4 212:2, 3

**lot** 119:22 142:16, 23 182:2 190:16 209:13 245:11 257:24 259:11

**Louis** 6:21 7:22 44:12 261:4 262:10 264:13

**low** 168:24 227:10

**lower** 181:12

**lunch** 115:22 136:5,8 143:13

---

**M**

**machine** 75:2 90:18 111:15,19,21

**made** 9:14 29:25 39:8,13 59:12,14, 21,22 60:19,20,24 61:15 63:25 64:5 100:13 105:17 114:19 132:1 144:14 190:22 215:20 224:17 229:2 230:1 232:4 234:1 237:10,20

**main** 264:14

**maintained** 21:10

**maintenance** 165:25

**make** 8:16 9:18 12:3 27:16 40:2 51:17 55:6 57:1 62:11 77:1 79:10 80:17 87:4 90:19 98:17 104:16 105:10 126:1 135:19 136:14 140:2 148:8,23 162:16 176:10 180:19 187:9 219:5 220:7 228:5 232:10, 13 235:10,17 239:5

**make-up** 237:5 240:20

**makes** 26:13 49:24 159:1 162:13 167:4, 6,8 228:3,11

**making** 44:3 79:10 195:10

**Makita** 6:15 7:3 15:3,13 18:2,14 21:3 38:10,11 44:16,19 45:7 52:3 56:2,12 57:9,21 58:7,22 59:7,15,22 60:15,17,18,19,25 61:3,5,14,15,17,21 94:14 99:14 227:15

228:2 229:7 230:9 231:11,15,20 236:4, 15,16,19,20 238:20, 23,24 239:12,13,16 240:8 257:11 263:13

**male** 94:23

**man** 139:14

**manageable** 220:22

**management** 22:12 228:22,25 229:10,15,18 238:4

**manager** 158:12 165:25 219:15

**Manchester** 264:12

**mandrel** 42:13,14, 15 252:23,25

**manner** 8:8 141:11 223:5 228:23 231:16 243:7

**manuals** 24:6

**manufactured** 237:25

**manufacturer** 15:24 47:6 63:1 94:11

**manufacturers** 94:22

**manufacturing** 51:18 238:3 245:4

**map** 108:20 109:2

**mapping** 33:21,24 222:13

**Maps** 15:1

**March** 43:13 45:12 46:3 116:17 117:7, 15

**Margaret** 261:6

**mark** 10:12 27:1 65:20 66:20 77:13 85:21 86:13 90:7,12 96:9,15,20 99:21 100:1,6 111:13

147:25 148:15 152:7 165:3 180:23 217:19 254:15 256:23

**marked** 10:13 27:3 65:9,22 66:21 77:15 85:23 86:15 90:10, 25 96:10,17 99:23 110:23,24 148:2 152:9 165:4 180:13, 21 217:20 239:6 256:25

**market** 94:18,21

**Markiewicz** 101:21,22,23 105:6

**Markiewicz'** 109:19

**marking** 10:3 28:1 92:19 95:22 96:23 170:7

**markings** 92:24 94:16 257:23

**Maryland** 263:5

**mat** 175:22 177:6 180:7

**match** 186:7

**matched** 95:22

**material** 8:19 9:7 28:15 31:1 76:14 81:6 154:6 181:24 182:4,12 184:14,17 185:4,5 186:9 191:1,4,11 197:25 198:16 215:5 228:8 235:25 236:5,21,22 237:10,19 238:17, 19 241:13 252:17, 21 255:19 257:4 259:17

**materials** 8:21 9:3, 5 11:19,20,23 12:18,21 13:13 20:14 24:24 30:23 107:22 108:1 116:5 123:19 143:1 144:2 162:18 167:21 175:1,2 177:25 179:22 182:23,24 184:12 186:10

USDC IN/ND case 3:21-cv-00252-DRL    document 86-4    filed 12/13/23    page 290 of 301
John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

196:11 198:5,7
204:15 207:6,7
211:11 225:5 233:5
235:10,12,16 236:7,
9,15,24 238:14
258:5,10,17

**matter** 9:24,25
12:12,20 14:2 18:3
21:5 23:22,24 25:16
26:20 29:6,12,19
30:9,12 32:13 34:10
35:1,8 36:13 37:4,6
43:20 44:24 45:2,
24,25 46:2,3 47:7,8
48:20 50:12 55:25
56:4 66:11 67:8,21
73:2 74:4 75:19
81:16 103:11 104:6
105:21 107:9,15
114:13,21 115:15
116:18,22 117:13
118:3,10,16 119:9
120:20,24 121:3,9,
15,22,23 122:1,4,15
128:14,21,24 129:6,
14 130:1,8 131:7
132:9 134:4,24
136:13 137:20
142:7 143:24 158:6
163:7 164:8 165:19
205:18 206:14
207:17 208:5,12
209:4 218:25 226:2
229:8 230:8 236:17
238:16 245:18
258:3,8,15 259:19,
20 263:19

**matters** 226:4

**Mcginley** 107:25
108:4,5,7 109:8
116:12 117:13,16

**Mcginley's** 116:14
117:10

**Mcguffey** 144:16,
23 145:7 146:8
204:18

**meaning** 60:19

**means** 54:25 55:16
56:18 69:22 84:12
112:14 137:8
147:19,20 149:23
156:1 197:21

214:11 233:13

**meant** 14:12 45:20
108:15,16

**measurable**
248:17

**measured** 245:24
246:2,3

**measurement**
256:4

**mechanical** 244:2,
25

**meet** 113:17

**meet all** 251:16

**meetings** 38:9,11,
12

**meets** 190:14
251:6,20 252:19
253:4

**Megan** 7:2,12
66:24 263:3

**melting** 252:22

**members** 15:5

**memorable** 156:21
158:2

**memorandum**
13:9 37:9

**memory** 66:19

**mention** 105:3
114:19 144:3 250:8,
9

**mentioned** 28:8,9
54:7 145:20 184:4
268:6

**menu** 22:23

**mesh** 191:24

**met** 113:20,21
251:13

**metal** 191:23
192:17 195:16
196:15

**method** 32:13,14
70:2 123:11 124:2
125:1,2 186:17
193:20 255:4

**methodology**
19:7,14 32:18,19
69:4 125:1 130:13
140:17 216:13
221:15 222:10,12,
21 223:3 248:2

**methods** 70:1
134:18

**Michigan** 43:3

**mid-december**
114:20

**mid-january**
114:21

**middle** 171:11
207:1

**Midwest** 12:18
20:13 37:8 72:5,7,
15 73:21 76:6,8,24
77:6 80:3 85:16
88:19 98:3,4 100:13
102:3 105:5 109:20
131:24 133:25
140:24 197:4
216:20

**million** 140:12

**millisecond** 181:1

**mind** 12:24 95:10
115:19 146:12
177:9 181:15
194:22 214:14
261:15

**minute** 136:7 202:5
255:7

**minutes** 64:25
156:5 158:3 177:10,
16,20 212:20 260:6

**Miscellaneous**
13:14,18,24

**Mischaracterizing**
104:20

**misconduct** 235:6

**misinterpreted**
145:22

**misleading** 159:19

**missed** 92:12
251:19

**Missouri** 6:22 43:2
261:1,11 262:10
263:6 264:13

**misstated** 150:6

**misstates** 26:16
28:25 58:16,25
105:22 106:22
128:10 132:4
142:21 150:17
151:8 155:4 158:8
159:13 163:14
172:25 178:18
179:15 197:1
203:21 216:22
229:12 234:18
242:17 246:10
258:25

**mistaken** 44:13

**misunderstandin
g** 165:16

**misuse/abuse**
229:5

**model** 85:2

**modes** 243:21

**modification**
51:17

**modifications**
51:6

**modify** 51:22

**moliver@
stantonbarton.
com** 263:9

**Molly** 6:18

**Monday** 8:18
113:23

**money** 103:17,21
105:12

**monitoring** 7:8,10

**month** 17:13

**morning** 23:14
221:21 224:9
257:25

**motion** 9:19 46:7

**motor** 92:6,20,21,
22 93:2,7

**move** 22:7 152:16
195:8 215:8 235:22

**moved** 89:15
252:12

**moves** 190:8,9,10

**moving** 195:24
196:3 212:11
219:22

**MSDS** 236:21

**multiple** 17:12 29:1
47:4 82:3 131:18
139:6 176:5

**Murata** 79:20,24
257:15

---

**N**

**named** 57:13

**narrates** 143:25

**narrow** 81:19

**National** 31:12

**natural** 61:9 136:6,
9

**nature** 14:22 53:4
58:17 60:4 145:2
167:13

**nauseam** 202:22

**necessarily** 54:7
81:17

**needed** 9:18 30:23
47:15,18,19 63:12
100:22 104:18
199:21,23

**needing** 93:23

**negative** 246:2,3
247:8,13,14 248:8,
12,19 252:10,15,19
253:1

**net** 196:9

**NFIRS** 125:17
127:9

**NFIRS-1** 125:14
126:16,23 127:3

**NFPA** 31:14 123:15

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

**NFPA-921** 24:13, 15,20 28:10,16 123:10 127:10 134:11 183:7 193:16

**NFPA.ORG/ EDUCATION** 31:17

Nfpa.org/ education. 31:16

**nice** 33:11

**nickel** 235:23

**night** 257:3

**nineties** 222:7

**nitpick** 18:7

**Nobody's** 140:3

**nomenclature** 82:14

**nomenclatures** 83:1

**non-oem** 62:22

**noontime** 225:14

**normal** 228:23

**north** 117:19 163:5 170:15 171:7,24 172:18 176:14,25 179:10,12 184:12 188:12,21,22 189:9, 11,18,20,22 190:12, 14 191:7 197:3,11, 12,22 199:2 202:24 203:1,5 204:1

**northeast** 176:13

**Northern** 6:16

**northwest** 176:24

**not-to-scale** 203:10

**Notary** 268:24

**notation** 82:20

**notations** 75:25 76:2 89:9 110:24 111:1 112:13,15,19

**note** 8:16 70:16 79:20 82:11 86:12

89:3,5 95:22 96:13 97:2 103:25 104:16 156:10

**note-taking** 90:1

**notes** 20:15,17,18 21:13 23:7 38:5,9, 12 67:5 71:11 72:17 75:19 76:5,11 77:9, 19,22 78:1,3,6,13, 17 79:4,8,11,17 84:14 85:18 86:5,6, 7,13 87:21,22 89:22,25 90:5,14 91:1 93:12,13 95:10,13,14 97:7 99:18 100:5,8,13,14 110:11,14,15,17 111:24 140:24 161:17 224:8 257:25

**notice** 10:18 60:10 159:8,9 261:9

**noticeable** 212:16 213:6,8,17,18

**noticed** 170:4 230:5 231:17

**noticing** 6:24

**noting** 91:25

**Null** 147:22 150:6 155:15 177:13 184:6

**Null's** 147:15 148:19 150:17 183:14

**number** 6:18 14:8, 16 15:2,23 16:6 17:25 18:12,20 19:23 23:20 28:20 31:24 32:6,13,25 33:20 34:1,4,24 36:19 37:9 42:18,20 43:1 44:14 46:5 48:15 54:4 55:19 56:8,20 58:12 79:13,25 80:1,5 88:12 89:7 91:13 94:6 95:24,25 116:20,25 117:1 121:6,11 181:16 189:10,19,24

201:22 227:25 234:3 243:5 248:20 263:24

**numbers** 80:2 94:7 96:22

**numerous** 105:19 198:24

———

**O**

**oath** 9:12

**oaths** 261:7

**object** 26:16 28:25 29:20 30:10 45:21 48:10 104:9,19 105:22 112:16 114:9 121:17 128:9 129:15 130:2 131:8 132:3,14,22 134:25 137:22 149:14 150:5 151:7 155:3, 21 157:12 158:7 159:13 163:14 164:2 172:25 178:11,18 179:15 187:18 192:8,18 196:25 203:21 209:9 214:7 216:22 229:11 233:3 245:7 246:9 258:25

**objection** 8:22 31:4 35:12,22 48:18 53:4,6 54:1 55:12 57:5 58:15,25 59:9, 16,24 60:1 64:17,22 83:14 100:19 106:14,21 110:4 123:1 127:11 134:13 135:11 137:5 138:24 141:23 142:9,21 143:6 150:16 154:16 160:3 167:11 175:15 176:20 182:18 186:3 193:1 194:12 201:23 205:10 209:19 214:25 216:9 223:15 227:3 235:3,11,19 237:11 238:15 240:19 241:23 242:16

243:23 244:12 259:21

**objections** 130:11 193:7 244:19 261:25

**obliterated** 196:17

**observation** 80:17,25 81:10 161:9 185:21

**observations** 80:7,18 186:7

**observe** 211:14

**observed** 147:19 151:4,20 157:20 161:1 185:12 196:22,23 198:22 200:19 211:15,16 213:16

**observing** 168:5

**obstruction** 213:22 214:4

**obstructions** 159:25 160:6,7 215:9,11

**obtain** 12:15 14:24 102:24 106:19

**obtained** 12:14 13:4 18:25 133:7 169:12

**obtaining** 15:14

**obvious** 254:1

**occasionally** 60:8

**occasions** 29:1 51:14

**occupants** 144:1

**occur** 113:11 164:7,9 178:3 238:10 244:10,14, 15

**occurred** 14:14 83:18 124:11 133:1, 11 156:5 160:24 195:14 219:21

**occurring** 187:7

**occurs** 23:12 154:3 182:25 232:19 240:22

**October** 66:14

**offer** 118:13

**offered** 69:4 260:1

**offhand** 127:5

**office** 7:22 17:20 21:15 44:8 112:11 115:6 156:15,22 160:21 161:3 164:17,18 264:3

**Office@ 360litigationservi ces.com** 264:16

**official** 127:18

**Oliver** 7:2 66:24 263:3

**one's** 89:19

**one-foot** 219:14

**ongoing** 164:5

**online** 32:23

**onsite** 99:5

**open** 76:16 92:1 96:21 192:24

**opened** 98:18

**opening** 191:16

**operate** 135:17 237:23

**operations** 39:22

**operator** 103:19

**opinion** 37:23 118:25 123:19 129:10 130:10 131:5 132:24 136:15 137:11,13 138:22 185:25 199:20,22 216:15 217:1,16 218:17 221:11 227:13,20, 22 233:20 258:22, 23 259:5

**opinions** 20:8 21:16 23:22,24

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

25:11,16,25 26:7
30:8,12,17 32:12
33:16 35:15,25
36:1,3,7,9,13 37:12,
23 38:6 45:4 46:12
47:10,12,15,18,19,
22,23 68:24 69:4,13
114:13 118:10,11,
13,16,21 119:20
120:18 121:3,16
128:24 130:25
132:4,11,20 133:1,
13,19 135:16
136:13 138:6
139:10,11,12 158:6
215:23 216:1,3
228:20 229:8
259:25

**opportunity** 9:11
212:11

**opposed** 19:8
24:10 36:22 94:6

**opposite** 207:18,
19

**oral** 6:5

**order** 23:16 35:15
46:9 47:18 48:1
66:4 88:2,7 119:23
120:3 123:4 125:5
219:4 258:5,10,17

**ordered** 263:20

**organic** 236:3
240:15

**organize** 71:14

**organized** 246:14

**orient** 171:9

**origin** 30:16,18
33:22 48:23 70:9
120:2,4,11 123:12,
17,22 129:3,10,13,
25 130:10 132:1
135:10 136:12,22
137:3 138:23
139:12 140:7,14,16,
18 141:10,19 142:5,
14,24 183:6,11
194:4 196:13 199:4,
10,13 202:17,24
210:19 211:5
215:10 217:16,24

218:3,7 258:6

**original** 170:19

**originally** 156:14
165:11

**originate** 196:4

**originated** 142:8
195:18

**OSB** 202:13 215:21

**outer** 252:7,20,25

**outline** 170:16,17
172:14,20,22 173:8
184:17,18,20

**outlined** 123:14
170:13 173:11,13
188:9 222:9 255:4

**outlining** 173:25
174:2

**outs** 160:13,14

**outset** 50:14
122:19

**outward** 248:16

**overhead** 44:3
149:23 189:10,19,
23

**overlap** 203:17

**overstepping**
127:15

**overview** 40:20
95:11

**Owners** 44:16

**oxidation** 195:16

———————

**P**

**p.m.** 143:16,19
146:20,23 212:24
213:2 260:14

**pack** 75:6 213:21
214:16 230:19,20,
23 238:4 241:18

**package** 176:7
178:3

**packages** 179:4,7
197:3

**packaging** 96:4
207:9

**packs** 226:25 231:1
257:12

**pages** 13:1 27:8
39:6 100:10 121:6
148:21 151:1
152:11,13 170:5
247:4 261:22

**paid** 110:3

**painstaking**
139:13

**paint** 153:3 175:20

**pair** 239:20,23
246:7 247:20 248:1
249:4,7,12,22
250:1,2,17,18,23
251:4 253:20

**pairs** 248:21

**panels** 196:15

**paper** 32:2 111:13
198:13 251:10

**papers** 234:4,6,17,
20

**paragraph** 125:12,
16 147:14 161:6,14
169:17 184:9
185:11 186:20
194:2 198:3 242:17
248:9

**paralegal** 37:11

**parallel** 158:15
159:20

**parentheses**
246:6

**parking** 257:24

**part** 30:15 59:1
62:25 68:1 87:5
88:25 89:25 97:1,3
121:21 124:25
133:17 135:3
137:13 142:1,2
150:7,18 152:18,19
161:21 188:4
193:16 204:5
212:17 223:2
224:20 230:17

240:20,21 244:21
256:7,8 260:2

**partial** 81:7 245:25

**participants** 87:16

**participate** 88:24
89:1 107:17 131:20

**participated** 131:6
132:2,12 134:2

**participating** 47:7
57:18

**particle** 191:2,3,4

**parties** 6:11 44:18
47:4 60:9 262:7,9

**parts** 55:13 60:2
90:24 106:22
112:17 126:11
160:10 165:14,17
166:8,13 176:21
230:19,21,23 231:6
259:22

**party** 6:24 15:20
17:22,24 47:15

**pass** 81:5 248:11

**passageway**
215:18

**past** 49:7,10 52:1
56:5 158:2 159:11,
19 181:19 231:3
247:8

**Pat** 116:11,14

**path** 158:10,17
159:17 160:2,17
165:12

**pathway** 159:21

**pattern** 141:5
142:10 194:2
195:11,12,13,17,18,
21,22,23 196:1,6,7,
13,14,16

**patterns** 141:4,6
142:6,7,12,15
193:16,22 194:7,11

**pay** 109:17,18
110:2

**payment** 21:20

**PDF** 119:14

**peer-reviewed**
19:5,13 24:8 34:6
122:8,12 123:6,23
124:1

**Peggy** 6:20

**pending** 261:9

**people** 145:7 146:8
164:7

**people's** 177:18

**percent** 18:9

**percentage** 49:20,
22 50:8 52:6 54:11
55:8 245:3

**percentages**
236:6,23

**perception** 177:18

**perform** 102:14
103:2,6 107:13
121:7 255:5

**performance**
230:5,7 231:10,11,
18

**performed** 15:19
16:7 102:21 105:16
107:3,5,8 122:23
128:20 129:9 223:4
232:2,16 245:23

**performing** 80:21

**period** 23:19

**permission** 88:18

**Perry** 6:20 261:6

**person** 10:4 101:9
163:6 198:1 211:14

**perspective**
184:21 199:21

**PG1** 116:5

**PG2** 116:6

**phase** 49:13

**phone** 67:10 84:20
109:7

**photograph** 91:8,
16 92:7,9,13,15,25

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

93:25 95:4,17 96:2
124:18 136:17
173:21 176:15
178:8,23 179:13
182:15 224:8

**photographing**
95:20

**photographs**
14:16,23 19:19
20:1,17,18 71:9,14,
17,18,23,25 72:3,4,
11,12 92:4 95:9,12,
13,18 96:1,5
107:23,24 108:3
111:5 116:12,14
117:10,11 124:14
125:9 126:7,10,15
131:16 170:4,23

**photography** 85:2

**photos** 70:17,18
112:15 180:24

**physical** 79:18
136:13,17,20,24
137:2,19 138:12,21
140:6 141:17,20,25
142:12,20 143:4
152:1 186:8,10,13,
18 190:24 191:5
197:6,24 201:5,20
224:15

**physically** 190:5

**physics** 141:9
142:19

**picked** 88:11

**picture** 123:10
178:9 203:6 255:3

**piece** 84:4 89:1
130:14,18

**pinpoint** 33:21
247:11

**place** 13:21 77:9
137:3 163:1 166:3,
6,7 188:21 192:15,
16 195:19 226:20

**placing** 8:22

**plaintiff** 7:1 23:25
29:13 47:1,5 52:14,
20 54:17 69:5 103:1

105:17 215:22
260:1

**plaintiff's** 10:13
27:3 28:2 29:18
30:1 65:22 66:21
77:15 85:23 86:15
90:10 96:10,17
99:23 147:1 148:2
152:9 199:20 216:1,
2 217:20 256:25

**plaintiffs** 55:18

**plan** 124:17,18

**plans** 119:4,5

**plant** 124:18
154:22 158:12,14
159:20 160:11
164:16,20 168:7
177:1,12 197:12
200:17 203:1,5
219:15 229:21

**plastic** 214:17

**plate** 191:9 198:14,
17 199:20

**plates** 82:21

**play** 180:22

**playing** 146:1

**plenty** 146:3 207:7

**plug** 94:18,21

**plywood** 191:4

**pocket** 256:12,13

**pods** 179:17
198:20

**point** 28:22 30:20
32:14 50:14 52:25
75:13 80:22,23
81:13,17,25 84:5,6
93:20 101:1 106:17
115:2 136:7 137:6,
7,10,11 143:5 151:6
157:10,16 158:11
165:24 168:25
169:22 175:24
185:23 187:4
188:14 189:24
193:25 194:1
200:15 201:16,17,
18,19 213:5,19

218:11 220:18
222:20 227:1,22
233:18,25 242:7
243:15 260:5

**pointed** 139:15

**pointing** 92:14
161:20 202:21
221:13 235:5 247:5,
22 250:11

**points** 58:16 81:1
84:7 102:22,23
106:16,20 108:18
144:7,8 146:10
151:3 202:2 227:23
247:25 248:2 252:4
254:12

**police** 18:21,24
143:23 145:9,20
146:9 147:2

**poor** 226:24

**pop** 213:10

**popcorn** 152:6

**pops** 44:15

**portion** 35:7 64:20
66:1 97:10,14
100:17 170:14
186:21 188:3 239:4,
15

**portions** 26:23
70:6 186:24 188:10
190:6,11

**posed** 8:12

**position** 145:5
201:3

**positive** 252:16
254:13

**possess** 9:7

**possession** 16:10
18:11 70:21 73:21

**possibilities**
60:21,22,23 204:12
205:4

**possibly** 72:21,22
116:8 225:23

**post-fire** 124:21

**potential** 50:13
123:22 204:22
205:1 206:9 211:4
226:8 229:4 259:15

**potentially** 60:11
145:25 146:10
153:14 176:9 193:5
204:17

**power** 226:24
238:6,7,24 239:14

**powered** 63:21

**pre-stamped**
91:24

**Precisely** 167:14

**predate** 133:24

**predates** 131:10

**prefer** 9:23 212:4

**premises** 14:10,
13,15,17 16:8

**prep** 113:11,15

**preparation** 72:19
74:6

**prepare** 25:7

**prepared** 20:1,22
21:14 37:10 86:8
197:4

**preparing** 112:19

**prepped** 113:9,13,
21

**prepping** 72:9

**presence** 182:12

**present** 68:12
91:18,22 109:3
131:23 132:5,6,12,
16,19 133:4 141:9
143:1 175:2 179:5,8
182:24 184:12
196:21 197:20
198:11,15,25
205:12 229:20
259:5

**presented** 99:13
100:20

**Presently** 259:2

**pressure** 83:7
187:3 196:19

**pressurized**
182:3,11 187:2

**pretty** 54:16,18,21,
24 55:1,2,7,8,16,17,
18 102:16 153:19
165:1 224:22

**preview** 72:13

**previously** 58:20
123:8 128:8 165:3
180:13,21 182:19

**primarily** 143:25
237:13

**primary** 252:12

**print-outs** 19:25

**printed** 11:3,14
231:6

**printing** 79:24

**prior** 24:1 49:10
50:9 123:3 127:24
133:14,20 160:18
187:5,7 213:16
230:2 231:9 251:4

**privilege** 14:6
38:19

**privy** 132:8

**probable** 227:24
228:1

**problem** 27:18
61:11 136:10 212:8

**problems** 231:15,
18

**procedure** 13:1
121:2

**procedures**
120:15 121:20

**process** 107:18,21
119:21,23 120:8
123:14 126:5
130:24 137:14
161:22 240:21

**processed** 108:21
109:6

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

**processes** 51:18
134:18

**processing** 111:15
126:9 264:4

**procured** 9:15

**produce** 15:20,23
18:16 19:22 21:17,
23 24:11 36:23
37:24 66:11 229:7

**produced** 11:21,24
12:8,18 13:10 14:3,
21 18:10,19,25
20:4,14 21:10
24:15,16 27:11
28:13,18 31:2,14
37:7,17 38:2,5 66:3
67:13 75:21 84:17
90:5 108:8 112:23
117:3 236:17

**product** 18:14 45:7
46:17,20 47:6,9
51:9,12,19 60:16,
18,19 61:15,17,21
62:25 63:5,8,15
94:14 140:11
214:18 229:8
231:18 257:4

**production** 15:9
16:5 112:3 235:1
236:5,16,19,20
238:20 257:11
264:11

**products** 15:18,25
26:19 29:5 37:4,6
50:22,24,25 51:2,5,
6,21 56:12 59:7,15
60:10 61:14 71:9,14
230:9 231:12,20,23

**professional** 39:1
42:25 68:23

**program** 22:19
42:6

**progressing** 177:9

**progression**
174:16

**project** 22:11
50:11,15 68:3,21,22
69:6,14,22 112:4
119:24 120:17

122:19,21 257:9

**projectiles** 154:19

**projects** 52:4
123:4

**promise** 27:20
256:23

**prompt** 264:4

**proof** 232:21

**propellant** 182:9

**proper** 243:9

**Properties** 44:16
56:4

**propounded** 6:6
261:25 262:3

**Protection** 31:12
32:3 33:5

**protective** 153:19

**protocol** 72:23,24,
25 73:2,14,16 98:8,
11,13

**prototype** 155:19,
23 156:12,15,22
158:18 159:12,17
160:18,21 163:23

**provable** 222:14

**prove** 63:3 230:12

**proven** 222:5
229:24 242:21
243:2

**provide** 16:20,21
18:4 38:14 52:25
69:3,13 75:10 76:17
104:14 109:11
134:2 194:20,24
207:2 230:24 238:6

**provided** 13:14
16:14,22 19:1 21:4
36:12 104:4 106:16
108:9 109:13 115:5
132:25 136:23,24
194:3 230:21 257:2

**providing** 194:17

**proving** 222:22

**public** 125:6,10

268:24

**publications** 24:5
32:9

**publicly** 32:4,22
34:2

**published** 19:6,12

**Publishers** 34:25

**pull** 9:22 10:11
26:25 65:9,20 66:18
71:25 76:16 77:13
85:21 90:7,25 96:8,
14 99:21 100:5
114:16 127:4
143:21 146:24
148:13,14 152:6
165:2 180:12 219:6
256:22

**pull-down** 22:23

**pulled** 10:6,16 27:6
71:17 77:18 88:16
96:19 99:25 180:16

**pulling** 10:2 71:8,
13 76:14

**purchase** 15:3,25
99:2,3,11,14

**purchased** 98:15
99:10

**purchases** 230:8

**purchasing** 99:7

**purple** 165:14,16
166:8 167:10

**purpose** 16:19
51:16 74:22 121:22
124:5 153:11,13,14
161:12

**purposes** 33:15
94:9 172:7

**pursuant** 261:8

**push** 83:7,8

**pushed** 81:23
252:14,15

**pushing** 256:9

**put** 23:11,14 32:2
66:5 75:8 81:10
94:4,22 109:5

110:25 111:12
115:13 118:21
150:22 151:2
161:11 170:6,7,22
186:12 219:17
222:18,22 227:7
236:14 238:1

**puts** 41:6 256:6

**putting** 73:13
102:19 186:15

---

**Q**

**qualification**
45:22

**qualified** 45:24
48:6 261:6

**qualify** 45:15

**quality** 102:17,19

**quantitative** 247:7

**question** 8:6,12
14:10,18,24 15:6,19
16:2 18:15,22 29:22
30:25 48:8,12 50:9
52:21 53:4 55:10,14
58:17 59:2,18
62:11,12,14 74:16
78:10 83:23 91:7
92:11,12 98:15,22,
24 101:8 102:13
105:24,25 113:6
121:10 128:16
129:11,17 130:5
132:10 133:2,16
134:15 136:4 139:6,
21 141:15 143:9
150:1,2,8 152:22,23
157:24 159:4
167:13 169:13
174:23,24 176:21
178:5,13,19 194:25
197:19 199:19
201:4,9 207:25
209:5 212:13 215:4
218:6,18 220:8
224:1 226:22,24
227:3 230:14,16
233:8 235:15
237:19 239:16
245:20 250:1
258:14

**questionnaires**
21:2

**questions** 6:8 25:6
26:10,11,22 30:13,
20 35:13 36:1 50:6
118:12,14,18,22
138:19 139:19
147:3 212:9 219:4
235:9 260:7 261:24
262:3

**quick** 12:3 27:1
61:10 91:6 98:15
103:15,22 104:12
105:10 115:18
194:15 252:8

**quickly** 25:8
180:14,22 183:4
203:12

**quotation** 246:10

**quote** 184:2

**quoted** 220:14
228:4

**quoting** 217:23
218:1,2

---

**R**

**Rackers** 73:24,25
74:1,3 75:11,18
85:2,5 110:25
111:25 114:18

**rags** 180:8,10

**randomly** 13:25

**range** 35:4 177:21

**rationalize** 161:24,
25 162:10,12

**raw** 173:9,10

**RC** 45:5

**re-looking** 89:21

**reach** 120:8 123:4
129:9

**reached** 64:5
217:16

**reaching** 38:6

**reaction** 238:9,11

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

240:15,25 241:3

**read** 23:21,23,25
37:15 64:19,21
128:14 148:20,22
150:19 152:12
153:8 155:10,16
161:14 194:6
212:17 216:10
218:21 233:1,6,14
234:6,9,16,25
245:24 260:11
263:18,22 268:2

**readily** 24:22

**reading** 25:1 77:2
83:3 218:9

**Reagan** 6:1,13
7:15,17 8:17 9:23,
24 10:1,19 39:2
65:8 116:3 133:3
138:6 139:19,21
143:20 147:5 213:3
218:20 235:9 260:8
263:11 268:1,11

**Reagan's** 8:20 9:4,
19 28:2

**real** 12:3 27:1
115:18 180:22
194:15 203:12

**rear** 200:17

**reason** 82:24
102:20 106:3,18
112:25 170:20,21
182:9 183:20
208:14 209:16
213:25 214:2

**reasonable** 200:6,
8,11,12 209:21

**reasons** 202:3

**recall** 35:23 40:23,
25 41:21,22 42:4
72:20 76:9 82:18
84:19 85:15 95:8
101:14,17 103:12
113:13,23 128:1
156:8 185:18 195:1,
3,4,9,11 234:8
242:7

**recalling** 73:4

**receipt** 109:15

**receive** 10:23 11:1
21:25 108:4

**received** 8:17 9:3
11:3 12:10 16:15,
17,24 17:16,21
19:21 20:23 21:25
37:18,19 102:10
105:6,19 107:25
112:6,8 116:5
120:22

**Recess** 65:5
115:25 143:17
212:25

**recognize** 10:20
66:7 67:18,25 73:12
77:23 86:6 90:14
100:8 257:5

**recollection** 57:8
99:2 133:23 219:24

**reconstructed**
126:12,13

**record** 6:9,23 7:16
8:16 9:2 53:5 64:21
65:3,6 115:23 116:1
128:15 140:3
143:15,18 146:16,
19,21,22 168:12
212:23 213:1

**recording** 170:2

**records** 21:20,21
22:1,2

**recovered** 16:8
224:11

**red** 166:22 167:6,10

**refer** 26:24 30:22
31:1 35:14 187:1

**reference** 24:7,14,
24 25:5 26:13 29:7
30:23 31:1,15,21,22
35:17 72:19 188:14
244:21 246:8 250:3
254:11

**referenced** 30:14
32:10 35:9,10,20
114:24 138:16
232:25 233:12,14
234:1,7,17 250:6

**references** 233:2,
5,8 234:4 236:12

**referencing** 98:1
236:18 244:11

**referred** 187:1
235:25

**referring** 31:3 74:7
78:14 110:20
142:10 189:4 203:3
240:6

**refers** 30:25 166:11
232:4 239:5 251:9,
10

**refined** 122:20

**reflect** 36:8 53:5

**reflected** 77:10

**refresh** 66:19

**refresher** 39:22

**refute** 70:6

**regard** 83:11
100:17 134:6
200:21 219:18
246:6

**regular** 50:24

**related** 12:12 14:2
50:3 61:14 68:25
72:6,7,8,9,22,23,24
78:7,10,11,14 79:18
85:8 89:17 98:22,25
99:6 102:1,2 107:20
208:11,25 222:12
262:8

**relates** 30:8 69:22
232:1

**relation** 76:3

**relative** 25:25 26:2
69:13 81:1 108:15
152:2 182:3 199:10
222:16 228:15
230:10

**release** 182:11

**releasing** 187:3

**relevance** 33:9
34:9,25

**relevant** 25:24 26:7
30:19 80:20 234:22

**reliability** 33:24
47:25

**reliable** 120:8
141:6 142:14 194:3

**reliance** 25:10,12

**relied** 20:8 21:16
24:3 25:5 28:22,24
35:8,11 36:20
103:14 105:18
117:12 121:16
134:3 136:14,16,19,
21 138:6,12,21
140:7 201:21 260:2

**relief** 83:7

**rely** 36:9 37:12

**relying** 135:5

**remain** 198:8

**remained** 198:5

**remaining** 102:25
142:13

**remains** 198:19

**remarks** 261:25

**remember** 23:17
43:19 45:3 48:3,4,
21 49:12 60:4
70:22,23,24 76:7
84:22 85:7 98:17
99:7 103:18 128:13
153:7,8 156:7
157:7,18 160:23
166:24 174:14
185:7,8 201:1,2,10,
12 219:12 234:16
241:11

**Remnants** 198:21

**remote** 211:11
244:8

**remotely** 6:11

**removed** 14:9

**render** 68:23

**repairing** 230:25

**repeat** 210:8

**rephrase** 8:8 30:6
106:7 135:7 169:5
187:22

**replicated** 243:12

**replicates** 181:9

**reply** 6:5

**report** 11:16 12:6,
7,10 13:1 14:21
19:18 20:23 24:1,14
25:2,7,11 26:1,9,12,
13,25 27:2,10 29:8
30:14 32:11 33:17
35:9,10,16,20,25
36:2,7 38:2,23
65:10 69:15,17
74:10,24 75:21
103:25 104:16
105:3,14 110:14,18,
19 112:1,18,20
113:25 114:2,4,14
117:25 118:3,7,9,17
119:3,14,16 120:14
121:24 124:6,16
125:14,18 126:15,
17,20,23 127:3,9,18
131:10 133:10,13,
20,24 138:4,14,16,
18 139:16 140:5,15,
21 141:1 143:22,25
144:4,24 145:9,21
146:9 147:3,4,5
150:22,25 151:9,17
156:10 157:3 162:2,
4 168:18 175:14
181:18 183:2,23
185:19 194:4,7,11,
14,20,21,24 195:1,2
197:1 203:2 205:2,
16 206:1,16,17
208:11 213:4
216:20,24 218:12,
13,14 220:17,20
221:10,12,15 223:1
228:19,21,24
231:14 233:2,5
234:3 239:4 242:6
246:10,13,16
247:20,23 248:4,6
249:2 250:15
251:14,20,25
253:14,25 256:8
259:1

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

**reported** 12:1
183:13 200:16
214:21,23 215:1,9
216:20 219:7 231:9
261:21

**reportedly** 224:13

**Reporter** 7:4 64:18

**reports** 12:7,11
19:20 20:21 23:20,
23 24:2 119:6
125:13 126:25
144:1

**represent** 6:21
167:5

**representations**
128:9

**representatives**
18:14 21:3

**representing** 18:2
52:20

**reputable** 102:16

**request** 8:24 12:8,
14 13:8 14:8,11
15:16 16:11 18:5,23
19:10,17 20:2,5,11,
24 21:6,18 24:12
36:24 37:14,25
69:12 75:6,9,17
107:6

**requested** 11:5,8,9
12:4 36:19 64:20
68:23 69:2 115:12
260:4

**requests** 12:5
75:10

**required** 39:21
122:25 258:5,10,17

**requirement** 232:8

**requires** 186:17
209:13

**requiring** 256:16

**reread** 152:23

**research** 32:3 33:5
41:5,6,7 232:24
233:11,14,19 234:1,
4,6,13,16,20

**reset** 212:11,20

**resolution** 168:24
169:1,2 181:12

**resolved** 54:9

**resources** 129:19

**respect** 139:9

**respects** 262:1

**response** 124:12
150:13 208:22

**responsible** 62:23
64:15

**responsive** 12:8
14:11 15:7,21 16:3,
11 18:5,16,23
19:10,16,23 20:5,
11,24 21:6,18 24:11
36:23 37:13,25

**rest** 87:9,12

**result** 32:16 51:18
144:5 221:23,25

**resulted** 232:17
243:1

**resulting** 211:10

**results** 196:10
208:16 232:19

**resume** 38:2 39:1,
3,9,13 40:3,13

**retained** 44:17,19,
20 46:24 55:25
56:5,12 57:10,21
61:2,13,20 63:7
142:24

**retrieving** 102:2

**return** 23:13 264:2

**returned** 221:1

**reverse** 66:4

**review** 8:23 9:5
17:15,18 110:11
121:24 125:8 135:9
194:4,14,18,21
216:15 221:11
258:4,9,17 259:18

**reviewed** 9:1 12:25
17:19 70:17 103:14

121:13,21,23 122:1,
4 125:14 129:6
139:9 150:22 168:4
236:14

**reviewing** 110:8

**ridiculous** 151:2

**right-hand** 170:14

**rigors** 222:18,22

**River** 6:14 15:9
16:4 124:20 227:14
229:21

**Road** 264:12

**Rodney** 127:19

**role** 68:24 208:24
209:23

**roll** 246:2 252:11,
15,17 255:15
256:10

**rolled** 81:22

**rolls** 175:7 197:10
198:10

**room** 7:7,10,13
162:16 170:3
189:15 190:8

**root** 12:6

**roughly** 172:10
203:23,24 204:1,2

**rounded** 166:5
248:16

**rounds** 166:14

**rubber** 175:22
177:6 180:7

**rule** 45:7

**rules** 8:1

**run** 104:12

**run-away** 208:15
211:9 212:15 213:6,
24 214:2 245:10

**runaway** 34:6,19

**running** 149:10
208:1 211:25 212:5,
6

**runs** 152:14

**runway** 34:21
211:9

**RV** 160:14

**— S —**

**Sacco** 107:24
108:4,5 117:8
204:9,24

**safety** 31:11 102:6,
8 238:17 241:12

**sale** 15:3

**sales** 15:24

**Samsung** 257:3,
10,13,18,19

**sat** 111:21 130:17
243:9

**saved** 111:13

**scale** 92:17 172:13,
23 173:3,4,5,6

**scan** 9:13 82:20
102:12 103:1,17,22,
24 104:8,14,18
105:13 106:4,8

**scanned** 106:24
239:24 253:9

**scanner** 115:3

**scanning** 104:3

**scans** 9:9,12 16:7
17:6,8,17,21 75:8
102:9,14,20 103:7
104:24 105:4 107:3,
4,7 110:9,12 115:5,
6,9,10,11 251:11

**scenario** 122:24
226:2 232:23

**scenarios** 122:14
213:20 214:3,6

**scene** 71:10,20,23
72:2 81:15 91:9
107:18,23,24 126:6,
8 131:14,18 142:13
175:3 223:9,11,13,
18,21,25 224:3
227:17 228:15

**scenes** 127:24
221:17

**Schaefer** 11:15
40:5,11 49:15 65:18
67:22 68:22 69:2,14
71:5 74:1 101:23
245:23

**schedule** 11:5
65:14

**schedules** 21:1

**scheduling** 101:19
109:9

**Science** 34:25

**scientific** 19:5 70:2
123:10,14 124:25
125:2 186:17
193:20 222:18,22

**scope** 51:9 68:3,22
69:6,9,10,13,22
72:6 119:13,15,19,
24 120:3,7,11
122:14,19,21
208:10,21,22
209:11,17

**scrap** 160:10

**screen** 10:16 27:16
36:17 38:24 65:11,
12,25 73:6,13 77:18
86:1,17 147:6
148:11,16 151:19
161:16 171:11
180:15 181:9

**screenshot** 173:15

**scroll** 10:22 11:4
28:3 38:23 39:2
66:10,23 67:16
72:16 78:21 90:16
91:10 95:7,21,23
101:7,21 148:24,25
149:1 152:17 161:5
183:2,10 207:3
211:8

**scrolling** 41:24
83:3

**seconds** 170:1,2
181:2,19 221:9

**section** 13:1,3
25:21,23 28:5,7,17,

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

23 35:21 36:10
39:16 43:2 122:6,7
124:6,22,23 125:3
140:15 147:11,12,
13,17 149:18
151:21 152:7
158:18 159:12
168:19 183:5,22
193:15 206:4,7
215:22,24 216:3,7,
14,21 217:14,22
218:1 219:5,7
221:11,14 222:25
223:23 225:7
227:12 228:19
231:8 232:6 253:16
254:14 256:8

**sectional** 110:22

**sections** 25:4,18
121:15,18 194:6
223:16

**sees** 162:5 163:3
165:22 195:11

**SEI** 233:1,13,22,24
235:25 237:21
240:10,14,17,24
243:3

**SEL** 102:11,14,16
103:2 105:2,5,21
106:1 109:11,20
110:2,3,9,12

**select** 131:3

**selected** 9:16
200:13 206:2
247:16

**self-explanatory**
223:9

**send** 28:10,15 31:6

**sensation** 182:15

**sense** 17:4,5 26:14
143:9 162:13,17
167:4,6,8 178:6

**sentence** 150:12,
19 152:4 161:7

**separate** 16:18
22:3 72:2 86:21
87:14,15 88:13
153:18 213:20

**separately** 87:14
88:22

**separator** 236:2
240:13

**September** 66:15,
25 67:2,17 69:7
98:12 100:15
107:13

**sequence** 227:16,
19 228:6

**service** 72:18

**Services** 6:21
264:10

**set** 72:10 77:19
79:11,19 96:1
135:15,18,19
261:23

**sets** 97:5

**setting** 24:8

**settlement** 47:5

**Seventh** 31:23

**Shaffer** 152:4
153:1 154:8 155:13
161:8 162:5,8,15
163:9,10,20,22
164:1,14,19 168:5,8
184:15 185:5 186:1
196:23 198:2
200:15,22 207:16
211:15 219:14,18,
19

**Shaffer's** 152:6,12
165:10 184:10
185:11 201:17
202:20

**shape** 202:13
204:5 224:22

**share** 37:19 112:5,
22 115:8 151:18
180:15

**shared** 70:21
115:6,9

**sharing** 27:23
148:11

**sheet** 23:4 237:13,
17 257:10

**sheets** 21:1,20
22:1,2 236:5,22,23
238:18 241:12,13
263:21,24,25 264:3

**shelves** 24:18,25

**shelving** 215:12

**shipped** 105:5
109:14 112:9 238:2

**shipping** 109:18
126:12 165:14,17
166:9,13

**short** 8:21 115:20
169:11 244:6 245:5,
9,12

**short-sighting**
210:22 211:1

**shortages** 222:17

**shot** 142:2

**show** 34:21 43:11
75:4 116:8 126:7
131:15,16 171:5
181:8 184:16
186:22,25 189:9,17
252:2 254:2,15

**showed** 186:10

**showing** 76:22
181:11 196:7

**shown** 100:10
154:22 167:23
173:10,18,25
261:19

**shows** 34:19,22
43:12 110:22 197:6
210:24 251:12
254:3

**side** 149:11 163:5
168:1 170:14 172:3,
9 196:8 198:2
207:18,19

**sides** 192:13

**sign** 83:5 91:12
260:12 263:18,24

**signature** 93:16
262:4 263:21,25
264:3 268:3

**significant** 248:9

**significantly**
177:23

**sill** 191:9 198:14

**similar** 18:12 32:17
34:1 160:17,20
221:16 222:6,11
231:21,24 241:2
242:14 248:11
249:19 254:18
256:19

**simply** 248:15

**Sincerely** 264:7

**single** 35:5

**sir** 83:5 99:16
118:12

**sit** 41:1 101:14
128:2 130:19 136:2
181:13 195:2 201:2,
13

**site** 37:20 109:3
116:12 117:19
129:21,24 130:7
257:19,20

**sites** 221:17,18

**sitting** 44:7 48:22
49:14 60:5 70:24
76:13 95:8 177:8
180:5 195:15
197:11 260:9

**situation** 193:5

**size** 220:4,6,12
221:1,8

**sketch** 203:10,13

**sketches** 171:5

**skip** 207:25

**skipped** 223:1,7
256:17

**Skipping** 223:5

**skosh** 148:23

**slide** 160:13,14

**small** 165:1 169:6
200:19,20 211:16
219:8 245:3

**smaller** 163:22

**smallest** 163:11,17

**smell** 157:22 158:4

**smelled** 156:25
157:4 160:23

**smoke** 62:7 156:25
157:16,21 158:4
160:24 190:16
192:6,15,16,24
193:11

**smoking** 144:18
204:19

**snapshot** 75:7

**soft** 144:8 247:10

**solely** 49:17

**solid** 200:18 229:1
240:11 241:1

**solution** 236:8

**solvent** 153:25
198:11 236:3

**solvents** 154:2,13
240:16

**someone's** 63:25

**something's**
57:13

**Sony** 232:2 237:4
257:14

**sort** 93:9

**sound** 117:4
212:16 213:7,8,17,
18 261:15

**sounds** 97:12
158:21,22 200:3

**source** 29:15
123:12,22,25
125:19 197:20
210:18 211:4,6
224:10,24 226:7,8,
11,16,18 228:8
243:10

**sources** 83:21
97:19 101:3 153:14,
18 196:21 204:6,23
205:1,9,12,23
206:9,10,12,18

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

209:17 259:8,12,16

**south** 6:17 161:11
162:15,18 163:5
167:2 179:13
184:13 187:11
188:3,18,25 197:17,
22,25 198:2 202:18
203:17 204:1,3

**southeast** 166:14
172:2 186:22 187:5,
8,10,12,13,17,24
188:1,5,14 189:3,6
207:12 210:25
211:2

**southwest** 169:17
170:3 181:21

**space** 176:11
252:17,19 256:10

**spacing** 246:1

**speak** 15:13 111:11
117:7,21 128:12
139:5

**speaking** 139:4

**speaks** 149:15
248:6

**spec** 257:10

**special** 85:1

**specific** 25:4,10
28:23 29:6,7,17
30:5,8 33:16 34:13
35:7 36:9 68:9
69:18 85:7 136:21
137:2 141:14,15
143:9

**specifically** 17:11
28:24 30:14 42:24
51:8,20 68:22 72:20
122:7 138:1,2
141:13 150:18
152:1 185:8 206:15

**Specification**
257:3

**specifics** 236:4,6

**Spectroscopy**
32:20

**speculation** 60:2
110:5 112:16

127:12 129:16
130:3 131:9 132:15,
24 134:14 135:1,12
160:4 164:3 182:19
192:9,21 193:8
229:12 243:24
244:13 245:8
259:22

**spend** 103:21
105:12

**spending** 103:17

**spent** 21:22 23:17
71:8 113:22

**split** 90:3 91:3

**spoken** 117:15

**spot** 61:8,9 136:9

**spray** 153:3 175:20

**spread** 141:11
143:3 154:14,25
155:7 179:24
182:16

**square** 166:22
167:3,6,10

**SS** 261:3

**St** 6:21 7:22 44:12
261:4 262:10
264:13

**stacked** 161:10
163:1 184:19

**staff** 19:20,21

**stage** 163:11,17,22
185:13,16,23 219:8

**stages** 126:8
220:23 256:9

**stand** 41:4 42:3
91:20

**Standard** 6:10

**standards** 28:9,12
122:6

**Stanton** 7:22 18:4
38:13 56:1,5,11
67:9,14 70:20 84:13
101:12 263:4

**start** 50:10 79:17
95:19 127:17

145:16 170:1 176:3
180:18 181:19
256:14

**started** 8:15 87:1,2
88:10,12 90:23
141:7 177:23

**starting** 144:3
185:23

**starts** 147:10 161:6
253:12

**state** 6:22 7:15
177:23 185:22
220:21 221:14
225:19,20,25 226:1,
5,7,10 227:1,9,10
229:3 261:1

**stated** 69:14
210:23 217:9 223:3

**statement** 55:14
104:20 143:24
147:23 151:11
167:12 183:17
195:20 212:18
228:3,5 251:18

**statements** 12:14,
16,17,23 13:5 135:5
147:11 151:11
227:17

**states** 6:16 43:1,5
255:14 261:10

**stating** 211:1 225:7

**statistic** 52:8 54:15
55:3,4,24

**status** 52:23

**stay** 177:13

**steel** 82:8 171:6
196:16,19 215:13
235:22 236:7

**stenotype** 261:21

**step** 128:25

**stepped** 63:1,6,18

**steps** 63:10
119:21,23 120:8
122:9 126:1,3,4
127:13 128:24
134:7,18 135:2

222:9,12 223:2,5,7
255:4

**stick** 155:23

**stood** 44:15

**stop** 180:23 195:25
196:2 227:5

**stopped** 63:14
144:20

**stopping** 136:6

**storage** 198:2
225:10 237:25

**stored** 153:5,10
162:18 167:21
175:1,8 176:9,18,23
177:1,3 179:20,22
184:11,14,16 185:4,
6 186:11 197:3,7
201:6 204:15 215:5

**straddle** 204:3

**Street** 14:25

**stricken** 46:6 47:3,
11,13,14

**strike** 47:21,22

**string** 67:1 221:22

**structure** 60:12
196:15

**stuff** 179:21

**subject** 67:16
208:12 229:19
232:11 242:12,17

**subjected** 232:7,
12,13 242:12

**subjective** 256:3

**subjectively**
248:14

**Subrogee** 6:14

**Subscribed**
268:14

**subsequent** 78:12
96:5

**Subsequently**
107:25

**substantially**

231:21,23

**succinct** 245:21

**sudden** 243:10

**sufficient** 9:17

**suggest** 139:18
201:6,7 212:10

**suggestion** 230:24

**suggests** 229:15

**suing** 140:11

**suit** 262:8

**Suite** 264:12

**summarized**
150:10

**summary** 68:21
157:19

**summation** 202:2

**support** 70:6
123:19 144:24
146:10 231:9

**supported** 217:1
228:20

**supporting** 232:24
233:11,14

**supports** 145:9
226:9

**supposed** 88:3
124:23 151:21
153:5,10 171:13,16,
18,23 193:23
215:24 234:25

**supposedly** 257:4

**survey** 109:5

**survived** 257:23

**suspect** 239:19
251:10 253:13

**suspected** 63:6

**suspended** 144:21

**sustain** 202:13

**swapped** 225:18

**swear** 7:5

**sworn** 6:3 261:17

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

268:14

**synonymous**
116:24

**system** 22:4,6
23:15 51:10 146:14
228:22,25 229:10,
15,17,18 238:4

**systematic** 223:2,
4

---

**T**

**T-E-P-I-N** 232:5

**tabbing** 239:1
240:7,9

**table** 161:15 170:18
171:5,6 172:4 174:3
188:9,11,13,20,22,
23,24 226:15

**taking** 135:18
140:12 149:16
190:7

**talent** 75:3

**talk** 8:3,4 94:5
137:7 188:6 196:20
204:11 222:25
242:8 244:23 248:7,
25 249:10 250:15
255:21

**talked** 21:8 28:20
58:6 64:6 70:4
85:11 107:12 118:2
119:13 164:4
169:19 183:3,5,14,
16,18 188:7 193:17
208:8 236:9 253:12
259:14

**talking** 10:7 13:16
28:4 35:25 46:2
50:25 56:3 57:17
58:10 63:11 69:21
79:15 91:2 98:8
108:17 122:5
125:17 127:17
132:24 138:21
154:14 160:16
165:16 169:9 172:7
174:13 175:11
176:11,12,14

181:23 187:10
189:13 192:10
195:10,12,13 196:1,
10 199:1 203:9
213:4,22 214:19
220:8 224:5 231:10
235:12 236:16
238:19 239:3
242:10,19,20,24
244:18 246:5
248:13 249:4
253:12,15 255:8

**talks** 75:22 244:25
250:18,23

**tall** 164:23,25

**Tanner** 142:2
154:23 155:14
177:9

**tape** 109:5 175:7,19
197:10 198:11

**tasks** 121:12,13

**taught** 42:20

**Tea** 33:21

**team** 69:5 260:1

**technical** 10:5
146:13 211:24

**Tecum** 10:19

**telling** 151:21

**tells** 122:9 196:2
228:6

**ten** 169:6,11

**Tennessee** 43:4

**tenths** 22:15

**Tepin** 232:5

**term** 49:23 55:8
182:1 185:14

**terminals** 94:23

**terminated** 145:5

**terminations**
94:23

**terminology**
247:10

**terms** 50:22 56:8
62:19 141:8 143:8

151:22 221:9
246:19 258:3,15

**test** 137:17 222:18
231:23 241:24
242:10,23 245:16

**tested** 222:2,5
233:25 241:21
242:4 243:14,18

**testified** 9:11 46:3,
4 48:13,16,21,25
58:21 122:16
127:23 128:4,6
154:8 155:22 156:4
157:22 158:1 161:9
165:18 166:23
167:9 168:8 175:8
177:8,10 186:2,5,6
201:10 204:24
217:2,10 220:3,13,
23 231:13 255:24
261:19

**testify** 6:3 45:23,24
58:23 119:1 153:4
156:4,20,25 157:15
168:4 200:22
204:25 220:11,12
221:2 231:2 261:17

**testifying** 48:17
176:19 205:17,19

**testimony** 26:17
29:1 38:15 43:11,
13,22,23,24 45:11,
13 46:6 47:2,11,24
49:5 58:16 59:1
105:23 106:22
118:18 128:1,11
133:1 135:6,8
136:18 142:22
145:18 146:7
147:15 149:15,18
150:6,9,15,18,20
151:8 152:7,12
153:7,9 155:4,10,
11,16 157:3 158:5,
8,9,22 159:14 161:8
163:15 165:10
166:11 167:1 168:3,
16 173:1 183:14
184:11 186:13,18
190:23 191:5 192:2
197:5 201:13,18,19,
21 202:20 203:22,

24 217:15 218:12,
17 229:6,13,14
232:5 233:17,18
234:11,12,15,18
246:13,17 259:1
261:20,23 268:5

**testing** 34:18 36:20
37:3,6 222:19
229:22,23,24
230:11 231:20
232:2,7,12,16,20,22
233:21 242:1,13,15,
21,25 243:3

**tests** 15:17 131:2
243:6

**Teva** 44:16 49:8
56:4

**text** 30:14

**textbooks** 24:6

**thereto** 262:1

**thermal** 34:5,19,21
208:15 211:9
212:15 213:6,24
214:2 244:3 245:1,
10

**thick** 35:2

**thin** 171:12

**thing** 11:15 23:14
47:14 63:4 75:15
161:16 177:4 180:3,
5 222:4 256:3
260:10

**things** 10:7 14:22
52:25 54:9 64:9,12
120:9 182:2 204:11,
21 207:9 246:4,24
247:1 256:20

**thinking** 34:14
220:24

**this_____day**
268:15

**thought** 60:16
62:17 102:17
126:19 157:4 169:8
242:3

**Thursday** 66:24

**tie** 228:14

**Tim** 87:17 88:15,20
94:2

**time** 6:10 8:10,21,
23,24 9:5 15:5 16:2
21:20,21 22:1,2,13,
22 23:3,4,17 39:14,
20 48:25 50:14
63:20 65:19 68:12
69:9 70:22 71:8
72:11 75:14 76:15
83:6,7 84:5,6 87:11
88:17 104:21
109:19 113:5,22
115:3 128:17 139:8
156:9 161:22
164:21 165:24
166:17 168:7,25
169:22 177:19
187:4 190:4 208:1
211:22 212:1,5,6
220:4 221:6,8
222:21 225:22
258:2,13 260:8

**times** 46:4 48:6,12,
13 56:4 57:9 61:12
64:14 105:19
113:20 132:23
139:7 181:16

**timing** 225:13

**title** 40:19 215:25

**titled** 13:20 86:23
87:20,22 96:13
100:4 116:5 151:18

**to-wit** 6:6

**today** 6:19 11:13
23:8,12 65:17
113:4,10,12 118:19
139:8 230:9 251:4
259:1,23 260:8

**Today's** 6:10

**toddler** 138:17
139:1,6,17,25
140:1,4

**told** 55:4 74:14,17
208:16,17

**Tommy** 144:16
204:18

**Tomography** 34:5

John Reagan - May 10, 2023
AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

**tomorrow** 23:14

**tool** 16:1 61:25 62:1,2,4,8,17,20 63:21 64:1,10 93:2, 7,9 95:4,6,14 98:16, 19,20,22,23,25 99:3,15 126:12 147:24 149:8,13,21 150:11,24 153:1 156:21 158:2 159:10,11,16,19,21, 22,24 160:1 161:10, 11 162:16,19,21,22, 23 165:24 166:15 167:2,3,24 168:1 169:18 170:3,8,15, 22 171:7,23 172:1, 5,19 174:20,22 176:13,24,25 177:3, 4 178:8,24 179:9, 10,12,13 180:11 181:21 183:22 184:5,12,13 186:24 187:11 188:2,16 189:10,18,23 190:18,19,22 191:6, 16,19,21,22,23 192:5,6,12,15,17 193:13 196:4,5,8,9 197:4,12,17,22,25 198:10,14,23 199:14,22 200:18, 20 202:11,16,17,18, 24,25 203:4,13,25 204:2 207:2,3,5,10, 13,19 209:23 210:25 211:3 215:7, 13,14,18,19 217:3, 11,13 218:8,10,11, 14,15,16 223:19,20 224:4,11,17 225:1, 9,16,17 226:24 227:15 228:2 230:19,23 231:12, 13,15 258:11,18

**tools** 15:4 62:14,15 68:25 208:13,25 223:12,14 224:1 230:21 238:24 239:14

**top** 41:25 66:1 81:21 86:3 91:11 92:4,15 93:1,24 95:7 117:25 125:12

152:15,19,21 161:10 162:15 163:3 164:24 166:16,18 167:18 174:20,21 177:24 183:5 185:24 190:17,19 191:19 192:14 193:13 196:15 203:6 215:16,23 227:12 250:19 253:21 254:10,11

**topic** 42:24

**topics** 35:4,6 119:18 183:7

**total** 196:10

**totaled** 117:2

**totality** 78:16 85:10 149:17 150:9,20 151:10,12 201:5,24

**totally** 185:1

**totals** 53:9

**tote** 96:3

**touch** 141:21

**track** 23:3

**tracking** 94:9

**trade** 32:8,9

**Trainer** 40:15

**training** 39:15,19, 24 126:21

**transcribed** 217:4, 7 261:21

**transcript** 64:21 150:22 151:1,12 261:20 262:2 263:23 268:2,4

**transcripts** 12:19 145:12

**transferred** 102:7

**transmittals** 37:16,18

**transportation** 33:7

**travel** 23:12 102:1

213:21 214:4,5,9,12

**traveled** 101:25

**treat** 138:17 139:2, 25 140:10

**treating** 138:25 139:5,17 140:1

**treatises** 24:5

**trial** 38:15 43:22 45:11,16,17,23 46:3,4,7 48:7,9,14, 16,21 49:1,3,12 119:1 261:12

**trials** 43:16 45:12

**trigger** 227:7

**tripled** 220:3,6 221:1,7

**tripling** 220:12

**trouble** 83:3

**true** 120:21 133:12 154:12 158:24 171:3 192:14 199:24 202:23 214:22 222:4 262:2 268:4

**truth** 6:3,4 261:17, 18

**turned** 226:15 239:25

**two-day** 78:7

**two-foot** 219:14

**two-minutes** 136:3

**two-page** 43:12

**tying** 230:9

**type** 15:14 22:6 25:12 31:25 32:7 41:7 44:1 46:15 65:15 73:11 80:5,23 81:13 103:6 111:20 225:2 242:14

**types** 10:7 49:22 52:4 64:11 68:19 141:12,13

**typewriting** 261:22

**typo** 42:5

---

**U**

**ultimate** 258:22

**ultimately** 32:20 51:5 60:24 63:3 64:4,8 68:15,17 69:12 93:23 103:23 222:1,3,19

**unclear** 218:17

**undergone** 39:20

**underneath** 41:2 81:6 127:16 147:17 173:14 196:16

**understand** 8:7,14 29:22 42:17 55:6,15 58:18,19 59:18 119:16 124:19 138:18 139:21 159:4 185:1 187:20 245:20

**understanding** 7:18 29:17 62:9 138:20 144:13 145:6 156:14 166:20 191:18 229:9

**understood** 8:4,5

**undertook** 120:16

**undetermined** 125:20,21 259:2,3, 5,6 261:10

**unit** 156:16

**United** 6:16 261:10

**unreliable** 222:3

**unstable** 228:23

**untested** 222:4,17

**upper** 92:8

**USA** 18:2 44:16,19

**usable** 142:11

**user** 227:6 230:5,6

**utilize** 36:2 106:19 248:3

**utilized** 81:13 94:25 128:6 222:10, 12

**utilizing** 104:7

---

**V**

**vacation** 126:21

**vacuum** 228:11

**vague** 29:20 30:10 31:4 35:12,22 45:22 48:10,18 53:4 55:13 59:16 60:1 62:17 64:17 83:14 100:19 104:9 106:14 112:17 121:17 123:1 129:15 130:2 132:14,22 133:2 135:12 137:5,22 138:24 141:23 142:9 143:6 154:16 157:12 159:6 160:3 176:20 182:18 186:3 192:8 194:12 201:23 205:10 209:19 214:25 216:9 233:3 235:11, 19,21 237:11 238:15 240:19 241:23 243:24 259:21

**valid** 32:14 195:21, 22

**validity** 222:23

**variations** 237:3

**varies** 236:11

**vehicle** 44:3

**vendor** 237:1

**vendors** 237:2

**vent** 192:15,16

**ventilate** 192:24 193:5

**ventilation** 174:19

**venting** 181:24

**vents** 182:5 212:16 213:7,9,14

AMERICAN HOME ASSURANCE CO. vs MAKITA CORPORATION OF AMERICA, et al.

**verbal** 75:17

**verbally** 75:12

**version** 17:19
168:24 169:2
181:12,15,17 237:6

**versions** 168:23
169:10

**versus** 6:15 44:16
159:2 161:17
248:16

**vetted** 204:21
205:23

**viable** 131:4

**video** 74:12,15,18,
19 125:7 141:2,3
142:1,15 145:13,19,
21,25 146:2,3,5,8
154:20,22,23 160:5
162:20 167:24
168:19,20,23,25
169:6,12,14,19,21,
23,24,25 170:12,19,
24 171:1,4 172:15,
21 173:8,25 174:15
176:3 177:10,14,15
178:1,3 180:12,16
181:2,20 184:16,21,
22 185:2 186:8,22,
25 188:6,8,10,11
189:8,12,14,17,20,
25 190:4,6,16
193:11 197:24
201:7 210:24

**videoconferencin
g** 6:12

**videos** 14:17 20:1
168:21 182:10

**videotapes** 19:19

**view** 110:22 124:18
189:8,17 190:1,10

**viewed** 37:22
158:20 168:21,23
221:6

**viewpoint** 190:7

**Virtual** 22:11

**viscous** 153:14

**visible** 170:24
181:20

**visual** 37:5 80:24
252:8

**volume** 190:4,15

**VPM** 22:12

**VTC5** 79:23

---

**W**

**wait** 87:11 111:7

**waive** 263:17

**waived** 262:5

**walk** 156:5,22
158:13,18 255:6

**walked** 82:9
155:19,24 156:1,11
158:2,14,25 159:11,
19,20 160:1,17
200:16

**wall** 153:20 170:6,
16 172:18 174:21
176:12,14,25 178:8,
24 187:16 188:3,25
189:9,10,11,18,20,
22,23,25 190:5,13,
14,25 191:7,8,13
196:8 197:12 198:9,
15,16,18,23 199:2
200:23 202:13
203:1,5,25 204:2
207:20,21

**walls** 174:5,8
191:8,11 192:13
207:10 215:19
253:17 254:5,12

**wanted** 8:16 79:9,
14 98:16 99:17
105:7 148:8 180:19

**wanting** 176:10

**watch** 174:16 176:3
177:13 180:14

**water** 196:19

**ways** 243:18
245:11

**weather** 195:15

**website** 31:15

**week** 8:18

**weeks** 195:14

**weight** 186:12,15

**welding** 166:1,13
204:20

**west** 195:25 196:3,
7

**Whirlpool** 48:4

**Whisler** 155:14
156:14 158:11,12
159:18 160:16,17,
23 161:1,18 219:11,
12,15 220:1,9,10,
20,23

**wide** 164:23 165:1
185:18 219:14

**window** 27:14
148:11 192:24,25
193:6

**wire** 32:15 191:20,
24

**wires** 33:25

**withheld** 14:6
38:19 234:21,25

**witness'** 104:20
105:23 128:11
151:8 159:14

**witnessed** 198:6
219:19

**witnesses** 12:16,
19 13:5 134:24
147:20 151:3
155:13,15 157:2
162:7 163:19,21,24
164:1,20 168:6
177:7 183:12 184:4,
11 185:3,11,22
196:22 214:21,22
215:16 217:9 219:7,
9 228:17

**wood** 190:25
191:1,9,10 192:3
198:16 215:15

**word** 50:2 71:21
96:23

**words** 62:24 72:2,
10 109:24 206:6
242:6

**work** 21:1,22 22:2,
17 49:22 50:7,8
51:4,7,9 52:6 54:11
55:17 62:16 71:6,
11,24 72:6 74:3,25
75:1 77:5 84:4 85:5,
8 87:1 89:1,13,16
102:20 103:2 114:4,
21,23 115:14
119:15,19 120:3,11
121:8,21 122:15
250:4,12

**workbench**
171:13,15,17,20,23
172:12,18 173:14

**worked** 23:8 40:5,
10 58:7,13,21 63:24
75:19 113:5,6
116:22

**working** 53:17,24
54:6 57:21 61:1
209:18

**workings** 42:12,17

**works** 248:20

**worry** 104:15
114:23

**worth** 104:3

**wrap** 87:19

**wrapped** 236:1

**write** 79:21 93:16
208:10

**writing** 37:21 80:4
118:22

**written** 23:7 46:13
83:1 88:3

**wrong** 89:4

**wrote** 110:6 126:20
143:24 184:1 242:3

---

**X**

**x-ray** 16:6 82:13,25
93:15,16,18 103:10,
14,15,23 104:7,12,

17,23 105:7,10
106:6,11,13

**x-rayed** 93:19
104:2

**x-rays** 9:14,15
103:8 104:1,4,25
105:2,15,17,18,20
106:1,16,19 259:24
260:2

---

**Y**

**year** 45:12 87:7,9

**years** 9:11 14:17
38:16 41:23 45:4,13
48:5 49:7,10 52:10,
16,17,18 216:19

**yellow** 92:24 93:1
203:7,8,15,19

**yesterday** 11:3
113:14,15,17,19

---

**Z**

**Zimmer** 155:14,19
156:11,20 157:6,16,
19 158:8,17 160:17
216:16,18 217:2,9

**Zimmer's** 155:10,
11

**zoom** 6:12 10:4
66:5 91:12 92:2,8,
14 100:3 118:1
152:14 165:15