**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | | |
|---|---|---|
| *AMERICAN HOME ASSURANCE COMPANY,* | ) | |
| *as subrogee of FOREST RIVER, INC.,* | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 3:21-cv-00252-JD-MGG |
| v. | ) | |
| | ) | |
| *MAKITA CORPORATION OF AMERICA, and* | ) | |
| *MAKITA U.S.A., INC.,* | ) | |
| | ) | |
| Defendants. | ) | |

<u>**DEFENDANTS' REPLY BRIEF IN SUPPORT OF ITS MOTION TO STRIKE**</u>
<u>**OPINIONS AND TESTIMONY OF MICHAEL ESKRA**</u>

COME NOW, Defendants Makita Corporation of American and Makita, U.S.A., Inc., (hereinafter collectively "Makita" or "Defendants"), by and through their counsel Stanton | Barton LLC, and pursuant to Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharmaceuticals*, 509 US. 579 (1993) and its progeny and, in compliance with N.D. Ind. L.R. 7-1 and this Court's Orders [Doc. 68 and 75], hereby submits its Reply Brief in Support of its Motion to Strike the Opinions and Testimony of Michael Eskra, [Doc. 78] ("Eskra") and, in opposition of Plaintiff's Response thereto [Doc. 85], hereby states as follows:

# I.    TABLE OF CONTENTS

I.    Table of Contents.................................................................................................ii

II.   Table of Authorities...........................................................................................iii

III.  Argument ...........................................................................................................1

    A.    QUALIFICATIONS WITHOUT RELIANCE ON FACTS, DATA OR THE USE OF A VALID SCIENTIFIC METHODOLOGY IS NOT ENOUGH FOR AN "EXPERTS" OPINION TO BE ADMISSIBLE UNDER RULE 702." .........................................................................2

    B.    ESKRA'S METHODOLOGY HAS NEVER BEEN TESTED OR SUBJECTED TO PEER REVIEW AND CANNOT BE REPEATED, VERIFIED OR PROVED UNDER ANY OBJECTIVE CRITERIA.. ..........3

    C.    ESKRA FAILED TO INVESTIGATE THE MAKITA PRODUCT(S) HE CLAIMS TO HAVE CAUSED THE INCIDENT OR ANY OF THE FACTS SURROUNDING THE FIRE OR THE PRODUCT(S) USE & HISTORY.................................................................................................6

    D.    ESKRA DID NOT USE, FOLLOW OR RELIED UPON THE METHODOLOGY SET FORTH IN MIKOŁAJCZAK'S 2007 ARTICLE.. ....................................................................7

## II.    TABLE OF AUTHORITIES

**Cases**

*Cummins v. Lyle Indus.*, 93 F.3d 362 (7th Cir.1996) ....................................................................*i*

*Dartey v. Ford Motor Co.*, 104 F. Supp. 2d 1017, 1022 (N.D. Ind. 2000) ...........................*i*, 1

*Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993) .........................................*passim*

*Fuesting v. Zimmer, Inc.*, 421 F.3d 528 (7th Cir. 2005) ...............................................1, 2

*General Electric Co. v. Joiner*, 522 U.S. 136 (1997) ..............................................3, 6

*Gopalratnam*, No. 13-CV-618-PP, 2017 WL 1067768 ................................................2

*Katz, Abosch, Windesheim, Gershman & Freedman, P.A. v. Parkway Neuroscience & Spine Inst., LLC*, 301 A.3d 42, 64 (2023) ...................................9

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) ...........................................1, 3

*Manpower, Inc. v. Ins. Co. of Pennsylvania*, 732 F.3d 796, 806 (7th Cir. 2013), ................8, 9

*EEOC v. Freeman*, 778 F.3d 463, 467, 472 (4th Cir. 2015) ...................................9

*Elcock v. Kmart Corp.*, 233 F.3d 734, 755-56 (3d Cir. 2000) ...............................9

*In re Mirena IUS Levonorgestrel-Related Products Liab. Litig. (No. II)*, 982 F.3d 113, 123 (2d Cir. 2020) ............................................................9

**Rules**

Fed. R. Evid. 702 ...................................................................................................*passim*

### III.    ARGUMENT

Plaintiff's efforts to recast Defendants' arguments and then feign outrage is neither persuasive nor compelling. Neither is Plaintiff's unsupported statements that Eskra's methodology is repeatable, verifiable and reliable and, therefore, admissible under Rule 702. Acknowledging that Eskra's methodology has never been tested, peer reviewed or accepted by experts in his field, Plaintiff seek to lower the bar by arguing there is no requirement that an expert's methodology be peer reviewed or even generally accepted to be "reliable". (Plaintiff's Response in Opposition Brief, Doc. 85 (hereinafter "Response"), p. 1). In reality, what factors the Court applies to a specific field is dependent upon the area of expertise and issue before the Court.  In this case, testing, peer review and general acceptance provide the necessary indicia of reliability where an individual claims to be able to discern a failure mode from ordinary damage experience in a fire based upon a secret incomplete review of the evidence.

> [T] he district courts are entitled to be "flexible" and are not required to consider the familiar *Daubert* "factors" (i.e., whether a theory or technique can be or has been tested, whether it has been subjected to peer review and publication, whether it has a known or potential error rate, and whether it enjoys a general acceptance within a relevant scientific community) in every case involving expert testimony. Rather, the Supreme Court held that the decision to apply some or all of the *Daubert* factors in a particular case lies within the district court's discretion. *Kumho,* 526 U.S. at 150 ("the factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." . . .. "whether *Daubert's* specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine.").

*Dartey v. Ford Motor Co.*, 104 F. Supp. 2d 1017, 1022 (N.D. Ind. 2000).

Here, Eskra's methodology and opinions are inconsistent with "the generally accepted method for gathering the relevant scientific evidence". *Cummins v. Lyle Indus.*, 93 F.3d 362, 368 (7th Cir.1996) (citing *Daubert*, 509 U.S. at 594-95), *see also Fuesting v. Zimmer, Inc.*, 421 F.3d 528, 534–35 (7th Cir. 2005).  Indeed, Eskra's methodology and opinions fail to meet any of the

1

reliability factors and are merely "unjustifiably extrapolated from an accepted premise" (*e.g.* Hackett's subrogation target) and a failure to "account for obvious alternative explanations" (*e.g.* the fire starting in the area where the eyewitnesses observed it). *Gopalratnam*, No. 13-CV-618-PP, 2017 WL 1067768, at *8–9  (*quoting Fusting I*). Plaintiff is unable to put forth evidence that the "methodology" used by Eskra, if any, bears any hallmark of scientific reliability[1] using known scientific norms, tests and methods. Indeed, Eskra admits his methodology is not "provable [or] repeatable". (Eskra II, p. 29). As a result, it is not scientific and cannot be relied upon by other experts in the field.

Eskra uses the complexity of his field as a tool to confuse the unwary and mislead the trier of fact. To those of us who have exposed the fluidity of his result-oriented opinions and the "methods" he uses to justify his clients' litigation goals, it is clear they are devoid of any scientific legitimacy and have no place in a modern courtroom. His opinions should not be admitted in the hope that the jury will be able to see though his charade—clouded in meaningless, ever-shifting, technical jargon. Defendants request, and Rule 702 requires, the Court protect the trier of fact from "junk science" and *ipsi dixit* so they are not duped by those who would seek to take advantage of the weight afforded to those who rely upon facts, data and science, subject their methods to peer review and scrutiny to aid in the jurors understanding of a fact at issue, no matter what the result.

A.    QUALIFICATIONS WITHOUT RELIANCE ON FACTS, DATA OR THE USE OF A VALID SCIENTIFIC METHODOLOGY IS NOT ENOUGH FOR AN "EXPERTS" OPINION TO BE ADMISSIBLE UNDER RULE 702.

In cases where the facts do not support Plaintiff's cause of action retained experts with no methodology, such as Eskra, provide a valuable service as they are willing to make unsupported conclusions under the guise of science to support a recovery. Within this framework, Plaintiff

---

[1] Plaintiff cites to Eskra's own testimony that his opinions are reliable as evidence of their reliability—but that is the circular nature of *ipsi dixit*.[1] (Response, p. 3).

raises a "Counter-Issue" quiring whether an expert's reliance on *unspecified evidence*, coupled with his expertise, will satisfy the requirements of Rule 702. (Response p. iv, ¶ 2). It will not. Mere expertise without a reliable and repeatable methodology leaves the expert as little more than an empty vessel subject to the whims and desires of his client. That is why *ipsi dixit* is insufficient to satisfy Rule 702 no matter how "qualified" that expert may be in his or her field. As the Courts have noted, time and time again, "[e]ven if eminently qualified, an expert cannot offer opinions based solely on his or her say-so (what lawyers call i*pse dixit*)." *See Kumho Tire Co. v. Carmichael,* 526 U.S. 137 at 157 (1999); *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Given the fact that expertise alone is insufficient to render opinions admissible under Rule 702, the Court must evaluate the reliability of Eskra's methodology—which Plaintiff acknowledges has never been peer reviewed and is not relied upon by experts in the field. (Response, p. 1).

**B.    ESKRA'S METHODOLOGY HAS NEVER BEEN TESTED OR SUBJECTED TO PEER REVIEW AND CANNOT BE REPEATED, VERIFIED OR PROVED USING ANY OBJECTIVE CRITERIA.**

Plaintiff raises as another "Counter-Issue" whether a "repeatable, objective and scientific method satisfies the reliability requirements under Rule 702." (Response p. iv, ¶ 3). It undoubtedly would. However, Eskra's methodology is not repeatable or objective and has never been tested to be validated and is therefore not "verifiable, provable and repeatable". (*See e.g.* Exhibit C-1[2] [Doc. 79-11], Deposition Transcript of Michael Eskra March 7, 2023 (hereinafter "Eskra I"), pp. 29, 33, 40-41, 44, 52, 59, 66, 68, 152).  As a result, his methodology is unscientific, as Eskra concedes.

**Q.    For a methodology to be scientific, it has to be repeatable, right?**
**A.    Yes.**
**Q.    Okay.  And it has to be objective, doesn't it?**

---

[2] Unless otherwise stated, all exhibits herein are attached to Defendant's Brief in Support of its Motion to Strike Opinions and Testimony of Michael Eskra [Doc. 79] and uses the same designations as set forth in the index [Doc. 79-1].

**A.**   **Yes.**

**Q.**   **Okay.  So meaning that your methodology has to be something that some other scientist with equal skill and knowledge can follow and then come to the exact same conclusion.**

**A**   **Yes.**

(Eskra I, p. 152:5 to 152:12).

Plaintiff represents to this Court that Eskra's untested methodology is both "repeatable and verifiable" to stave off an adverse ruling under Rule 702. (Response, p. 3). It is axiomatic that for a methodology to be repeatable and verifiable it must first be tested.

**Q**   **Have you done any testing to establish that your methodology is provable and repeatable?**

**A**   **No.**

(Exhibit C-2 [Doc. 79-12], Deposition Transcript of Michael Eskra May 1, 2023 (hereinafter "Eskra II"), pp. 29:6 to 29:8).

There is a reason why Eskra has never subjected his methodology[3] to peer review and refuses to test it. As soon as he creates an objective, verifiable methodology and subjects it to testing and peer review to validate his conclusions, he will no longer be of service to clients who seek to advance claims against subrogation targets in the absence of evidence.  Moreover, because his methods have no relationship to science they cannot be tested, challenged by others or withstand peer reviewed scrutiny or any other objective criteria that separates unsupported opinion and science. Eskra knows his business model can only survive so long as his methods remain secret, untested and unverifiable so that his opinions can remain fluid and untethered to the facts of the case or science.

---

[3] Plaintiff claims that "[t]he entirety of the methodology utilized . . . is found in Appendix B to Mr. Eskra's report." (Response, p. 8; *See also,* Eskra's Report Exhibit 259 [Doc. 79-7] (hereinafter "Eskra's Report")). The Appendix is an unpublished article from one of Eskra's contract employees describing a number of elements of how lithium-ion batteries fail. The Court should read Appendix B in its entirety and see if it contains a methodology for determining when a battery cell is the cause of the fire.  Interestingly, one of the aspects of the "methodology" calls on the investigator to note the precise locations of the cells in the area of origin. (Eskra's report, p. 47). Something Eskra failed to do in this case—among the other failures.

Plaintiff's "Counter-Issues" and the unsupported claims contained in its Response underscore the reasons why *ipsi-dixit* opinions are dangerous, prejudicial and inadmissible under Rule 702. Eskra's opinions will only mislead the trier of fact and sow confusion. If allowed, Plaintiff will be free to make bald claims[4] to the jury which contradict the facts and scientific norms based solely on the *ipsi dixit* of Eskra. This strategy is the modern-day equivalent of a "snake oil salesmen"—touting unsupported fantastic claims with nothing to back it up but fancy words and the say-so of someone who professes to be in the know. Rule 702 was designed to protect jurors and the Courts from such opportunistic strategies. Consider that the *ipsi dixit* nature of the "methodology" used by Eskra defies logic by using the same criteria for determining whether a cell was causative of, or attacked by, a fire. Eskra can merely describe the characteristics of a cell that was involved in the fire and, applying his *ipsi dixit,* pick the one that will advance his clients' interests because the characteristics are identical.

> **Q.** **Okay. And would you agree with me that each one of those criteria can also be used to describe a cell that has been attacked by fire?**
> **A.** **They can be used, yes.**

(Eskra I, pp. 73:05 to 73:07).

To put this in perspective, every cell inside the Forest River facility was attacked by fire. Thus, no one, other than Eskra, can determine whether the identical criteria he selected (but never tested) will be used to establish causation or to show the cell was merely attacked by fire. In

---

[4] By way of example, there is no evidence any Makita tools that may have been located at the Forest River facility ever experienced "over-discharge". Yet Plaintiff repeats Eskra's false claims that there are numerous articles and peer-reviewed literature that support his opinions over-discharge can cause thermal runaway. (Response, p. 9). Plaintiff falsely claims that "[m]any of the document's referenced in Appendix A to his report inform the reader that a lithium ion battery call can fail when it is discharged below 2.5 volts." (Response p. 10). In reality none of them do—as ultimately acknowledged by Eskra. (*See generally*, Exhibit C-3 [Doc. 79-13], Deposition Transcript of Michael Eskra May 18, 2023 (hereinafter "Eskra III"), (literally going through every document identified in Appendix A to confirm they do not stand for the proposition Eskra falsely claims they do)).

excluding the *ipse dixit* of the expert, the Court may conclude that there is simply too great an analytical gap between the data and the opinion proffered. *General Electric Co.*, 522 U.S. at 140.

> **C.** **ESKRA FAILED TO INVESTIGATE THE MAKITA PRODUCT(S) HE CLAIMS TO HAVE CAUSED THE INCIDENT OR ANY OF THE FACTS SURROUNDING THE FIRE OR THE PRODUCT(S) USE & HISTORY.**

Eskra did not investigate the scene of the fire, take witness statements, or evaluate the history and use of the Makita products at issue or even the artifacts found in the area where the fire actually started. Those tasks were delegated to Fred Hackett who reached his conclusions without conducting a prior fire investigation. (*See generally*, Doc. 77, Makita's Motion to Strike Opinions & Testimony of Fred Hackett).  In addition to **_not_** performing the tasks before deciding his conclusion, Hackett did not share his report or his findings with Eskra. (Eskra, I, p. 93 ("When did you receive [Hackett's report]? A. After I wrote my report")).  Similarly, Eskra did not receive Tim Johnson's report[5] until after he had written his report. *Id.* Further, Eskra did not rely on Johnson's findings in "any way, shape or form". *Id.*

Eskra's first task and only task was to attend a secret unilateral destructive lab exam[6] with Hackett to select specific cells (*i.e.* identify Makita cells) for x-ray and CT scanning. (Eskra I, p. 163-164). Conveniently, Hackett selected the artifacts that he wanted Eskra to review but chose not to document which ones. (Eskra I, p. 230).

> **Q.** **Okay.  Other than the inspection that you and Mr. Hackett had together, had you examined any of the cells or other artifacts in connection with this case before?**
> **A.** **No.**

---

[5] Mr. Johnson was retained to evaluate the artifacts in Hackett's area of origin. As the area of origin was incorrect his limited review and findings are irrelevant. More importantly, he did not render any opinions regarding the area of origin or causation. (*See generally*, Exhibit D [Doc. 79-14], Deposition Testimony of Tim Johnson (hereinafter "T. Johnson")).

[6] Plaintiff claims that Defendant's assertion that Eskra's evaluation of the batteries was covert, unilateral and document is unsupported by the evidence. (Response, p. 12). The record is well developed regarding the secret meeting and fact that Plaintiff chose to alter and manipulate the evidence without documentation or placing Makita on notice. Eskra claimed it "wasn't his party" when confronted with the violation of investigation norms and requirements. (Eskra I, p. 233).

**Q.    Okay.  Have you since?**
**A.    No.**

(Eskra I, pp. 24:22 to 25:3)

No one from Makita was invited to the covert unilateral examination of select unspecified and undocumented artifacts. To keep the examination secret and avoid scrutiny, there was no protocol, no notes and no documents confirming what cells were reviewed. (Eskra I, pp. 15-23). After the secret examination, certain unknown cells from the group selected by Hackett were transported to an unknown lab and allegedly x-rayed. (Eskra I, p. 17). No notes or documents were generated to confirm the activities at the lab who x-rayed the cells. (Eskra I, pp. 16-19). To make matters even less transparent, Eskra did not obtain copies of the x-rays (if any) and doesn't know if they were preserved. (Eskra I, pp. 16-19). Presumably, this secret undocumented inspection was conducted to conceal their efforts to select a Makita battery cell.[7]

Importantly, Eskra had no knowledge or information concerning where any of the lithium-ion batteries in this fire were found[8] or, more specifically, where the ones that he claimed are a potential ignition source of the fire were located. (Eskra I, p. 72). Thus, his secret review and selection of cells was done in a vacuum. When you rely upon *ipsi dixit* and have no methodology, facts like the location of the cells do not matter.

**Q.    Did you endeavor to ascertain where each of the cells were found?**
**A.    No.**

(Eskra I, pp. 72:17 to 72:20).

---

[7] Plaintiff claims there is no dispute that the "causal cell" is a Makita cell citing to p. 13 of Doc. 77, Defendant's Brief in Support of its Motion to Strike Opinions and Testimony of Fred Hackett. (Response p. 9). Notably, no such admission exists or can be remotely discerned from Plaintiff's citation.

[8] One of the aspects of the "methodology" touted by Plaintiff and contained in Eskra's report calls on the investigator to note the precise locations of the cells in the area of origin. (Eskra's report, p. 47). Eskra chose not to do that in this case.

In addition, Eskra did not know any basic information about the cell's history or the tool it was associated with. This basic information is important to any evaluation of potential causation.

> **Q.** **Okay. The cell that you claim to be the cause of the fire, was it attached to a tool? Was it just loose on the desk? Was it attached to a charger? Do you know?**
> **A.** **I don't know.**
> **Q.** **The cell that you claim to be the cause of the fire, was it in a drawer? Was it on top of the desk? Was it on a shelf? Do you have any clue?**
> **A.** **I don't know.**
> **Q.** **Okay. The cell that you claim was the cause of this fire, do you know the last time it was used or how often it was used?**
> **A.** **No.**
> **Q.** **All right. And I think you already established, this cell that you believe to be the cause of this fire, you don't know what the state of charge[9] was at the time the fire erupted, right?**
> **A.** **Correct.**

(Eskra I, pp. 155:24 to 156:16).

It is clear that Eskra willfully remained ignorant of any facts that may bear on his opinions. Nevertheless, without citation Plaintiff claims that "Eskra eliminated other possible causes of the fire systematically using examination of the fire scene and interviews with witnesses." (Response, p. 2). Eskra did not eliminate other potential causes of the fire, nor did he examine the scene and or interview any witnesses. Instead, he was retained to evaluate select battery cells to determine which ones were similar to a Makita product in an effort to justify Hackett's pre-investigation determination of a subrogation target.

Citing to *Manpower, Inc. v. Ins. Co. of Pennsylvania*, 732 F.3d 796, 806 (7th Cir. 2013), regarding the admissibility of financial opinions based on an incomplete data set in economic models, Plaintiff asserts that Eskra's reliance on incomplete or missing "quantitative and qualitative" data merely impacts the foundational underpinnings of his opinion does not fall within

---

[9] According to Eskra, the higher the state of change the more damage he would expect to see in the cell. (Eskra I, p. 31). The fact that he does not know and has not endeavored to learn this information is important to understanding the value and reliability of his opinions—particularly when coupled with the other omissions and assumptions.

the prevue of Rule 702. (Response, p. 1). Even if Eskra's opinions involved financial calculations for damages, Plaintiff's analysis would be incorrect.[10]  However, and more importantly, Plaintiff conveniently omits the introductory sentence in the quoted holding in *Manpower*—which more aptly addresses the issue before this Court.

> ***Reliability, however, is primarily a question of the validity of the methodology employed by an expert***, not the quality of the data used in applying the methodology or the conclusions produced. "The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact, or, where appropriate, on summary judgment." *Smith v. Ford Motor Co.,* 215 F.3d 713, 718 (7th Cir.2000).

*Manpower, Inc.,* 732 F.3d at 806 (emphasis added).

We agree with the *Manpower* court, the validity of the methodology is what makes the experts opinions reliable. *Id.*  Here the Court is being asked to strike Eskra opinions ***because his methodology***, (he will know it when he and he alone sees it) ***is unsound, not repeatable and not scientific*** and therefore unreliable. Defendant does not challenge Eskra merely because his conclusions are wrong (they are) but because Courts and the scientific field do not allow *ipsi dixit* to stand in the place of repeatable, objective analysis. *Daubert*, 509 U.S. at 595.

The battery Eskra believes is a potential ignition source of this fire is contingent upon it being located in the area of origin selected by Hackett. (Eskra III, p. 62).

---

[10] *See e.g. Katz, Abosch, Windesheim, Gershman & Freedman, P.A. v. Parkway Neuroscience & Spine Inst., LLC*, 301 A.3d 42, 64 (2023) (noting "[t]he *Manpower* Court's understanding of the line between data and methodology, of course, does not bind this Court, and its rigidity is not in keeping with the approach taken by other federal appellate courts. Instead, many federal courts have explained the *Daubert* standard in ways that reject this sharp line and acknowledge that problems with data and data selection (which itself can involve its own methodology) can bear on admissibility before the judge and not just weight before the jury. *See, e.g., EEOC v. Freeman*, 778 F.3d 463, 467, 472 (4th Cir. 2015); *Elcock v. Kmart Corp.*, 233 F.3d 734, 755-56 (3d Cir. 2000); *In re Mirena IUS Levonorgestrel-Related Products Liab. Litig. (No. II)*, 982 F.3d 113, 123 (2d Cir. 2020)").

> **Q.    Okay.  By May 1st, it was back to probable cause of the fire, but you also acknowledge that if an object is not in the area of origin, it couldn't be the cause of the fire.  You still agree with that part, right?**
>
> **A.    Yes.**

(Eskra III, pp 62:13 to 62:18)

The lithium-ion cell Eskra claims was a "probable cause" was not located in the area where the eyewitnesses first observed the fire either before or after the incident.[11] A post litigation investigation conducted by Defendants of the evidence ignored by Plaintiff established where the eyewitnesses observed the fire while it was in its incipient stage. The fire was first observed in the flammable storage area near where welding had occurred that day and where a disgruntled employee who was challenging his termination was seen smoking on his way out. Once Defendant established through a proper (and basic[12]) investigation that Hackett's area or origin was wrong, Plaintiff now claims the location of area of origin is not material to the reliability of Eskra's opinion. (Response, p. 11). A basic tenant of fire science investigation is that the initiation of the fire occurred in the area of origin, something even Eskra acknowledge. (Eskra I, p. 154; Eskra III pp. 62).

After realizing the selected cell was not located where the witnesses observed the fire, Eskra made wild claims about cells shooting 150 feet (or 300 yards at times) and blowing though steel walls. (Eskra III, p. 73). Of course, the only problem with these factually unsupported

---

[11] The area where the six eyewitnesses observed the fire was in a location where no Makita products were stored or used prior to the fire or found after the fire. (Eskra II, p. 68;  Exhibit B [79-10] Deposition Testimony of Fred Hackett ("Hackett"), pp. 343-344). Further, no lithium-ion batteries were found in the area where the six witnesses saw the fire. This is important because, for Eskra's causation opinion to be correct, the cell he believed caused this fire must first be found within the area of origin. (Eskra I, p. 154).

[12] Interviewing the last people who were in a structure and observed where the fire started and what was occurring in the area before the fire is a basic fire science technique. (Hacket, pp. 42-43; Noting the observations of the last people in the structure can provide "a fairly reliable indication of potential wherever origin is or a compartment of origin or what's transpiring.").

arguments is how the battery returned to where it was ultimately found after the fire (not that Eskra knows where that is).

> **Q.    Okay.  Is it your testimony that this particular cell that you believe to be the cause of the fire somehow traveled from wherever it was recovered to the area where each of the witnesses say they saw the fire and then somehow traveled back to wherever it was found?**
> **A.    No.**
> **Q.    That would be a highly unusual scenario, right?**
> **A.     Well, that's also a silly analogy. . . .**

(Eskra I, p. 162:3 to 162:14)

Despite Plaintiff's argument to the contrary, Eskra chose not to evaluate all of the potential ignition sources in Plaintiff's desired area of origin or even where the witnesses actually saw the fire start. (Response, p. 2). To be fair, Plaintiff outsourced the review of potential ignition sources to Tim Johnson but, of course, Eskra did not receive Johnson's report until after he had finalized his opinions. (Eskra I, p. 93). Thus, he had no evaluation or information concerning the potential ignition sources in the area of origin.

> **Q.    Okay.  Have you performed any evaluation into what potential ignition sources existed in the area of origin?**
> **A.    No.**

(Eskra I, p. 95:17 to 95:20),

In its response, Plaintiff claims that Defendant ignores the opinions and testimony of Tim Johnson[13] claiming they support Eskra's opinions. (Response p. 16). They do not. First, Eskra did not rely on or even know what Johnson's opinions are or were or even who Johnson was. (Eskra I, p. 93).  Similarly, Johnson had no idea what Eskra's opinions were and the two never spoke to him let alone shared information that could be used to form an opinion.

> **Q.    Okay.  Did you send your report to Mr. Eskra?**

---

[13] Mr. Johnson is an electrical engineer that was retained by Plaintiff to review select artifacts contained within the area of origin identified by Hackett—an area which failed to include the location where the eye-witnesses observed fire.

11

A.    No.
Q.    **Have you ever provided Mr. Eskra with an evaluation of the electrical appliances that were located inside the tool crib?**
A.    No.
Q.    **Have you ever provided Mr. Eskra with an evaluation of the electrical ignition sources that existed outside of the tool crib?**
A.    No.

(T.Johnson, pp. 263:15 to 264:1).

Plaintiff's accusation that Defendant ignored the contribution of Johnson to Eskra's opinions, is inaccurate and misplaced. (Response p. 16). Johnson provided no contribution to Eskra's opinions, in "any way, shape or form" according to Eskra. (Eskra I, p. 93). It is clear that Eskra did not have the benefit of any facts or data concerning this fire scene or the products at issue when he made the declaration necessary of Plaintiff to file suit.

### D.    Eskra Did not Use, Follow or Rely Upon The Methodology Set Forth in Mikołajczak's 2007 Article as Plaintiff Claims.

Plaintiff claims Eskra "primarily" used the methodology described in "*A Scientific Methodology for Investigation of Lithium-ion Battery Failure*" authored by J. Mikołajczak, *et al.*, and published during the IEEE International Conference on May 25, 2007 (*See* Exhibit 314, hereinafter "Mikołajczak's 2007 Article"). (Response, p. 16). A basic review of Mikołajczak's 2007 Article confirms that Eskra did not follow the methodology contained therein "primarily" or otherwise. More importantly, Mikołajczak's 2007 Article is not a methodology for declaring a cell the cause of the fire. (*See generally* Mikołajczak's 2007 Article).

Under the heading "Methodology", the Mikołajczak's 2007 Article provides guidance to the investigator concerning the useful information to gather and evaluate when investigating a fire where lithium batteries are located in the area of origin—virtually none of which Eskra engaged. For example, Eskra did not collect information "from the end user's description of the background of the device" at issue. (Mikołajczak's 2007 Article, p. 1). Indeed, Eskra received no information

"from the end user's description of the background of the device" and, in fact didn't even know who that was. (Eskra I. p. 95).

> **Q**      **Okay.  And am I correct that you still have no information concerning the history or use of the Makita products that are allegedly at issue in this case?**
> **A**      **That's correct.**

(Eskra II, pp. 28:2 to 28:6).

Gathering information on the products involved is one of the primary parts of the "methodology" Plaintiff claims Eskra followed. The products use and history were available by simply talking to the tool crib manager—something Eskra chose not to do. Faced with this reality, Plaintiff pivots, once again, and claims Eskra's lack of knowledge concerning the use and history of the products he claims caused the fire is irrelevant in determining whether his opinion is reliable under Rule 702. (Response, p. 20). Either Eskra followed the methodology set forth in Mikołajczak's 2007 Article or he did not.  Plaintiff cannot claim Eskra followed the methodology, provide excuses why the steps were not followed and then claim the elements required under the methodology are irrelevant. A similar analysis for each of the criteria identified in Mikołajczak's 2007 Article can be done.

Eskra did not gather "information... [regarding] the events of the incident". (Mikołajczak's 2007 Article, p. 1). Eskra failed to gather "information useful to the investigation ... [from] the incident site." *Id.* Eskra failed to evaluate the "length of time the battery had been in service"; *Id.* Eskra failed to evaluate the "state of the system at the time of the incident (plugged in or not, for how long, on or off)." *Id.* Eskra failed to evaluate the "usage environment (hot, cold, humid, vibration)." *Id.* Eskra failed to evaluate and consider "extenuating factors such as liquid spills, dropped systems, or recent repair activities". *Id.* Eskra failed to review the witness "observations during or after the incident" *Id.* Eskra failed to evaluate the "user's actions in response to the

incident". *Id.* Eskra failed to conduct a "systematic inspection of the incident site and careful documentation of the surroundings of the physical evidence present an opportunity to gather valuable information to determine the root cause of an energetic product failure." (Mikołajczak's 2007 Article, p. 2). Eskra did not conduct a "systematic inspection" and did not receive the report of Hackett or the benefit of his "conclusions" prior to rendering his opinions. Eskra did not document the surroundings or the physical evidence, during his secret destructive lab examination or at any other time.

Eskra failed to properly evaluate "physical objects identified as important to establishing the cause of the battery failure" nor did he handle the evidence "appropriately to establish the chain-of-custody and to protect the evidence from spoliation [under] ASTM E1188". (Mikołajczak's 2007 Article, p. 2). Quite the opposite as demonstrated during his secret undocumented examination. Eskra failed to "thoroughly document the condition of the system upon receipt, both for establishing the chain-of custody and to provide clues as to the root cause of the incident." *Id.* Part of the methodology requires that "[i]f the incident unit is not fully assembled when received, the investigator should reconstruct the system, if possible, by placing the appropriate parts into the system in their original location and/or orientation without introducing any additional damage or altering the condition of the evidence." *Id.* Eskra did not account for all of the cells in the battery pack and did not compare and contrast them.

The methodology instructs that "X-ray images should be taken to allow for a complete view of the assembled battery pack." (Mikołajczak's 2007 Article, p. 2). Since the pack was never assembled, this was not done nor were any x-rays preserved or disclosed. The methodology notes how important the x-rays are noting "Detailed X-rays of each cell should be taken at two or more planes at different angles depending on the cell type." *Id.* Eskra chose not to x-ray all of the cells

and only (allegedly) x-rayed a select number of the cells Hackett gave him during the secret inspection. Importantly, "[t]o determine the cause of a failure, it is generally necessary to open a damaged battery pack, extract and examine the remains of the cells, the battery protection printed circuit board(s) (PCBs), and any fuses or thermal cutoff devices." *Id.* at 3. Again, this was not done by Eskra. According to the methodology, the disassembly process should be conducted carefully, and any abnormalities noted and documented. *Id.* Eskra made no such notes and engaged in no disassembly process. The methodology also requires "[c]ell "unrolling," where the cell case is removed and the windings are either unrolled (wound cells) or separated (stacked cells) and examined" (Mikołajczak's 2007 Article, p. 4). Again, this is not something Eskra did. Of course, the methodology also states that "CT scanning is particularly useful for cylindrical cells that have experienced significant damage upon venting, such that cell unrolling is not possible." *Id.* The damage to the cells identified by Eskra would have allowed dissection to occur. Regardless, only a limited number of the cells Eskra identified as being likely Makita products were subject to CT scanning.

The problem with claiming Eskra utilized a methodology, which he clearly did not, is that we can compare what he did with the criteria set forth in the published methodology. Perhaps that is why he is reluctant to take notes, publish his methodology, create a testing protocol or subject his "theories" to scientific testing. Of course, the methodology set forth in the Mikołajczak's 2007 Article does not provide a method for declaring a cell as the cause of the fire based on a review of the damage it sustained during the fire. Only Eskra claims to be able to make such a conclusion in a vacuum.

WHEREFORE, Defendants respectfully request this Honorable Court to enter an order granting its Motion to Strike the Opinions and Testimony of Michael Eskra pursuant to Rule 702, and for such other and further relief the Court deems just.

Respectfully Submitted,

STANTON | BARTON LLC

By:    */s/ Jonathan T. Barton*
Jonathan T. Barton, *Admitted PHV*
Megan M. Ratelle, *Admitted PHV*
8000 Maryland Avenue | Suite 450
St. Louis | Missouri | 63105
(314) 455-6500
jbarton@stantonbarton.com
mratelle@stantonbarton.com

*Attorneys for Defendant Makita Corporation of America and Makita U.S.A., Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been filed with the Clerk of the Court using the CM/ECF system on this 13th day of December 2023.  Notice of this filing will be sent to all counsel of record by operation of the Court's electronic filing system.

*/s/ Jonathan T. Barton*

16