UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

AMERICAN HOME ASSURANCE
COMPANY,

        Plaintiff,

    v.                                   CAUSE NO. 3:21cv252 DRL

MAKITA CORPORATION OF AMERICA *et al.*,

        Defendants.

OPINION AND ORDER

On March 12, 2019, a fire broke out at a Forest River manufacturing facility. American Home Assurance Company, a subrogee of Forest River, says a lithium-ion battery from a Makita power drill is to blame. American sued both Makita Corporation of America and Makita U.S.A., Inc. under Indiana's Product Liability Act. The two companies (called Makita today for short) seek to exclude testimony from two of American's opinion witnesses, Michael Eskra and Fred Hackett, under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). The court held oral argument on August 13, 2024. The court now grants the motion to exclude Mr. Eskra's opinions, and only one part of Mr. Hackett's opinions, else Mr. Hackett may testify.

STANDARD

A witness may testify in the form of an expert opinion when (1) the witness is "qualified as an expert by knowledge, skill, expertise, training, or education;" (2) the testimony is "based on sufficient facts or data;" (3) the testimony is "the product of reliable principles and methods;" and (4) the opinion "reflects a reliable application of the principles and methods to the facts of the case" in such a way that the testimony will "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702 (as amended). Although analysis under Rule 702 remains flexible, *Daubert*, 509 U.S. at 594,

the fundamental considerations of what makes expert opinion admissible are well understood, *see Constructora Mi Casita, S de R.L. de C.V. v. NIBCO, Inc.*, 448 F. Supp.3d 965, 970-71 (N.D. Ind. 2020).

In short, the Federal Rules of Evidence strike a balance between two competing concerns: apprehension of the free-for-all admission of unreliable theories that might baffle juries and a "stifling and repressive scientific orthodoxy" that might inhibit new truths or legitimate cases. *Daubert*, 509 U.S. at 596. While preserving that balance, the analysis is not a substitute for crossexamination, contrary and compelling evidence, thoughtful jury instructions, and other methods inherent in federal trials to challenge shaky evidence. *Id.*; *see also Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 766 (7th Cir. 2013).

The proponent of expert testimony must establish its admissibility by a preponderance of the evidence. *See* Fed. R. Evid. 702; *Varlen Corp. v. Liberty Mut. Ins. Co.*, 924 F.3d 456, 459 (7th Cir. 2019). The court needn't conduct an evidentiary hearing. The skilled briefing, proffered expert reports, exhibits, deposition testimony, and oral argument permit the court to rule. *See, e.g., Kirstein v. Parks Corp.*, 159 F.3d 1065, 1067 (7th Cir. 1998); *Target Mkt. Publ'g, Inc. v. ADVO, Inc.*, 136 F.3d 1139, 1143 n.3 (7th Cir. 1998). The parties agreed too that oral argument sufficed in lieu of an evidentiary hearing [88, 89].

DISCUSSION

A.  *Michael Eskra.*

Michael Eskra is American's proposed battery expert. He presents two opinions: that the fire at Forest River was most probably caused by a Makita power tool battery's failure, and that the poor design of its battery management system caused its failure when its cell became unstable under normal intended use [79-7]. He views the damage to this cell to be inconsistent with fire attack, and instead consistent with internal damage and thus a source of the fire.

Mr. Eskra has more than 43 years of experience in the battery industry. He earned a bachelor of science in chemical process engineering at the University of Wisconsin and later a master's in engineering management at the Milwaukee School of Engineering. Early in his career, he worked as a process engineer

in battery manufacturing plants, a manager of advanced battery engineering, and then a program manager. He later ran a research and development company that developed batteries. Since 1996, he has owned Eskra Technical Products, Inc., which develops battery products and conducts battery failure investigations. He has published over 300 papers and articles. He is a member of various professional organizations, including the American Institute of Chemical Engineers, the National Association of Fire Investigators, the International Association of Arson Investigators, and the National Association of Subrogation Professionals. Makita focuses its attack on his methodology rather than cogently questions his credentials, so the court turns to his method.

Mr. Eskra inspected battery cells from the Forest River site to determine whether a battery cell caused the fire. He started his work in July 2019 (about four months after the fire) [79-11 Tr. 164]. He first visually inspected the batteries to winnow candidates for further analysis. In his words, the "initial goal was to separate those cells that were apparent fire attack from any that exhibited significantly less damage that could not be explained by such things as the whole battery pack is intact or the battery was likely at zero state of charge" [79-7 at 7].

During the July 2019 inspection, Mr. Eskra worked with Fred Hackett (the insurer's area of origin witness) to review about 80 cell artifacts [79-11 Tr. 15]. Mr. Eskra did not photograph each cell [*id.* 16], though he took some [*id.* 35]. He took no notes [*id.*]. Mr. Eskra completed a "non-destructive inspection" to downselect candidate cells for analysis [79-11 Tr. 16, 24 ("What we did not do is break any masses.")]. In short, he tried to determine whether any cell was distorted. He presumed distorted cells to be fire attacked rather than an origin of the fire [*id.* 26-27]. He looked for features of distortion in the aggregate.

As one feature, he looked for "bulbous ends, so if it had bulbous ends, [he] set them aside" [*id.* 16]. When pressed to quantify the degree of bulbous or rounded ends (at the cell's negative end), Mr. Eskra admitted he could not do so [*id.* 28-29], nor had he performed any testing to quantify whether a cell was "rounded enough" [*id.* 28-29, 36]. At the time he prepared his report and testified in deposition,

he had not authored any peer-reviewed articles on this theory of rounded ends being indicative of a fire attack as opposed to a fire's cause [*id.* 29]. More simply, it seems a cell's initial candidacy hinged on whether the negative end was flat or rounded, with the goal in his mind to eliminate "the ones that are more grossly distorted" [*id.* 27-28]. A "slightly rounded one," on the other hand, might be a candidate for an x-ray for further analysis [*id.* 29-30]. At the same time, he admitted that a cell's state of charge could likewise contribute to a rounded negative end [*id.* 30-31].

As a second factor of distortion, Mr. Eskra looked for longitudinal stretching or elongation of the cell's crimp (*see* Figure 1). He explained that, when gas gets generated during heating over time, the crimp softens and elongates [79-11 Tr. 32]. In this event, according to him, it "tends to be more that it was a slow heating process, a longer heating process, so it would be heat-attacked" [*id.* 33]. Even this feature he struggled to specify, merely saying external heat "tends to move [it] a little bit"—but even then "almost all cells will vary" and even "in causal cells[] it may move" too [*id.* 32-33]. To date, he has never measured this elongation to know how much or tested this feature to confirm his theory; and, at the time of his report, he had not published his theory for peer review [*id.* 33-34]. He views rounding as the result of changes in the enthalpy of chemical reactions, with the generation of pressure within the cell to be measured by the ideal gas law (PV = nRT) [79-7 App. B at 48-54].



**Figure 1**

Mr. Eskra says cells with bulbous negative ends or elongated crimps should then be evaluated by x-ray [79-7 App. B at 49]. He selected 20 cells for further analysis [79-11 Tr. 16-17]. Fred Hackett completed the x-rays at a different location, and Mr. Eskra thereafter observed the films through Skype [79-11 Tr. 17-18]. Mr. Eskra never obtained the x-rays and never preserved them [79-11 Tr. 17, 22-23]. It seems no one else preserved the x-rays, and Mr. Eskra never documented his examination of the x-rays of the 20 cells [79-11 Tr. 22-23].

In his method, Mr. Eskra looks for differences in the active material or "jellyroll" within the cylinder of the battery. The jellyroll is the core of the battery cell—"layers of cathode, separator and anode [are] wrapped together to form a spirally-wound 'jellyroll'" [79-7 App. B at 48]. His report offers exemplar x-rays (not from this case) of his focus at this step—in particular, he looks for large gaseous pockets at the negative ends that will eliminate the cells as causal; and, contrastingly, the jellyroll remains pushed toward the negative and positive ends that will identify potential causal candidates [*id.* 48-50]. Otherwise put, Mr. Eskra looked "for a gas pocket [] along the negative end and generally [] a kind of a parabol[ic] movement of the jellyroll" [79-11 Tr. 30 (corrected)]. He also looked for melting of the external wraps and wrinkling of the inactive material to determine that the cell's damage stemmed from an external fire attack [79-11 Tr. 47]. To him, these features revealed that the cell was attacked by fire, rather than was the cause of it [*id.*]. In contrast, jellyroll "telescoped" to the two ends of the cell (*i.e.*, pushed in paths) indicated that the cell failed or shorted [*id.* 38-40, 43].

Mr. Eskra admitted that he had not performed any testing to validate his theory of the jellyroll being pushed to the negative or vented ends [*id.* 41]. He admitted that, at the time of his deposition, he had not authored any peer-reviewed publications on this theory [*id.*]. After his work and report was prepared in this case, Mr. Eskra found a paper from a scientific journal that he says supported his view on telescoping jellyroll [*id.* 40-44]. He also reported that the ideal gas law would inform the location of an initial short [79-7 App. B at 49].

Nothing seems to memorialize Mr. Eskra's selection process at this stage, but he narrowed the number of candidates from 20 cells to four (two cylindrical cell pairs) using his method [79-11 Tr. 38]. Of curiosity to him, each of the cell pairs had one cell that had a rounded negative end and elongated crimp, which to him exhibited signs of external heating, whereas the paired cell did not [79-7 at 8]. He ordered CT scans of the two cell pairs (someone else conducted them), and he received the scans (and preserved these) [79-11 Tr. 19-20]. He explains that such a higher-resolution CT scan provided a three-dimensional image and enabled a better examination of the movement of gases within the cell [79-7 App. B at 49]. At this stage, he reexamined rounding and elongation, and the venting of pressure inside the cell that contributed to these features [79-11 Tr. 45].

At this stage, Mr. Eskra acted as a sort of tracker or hunter. He examined the cell to determine whether it showed signs of venting at multiple points and, if so, which one occurred first [*id.* 48]. He described the process as "following a deer through the tall grass," with the venting that occurred first bending the jellyroll (the "grass") heavier and the venting bending the jellyroll in the direction of the venting gas flow [*id.* 50-51]. Mr. Eskra started by finding the venting point, then beginning at the opposite end worked his way through the axial plane moving longitudinally to look for intact jellyroll [*id.* 54]. "If the jellyroll [was] intact and relatively flat, and not parabolic, it [told him] that there's a chance that it may be causal . . . [b]ecause if it's parabolic, if the jellyroll has moved away from the negative end, it's typically a sign of heat attack" [*id.*]. Venting would not inform whether a cell caused the fire, but inform the locations where he needed to examine [*id.* 53]. With a causal cell, chaos within the jellyroll will have occurred before the gas pressure vents, including melting or cutting or additional shorting [*id.* 52].

Using the first CT scan (shown in his report as Figures 2 and 3), Mr. Eskra determined that this cell pair was damaged by external events based on his examination of rounding, elongation, and jellyroll analysis [79-7 at 8-9]. Using the second CT scan (shown in his report as Figures 4 and 5), he determined that one cell—what he describes as the lower or bowed cell—was fire-attacked because of "a large gas

bubble appearing in the lower left longitudinal section [*id.* 11]. For the other (top) cell, he found no evidence of the "same distortion [or] gas generation and shoving of the jellyroll materials" [*id.*].

Mr. Eskra thus focused more heavily on this top cell of the second pair. He used a longitudinal image of this cell (Figure 6 in his report) to say the negative end of the cell appeared "fairly normal" and the spacing between the jellyroll and the can at the negative end was "slightly tighter" than a healthy cell [*id.* 12]. Without having x-rayed all the other cells, he then offered a prediction—that this would be the "opposite of what would be seen on all the other cells if they were all x-rayed" [*id.*]. In short, he eliminated all the other cells as causal because they showed signs of physical rounding and venting [*id.*]. For this last candidate, he concluded that the "lack of external damage to the cell compared to all other cells involved in the fire along with the good condition of the jellyroll at the negative end of the cell" made it the probable cause of Forest River's fire [*id.* 14]. Said another way, it looked "unlike all the other cells inspected" such that the "damage to the cell [was] internal in nature and should be considered as a probable source of ignition of the fire" [*id.* 17].

Expert testimony must originate from reliable principles and methods. Fed. R. Evid. 702(c). *Daubert* helps "to make sure that when scientists testify in court they adhere to the same standards of intellectual rigor that are demanded in their professional work." *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 318 (7th Cir. 1996); *accord Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999); *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Scientific testimony such as this may be validated if the theory or technique can be or has been tested, if it has been subjected to peer review and publication, if it has a known or potential error rate, and if it enjoys general acceptance in the relevant scientific community. *See Daubert*, 509 U.S. at 593-94. The court focuses on the method, not specific inputs of data. *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017); *Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 806 (7th Cir. 2013) (reliability primarily hinges on method's validity).

For one, Mr. Eskra has never tested his theory—not once—though it could be tested [79-11 Tr. 260; 79-12 Tr. 29].[1] Indeed, he has had decades to do so. His theory has never been published. His theory has not been generally accepted in the relevant scientific community, much less accepted by peer review at this point [79-11 Tr. 152]. And, as the court explains soon, his theory remains prone to unacceptable error based, as it is, on entirely subjective observations that might indicate a causal cell failure or might be indicative of something else—and, at critical moments, rests entirely on his say-so rather than a preserved record. Indeed, in many ways, and no matter Mr. Eskra's permission to testify in other cases, he stubbed his toes here by not following the methods recognized by the industry.

American has the burden to demonstrate its proposed expert's reliability. *Varlen*, 924 F.3d at 459. American must "explain the methodologies and principles supporting the opinion." *Minix v. Canarecci*, 597 F.3d 824, 835 (7th Cir. 2010). At first, American says Mr. Eskra employed a methodology similar to that described in C. Mikolajczak, *A Scientific Methodology for Investigation of a Lithium Ion Battery Failure* [85-15], a 2007 paper by Exponent Failure Analysis Associates, a reputable firm well-known to the court. Mr. Eskra agreed his method has never been peer-reviewed, though he too equated his method to that of Exponent [79-11 Tr. 152-53].

This turns out to be a poor defense of Mr. Eskra's method because he deviated in material ways from it. His method marginally overlaps the Exponent method at best. Exponent mentions the importance of x-rays and CT scans certainly, but it speaks little of negative end rounding, crimp elongation, or the particular jellyroll dynamics that Mr. Eskra offers to support his causation theory, and Exponent directs rather key investigative steps that Mr. Eskra just skipped. No good explanation has been offered why. That deviation from an industry-recognized methodology for conducting cause-of-failure analysis in a battery fire also renders his opinion unreliable. *See Brown v. Burlington Northern Santa Fe*

---

[1] "Q. And you have done no test whatsoever at any time in your career to establish the methodology that you're relying on in declaring this cell the cause of the fire, have you? A. No." [79-11]. "Q. Have you done any testing to establish that your methodology is provable and repeatable? A. No." [79-12].

*Ry. Co.*, 765 F.3d 765, 773 (7th Cir. 2014) ("an expert must do more than just state that she is applying a respected methodology; she must follow through with it"); *see also Braun v. Lorillard Inc.*, 84 F.3d 230, 235 (7th Cir. 1996) (calling a deviation from a generally accepted method problematic).

Without a tested or generally accepted model, Mr. Eskra can offer only subjective judgments throughout his opinion. For instance, he looks for a "grossly distorted" negative end (versus a flat end) to identify fire-attacked cells, though a "slightly rounded" one might still be causative and improper to eliminate as fire-attacked.[2] He cannot offer an objective criterion for an elongated crimp either, calling a "a little bit" of movement enough to classify a cell "fire-attacked" and eliminate it from consideration as a cause. But this elongated crimp also proves troublingly variable and subject to his mere say-so for interpretation, for he concedes that "almost all cells will vary" and even "in causal cells[] it may move" too [85-19 Tr. 32-33]. He can't offer a measurement, much less even a "specific description" of how much rounding would typically demonstrate a fire-attacked cell versus a causal cell [85-20 Tr. 59]. Subjectivity won't doom every proposed expert; indeed, some fields of expertise (*e.g.*, handwriting analysis) may elude precise measurements and require discerning judgment, but a field of science such as this cannot be left to opinion that eludes not just measurement but a "specific description." Indeed, and Mr. Eskra concedes this, his down-selection criteria could be evidence that a cell was attacked by fire or, rather differently, that a cell was a cause of the fire [79-11 Tr. 73; 79-12 Tr. 63].

American, as the proponent of this opinion, never once explains why such subjective imprecise criteria—which may show one thing or indeed the opposite thing—can reliably support his winnowing of 80 candidate cells to only 20 cells for x-ray analysis. *See Brown*, 765 F.3d at 773 (excluding expert because of the "perils inherent in applying subjective experience instead of a proper scientific approach"); *see also In re TMI Litig.*, 193 F.3d 613, 703 (3d Cir. 1999) (finding expert unreliable when his "parameters to

---

[2] At the same time, he confesses the battery's state of charge might contribute to a rounded negative end (because it causes more side reactions that generate more gas), but he has no idea the states of charge of any of the examined cells, though this fact often proves "helpful" [85-19 Tr. 30-31, 96, 176].

determine causation [were] purely subjective"). And nothing within the Exponent method seems to contemplate using such loose criteria to eliminate cells before conducting x-rays [85-15]. *See Brown*, 765 F.3d at 773.

Mr. Eskra's method gets worse at the x-ray stage because he preserved none of his work. He claims to have examined images of 20 selected cells, but he cannot produce any x-rays. Of course, he reviewed these images through Skype with another fire investigator, but no one else seems to have retained any x-rays either. Exponent calls an x-ray "crucial" in determining the sequence of thermal runaway and developing an opinion about a cause for a cell failure [85-15]. Exponent recommends that x-rays "should be taken at two or more planes at different angles" and that the x-rays should be "examined closely" to assess such things as internal damage, cell windings, separator melt, damage patterns, and the physical relationship between the damage and surrounding parts [*id.*].

Even giving Mr. Eskra the benefit of the doubt that x-ray analysis through Skype could qualify as such a close examination of a cell's internal features (*e.g.*, gas pockets, jellyroll movement, and the like), he offers nothing but his say-so today about what could be seen back then. He never videotaped the down-selection process; he created no notes or other documentation from his review of x-rays; his report replicated no x-ray images; and no one preserved the x-ray images [79-7; 85-19 Tr. 22-24]. This isn't anything akin to the scientific method. *See City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014) ("Opinion based on unsubstantiated and undocumented information is the antithesis of . . . scientifically reliable expert opinion."); *see, e.g., Blevins v. Kirk*, 2019 U.S. App. LEXIS 15290, 6 (6th Cir. 2019) (expert's methodology could not be validated because he "did not publish the test results or keep any data from them"). "[O]pinion has a significance proportioned to the sources that sustain it." *Petrogradsky Mejdunarodny Kommerchesky Bank v. Nat'l City Bank*, 253 N.Y. 23, 35, 170 N.E. 479, 483 (N.Y. 1930) (Cardozo, J.).

Nor can the court merely tell counsel to cross-examine Mr. Eskra when he failed to preserve the source material he claims to have used to reach his conclusion. Counsel would have nothing to use, and Makita's specialist could not review the same x-rays and aid the company with any critique either.[3] Makita—and thereby the jury—would need to accept Mr. Eskra's assessment of these x-rays based merely on what he says he saw. Even if eminently qualified, an expert cannot offer an opinion based solely on his say-so (what lawyers call *ipse dixit*). *See Kumho Tire*, 526 U.S. at 157; *Joiner*, 522 U.S. at 146.

By this point, Mr. Eskra winnowed 80 cells down to 4 cells (two 2-cell pairs, with only one cell of each pair of real interest to him). So by this point, 95 percent of his process occurred under unreliable circumstances—untested or unverifiable as it was. Exponent's method may offer something testable and repeatable, whereas Mr. Eskra's method did no such thing [79-12 Tr. 29].[4] He may be experienced, and he may have done better in other cases, but "experience without [a] reliable, testable methodology is not sufficient." *Brown*, 765 F.3d at 776. Exponent explains the critical steps of recovering physical evidence, reconstructing that evidence, and then examining that evidence in a way that preserves the chain of custody for further analysis. Indeed, the scientific method anticipates that an expert will similarly document her work, and then preserve it for others to review or replicate should that prove necessary. Every middle school science student knows the importance of "showing your work." Mr. Eskra does too [85-19 Tr. 152].[5] He wants to call his method repeatable, but it isn't.

Mr. Eskra performed CT scans on the 4 remaining cells. Exponent contemplates the use of CT scans, "particularly useful for cylindrical cells that have experienced significant damage upon venting,"

---

[3] American never offers a fair substitute for assessing the work Mr. Eskra claims to have done at this step in his method, including x-rays of these cells years later, albeit different image perspectives than Mr. Eskra ostensibly viewed.

[4] "Q. Have you done any testing to establish that your methodology is provable and repeatable? A. No."

[5] "Q. For a methodology to be scientific, it has to be repeatable, right? A. Yes. Q. Okay. And it has to be objective, doesn't it? A. Yes. Okay. So meaning that your methodology has to be something some other scientist with equal skill and knowledge can follow and then come to the exact same conclusion. A. Yes."

because it provides a three-dimensional view of damage within the cell and "show where the internal windings are distorted, torn, or melted . . . whether the cell has experienced severe over-discharge, and a variety of internal defects that may otherwise go undetected" [85-15 at 4]. The court will assume that Mr. Eskra's focus on jellyroll displacement (telescoping) mirrors in material ways this same examination that others in the industry conduct, but this step in his method proves problematic too.

In looking at the two cell-pairs, Mr. Eskra said the one pair (called 10-54-56) had a cell that had a rounded negative end, extended crimp, and mostly expelled jellyroll (which to him eliminated it as causative), but the other had a negative end "less bowed," a "tight" crimp, and jellyroll pushed in multiple directions (with electrode material pushed into the cell's center space). Though the second cell exhibited some of the features he claims in his method would be a candidate for a cell that caused a fire, he excluded it [79-7 at 9]. Of course, one must remember that the same criteria Mr. Eskra would use to describe a causal cell could also describe a cell that was attacked by fire [79-11 Tr. 73].[6] In the second pair (called 8-24-29), the one cell of concern exhibited a "fairly normal" negative end with the spacing of the jellyroll "slightly tighter than a healthy cell" [79-7 at 12]. Mr. Eskra used cross-sectional slices near the negative end to confirm the condition of the jellyroll [*id.*].

Suppose for a moment that these fine appraisals all coincide with those examinations conducted by experts in this field (including Exponent)—and that seems untenable when the same criteria could suggest opposite results—Mr. Eskra still made a bold leap on this record that was not contemplated by the Exponent method. He concluded that the lack of external damage to this cell and the good condition of the jellyroll at the negative end made this cell the probable cause of the fire, albeit by saying this would be "the opposite of what would be seen on all the other cells if [they] were all x-rayed" [*id.*]. For two

---

[6] "Q. Mr. Eskra, have we reviewed all the criteria that you looked to in evaluating a CT scan to determine which cell is the cause of the fire? A. I believe so, yes. Q. [] And would you agree with me that each of those criteria can aso be used to describe a cell that has been attacked by fire? A. They can be used, yes. Q. And you know of any peer-reviewed methodology that has been published in any scientific journal that allows an individual to objectively identify a lithium-ion battery cell that is the cause of the fire? A. No."

reasons, this is nothing more than his say-so: he never preserved any x-rays, and he never actually x-rayed 60 of the 80 cells. A Rule 702 witness must "employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152; *accord Jenkins v. Bartlett*, 487 F.3d 482, 489 (7th Cir. 2007). On this record, Mr. Eskra's method at this stage was more speculative than science. *See Daubert*, 509 U.S. at 590 ("The adjective 'scientific' implies a grounding in the methods and procedures of science.").

From here, Mr. Eskra once more deviated from the Exponent method in a critical way. Exponent says, to determine the cause of a battery failure, "it is generally necessary to open a damaged battery pack, extract and examine the remains of the cells, the battery protection printed circuit board(s) (PCBs), and any fuses or thermal cut-off devices" [85-15 at 3]. Exponent favors two approaches—either "unrolling" a cell or using optical and scanning electron microscopy (SEM) and energy dispersive spectroscopy (EDS). Exponent warns this step is destructive such that all parties should be contacted beforehand. Exponent, in rather replete detail, specifies all the things to document at this stage (voltages, weights, impedances, denting, electrode degradation, dendrite growth, internal contaminants, melting, and other things). Mr. Eskra never performed this work, or explains why not.

Taking American's defense at its word, perhaps these reasons alone suffice to show Mr. Eskra's opinion to be unreliable. But there is more. Exponent recommends gathering information about the battery cells, which "can generally be collected from the end user's description of the background of the device and the events of the incident, as well as from the incident site" [*id.* 1]. Mr. Eskra collected no information from Forest River about the use of these battery cells. He didn't know their state of charge [79-11 Tr. 31]. He didn't know where the batteries had been found [*id.* 72], or whether they were even in the area of the fire's origin [79-12 Tr. 38, 40]. He didn't know how long Forest River had the batteries or how they used them [*id.* 28]. He collected no photographs from Forest River [79-11 Tr. 159; *see* 85-15 at 1-2].

Exponent recommends "thoroughly document[ing] the condition of the [battery] system upon receipt, both for establishing the chain-of-custody and to provide clues as to the root cause of the incident," including "damage patterns such as soot deposits, regions of charring, and evidence of melting" [85-15 at 2]. Mr. Eskra failed to do this—he never photographed each cell he visually examined [79-11 Tr. 16] or took notes that would show his observations of individual cells [*id.* 35]. Exponent calls for the removal of the protection PCB for visual examination, x-ray, and cleaning, which can show damage "from direct thermal exposure associated with venting of the adjacent cells, or may signify an over-current failure within the PCB" [85-15 at 5]. "The protection circuitry can also be a source of information about the pre-incident condition of the battery pack" [*id.*]. This wasn't done.

American views these final arguments from Makita as challenges to Mr. Eskra's factual basis and thus appropriate for crossexamination. Perhaps some alone might be, but these and his other failings are not just glaring gaps in his factual basis. They reflect a fundamental failure to conform his method to the one he says he tried to use. If American wants to use the Exponent method as a sword, it must be willing to live or die by it. To say Mr. Eskra "primarily employ[ed] the same methodology" or "completed virtually all steps" as Exponent are bold overstatements. In reality, he employed very little of the Exponent methodology. His substantial deviation from his professed method, without explanation, renders his opinion unreliable. *See Brown*, 765 F.3d at 773.

At this point, American has failed to establish that Mr. Eskra's opinion has been tested, that it could be tested (or replicated), that it has been published or peer-reviewed, that it originated from a scrupulously-followed scientific method or one that enjoys any acceptance in the relevant scientific community, or that he derived his opinion from the same rigorous method that those in this field would use rather than one based on subjective assessments or his plain say-so. *See Kumho Tire*, 526 U.S. at 152; *Daubert*, 509 U.S. at 593-94; *see also In re TMI Litig.*, 193 F.3d at 703 n.144 ("it is impossible to test a

hypothesis generated by a subjective methodology because the only person capable of testing or falsifying the hypothesis is the creator of the methodology").

The court sees that Mr. Eskra cites other authorities in his report, but American marshals none other than Exponent to defend his methodology here. And American has the burden today. *See Varlen*, 924 F.3d at 459. American cites the ideal gas law once, as does Mr. Eskra at least two times in his report [*e.g.*, 79-7 App. B at 49]. This law might explain why pressure build-up, venting, or a rounded negative end *can* occur, just as one example; but, on this record, American provides no explanation for why this law helps an expert in this field differentiate causal and fire-attacked cells, absent Mr. Eskra's subjective judgments that, without showing his homework, rest on his say-so. Subjective judgments within a scientific study tend to increase the error rate, not mitigate it. *See Daubert*, 509 U.S. at 593-94. Exponent never specifically speaks to these features of interest to Mr. Eskra. So there his opinion finds no real support. And other published authority in the industry says such features as crimp analysis and flat negative terminals, as examples, aren't indicative of battery cells that failed and caused a fire. *See* Tal Nagourney *et al.*, *The Implications of Post-Fire Physical Features of Cylindrical 18650 Lithium-Ion Battery Cells*, 57 Fire Tech. 1707-1722 (2021) (as corrected). Indeed, even as Mr. Eskra seems to recognize, these features can appear in non-defective cells that were victims of fires too.[7] *See id.* Rather than show support in the industry for Mr. Eskra's method, this record tends to belie it.

Earlier this year, after being in the battery business since 1977, Mr. Eskra (and two other individuals from his firm) offered his proposed method up for peer review and publication. Thus in a proposed surreply, American seems to pivot to say Mr. Eskra followed a modified method—his own.

---

[7] This testing was conducted and article published by a reputable scientific investigation and analysis firm called ESi that in the industry would be generally on par with Exponent. According to the authors, although crimp deformation can be caused by pressure building too quickly, it could occur in both fire-attacked or causal scenarios; it was "not exclusive" to cell failures. *See supra* at 1717. Likewise on negative terminal deformation, cells that were victims of a fire might not just have rounded negative ends but could "retain their flat negative terminals," and indeed both "conditions were observed in the experiments." *See supra* at 1718.

American never defends the many discrepancies between his method and Exponent's method in this surreply. This shift in story only tends to undercut the original proposal that Exponent served as the exemplar method Mr. Eskra followed. American had a choice because more than 75 days before it filed its response Mr. Eskra proposed his own method for review with SAE International to be published in the *SAE International Journal of Electrified Vehicles*. American chose Exponent.

To the extent American suggests that Mr. Eskra, despite his testimony that he followed Exponent, really followed an admixture of two methods—Exponent and his own—the reality still is that he has never tested his revisionary method. *See, e.g., Elcock v. Kmart Corp.*, 233 F.3d 734, 748 (3rd Cir. 2000) (reversing admission of expert testimony when witness used an untested "novel synthesis" of two accepted methods that allowed him to "offer a subjective judgment . . . in the guise of a reliable expert opinion"). Moreover, as it stands today, his proposed method has not been approved for publication. His proposed article was challenged in April 2024, and SAE suspended any publication pending further peer review, adding a "notice of concern" to it. The court has afforded more time for that peer review process to unfold and gave both sides after oral argument the opportunity to submit two pages on the article's status.[8] Even as of today, no one—not even SAE—has approved Mr. Eskra's untested method for publication. Perhaps someday that may change, but the "[l]aw lags science; it does not lead it." *Rosen*, 78 F.3d at 319.

This proposed article also raises yet more questions of reliability [90-1]. It seems to refer to no testing that would support Mr. Eskra's opinion—nothing that builds on what was likewise absent in this case. American points to nothing within this proposed article (and the company had this chance before its original response) that discusses any testing that would demonstrate the wisdom of subjectively eliminating certain rounded ends, certain elongated crimps, and certain parabolic movement of the

_____

[8] Contra the court's instructions, both sides submitted more than two pages, including American's submission of 72 pages. The court accordingly strikes the overage on both sides [96-1 to 96-3 and 97-1 to 97-6].

jellyroll at the negative end, for instance [79-11 Tr. 28-29, 33-34, 41].[9] The proposed article speaks to the importance of conducting a visual inspection of cells with specific notations of observations, but Mr. Eskra did no such thing [*id.* 35]. The proposed article speaks to a "systematic and careful" framework of analysis "reliant on collection" of forensic evidence and "the scientific method of inquiry," and identifies x-ray review as a key step in this method, but Mr. Eskra never obtained the x-rays, much less preserved them. The proposed article says a battery investigation begins "[a]fter the area of origin has been determined" [90-1 at 3], but it was not done this way.[10] This speaks to his method, not just his factual basis as American argues the point. Mr. Eskra absolutely may rely on another expert (and Fred Hackett offered an opinion on the fire's area of origin), *see United States v. Truitt*, 938 F.3d 885, 891 n.1 (7th Cir. 2019), but Mr. Eskra did not do that here. He didn't review Mr. Hackett's report before writing his own [79-11 Tr. 93] and admits he declared the one cell the probable ignition source of the fire without ever knowing whether the cell was even in the area of the fire's origin specifically [*id.* 72; 79-12 Tr. 38, 40], though he concedes a cell not within the area of origin could not be the cause of the fire [79-13 Tr. 62].[11]

In sum, though Mr. Eskra has experience in this field, his opinion proves unreliable for a host of failings in his methodology under Rule 702 and *Daubert*. As such, his opinion will not aid the jury, either because it would invite that factfinding body to speculate or to act on nothing more than the bottom line of Mr. Eskra's say-so. *See McMahon v. Bunn-O-Matic Corp.*, 150 F.3d 651, 658 (7th Cir. 1998). The court

---

[9] Even the proposed article notes, for instance, that potential causal cell candidates will "usually show little movement of the jellyroll," and yet "[i]n some cases, the remains of the jellyroll may be pushed down into the negative end of the cell container or into the positive vent end" [90-1 at 4]. So in each case, like here, these features remain subject to subjective judgments for which Mr. Eskra admits he cannot provide specific description.

[10] Exponent too recommends "systematic inspection" of the incident site [85-15 at 2].

[11] Mr. Eskra explains that, in certain scenarios, it is "possible" a causal cell might be located outside the area of the fire's origin, but he offers no such explanatory opinion here [79-7; 79-12 Tr. 40-41]. Mr. Eskra generally mentions in one sentence the area of origin per Fred Hackett in his report, but the court credits his sworn testimony over his unsworn report. Mr. Hackett's associate (Tim Johnson) also evaluated the artifacts from the Forest River fire, but Mr. Eskra also never reviewed his report and says he never relied on it [79-11 Tr. 93]. This is troubling because this means Mr. Eskra reached his opinion about the probable cause of the fire without, as part of his method, having disposed of numerous alternative ignition sources within the area of origin.

thus excludes his opinion based on his down-selection of 80 cells and identification of one cell as a probable cause of the fire at Forest River.

The court thus turns to another opinion from Mr. Eskra. He examined the external tabbing of the one battery cell, which differs for each manufacturer, to determine that it was a Makita cell and matched that of a Makita 10-cell battery pack [79-7 at 2]. The cell of concern was an 18650 cell that is often used with tools (and other products). He then sought to determine the cause of the battery's failure. He opines that, though "most cell designers suggest keeping the cell voltage above 3.0 volts, though allowing pulse voltages to get to 2.5 volts," a typical Makita 10-cell battery pack would "allow[] the voltage to continue to 1.75 volts and below" [*id.* 15]. He calls this damaging to the solid electrolyte interphase (SEI)—that thin film that forms during charging and discharging that plays a crucial role in the long-term cyclability of a lithium-ion battery.

As Mr. Eskra describes it, "upon recharge the areas of damaged SEI consume electrolyte, through decomposition, further exacerbating the instability of the cell chemistry" [*id.*]. He says the "existing battery management system is not programmed correctly to protect the battery cells from being over discharged and subsequently being recharged" and "[t]his creates an instability internal to the battery cell" [*id.* 17]. Mr. Eskra says Makita's "battery management system was designed in such a manner that the cell became unstable due to normal intended use" [*id.*].

Mr. Eskra conducted testing related to the voltage levels of Makita battery packs [79-7 App. C]. The court will not recount the various testing (which Makita seems not to challenge), and Mr. Eskra reprints a discharge curve on five Makita battery packs in his report that shows voltage dips below two volts [79-7 Fig. 10]. American says he then used "qualitative reasoning" to determine that such voltage levels damage the SEI, relying on "numerous peer-reviewed articles and other published papers."

American points generally to Exhibit A of Mr. Eskra's report for the proposition that SEI degradation happens when a cell's voltage drops below 2.5 volts [79-7 App. A]. This paper, both by Mr.

Eskra and Dr. Rodney LaFollette, who seems to be an employee at Mr. Eskra's firm, purports to be a survey of reported studies on the effects of overdischarging lithium-ion cells, particularly with respect to safety [*id.*]. American says most articles in the survey indicate that when lithium-ion cell voltage drops below 2.5 volts, the SEI layer becomes degraded and can lead to thermal runaway—that rapid rise in temperature caused either by an internal short-circuit or, it seems in this case, overdischarging below a specific voltage level and overheating. According to Mr. Eskra, "[d]epending on the cell's particular chemistry, design and level of charge, a cell in thermal runaway can reach temperatures high enough to allow the aluminum cathode current collector to melt and vent with the electrolyte, and possibly form a thermite cloud and explosion" [79-7 at 3].

Makita counters that each of the articles in the survey addresses issues of longevity and battery life (capacity), but not fire risk. The company calls Mr. Eskra's voltage opinion *ipse dixit*. Unhelpfully, at times, though American does better, both sides refer to a host of articles generally and again testimony generally from a whole deposition without identifying something specific to support their respective view of the record. Mr. Eskra admits he has never tested SEI degradation below 2.5 volts [79-11 Tr. 210], so he relies entirely on his interpretation of this literature in his survey. He interprets these articles together [*id.* 213].

When pressed to identify an article that supports the conclusion that falling below 2.5 volts will cause degradation of the SEI layer or a failure that will increase the risk of fire by way of thermal runaway, Mr. Eskra fairly struggles, as many articles concern battery capacity (not safety), other battery designs (those without a battery management system or pouch cells that vent differently than cylindrical cells), voltage drops altogether different (zero volts or cell reversal work of minus two volts), or thermal increases (that warming that rechargeable batteries often exhibit) without thermal runaway, or, as Mr. Eskra concedes, just never say any particular failure in the cell would increase the risk of a fire hazard [79-13 Tr. 16-57]. He points to one, *see* M. Brand *et al.*, *Electrical Safety of Commercial Li-ion Cells Based on*

*NMC and NCA Technology Compared to LFP Technology*, 6 World Elec. Vehicle J. 572 (2013) [85-4], that he interprets as reaching the conclusion that an SEI layer failure occurring below 2.5 volts increases the risk of fire hazard [79-13 Tr. 16-21; *but cf.* 79-11 Tr. 204-06]. Mr. Eskra adds that "the battery industry as a whole does not talk about fires," but "a thermal event is a fire in the terms—or a failure is a fire in this industry" [79-13 Tr. 21].

At best, though, Mr. Eskra vacillates on this point under oath [79-11 Tr. 204-06]. Earlier he consistently testified that none of his articles show that a lithium-ion battery cell that falls below two volts will have an increased risk of fire hazard, but inconsistently testified that none of his articles demonstrated a premature failure that created a safety hazard (they just affected the cell's lifespan) [*id.*]. Such inconsistency under oath tends to show unreliability; perhaps that point would otherwise hinge on a credibility determination and call for an evidentiary hearing. But for now, upon review, this one article is readily available online and on its face speaks to overcharge and overdischarge, and specific to thermal stability and concerns contributive to thermal runaway. Of course, it isn't the court's job to determine whether Mr. Eskra is "right" here—only whether he has a reliable method and basis to conclude that overcharging or overdischarging could damage the SEI layer or contribute to thermal runaway. *See Smith v. Ford Motor Co.*, 215 F.3d 713, 719 (7th Cir. 2000) ("It is not the trial court's role to decide whether an expert's opinion is correct."); *Walker v. Soo Line R.R. Co.*, 208 F.3d 581, 589 (7th Cir. 2000) ("To the degree that [the expert] might have relied on faulty information, the matter certainly could be explored on cross-examination."). Insofar as Mr. Eskra's opinion concerns what can happen, he may have some support for this.

Even so, what can happen and what did happen are two different questions. There needs to be some defect, and that defect must not just have the ability to cause this fire (general causation) but more likely than not did cause this fire because of that defect (specific causation). *See* Ind. Code §§ 34-20-2-1, 34-20-2-2. These are the questions the jury must answer, and what an opinion that fits this case must aid

the jury in answering. *See* Fed. R. Evid. 702(a), (d); *Daubert*, 509 U.S. at 593. Mr. Eskra can aid the jury to answer the question of what can happen with a Makita cell in terms of its voltage drop (something he tested backed by his experience) and perhaps what can happen by way of thermal runaway when a lithium-ion cell drops below a certain voltage (something he has experience to discuss with industry support), but American, as the proponent of his opinion, never explains that it needs or intends to offer just a general causation opinion here (an issue often stipulated) rather than meet its need for a specific causation opinion.

Anything beyond what can happen is just Mr. Eskra's say-so, as Makita argues. Mr. Eskra just assumes the one cell he identified, albeit after an unreliable process of down-selection, experienced such thermal runaway. For one, he has no knowledge about the history or use of the Makita products at Forest River [79-12 Tr. 28]. For all he knows, the battery cell at issue was brand new—never experiencing the overdischarge (or recharge) that he says can lead to thermal runaway. He guesses—and, in doing so, invites the jury to guess along with him. He offers nothing in his report that would indicate that this one cell experienced overdischarge or deterioration of the SEI layer. Perhaps for this reason, Exponent recommends taking apart cells for further analysis or more refined scopic examination, saying it is "generally necessary" to "extract and examine the remains of the cells" to "determine the cause of a failure" [85-15 at 3]. Mr. Eskra didn't, however.

Mr. Eskra says his thermal runaway theory remains contingent on "the cell's particular chemistry, design and level of charge," but, as Makita points out, he has no opinion about any design defect in Makita's product (taking him now at his sworn word) [79-12 Tr. 53], and his method omitted any step to learn about the state of charge of this Makita cell (or any other cell) [79-11 Tr. 31]. Mr. Eskra opines that lithium-ion cells "rarely" fail directly due to overdischarge but fail instead in "subsequent charging" [79-7 App. A at 39], but in his method he never developed any evidence that this cell had been overdischarged or even subsequently recharged [79-12 Tr. 28]. His report says a cell's remnants can provide a reasonable

indication of how the battery was treated over its life, but Mr. Eskra offers no opinion as to the historical recreation of this battery's use [79-7 at 7]. He marshaled no facts and conducted no testing to demonstrate that his theory about thermal runaway occurred.

These omissions in his method aren't just a passing concern because Mr. Eskra says long-term storage of overdischarged cells "will usually show bulging at the bottom of their containers upon recharging," caused by "the significant rise of internal cell pressure due to gas evolution" [79-7 App. A at 39]. "In a more constrained cell configuration, such as a spirally-wound 18650 cell (housed in a sealed steel can), the presence of evolved gases is manifest in an increase in internal pressure, and possibly in bulging of the cell can" [*id.*]. Here he returns once more to the ideal gas law. But, remember, the bowed cells in his deselection process he views as fire-attacked, not causal. Here a bulging cell he views as causal, not fire-attacked. So the inherent variability and subjectivity of his method—unaccepted by or different from the industry, *see Scientific Methodology for Investigation* (Exponent), *supra* at 8-15; *Implications of Post-Fire Physical Features*, *supra* at 15—seem to come full circle. His observations about the one cell he called the likely cause of this fire *lacked* any signs of bowing and *lacked* evidence of gas generation (and thereby shoving of the jellyroll materials) that he now says would be demonstrative of thermal runaway [79-7 at 11]. A reliable method cannot let him have it both ways, not on this record.

To finish this journey, quite oddly in the end Mr. Eskra says whether this Makita cell ever fell below 2.5 volts does not matter to him because he believes the cell still failed regardless of this so-called defect [79-11 Tr. 263]. He says it is material only because he believes this is why there are Makita fires generally [*id.* 263-64], but again he cannot speak to the specific cause here. Just as Makita argues, if the opinion does not matter to him, this theory about the failure in the battery cell likewise does not aid the jury to answer an issue of consequence in this particular case—either what defect or what cause. Instead, Mr. Eskra merely offers an opinion based on his earlier, albeit unreliable, deselection process and cell analysis or based on a theory only about what can happen. In short, if this theory of voltage drop and

damage does not matter to him in showing causation, the court will not consider it as mattering to the jury. The court thus excludes Mr. Eskra's opinions.

B. *Fred Hackett*.

Fred Hackett is American's proposed fire origin expert. He opines that the fire originated within Forest River's tool crib—more particularly, at or near the southeast end of the tool crib, following the failure of a lithium-ion battery [77-7].

No one contests Mr. Hackett's qualifications as a fire origin expert. His report leaves his credentials unaddressed, and his curriculum vitae [83-12] proves difficult to follow at times, so the court endeavors to restate his credentials accurately just by way of introduction. Mr. Hackett was a firefighter from 1977-1978 and then from 1982-1998. He was a lead arson investigator and documentation officer for the Pike Township Fire Department. For about eleven years before his retirement in 1998, he conducted technical investigations of commercial and residential fires and gas explosions. For five overlapping years during this time, he also was a fire and explosion investigator for Wolf Technical Services, Inc. In 1995, he became president of Midwest Forensics—a position he still holds today.

In both 2003 and 2008, he was certified as a fire and explosion investigator through the National Association of Fire Investigators. He has attended numerous conferences on fire investigations for the better part of 40 years, as well as served as an instructor at times, including on CT imaging and analysis for the past 15 years and state certifications for firefighters studying fire origin and cause for the past 34 years. He has received fire and arson training over the years too. It seems much of Mr. Hackett's considerable experience over several decades has been acquired through his employment and subsequent training or certification, though it seems he also completed coursework (though apparently no degree) at several higher education institutions, such as the University of Maryland, Central Texas College (England), the Indiana Vocational Technical College, Ohio University, and the University of Wisconsin-Madison.

Mr. Hackett was retained to determine the fire's origin and cause on March 13, 2019—the day after the fire [77-7 at 2]. He and his associate completed an initial "scene size-up" on March 14 and 15. On March 14, Mr. Hackett interviewed the plant manager (David Whisler). At some point, he also interviewed the tool crib manager (Lanny Kistler). Mr. Hackett collected information from the Elkhart Fire Department, which responded to the fire.

A joint scene examination was conducted on April 1-5 and May 6-10 that same year. During the April visit, the collapsed roofing structure was removed. This process was photographed by Mr. Hackett's associate [77-33 Tr. 98-100]. After its removal, the scene was processed using sifting equipment and a grid structure to mark the location of each artifact [*id.* 103; 77-7 at 15-16].

In preparation for his opinion, Mr. Hackett considered a great deal of information. He reviewed the deposition of Larry Shaffer who first saw the fire, overview photographs of the building, a video taken inside the building during the fire, physical damage to a desk located in the tool crib, and burn patterns on a filing cabinet [*id.* 12]. He considered witness accounts, interpreted burn patterns, and evaluated the physical damage to conclude that the fire originated within the tool crib [*id.*]. He created a timeline of events and considered nine possible or competent ignition sources [*id.* 19-20]. He eliminated eight through his examination of the evidence and concluded that the fire was caused from a lithium-ion battery failure at or near the southeast end of the tool crib [*id.* 30].

Makita advances several arguments to exclude Mr. Hackett's opinion. First, the company says his opinion contravenes the National Fire Protection Association Guide for Fire and Explosion Investigations (commonly called NFPA 921). NFPA 921 is "a comprehensive, peer-reviewed, and detailed guide for fire investigation, and [courts] have held that its methodology is reliable for purposes of Rule 702." *United States v. Thomas*, 2022 U.S. Dist. LEXIS 962, 27 (N.D. Ind. Jan. 3, 2022) (citation omitted); *see also Abu-Hashish v. Scottsdale Ins. Co.*, 88 F. Supp.2d 906, 908 (N.D. Ill. 2000) (NFPA 921 is a

"recognized guide for use by fire investigators in the fire investigation process"). Indeed, all the fire origin specialists here used it.

NFPA 921 recommends that fire investigators use a "systematic approach" of analysis based on the scientific method. NFPA 921 § 4.2; *see Abu-Hashish*, 88 F. Supp.2d at 908. It recommends that fire investigators follow several steps: "(1) identify the problem; (2) define the problem; (3) collect data; (4) analyze the data; (5) develop a hypothesis; (6) test the hypothesis; and (7) following any repeated rounds of refining and testing the hypothesis, select the final conclusion." *United States v. Aman*, 748 F. Supp.2d 531, 535 (E.D. Va. 2010). That said, a failure to follow NFPA 921 will not alone render a person's method unreliable because it offers a guideline, not a straitjacketed rule. *See Thomas*, 2022 U.S. Dist. LEXIS 962 at 9.

NFPA 921 identifies traditional sources of information to use in determining a fire's origin— witness statements, electronic data, burn patterns, fire dynamics, and (under the latest 2017 edition) arc mapping, though the extent of melting here prevented every investigator from arc mapping. NFPA 921 § 18.1.2. As the proponent of Mr. Hackett's opinion, American argues that he considered NFPA's recommended sources of information in determining the fire's origin. Makita says he ignored critical statements from eyewitnesses to the fire.

At the start, Makita's argument reads as though eyewitness accounts offered the only evidence of the fire's cause, but that tells only half the story. For instance, to reach an opinion about the fire's origin and consistent with NFPA 921, Mr. Hackett relied on burn patterns on the filing cabinet directly west of the desk that showed directional fire traveling from east to west [77-7 at 12]. Makita posits a flashover such that burn patterns would be nonexistent; but it cites no uncontroverted evidence of this dynamic here, and a lawyer's questions about this hypothetical will not do. Mr. Hackett also relied on photographs, a video taken of the early fire, information gathered from the Elkhart Fire Department, and physical damage on recovered artifacts. He took notes from his meeting with the Forest River plant manager,

assistant plant manager, and tool crib manager (as well as state and local fire marshals) during the initial inspection. Mr. Hackett relied on multiple sources of information to reach his opinion, in accordance with NFPA 921. He also explained how these sources led to his conclusion.[12] Witness observations were a source of information, but not the only source.

There also seems to be a disconnect between the parties as to whether Mr. Hackett reviewed the deposition testimony of six eyewitnesses to the fire in preparing his report or sometime afterwards. Makita confesses at oral argument that Mr. Hackett testified under oath that he reviewed the depositions of all six witnesses [77-23 Tr. 141-42] but questions his veracity because his report never mentions the depositions specifically in analysis (though the report says he relied on "all" fact witness depositions) and because his billing records identify a different date for reviewing these depositions (a month after issuing his report). Mr. Hackett testified to the clerical error in his bill—particularly that it reflected multiple entries for "December 10" when by virtue of the sheer number of hours these tasks could not all have been completed within the 24 hours of that day and thus necessarily reflect tasks over time rather than just that day. Ultimately, this is a credibility question—one of weight, not admissibility—particularly when Mr. Hackett has offered a logical explanation for the billing error.

As such, this motion devolves into whether Mr. Hackett afforded a particular eyewitness too much weight or not enough weight, and such points are designed for crossexamination rather than a pretrial attack on his method. To this point, under NFPA 921, a fire investigator in the field may evaluate the quality of the information shared by an eyewitness, assessing with common sense the person's knowledge and any potential bias. *See* NFPA 921 § 14.4.1.2 [83-26].

---

[12] For instance, in considering the video, Mr. Hackett notes the "fire involvement of the ceiling over the tool crib" that was "several feet into and over the tool crib" and explains that, if the fire originated outside the tool crib, "it is unlikely that fire would occur this far into the tool crib this early in the fire" [77-7 at 17]. He noted that the video showed the tool crib's walls on fire.

In addition, Mr. Hackett relied on testimony from Larry Shaffer—the first person to see the fire. Mr. Shaffer said he saw the fire at or near the southeast corner of the tool crib, what he described as a fire about one foot tall and two feet wide. He saw the fire nowhere else. Cannisters began exploding, and he exclaimed the fire's presence to his fellow employees. Mr. Hackett also relied on statements made by David Whisler (the plant manager) during an interview with the Elkhart Fire Department's investigator[13] and a few days later to Mr. Hackett's associate that the fire appeared near the door of the tool crib. Mr. Hackett additionally used screenshots of a video taken by an unnamed eyewitness in the early stages of the fire [77-7 at 17-18].

Makita marshals testimony from the other eyewitnesses, but each seem to have seen the fire later in time and in a different location. It cannot be said on this record, much less under the NFPA 921 method, that Mr. Hackett's reliance on the first observer in helping to pinpoint the fire's origin was inappropriate, or that his reliance on early statements from the plant manager soon after the event rather than years later in deposition was inappropriate. A first observer could be compelling. And memories can fade. There is no guessing that this fire grew exponentially—indeed, the entire building became ashes— so the theory that the fire grew larger and spread to other areas (as arguably viewed by other eyewitnesses) isn't surprising. That dynamic doesn't show Mr. Hackett's method is unreliable. The court may find his seeming inflexibility about other hypotheticals discomforting, but such is the purpose of crossexamination and for the jury to assess.

Makita largely argues that Mr. Hackett chose his data poorly. To be sure, an "opinion witness must have a sound factual basis to be declared an expert." *Scci Hosps. of Am., LLC v. Home-Owners Ins. Co.*, 571 F. Supp.3d 942, 950 (N.D. Ind. 2021). Even if eminently qualified, an expert cannot offer opinions based solely on his say-so. *See Kumho Tire*, 526 U.S. at 157; *Joiner*, 522 U.S. at 146. Expert testimony must be based on sufficient and known facts. Fed. R. Evid. 702(b), 703; *see Daubert*, 509 U.S. at 590; *see, e.g.,*

---

[13] American cites Exhibit 3 for this interview, but the insurer seems not to have submitted it to the court.

*Wasson v. Peabody Coal Co.*, 542 F.3d 1172, 1176 (7th Cir. 2008) (one sale was insufficient basis to calculate average of sales over twenty years).

The court's gatekeeping role doesn't make it the trier of all facts that relate to an opinion witness's testimony. *Stollings*, 725 F.3d at 765. The "soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact." *Smith*, 215 F.3d at 718. *Daubert* isn't meant to limit expert testimony to "conclusions [that] are unimpeachable." *Stollings*, 725 F.3d at 765. A "valid and properly applied methodology" may leave conclusions open to "doubt"—that doubt that good trial lawyers explore in crossexamination and that the jury weighs and credits as it sees fit as the factfinder. *Id.* at 766; *see Manpower*, 732 F.3d at 807.

The court's analysis thus focuses on the methodology, not specific inputs. *See Manpower*, 732 F.3d at 807 (reversing court's consideration of the quality of data); *see also Lees v. Carthage Coll.*, 714 F.3d 516, 525 (7th Cir. 2013) (admissibility not dependent on "flaw-free set of data") (citation omitted). The court risks abusing its discretion by "drill[ing] down to a third level in order to assess the quality of data inputs." *Manpower*, 732 F.3d at 807. The "critical inquiry is whether there is a *connection* between the data employed and the opinion offered" and whether the witness employed the kinds of facts or data on which experts in the field would "reasonably rely." *Gopalratnam*, 877 F.3d at 781. The court's review of other information offered by Makita illustrates that the company's concern focuses on Mr. Hackett's selection of and weight placed on data, not that his opinion is bereft of a legitimate industry-recognized methodology or factual footing.

In another area, Makita simply has its facts wrong. The company argues that Mr. Hackett incorrectly assumed the tool crib was constructed of a porous metal cage material, suggesting he did this so he could claim, in some "tortured effort," that the fire the witnesses saw outside the tool crib was actually inside the crib. The company represents that Mr. Hackett was forced to admit that the tool crib's walls were solid. These are gross misstatements of Mr. Hackett's testimony [83-27 Tr. 89-93, 314-15], and

the court will not entertain them. *See also Auto-Owners Ins. Co. v. Makita USA, Inc.*, 2021 U.S. Dist. LEXIS 247933, 17 (W.D. Wis. Dec. 30, 2021).

Makita next argues that Mr. Hackett's opinion was reached based on an expectation bias and later reinforced by a confirmation bias framed with cherry-picked facts. This is an argument that Makita may offer the jury if the company thinks it compelling. Makita offers no evidence on this record that Mr. Hackett fell prey to an early expectation bias—a preconceived idea of the fire's origin—or a confirmation bias—merely selecting data to confirm this idea.

Makita also complains that Mr. Hackett used a negative corpus method, which has long been abandoned by the fire science community. For instance, NFPA 921 instructs a fire investigator to collect data, analyze the data, and develop a hypothesis based on analysis. In this, an investigator should use a systematic approach, based on the scientific method, to eliminate potential ignition sources:

> The process of elimination is an integral part of the scientific method. . . . However, the process of elimination can be used inappropriately. Identifying the ignition source for a fire by believing to have eliminated all ignition sources found, known, or suspected to have been present in the area of origin, and for which no supporting evidence exists, is referred to by some investigators as negative corpus. . . . The negative corpus process is not consistent with the scientific method, is inappropriate, and should not be used because it generates untestable hypotheses, and may result in incorrect determinations of the ignition source and first fuel ignited.

[83-26 at 13].

Here, although Mr. Hackett used a process of elimination in reaching his conclusion, he had supporting evidence for eliminating certain potential ignition sources. *See Ball Corp. v. Air Tech of Mich., Inc.*, 2022 U.S. Dist. LEXIS 98548, 20 (N.D. Ind. June 2, 2022); *Thomas*, 2022 U.S. Dist. LEXIS 962 at 30 (explaining that negative corpus is "determining an ignition source by eliminating sources when having 'no supporting evidence'" and concluding that the fire investigator "used a process of elimination *with* additional supporting evidence"). Mr. Hackett developed nine hypotheses as to possible ignition sources. For eight, all save a hypothesis that lithium-ion batteries started the fire, he ruled them out as ignition sources and explained why, including by relying on witness testimony and the examination of artifacts.

Mr. Hackett has the expertise, factual analysis, and industry-recognized method to explain why he eliminated certain potential causes of the fire; whether the jury will credit these explanations or find them flimsy, only the jury can say. But this is a far cry from saying a lithium-ion battery caused the fire.

Mr. Hackett confesses he has no expertise in batteries, and no expertise in distinguishing batteries that have caused a fire from those that have been attacked by one [83-27 Tr. 182-83]. He has no expertise in electrical or chemical engineering [*id.* 196]. He admits he "can only go off of what we are being told from our expert" (*i.e.*, Mr. Eskra) [*id.* 183]. He repeatedly admits he must defer to Mr. Eskra as to causation [*id.* 185-87]. He cannot identify (and has not identified) any manufacturing, design, or warning defect in a Makita battery cell or pack [*id.* 189-92]. He performed no testing of any artifact or other exemplar battery cells to reach this conclusion [*id.* 196]. Anything by way of documentation or information concerning the Makita cell's design that he believes caused the fire comes only from Mr. Eskra [*id.*]. Only Mr. Eskra directed which cells to CT scan, and Mr. Hackett could not identify any anomaly from a CT scan [*id.* 197]. Though at one point Mr. Hackett refers to the "totality of evidence" [*id.* 183], his opinion on causation rests so squarely on that of Mr. Eskra that he admits that if Mr. Eskra is wrong, so is he [*id.* 167]. In his words, he just "adopts" Mr. Eskra's opinion as his own causation opinion [*id.*].

"[Though] one expert may rely on another expert's work, he cannot serve as a mere mouthpiece in order to circumvent the Rules of Evidence." *United States v. Truitt*, 938 F.3d 885, 891 n.1 (7th Cir. 2019). It is not uncommon for opinion witnesses, often retained later in an investigation or during the course of litigation, to rely on the evidence preserved and reports prepared by other investigators. Mr. Hackett isn't merely relying on another expert's opinion, but proposing to repeat it—worse yet without a factual understanding of the circumstances, any supporting testing or analysis, or a credentialed basis for offering the opinion. This makes his opinion unreliable. *See Varlen*, 924 F.3d at 459; *see also Kumho Tire*, 526 U.S. at 150.

Moreover, the record is devoid of any experience Mr. Hackett has developed with fires originating from lithium-ion battery failures or the dynamics of such fires (much less a Makita-designed cell or comparable tool manufacturer), and that burden rests on American. *See Varlen*, 924 F.3d at 459. American suggests that Mr. Hackett adds independent research to Mr. Eskra's findings, but American cites only two YouTube videos—both of lithium-ion powered scooters, with no information about the circumstances of those fires or the design of those lithium-ion batteries. Only mere seconds of these videos could be said to offer anything pertinent to this case (else they address safety recommendations for consumers). One could hardly call seconds of two YouTube videos independent or sufficient evidence to render a causation opinion, given Mr. Hackett's ready admissions that he is not the person with expertise to ask.

Mr. Hackett may say a smoldering fire was unlikely the cause and that a "rapid-ignition sequence of events" makes more sense, but he cannot say this fire originated from a lithium-ion battery. He also may say this fire appears to have been violent, explosive, and immediate in nature (and explain why based on this fire's dynamics and site or witness evidence), but again he cannot say this fire originated from a lithium-ion battery. And why? He has no pertinent expertise. He has done no testing. He has done no examination of the battery cells. He has done nothing to validate this opinion. He lacks a sufficient factual basis. In short, his opinion in this lone respect lacks indicia of reliability. *See* Fed. R. Evid. 702; *Daubert*, 509 U.S. at 592-94.

And he proposes merely to parrot Mr. Eskra, not just rely on him—and that is improper. *See Truitt*, 938 F.3d at 891 n.1. Mr. Hackett adds nothing of real substance to the opinion from Mr. Eskra and offers in truth just a bottom line. *See Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005) ("An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process."); *Smith v. Nexus RVs, LLC*, 472 F. Supp.3d 470, 480 (N.D. Ind. 2020) (same). To the extent American says the two videos show lithium-ion batteries *can* cause fires, this point of general causation is

wholly outside the question the jury here must answer of whether the Makita battery cell *did* cause the fire (but-for or specific causation). So his opinion would not aid the jury to decide an issue of consequence—a question of fit, *see Daubert*, 509 U.S. at 591, 593—and would instead invite the jury to speculate that because a lithium-ion battery can cause a fire that it must have done so here, *see* Fed. R. Evid. 403, 702; *see also Daubert*, 509 U.S. at 590 (expert opinion cannot be based on "subjective belief or unsupported speculation"); *Logan v. City of South Bend*, 564 F. Supp.3d 719, 733 (N.D. Ind. 2021) ("the law won't permit juries to speculate").

For a host of reasons then, Mr. Hackett can offer his opinion about the fire's area of origin and its related dynamics, as well as explain why certain potential sources of ignition should be eliminated, but he cannot speak to the ultimate cause of the fire. That must be left to others.

CONCLUSION

Accordingly, the court GRANTS the motion for leave to file a surreply given the subsequent opportunity to address the same in oral argument and supplemental briefing [90], GRANTS the motion to exclude Michael Eskra's opinions [78], GRANTS IN PART and DENIES IN PART the motion to exclude Fred Hackett's opinions [76], and STRIKES unapproved submissions [96-1 to 96-3 and 97-1 to 97-6], though not the supplemental two-pages submissions [96 and 97].

SO ORDERED.

September 30, 2024                              *s/ Damon R. Leichty*
                                               Judge, United States District Court